

# CapWealth Advisors, LLC

## *Policies and Procedures Manual*

# August 2019

Case 3:20-cv-01064   Document 14-1   Filed 02/11/21   Page 1 of 85 PageID #: 53

# Table of Contents

*Definitions* ........................................................................................................................................... 6
*1.* *INTRODUCTION* ............................................................................................................................. 7
    **1.1** **CapWealth Advisors, LLC** ................................................................................................ 7
    **1.2 Compliance Manual** ......................................................................................................... 7
    **1.3 Organization of Investment Advisor** ................................................................................ 7
    **1.4 Overview of Supervisory Relationships** ............................................................................ 8
        Qualifications of Supervisor ........................................................................................... 8
    **1.5 Overview of Investment Advisory Programs** .................................................................... 9
    **1.6 Registration Issues** ......................................................................................................... 10
        CapWealth Registration ............................................................................................... 10
        Registration of Investment Advisor Representatives ................................................... 10
    **1.7 Form ADV/Brochure Disclosure and Delivery** ............................................................... 11
        Delivery of Form ADV/Brochure ................................................................................... 11
        Amendments to Form ADV ........................................................................................... 11
    **1.8 Fiduciary Status and General Duties** ............................................................................. 12
    **1.9 Liability Under the Advisors Act** ................................................................................... 14
    **1.10 Treatment of Client Complaints and Legal Actions** ..................................................... 14
    **1.11 Confidentiality of Client Information** ........................................................................... 14
    **1.12 Money Laundering** ....................................................................................................... 15

*2.* *GENERAL* ..................................................................................................................................... 16
    **2.1 DUTIES AND RESPONSIBILITIES OF MANAGEMENT** ......................................................... 16
    **2.2 DUTIES AND RESPONSIBILITIES OF THE CCO** ................................................................. 16
        Supervision .................................................................................................................... 17
        Annual Training ............................................................................................................. 17
    **2.3 INTERNAL CONTROLS** ..................................................................................................... 18
        Characteristics of an Effective Compliance System ..................................................... 18
    **2.4 EMPLOYEE LICENSING AND REGISTRATION** .................................................................. 18
        Conducting Business in States where not Registered ................................................... 19
        IARD .............................................................................................................................. 19
    **2.5 BOOKS AND RECORDS REQUIREMENTS** ......................................................................... 19
        Custody Related Books and Records .............................................................................. 21
        Customer Account Records ............................................................................................ 21
        Advertising and Sales Literature ................................................................................... 22
        Other Books and Records .............................................................................................. 22
        13F Filings ..................................................................................................................... 23
        Disaster Recovery Plan / Business Continuity Plan ...................................................... 23
        Email Archiving ............................................................................................................. 24
    **2.6 ANNUAL REPORTING/FORMS** ........................................................................................ 24
        Form ADV ...................................................................................................................... 24
        Secretary of State ......................................................................................................... 24
        Tax Reporting ................................................................................................................ 25
    **2.7 FIDUCIARY RESPONSIBILITIES** ....................................................................................... 25
    **2.8 PROHIBITED INVESTMENT ADVISOR ACTIVITIES** ........................................................... 26
        Front Running ............................................................................................................... 26
        Hot Issues Restriction ................................................................................................... 26
        Diverted Opportunity .................................................................................................... 27
        Telephone Solicitation .................................................................................................. 27
        Borrowing From, or Loaning Money to a Customer ..................................................... 27

Case 3:20-cv-01064   Document 14-1   Filed 02/11/21   Page 2 of 85 PageID #: 54

Personal Gain on Customer Accounts ................................................................................ 27
Quarterly Disclosure .......................................................................................................... 27
Outside Activities ............................................................................................................... 27
Gifts and Gratuities ............................................................................................................ 27
Regulation S-P ..................................................................................................................... 27
Trustee ................................................................................................................................ 28
Restricted Terms ................................................................................................................ 28

**3.  Customer Accounts ....................................................................................................... 28**
   **3.1 GENERAL CONSIDERATIONS FOR ACCEPTANCE OF ACCOUNTS ............................. 28**
   **3.2 ACCOUNT OPENING ................................................................................................. 29**
      Setting up the Client Account .......................................................................................... 29
      Determining Suitability .................................................................................................... 29
      Required Account Opening Documents ............................................................................ 30
      Approval of New Accounts ............................................................................................... 30
      Disclosures ....................................................................................................................... 30
   **3.3 CUSTOMER SOLICITATION – FINDER'S FEES ........................................................... 32**
      Requirements under Rule 206(4)-3 .................................................................................. 33
   **3.4 DISCLOSURE REQUIREMENTS--BROCHURE RULE ..................................................... 34**
      Form ADV/Brochure Disclosure ....................................................................................... 35
   **3.5 MONITORING AND MAINTENANCE OF CUSTOMER ACCOUNTS ............................. 36**
   **3.6 CUSTOMER RECORDKEEPING ................................................................................... 39**
      Documentation of New Account Information .................................................................... 39
      Contracts .......................................................................................................................... 39
   **3.7 PROTECTION OF CUSTOMER INFORMATION ............................................................ 40**
      Safeguarding Information ................................................................................................. 41
      Third Parties to Whom We Disclose Information ............................................................... 42
   **3.8 CUSTODY ................................................................................................................. 42**
      SEC Definition of Custody ................................................................................................ 42
      Withdrawal of Advisory Fees from Clients' Accounts ....................................................... 42
      Annual Examination .......................................................................................................... 43
      SEC Rule 206(4)-2 Annual Examination Exceptions .......................................................... 43
      Client Checks Received ..................................................................................................... 43
      Insurance ........................................................................................................................... 44
   **3.9 FEES AND OTHE CHARGES ....................................................................................... 44**
      Advisory Fees Based on Assets under Management ......................................................... 44
      Performance Based Fees ................................................................................................... 44
      Fee Calculation .................................................................................................................. 44
      Fee Deduction ................................................................................................................... 45
      Other Fee Information ....................................................................................................... 45
   **3.10 CLOSING CUSTOMER ACCOUNTS .......................................................................... 45**
      Termination by Client within Five Days ............................................................................ 45
      Pro Rata Refund of Fees .................................................................................................... 45
      Termination Fees .............................................................................................................. 45
      Brokerage Transactions after Termination ....................................................................... 46
      Delivery of Securities/Liquidation .................................................................................... 46
      Account Transfers ............................................................................................................. 46

**4.  Trading and Brokerage Policies ..................................................................................... 46**
   **4.1 SECURITIES TRADING ............................................................................................... 46**
      Orders Designated to a Broker ......................................................................................... 46
      Directed Transactions ....................................................................................................... 46

Case 3:20-cv-01064   Document 14-1   Filed 02/11/21   Page 3 of 85 PageID #: 55

    **4.2 BEST EXECUTION** ................................................................................**46**
    **4.3 BROKER REVIEW - QUALIFICATION OF BROKERS** ...............................**47**
    **4.4 DIRECTED BROKERS** ..........................................................................**48**
    **4.5 BLOCK TRADING / TRADE ALLOCATION** .............................................**49**
    **4.6 USE OF BROKERAGE** ...........................................................................**51**
    **4.7 TRADING ERRORS** ..............................................................................**51**

**5. *Conflicts of Interest*** ...........................................................................***52***
    **5.1 PERSONAL INVESTMENTS AND INSIDER TRADING** .............................**52**
        Trading Restrictions ....................................................................52
        Personal Securities Transactions ................................................53
        Insider Trading .............................................................................54
        Identifying Insider Information ...................................................55
        Steps to Prevent Insider Trading ...............................................56
        Steps to Detect Insider Trading .................................................56
    **5.2 PURCHASE OF SHARES OR OBLIGATIONS OF CAPWEALTH OR AFFLIATES**............................**56**
    **5.3 EXECUTING SECURITIES TRANSACTIONS THROUGH AFFILIATES**.........................**56**
    **5.4 PURCHASE OF NEWLY ISSUED SECURITIES FROM CAPWEALTH OR ITS AFFILIATES** ...............**57**
    **5.5 PURCHASES AND SALES FOR CUSTOMERS OF CAPWEALTH** .................**57**
    **5.6 CHINESE WALL** ..................................................................................**57**
        Corporate Finance Department ..................................................57
        Unaffiliated Individual(s) ............................................................57
        Breach of the Chinese Wall .........................................................58
    **5.7 IMPARTIAL TREATMENT OF ACCOUNTS** ...........................................**58**
    **5.8 TRANSACTIONS BETWEEN ACCOUNTS** ..............................................**58**
    **5.9 PAY TO PLAY POLICY** ........................................................................**59**
        Background....................................................................................59
        Definitions ....................................................................................60
        Policy and Procedures .................................................................61
        Recordkeeping .............................................................................61

**6. *Miscellaneous*** ....................................................................................***62***
    **6.1 COMMUNICATIONS WITH THE PUBLIC** ............................................**62**
        Customer Correspondence..........................................................62
        Advertising and Sales Literature.................................................63
        Customer Complaints ..................................................................66
        Customer Complaint Notification Requirements .......................66
        Media............................................................................................67
    **6.2 PROXY VOTING POLICY**....................................................................**67**
        Proxy Voting Agent .....................................................................68
        Voting Guideline ..........................................................................68
        Proxy Voting Committee .............................................................68
        Conflicts of Interest ....................................................................69
        Amendments to these Procedures .............................................69
    **6.3 INVESTMENT POLICIES** ....................................................................**69**
    **6.4 UNREGISTERED ENTITY CONSIDERATIONS**......................................**70**
        UnRIA............................................................................................70
        Unregistered Investment Company ...........................................70
        Monitoring by Compliance Department.....................................71
    **6.5 WHISTLEBLOWING POLICY**..............................................................**71**

**7. *ANTI-MONEY LAUNDERING POLICY*** ....................................................***72***

Patriot Act.................................................................................................................72
AMLCO.....................................................................................................................73
Policy Statement.......................................................................................................73
Third Parties .............................................................................................................74
Customer Due Diligence ...........................................................................................74
CIP............................................................................................................................75
Inability to Identify Customer...................................................................................75
CIP Notification.........................................................................................................75
Individual Accounts ..................................................................................................76
Business Accounts ....................................................................................................76
Review for known or suspected terrorist connections..............................................77
Future Updates to OFAC List ....................................................................................77
Names not found on OFAC List.................................................................................77
Names found on OFAC List .......................................................................................78
Non-Documentary Forms of ID Verification .............................................................78
Wire Orders and Transfers .......................................................................................78
Red Flags...................................................................................................................79
Independent Testing .................................................................................................82
Record Keeping.........................................................................................................82
FinCen.......................................................................................................................82

**SENIOR MANAGEMENT APPROVAL** ..................................................................... **83**
**AMLCP SENIOR MANAGEMENT APPROVAL** .......................................................... **84**
**ATTESTATION OF RECEIPT AND REVIEW OF THE POLICIES AND PROCEDURES MANUAL INCLUDING THE AMLCP.** **85**

Case 3:20-cv-01064   Document 14-1   Filed 02/11/21   Page 5 of 85 PageID #: 57

# Definitions

| | |
|---|---|
| Automated Customer Account Transfer | ACAT |
| Advent Portfolio Exchange | APX |
| Anti-Money Laundering | AML |
| Anti-Money Laundering Compliance Officer | AMLCO |
| Anti-Money Laundering Compliance Policy | AMLCP |
| Automated Customer Account Transfer Service | ACATS |
| Bank Secrecy Act | BSA |
| CapWealth Advisors, LLC | CapWealth or the Advisor |
| Central Registration Depository | CRD |
| Charles Schwab & Co, Inc | Schwab |
| Chief Compliance Officer | CCO |
| Chief Executive Officer | CEO |
| Chief Financial Officer | CFO |
| Client Bookkeeping Solutions | CBS |
| Creative Solutions Accounting | CSA |
| Customer Identification Procedures | CIP |
| Electronic Data Gathering, Analysis and Retrieval | EDGAR |
| Employee Retirement Income Security Act | ERISA |
| Financial Industry Regulatory Authority | FINRA |
| Global Investment Performance Standards | GIPS |
| Initial Public Offering | IPO |
| Institutional Shareholder Services | ISS |
| Investment Advisor Registration Depository | IARD |
| Investment Management agreement | IMA |
| Material Non-Public Information | MNPI |
| Non-Automated Customer Account Transfer | Non-ACAT |
| Policies and Procedures Manual | The Manual |
| Political Action Committee | PAC |
| Registered Advisor | RA |
| Registered Investment Advisor | RIA or Advisor |
| Registered Representative | RR |
| Securities and Exchange Commission | SEC |
| Securities Investor Protection Corporation | SIPC |
| Significant Business Disruption | SBD |
| Vaden Group CPA's | Vaden |
| Specially Designated Nationals and Blocked Persons list | SDN |
| Suspicious Activity Reporting | SAR |
| The Investment Advisors Act of 1940 | Advisors Act |
| The Uniform Application for Investment Advisor Registration | Form ADV |

# 1. <u>INTRODUCTION</u>

## 1.1  CapWealth Advisors, LLC

CapWealth is an Investment Advisor registered with the SEC pursuant to the provisions of Section 203 of the Advisors Act.

As a RIA, CapWealth and its associates are obligated to conduct their investment advisory activities in compliance with all applicable provisions of the Advisors Act.  In addition to any federal requirements, CapWealth must also operate in compliance with the rules and regulations of each state in which it conducts business.

## 1.2 Compliance Manual

The CapWealth manual is intended to assist the Advisor and its employees to comply with the applicable rules and regulations of the SEC and the states, as well as to establish proper supervision of advisory activities. Employees of the Advisor and their supervisors should refer to this manual for guidance with compliance issues.  Issues which cannot be resolved by reference to this manual should be directed to the appropriate supervisor.

Each employee having managerial or supervisory responsibilities must:

- Be familiar with and understand the contents of the manual;
- Ensure that all employees are familiar with and understand this manual; and
- Ensure that any subsequent changes or additions to this manual are distributed to the appropriate staff.

This manual is not to be construed as all-inclusive, but rather is to serve as a guide in conducting and supervising the daily activities of the Advisor and its representatives. Additions and changes to the manual will be announced as events occur requiring such revision. On an annual basis, the Compliance Department will review and update the manual to reflect policy or regulatory changes. This will be memorialized through Senior Management Approval on the last page of the manual.

Each associate of CapWealth and other affiliated persons will be provided a copy of this manual and will be required to acknowledge receipt of it and sign a statement that they have read and will comply with the provisions contained in the manual.  Also, each associate will be required annually to reaffirm that he/she has read and will comply with all new provisions of the manual by completing an annual manual attestation.

## 1.3 Organization of Investment Advisor

The Advisors Act was enacted by the U.S. Congress in 1940 in conjunction with the Investment Company Act of 1940 for the purpose of establishing a set of uniform laws to regulate the activities of those persons and institutions involved in providing investment advisory services and the vehicles (investment companies) through which investors are able to participate in the growth of American industry and technology.  The term "Investment Advisor" is defined in Section 202(a)(11) of the Advisors Act as, "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities.

The term "for compensation" has been broadly interpreted by the SEC and includes the receipt of any economic gain, whether in the form of a planning fee, a commission from the sale of a product, a fee paid by a sponsor for recommending a specific product or any other type of financial remuneration.

7

Additionally, the Commission staff has stated that it is not necessary that an Advisor's compensation be paid directly by the person receiving investment advisory services, but only that the Investment Advisor receives a fee, commission or other compensation as a result of his activities as an Investment Advisor.

The Advisors Act gives the SEC broad authority to make and enforce rules necessary and appropriate in implementing the provisions of the Act. In carrying out this mandate, the SEC has enacted various rules under the Advisors Act. It is primarily through these rules that the SEC regulates the activities of Investment Advisors.

The Advisors Act and recently enacted amendments to the Act require that persons engaged in certain investment related activities register as Investment Advisors, whether with the SEC or with the state in which the Advisor maintains its principal business, depending on the value of assets under the Advisor's management. Advisors that have less than $100 million of assets under continuous and regular management generally must register with the state or states in which they have a place of business and in which they have clients, while Advisors that have more than $100 million under management must register with the SEC.

The SEC and the courts have stated that portfolio management professionals, including RIAs, have a fiduciary responsibility to their clients. In the context of securities investments, fiduciary responsibility should be thought of as the duty to place the interest of the client before that of the person providing investment advice and failure to do so may render the Advisor in violation of the anti-fraud provisions of the Advisors Act. Fiduciary responsibility also includes the duty to disclose facts significant to an investor's decision to purchase, or refrain from purchasing, a security recommended by the Advisor. The SEC has made it clear that the duty of an Investment Advisor to refrain from fraudulent conduct includes an obligation to disclose material facts to his/her clients whenever the failure to disclose such facts would cause or has the potential to cause financial harm to the client or prospective client. An Advisor's duty to disclose material facts is particularly important whenever the advice given to clients involves a conflict or potential conflict of interest between the employees of the Advisor and is clients.

## 1.4 Overview of Supervisory Relationships

The CapWealth Compliance Department will be responsible for supervision of investment advisory activities of CapWealth, its employees and Investment Advisors. The CCO, located at the Advisor's principal place of business, primary responsibilities include:

- Assuring that CapWealth's compliance manual and supervisory procedures are designed to achieve compliance with applicable laws, regulations and industry practices; and
- To advise those members of CapWealth's management with responsibility for supervising the investment advisory activities of CapWealth and its associates providing investment advisory services.

The CCO may assign other associates of CapWealth to assist in fulfilling his/her responsibilities. Ultimate responsibility for ensuring compliance with the provisions of this manual and the federal and state securities laws rest with the CapWealth management. In the absence or incapacity of the CCO, either another member of the Compliance Department or the Chairman of CapWealth will serve in his/her place with full responsibility without further authorization to the extent permitted by qualifications according to regulations until a replacement can be secured.

### *Qualifications of Supervisor*

Individuals who are qualified and are currently designated as an OSJ of CapWealth will be required to maintain supervisory responsibilities of any Investment Advisory Representative under their jurisdiction. Supervisory responsibilities may include, but are not limited to the following:

- Review of opening of new client accounts

- Review of new account documentation
- Review of client activities for abuses
- Review of transactions by Investment Advisory Representatives
- Review of correspondence
- Verification of offering and distribution of Form ADV Parts 2A and 2B and/or Brochure
- Proper registration of Investment Advisory Representatives in appropriate states
- Maintenance of adequate books and records
- Review of client files
- Compliance with the Investment Advisory Representatives manual

### 1.5 Overview of Investment Advisory Programs

**"Advisory Services"** refers to the way in which an Advisor conducts its business and its relationship with individual clients. CapWealth's duty to each client and the degree of management responsibility assumed varies with the type of service the client may need. In addition, CapWealth and its Investment Advisor Representatives have a fiduciary duty to learn the essential facts about each client's financial situation, investment experience, investment objectives and risk tolerances, income, net worth, time horizon, tax bracket and liquidity needs before executing any transaction for that client. CapWealth's principal service involves counseling our clients on appropriate courses of action designed to meet specific investment objectives and/or achieve financial independence.

CapWealth offers individualized portfolio management services through its Investment Advisor Representatives who have the requisite qualifications to manage client accounts. These accounts may be managed on a discretionary or non-discretionary basis, and the degree of management responsibility may range from "investment supervisory services" to "management services" or may involve only ad hoc consulting on specific issues of concern to the client.

**"Investment Supervisory Services"** is defined as "giving continuous investment advice to a client or making investments for the client based on the individual needs of the client. Individual needs include the nature of other client assets and the client's personal and family obligations." For purpose of this Compliance Manual, Investment Advisor Representatives, advising clients under an investment supervisory program are required to consider the totality of each client's financial circumstances before recommending a specific security or investment program to the client.

**"Management Services"** includes portfolio management where the Investment Advisor Representative usually does not consider the overall financial circumstances of the client before purchasing or selling a security but focuses instead on meeting the client's specific investment objectives.

The investment services offered by CapWealth can be provided on either a discretionary or non-discretionary basis.

Under the Discretionary IMA, clients grant CapWealth complete and sole discretion to manage their account(s). The account(s) will be managed in accordance with each client's financial situation, investment experience, investment objectives and risk tolerances, income, net worth, time horizon, tax bracket and liquidity needs. Management of the account(s) is subject only to any reasonable restrictions that the client has provided to CapWealth in writing. Pursuant to this grant of discretion, clients authorize CapWealth to invest in securities and other investments of any nature whatsoever, at the time and in the manner that CapWealth determines. CapWealth will also act on the client's behalf in all other matters necessary or incidental to the handling of the account, without discussing these transactions or actions with client in advance. The specific terms of the investment advisory relationship between each client and CapWealth are set forth in the client's IMA.

Under the Non-Discretionary IMA, CapWealth provides investment advice to clients on a non-discretionary basis. This advice is in accordance with each client's financial situation, investment experience, investment objectives and risk tolerances, income, net worth, time horizon, tax bracket and

liquidity needs. CapWealth will recommend the purchase and/or sale of securities to clients. But, will not execute any recommendations until such time as CapWealth obtains the client's authorization to do so. The specific terms of the investment advisory relationship between each client and CapWealth are set forth in the client's IMA.

Each client informs CapWealth of his/her financial situation, investment experience, investment objectives and risk tolerances, income, net worth, time horizon, tax bracket and liquidity needs for the account(s). Each client will also notify CapWealth of any reasonable restrictions that the client wishes to impose on the management of the account(s). These restrictions could include designating particular securities or categories of securities that should not be purchased or sold in the account(s). CapWealth reviews this client information and discusses this information with the client. Based upon the information provided by the client, CapWealth will tailor services to meet the individual needs of each client.

## 1.6 Registration Issues

### *CapWealth Registration*

Investment Advisors must register or become licensed with either state or federal regulators, based upon the following:

<u>State Advisors:</u>

- Have less than $100 million in assets under management;
- Provide only financial planning or other services that do not involve regular and ongoing management of clients' securities; and
- Solicit clients on behalf of other advisors but provide no advice themselves

<u>Federal Covered Advisors:</u>

- Have $100 million or more in client assets under regular and ongoing management;
- Are advisors to investment companies under the Investment Company Act of 1940;
- Are providing services in 15 or more states;
- Are eligible for an exemption by rules or orders under the Investment Advisors Act of 1940; and
- Must make a notice filing with the state if they have a place of business in the state or have six or more clients in that state in a 12-month period, regardless of place of business

CapWealth meets the definition of a federally covered Advisor and thus is registered with the SEC.

### *Registration of Investment Advisor Representatives*

Individuals associated with CapWealth that render investment advice or in certain instances act as a solicitor will be required to register as an Investment Advisory Representative of CapWealth. Currently, there are no federal regulations requiring examinations or minimum qualifications of Investment Advisory Representatives. However, many states require the Investment Advisor Exam(s), (e.g., Series 65 or 66). This requirement should be reviewed upon initiating the state registration process and appropriate steps taken to maintain compliance with each state's requirements.

CapWealth must register an Investment Advisory Representative with his/her home state in order to conduct investment advisory services. The registration process will vary by state and by circumstances. CapWealth will file a Form U-4 application for each Investment Advisor Representative who will provide services on behalf of the Investment Advisor. The U-4 is filed electronically via the IARD.

## 1.7 Form ADV/Brochure Disclosure and Delivery

Under Rule 204-3, CapWealth must prepare and maintain a current Form ADV or other disclosure document that contains specific information about CapWealth and its officers and associates who are engaged in the business of providing investment advice to clients.

**Part 1 of Form ADV** is primarily for SEC, Part 1A, and state registration purposes, Part 1B.  It must provide among other things, the following information about CapWealth:

- CapWealth's address and location of its books and records;
- State(s) in which CapWealth is registered;
- Number of securities portfolios and the aggregate market value of these portfolios under management both for discretionary and non-discretionary accounts;
- Whether CapWealth has custody of client assets;
- A description of the ownership structure of CapWealth and,
- The name, title, controlling interest and ownership of all direct owners and executive officers.

**Part 2A of Form ADV** is required under the "brochure rule" (Rule 204-3) and is used primarily as a disclosure document for clients and prospective clients of CapWealth.  The brochure includes the following topics:

- Advisory business
- Fees and compensation
- Performance-based fees and side-by-side management
- Methods of analysis, investment strategies, and risk of loss
- Disciplinary information.
- Code of ethics, participation or interest in client transactions, and personal trading
- Brokerage practices

**Part 2B of Form ADV** is a supplement that is required to be delivered to clients.  The supplement will contain brief resume like disclosures about the educational background, business experience, other business activities, and disciplinary history of the individual(s) providing investment advice so that the client can assess the person's background and qualifications.  To ensure all clients receive the brochure, a note is made in APX to memorialize that the brochure was given to the client. Additionally, all notes are also scanned into Laserfiche for record keeping purposes.

### *Delivery of Form ADV/Brochure*

Parts 2A and 2B of Form ADV or Disclosure Brochure will be furnished to prospective clients:

- Not less than forty-eight hours prior to entering into a written or oral contract with the client; or
- At the time of entering into any contract if the client has the right to terminate the contract without penalty within five business days after entering into the contract.

The Disclosure Brochure or Parts 2A and 2B of Form ADV will also be offered, without charge, to existing clients at least annually.  If there have been any material changes since the last delivery, a copy of Part 2A will be provided to all CapWealth clients.

### *Amendments to Form ADV*

With respect to when CapWealth's Form ADV should be amended to correct inaccuracies, Rule 204-1(b)(1) of the Advisors Act states, in relevant part, that CapWealth must amend the Form ADV by filing additional amendments (other than the annual amendments) promptly.

## 1.8 Fiduciary Status and General Duties

Investment Advisor Representatives and RIAs are subject to Section 206 of the Advisors Act, which prohibits an Advisor from engaging in any fraudulent, deceptive, or manipulative conduct. The Advisor and Investment Advisor Representatives assume a fiduciary responsibility and an obligation to act in the best interest of clients and to fully disclose all material facts, including but not limited to, any actual or potential conflicts of interest. The SEC has defined an Advisor's fiduciary duty as:

"[U]nlike the…[other federal securities laws], the Advisors Act does not require a transaction to have occurred for actionable fraud to have been committed. An Investment Advisor is a fiduciary who owes his clients undivided loyalty, and is prohibited from engaging in activity in conflict with the interest of any client. A breach of an Advisor's fiduciary obligations constitutes a violation of the antifraud provisions of the Advisors Act. This fiduciary obligation imposes on an Advisor a duty to deal fairly and act in the best interest of its clients. Such duty imposes upon an Investment Advisor numerous responsibilities including the duty to render disinterested and impartial advice; to make suitable recommendations to clients in light of their needs, financial circumstances and investment objectives; to exercise a high degree of care to insure that adequate and accurate representations and other information about securities are presented to clients' and, to have an adequate basis in fact for its recommendation, representations, and projections."

Specifically, the regulators have referenced the following fiduciary responsibilities as they relate to the Advisor's investment advisory activities:

<u>Duty to Disclose Material Facts Regarding Advisory Relationships</u>

An Investment Advisor who has custody or discretionary authority over client funds or securities, or who requires prepayment of fees of more than $1,200 per client for services to be performed over a period in excess of six months must disclose any financial condition which might impair the Advisor's ability to meet its contractual commitments to clients. For this reason, it is the responsibility of the CFO to ensure that CapWealth's net worth remains positive at all times. At any time, should CapWealth's liabilities actually exceed its assets, or it appears that liabilities may exceed assets, the CFO will immediately notify the Chairman who will take steps to correct the actual or pending net worth deficiency and, if necessary, commence steps to comply with the financial disclosure provisions of Rule 206(4)-4. If the Chairman, after consultation with the CFO, determines that CapWealth's financial condition is such that there would be no impairment of its ability to met contractual commitments to clients, the Chairman will have the sole authority to defer implementing the financial disclosure provisions of the rule. However, if such disclosures are deemed necessary by the CCO, existing clients must be notified in writing of CapWealth's financial condition and prospective clients must be informed of such condition before entering into any agreement for advisory services.

In addition, Rule 206(4)-4 also requires that CapWealth disclose relevant facts about any legal or disciplinary "event" which would be material in evaluating CapWealth's integrity or ability to meet contractual commitments to clients. The following factors are to be considered in determining if an event is "material":

- The separation of the individual and the "event" from the advisory functions;
- The nature of the violation or infraction of the law;
- The severity of the sanctions imposed; and,
- The time that has elapsed since the violation or infraction

Rule 206(4)-4 also requires that if CapWealth or any associate designated as a "management person" is found to have committed any of the offences listed in sub-section (a) of the rule, such information must be disclosed to clients promptly, and to prospective clients not less than 48 hours prior to entering into any agreement for advisory services, or no later than the time of entering into such agreement if the client has the right to terminate the contract without penalty within five business days after entering into the agreement. Rule 206(4)-4 defines "management person" as a person with the power to exercise, directly

or indirectly, a controlling influence over the management or policies of CapWealth, or to determine the general investment advice given to clients. For purposes of this rule, the term "promptly" shall mean within ten business days. Disciplinary information may be disclosed to clients and prospective clients in CapWealth's Form ADV Part 2A provided that delivery of the ADV Form satisfies the timing of disclosure requirements described in paragraph (c) of Rule 204-3.

Under certain circumstances, disclosure of some disciplinary information may not be required after a period of 10 years from the date of the violation or if the violation was not material. Any required disciplinary disclosures are to be reported on Form ADV. It is the responsibility of the CCO to ensure that any disciplinary information requiring disclosure is promptly reported on CapWealth's amended Form ADV and that client's and prospective clients receive the information within ten business days.

If there are, or at anytime become, any affirmative responses to the disciplinary action section of CapWealth's ADV, the CCO will provide a detailed explanation of the circumstances of the affirmative response. Questions relating to custody or possession of client funds and securities, discretionary authority or the use of solicitors should be reviewed for compliance with the applicable rules since affirmative responses to any of these items may require the preparation of additional books and records.

### Duty to Act in the Best Interest of Clients

It is the fiduciary duty of CapWealth to act in the best interest of our clients. The Compliance Department will review actions by the Advisor and its associates on a regular basis to verify that both CapWealth and the Investment Advisor Representative are acting in the best interest of the client. This is specifically important regarding decisions by the Advisor in situations where a conflict of interest may arise.

### Duty to Disclose Conflicts of Interest

It is the responsibility of the Advisor to determine any area that would be a conflict of interest. Upon identification of a conflict of interest, CapWealth must verify and ensure that the client is not harmed due to this conflict. In addition, CapWealth must disclose any possible conflicts of interest to clients in Part 2A of Form ADV and the Advisor's Disclosure Brochure. The specific information regarding any current or potential conflicts of interests must be described clearly. Generally, conflicts of interest may be defined as any existing or prospective business relationship in which the Advisor or its Investment Advisor Representatives may have actual or potential incentives to place their interests above those of the client, and thereby violate CapWealth's fiduciary responsibilities to the client.

### Duty to Treat Each Client Fairly

It is the fiduciary responsibility of CapWealth and its associates to treat each client fairly and to avoid preferential treatment of clients. CapWealth utilizes various policies and procedures to ensure that specific clients are not given preferential treatment, such as in the distribution of IPO's or assignment of options. In most cases, CapWealth utilizes the random selection method for determination of assignment to clients. However, should CapWealth allow certain clients the first option for purchase of IPO's or such, then a disclosure would be provided to clients notifying them of the selection process and their category within the process.

### Duty to Seek Best Execution

In trying to obtain "best execution", each Investment Advisory Representative or trader must consider the following factors in placing securities transactions with broker-dealer:

- Execution
- Commission Rates
- Responsiveness and Financial Responsibility
- Other Factors for Determining Best Execution

<u>Duty to Provide Suitable Investment Advice</u>

It is the fiduciary responsibility of CapWealth and its associates to provide suitable investment advice to clients. Upon the initiation of an advisory relationship with each client, CapWealth and the Investment Advisory Representative will identify a client's financial background, prior investment experience, investment objectives, goals and restrictions, if any, and risk tolerance, among other things. The Advisor also includes in its review of a client's background information and investment objectives, consideration as to the suitability and appropriateness of advisory services for a particular client. The client profile information is maintained by CapWealth for its clients and updated client information is either provided by a client or obtained by the Advisor or Investment Advisory Representative on a periodic basis. This information is utilized to verify that CapWealth and its associates are providing suitable investment advice.

### 1.9 Liability Under the Advisors Act

Under the Advisors Act, a RIA and its associates can be subjected to various forms of liability, including the following, which can be in many forms, such as fines, censure, sanctions, or any combination:

- Criminal Liability
- Administrative Liability
- Civil Liability

### 1.10 Treatment of Client Complaints and Legal Actions

It is the responsibility of the CCO or his designee to respond to each complaint promptly and to retain any subsequent correspondence from the client on the matter.

An Investment Advisor Representative's primary responsibility in handling any complaint that may be made concerning one of his/her client accounts is to cooperate fully and honestly with the principals investigating the complaint. If a client makes a complaint, the Investment Advisor Representative should immediately refer the complaint to the Compliance Department, which will require the Investment Advisor Representative to provide a written statement concerning the transaction. Any Investment Advisor Representative or associate of CapWealth who receives any material verbal complaint from a client must immediately notify his/her supervisor of the nature of the complaint. The supervisor investigating the complaint should ensure that the client has also been asked to make a written statement about the complaint. If the client refuses to do that, it is the responsibility of the Investment Advisor Representative or associate to document to the best of his/her ability the events leading up to the client's complaint. The term "material" in this context means any matter that could adversely affect the reputation of CapWealth or has a potential likelihood of regulatory or legal action against CapWealth of any of our associates. Any doubt on the materiality of a complaint should be referred to the CCO for resolution.

A tracking log is kept by the Compliance Department to record any complaint made. All documents related to the complaint will also be maintained for record keeping purposes.

### 1.11 Confidentiality of Client Information

The SEC Regulation S-P, in conjunction with the federal law defined in the Gramm-Leach-Bliley Act, requires CapWealth to maintain policies and procedures reasonably designed to (a) ensure the confidentiality of client records and information; (b) protect against any anticipated threats or hazards to the security of client records and information; and (c) protect against unauthorized access or use of client records or information that could result in "substantial harm or inconvenience" to any consumer. The privacy provisions of Regulation S-P apply to information that is "nonpublic personal information." CapWealth has a Privacy Policy to protect confidential client information.

### 1.12 Money Laundering

Money is "laundered" to conceal criminal activity associated with it, including the crimes that generate it, such as drug trafficking or illegal tax avoidance. It conceals the true source of funds so that they can be used freely. Money laundering is a diverse and often complex process. It involves three independent steps that often occur simultaneously:

- <u>Placement</u> – Physically placing bulk cash proceeds.
- <u>Layering</u> – Separating the proceeds from criminal activity through layers of complex financial transactions.
- <u>Integration</u> – Providing an apparently legitimate explanation for the illicit proceeds.

For money laundering to be successful, there must be no "paper trail" to connect the three steps of this process. In the U.S., this is most commonly done by infiltrating the banking or brokerage systems. Within the banking or brokerage systems, launderers may structure transactions, coerce employees to not file proper reports, or establish legitimate "front" businesses to open accounts. The U.S. has imposed many legislative and regulatory standards to deter money laundering, including:

- The BSA of 1970
- The Money Laundering Control Act of 1986
- The Anti-Drug Abuse Act of 1988
- Section 2532 of the Crime Control Act of 1990
- Section 206 of the Federal Deposit Insurance Corporation Improvement Act of 1991
- Title XV of the Housing and Community Development Act of 1992
- Annunzio-Wylie AML Act of 1992
- Money Laundering Suppression Act of 1994
- Money Laundering and Financial Crimes Strategy Act of 1998
- USA Patriot Act of 2001
- Intelligence Reform and Terrorism Prevention Act of 2004

Some items to look for include the following:

- Activity not consistent with the customer's business
- Attempts to avoid reporting of record keeping requirements
- Certain transfer of funds activities
- Any customer who provides insufficient or suspicious information
- Conduct of certain employees
- Frequent deposits of cashier's checks, money orders, and/or wire transfers

Any of the above may warrant attention. However, just because a situation falls into the above list it does not mean that it involves illicit activity. It only means that the situation requires closer scrutiny. Many of these situations are suspicious or inconsistent with typical customer behavior. Many transactions will be found, upon closer examination, to result from legitimate business activity. Similarly, other transactions, or activities not mentioned above may be suspicious and require closer examination. Common sense plays a significant role in detecting money laundering. CapWealth follows all appropriate regulation regarding the monitoring and reporting of money laundering. Any concerns regarding customer activity should be directed to the Compliance Department.

# 2. GENERAL

## 2.1 DUTIES AND RESPONSIBILITIES OF MANAGEMENT

Under SEC Rule 206(4)-7, it is unlawful for an investment adviser registered with the SEC to provide investment advice unless the adviser has adopted and implemented written policies and procedures reasonably designed to prevent violation of the Advisers Act by the advisor or any of its supervised person. The Rule requires advisors to consider their fiduciary and regulatory obligations under the Advisers Act and to formalize policies and procedures to address them.

The Rule requires that policies and procedures be reasonably designed to prevent violation of the Advisers Act and needs to encompass compliance considerations relevant to the operations of the Advisor. The Rule requires the Advisor to review policies and procedures annually to determine their adequacy and the effectiveness of their implementation. The review should consider any compliance matters that arise during the previous year, any changes in the business activities of the adviser or its affiliates, and any changes in the Advisers Act or applicable regulations that might suggest a need to revise the policies or procedures. Although the Rule requires only annual reviews, advisors should consider the need for interim reviews in response to significant compliance events, changes in business arrangements and regulatory developments.

Management of CapWealth provides oversight to the Investment Advisor activity conducted by the Advisor. Management will delegate such duties and responsibilities, as it may consider appropriate to designated supervisors or other officers or employees of the Advisor.

Management has adopted policies and procedures designed to provide effective compliance and adequate supervision of representative activities. These policies and procedures will be regularly reviewed and, where appropriate, updated to ensure adequate supervision of the Advisor's investment activities and representatives. Even with sufficient policies and procedures, CapWealth must and will have a culture of compliance that is instilled from the top down to promote a compliant and high integrity atmosphere.

## 2.2 DUTIES AND RESPONSIBILITIES OF THE CCO

Rule 206(4)-7 requires the Advisor to centralize responsibility for overseeing compliance and to provide a resource for giving guidance and answering employee questions, management shall designate a CCO whose responsibility is to:

- Propose policies and procedures designed to provide reasonable assurance that the Advisor's operations are conducted in compliance with applicable federal and state laws and regulations;
- Establish and implement a program to assure that the Advisor's representatives understand the Advisor's policies and procedures and their responsibility to comply with those policies and procedures;
- Implement a program of testing and reviews designed to provide reasonable assurance that the Advisor's policies and procedures are effective and are being followed;
- Manage and oversee the interaction with the SEC. This includes the management of contacts, visits and examinations; and
- Coordinate the implementation of any corrective action needed or required by the SEC in any deficiency letter or other communication.

It is the policy of the Advisor to allow for the delegation of these activities to qualified individuals supervised by the CCO. The CCO of the Advisor is Phoebe Venable.

The CCO may assign other associates of CapWealth to assist in fulfilling his responsibilities. Ultimate responsibility for ensuring compliance with the provisions of this manual and the federal and state securities laws rest with the CapWealth management.

Case 3:20-cv-01064   Document 14-1   Filed 02/11/21   Page 16 of 85 PageID #: 68

In the absence or incapacity of the CCO, either another member of the Compliance Department or the Chairman of CapWealth will serve in his/her place with full responsibility without further authorization to the extent permitted by qualifications according to regulations until a replacement can be secured.

*Supervision*

The Compliance Department, or designated principal(s) under the supervision of the Compliance Department, will be responsible for supervision of Investment Advisor Representatives.

The Compliance Department, or designated principal(s) under the supervision of the Compliance Department, will be responsible for review of trade blotters of Investment Advisor Representatives for suitability and prohibited transactions. On a daily basis, the CCO prints the daily blotter for review, signs and dates the blotter to memorialize review and files for record keeping purposes. The CCO also conducts a weekly review of trades by means of random sampling. On a monthly basis, the CEO conducts a review of the monthly blotter by means of random sampling. The CEO signs and dates the blotter to memorialize her review and files for record keeping purposes. All reviews are monitored via a tracking log.

Investment Advisor Representatives review advisory accounts on a daily basis to monitor for deficiencies or concerns. Additionally, the Compliance Department, or designated principal(s) under the supervision of the Compliance Department, will conduct a quarterly review of approximately 5% of the advisory accounts. This process is used in order to evaluate and monitor client activity and documentation. The review process includes, but is not limited to the following:

- Assess client goals and objectives
- Evaluate the strategy that has been employed
- Monitor portfolio activity
- Address the need to re-balance
- Verification of investment supervisory services
- Validate annual management fee

Following the review, the Compliance Department will memorialize their quarterly review in a tracking log and notify the Investment Advisor Representative of any concern or deficiency detected. Any deficiency will be addressed promptly by the Investment Advisor Representative. The Investment Advisor Representative will notify the Compliance Department when resolved or if further action is needed.

The SEC has authority to audit CapWealth at such intervals as deemed appropriate, based on trading activity, volume, nature of customer complaints, etc. All required books and records are subject to review by the auditor. CapWealth may or may not receive advance notification of these audits. As a result of any audit, CapWealth may initiate changes in procedures.

*Annual Training*

All CapWealth employees receive annual training courses selected individually based upon each employee's role and responsibilities. Additionally, all employees are given AML training. All documents relating to these training courses are maintained in the Advisor's books and records. All employees must complete their selected courses within the required timeframe or they will face disciplinary action. The Compliance Department maintains a tracking log to monitor and ensure all employees complete their required training.

Annual training is deployed via online coursework, guest speakers and compliance meetings.

## 2.3 INTERNAL CONTROLS

A primary responsibility of the Compliance Department is ensuring that all advisory activities of CapWealth are in compliance with the provisions of the Advisors Act and the various SEC rules there under. In fulfilling this responsibility, the Compliance Department will implement a compliance system to which both management and associates are fully committed, and which has the effect of fostering a compliance-oriented environment within CapWealth.

### *Characteristics of an Effective Compliance System*

Specific characteristics of CapWealth's compliance system require that:

- All relevant advisory activities of CapWealth are addressed in its written compliance manual
- The compliance manual is updated periodically and reviewed annually by the Compliance Department
- The compliance manual assigns specific responsibilities to individual associates of CapWealth; and,
- All newly employed associates are required to read the compliance manual as part of CapWealth's orientation procedures, and all associates of CapWealth will receive periodic training in matters of regulatory importance. In addition, the Compliance Department will distribute to all associates involved in providing advisory services, copies of amendments, revisions and up-dates to the compliance manual as well as relevant regulatory information received from the SEC and other authorities.

To ensure a reliable and effective compliance system meeting the above characteristics, the Compliance Department will develop a system of internal controls to monitor compliance with the procedures specified in this compliance manual. The compliance system developed by the Compliance Department will be reviewed and, upon approval, will be implemented by CapWealth's CCO and Chairman.

A risk assessment is conducted annually by the Compliance Department to ensure the effectiveness of the Advisor's policies and procedures and to determine the effectiveness of these policies. Risks and the corresponding policy are identified. Upon review of each risk and the policy in place to minimize the risk, any finding must be notated on the assessment. Any findings require an immediate response to the Advisor's policies and procedures. Policies will be amended if needed and implemented in a timely manner. If any new risks are identified during the review, a new policy and/or procedure must be added.

## 2.4 EMPLOYEE LICENSING AND REGISTRATION

The CCO may deem it necessary for employees or officers of the Advisor to register to take the Series (65) Investment Advisors Representative exam or Series 66 exam, and become registered as a RA ("RA") if an employee performs one or more of the following roles:

- Make any recommendations or otherwise render advice regarding securities directly to customers;
- Manage accounts or portfolios for customers;
- Determine which recommendations or advice regarding securities should be given; or
- Immediately supervise employees in the performance of the activities above.

Each employee to whom this requirement applies will receive study materials and a U-4 application from the CCO. This form is used to register the employee to take the Series 65 or Series 66 exam. After completion of the form, the employee should return it to the CCO who will submit the form electronically via WebCRD. The employee will receive notification from the CCO with the date by which the employee must take the exam (exam windows are valid for 120 days.)

**An employee must receive confirmation from the CCO that their "RA" registration is effective in the appropriate jurisdiction prior to making any solicitations of investment advisory services to prospective customers or opening accounts**.

In addition, each CapWealth branch office location, if any, will be listed with the SEC via Schedule D of Form ADV. The CCO will provide Schedule D and complete the necessary filing.

### *Conducting Business in States where not Registered*

Most states have regulations requiring registrations and/or educational testing of Investment Advisory Representatives who conduct investment advisory business in their respective states. Some states do permit certain isolated exemptions (i.e. advisory relationships with five residents without being registered); however, each state's regulations must be closely reviewed and strictly followed. Investment Advisor Representative must contact the Compliance Department to determine the registration requirements of that state.

When an offer of employment is extended, the hiring manager must notify the CCO in order to begin the appropriate registration process. CapWealth may conduct a FINRA background check through WEBCRD or WEBIARD, FBI background check, consumer credit check and employment verification on each applicant prior to approval for registration as an Investment Advisor Representative. Upon registration approval, the Compliance Department will provide each Investment Advisor Representative a compliance manual. Each representative must acknowledge receipt of the manual in writing, which will be maintained in a file in the Compliance Department.

Any time an employee changes his/her home address, name, resigns or is terminated from the Advisor, the CCO must be notified immediately in order to process the necessary registration updates/terminations.

The Investment Advisor Representative's manager must notify the CCO if it becomes necessary to register a representative in additional states.

Representatives are prohibited from dual registration with two Investment Advisors without express written consent of the CCO.

### *IARD*

The IARD is an electronic filing system for Investment Advisers sponsored by the SEC and NASAA, with FINRA serving as the developer and operator of the system. The IARD system collects and maintains the registration, reporting and disclosure information for Investment Advisers and their associated persons. The IARD system supports electronic filing of the revised Forms ADV and ADV-W, centralized fee and form processing, regulatory review, the annual registration process, and public disclosure of Investment Adviser information.

The IARD system facilitates the collection and disbursement of fees associated with filings processed on the system. CapWealth has established an IARD Financial Account to cover the expense of any filings through the IARD system. The CCO must ensure that the account balance is sufficient to cover the cost of any filing. If the account balance is insufficient, funds must be wire to the account.

## 2.5 BOOKS AND RECORDS REQUIREMENTS

Pursuant to Rule 204-2 of the Advisors Act, the Advisor is required to keep and maintain certain books and records as may be appropriate for its business. Among the various types of records identified in the rule are documents relating to the internal affairs of the Advisor, documents relating to customers, specific recommendations made to clients and the transactions effected on behalf of the clients, records of transactions in securities in which the Advisor or its Advisory Representatives has (or by reason of such

transaction acquires) any direct or indirect beneficial ownership, and records of all advertisements, circulars, newspaper articles, investment letters, etc.

Rule 204-2(e) requires all books and records to be maintained and preserved for a period of not less than five (5) years from the end of the fiscal year during which the last entry was made on such record. CapWealth will maintain all records for the first two years in a readily accessible area. The original and copies of all books and records should be separated from each other and all measures to reasonably safeguard from loss, alteration or destruction must be taken.

Rule 204-2(g) permits an Advisor to maintain and preserve records in computer storage medium in lieu of having to preserve such records in hard copy format. However, any records maintained in computer storage must be retrievable in document format. Data retrieval by itself may not be acceptable to the SEC.

**Accounting and Financial Records – The Advisor Act imposes specific record keeping requirements on RIAs. Generally, Rule 204-2 of the Advisors Act requires Advisors to maintain two basic types of books and records: (i) typical business accounting records and (ii) certain records the SEC believes an Advisor should keep in light of the nature of its business. This Rule requires, among other things, that records be current and readily available.**

The term "current" as used in the Rule is not defined. The SEC, however, has taken the position that the term is not a fixed concept, but varies with the circumstances of an Advisors business and the nature of the records.

The SEC permits accounting records to be kept on the cash basis, the accrual basis or some combination thereof. The method chosen by an Advisor should be reasonable in light of the circumstances of the business. The basis on which financial statements are prepared may be different than the basis used to maintain accounting records. Although accounting records may be maintained on the cash basis, generally accepted accounting principles require that certain financial statements must be prepared on the accrual basis. It is the policy of CapWealth that all accounting records will be prepared on an accrual basis.

Once all entries, checks, etc. are posted as they occur in QuickBooks Online and reconciled at month end by the Controller. At each quarter end, Vaden Group is notified, and they begin the closing process. Amounts are verified that they are posted to the correct accounts and balance sheet items reconciled as necessary. A draft of the financials is sent from Vaden Group to the Controller. The Controller then may have some journal entries and or corrections to be changed by Vaden Group. Once those entries have been entered into QuickBooks Online the Controller notifies Vaden Group and they create a new draft of the financials reflecting any changes. Once the review process is complete, the final financials are then created by Vaden Group and emailed to the Controller on a quarterly basis.

**A complete list and description of the books and records required to be maintained by Investment Advisors are as follows:**

- A journal or journals, including cash receipts and disbursements records, and any other records of original entry forming the basis of entries in any ledger;
- General and auxiliary ledgers (or other comparable records) reflecting asset, liability, reserve, capital, income and expense accounts;
- All check books, bank statements, and canceled checks and cash reconciliation of the Advisor's accounts;
- All bills or statements (or copies thereof), paid or unpaid, relating to the business of the Advisor. For example, copies of customer checks both front and back or similar evidence of payment of invoices must be maintained by the Advisor; and

20

- All trial balances, financial statements, and internal audit working papers relating to the business of the Advisor.

**Operational Books and Records – Rule 204-2(a)(3) requires the preparation of a memorandum or "order ticket" of each transaction for the purchase or sale of any security for a client's portfolio. All purchase and sell orders must include the following:**

- Terms and conditions of the order (buy or sell);
- Any instruction, modification or cancellation;
- Identity of the person who recommended the transaction to the customer and who placed the order;
- The account for which the transaction was entered and the date of entry;
- The identity of the bank, broker or dealer by or through whom the order was executed;
- Designation of orders entered pursuant to use of "Discretionary Authority";
- Whether the transaction was a market order, limit order or subject to special instructions;
- The time the order was received by the trader;
- The time the order was placed with the broker/dealer or the time the order was executed or canceled; and
- The price at which the order was executed.

*Discretionary Client Records* – CapWealth manages client accounts on both a discretionary and non-discretionary basis. In order to meet the requirements of Rule 204-2(a)(3), the Compliance Department will maintain a list of all accounts managed by CapWealth on a discretionary basis. Discretionary accounts are defined as the ability to:

- Select the security to be purchased or sold;
- Determine the amount of the security (dollars or shares);
- Select the time a transaction will take place; and
- Determine the unit price that is paid or received.

### *Custody Related Books and Records*

The Advisor does not have custody or possession of securities or funds of any customer. If the Advisor were to take custody or possession of securities or funds of any customer, in addition to all of the recordkeeping requirements listed above, it shall also retain:

- A journal or other record showing all purchases, sales, receipts and deliveries of securities (including certificate numbers) for accounts and all other debits and credits to those accounts.
- A separate ledger account for each customer showing all purchases, sales, receipts and deliveries of securities, the date and price of each purchase, sale, debit and credit.
- Copies of confirmations of all transactions effected by or for the account of any customer.
- A record for each security in which any customer has a position, showing the name of each customer having any interest in each security, the amount or interest of each customer, and the location of each security.

### *Customer Account Records*

Rule 204-2(d) permits an Advisor to use a numerical or alphabetical coding in lieu of the actual names of clients for whom the Advisor renders investment advisory services. The intent of this provision is to permit Advisors to keep the identity of their accounts confidential. However, the Advisor must use any such system of coding client records on a regular and consistent basis.

When the Advisor renders investment, supervisory or management services to a client, with respect to the supervised or managed portfolio, it must keep accurate and current:

- Records separated by customer, which include the following information about each transaction; purchase, sale, date, amount of the transaction and the price of the security.
- For each security in which any such customer has a current position, information from which the Advisor should be able to promptly furnish the name of the customer, and the current amount or interest of such customer.
- All written "acknowledgements of receipt" obtained from clients, and copies of disclosure documents delivered to clients.
- All written agreements (or copies thereof) entered into with any customer or otherwise relating to the business of the Advisor.
- A separate file for customer complaints. The file will include the name, date, notice of complaint, any correspondence, and the resolution of each complaint. Representatives and CapWealth must maintain this file, even if no complaints have been received.

### *Advertising and Sales Literature*

Copies of communications, including quarterly investment newsletters, recommending the purchase or sale of specific securities, sent to 10 or more persons and a record of the factual basis and reason for the recommendation are reviewed by the Communications Director and CEO. All reviewers must memorialize their review within the Advertising and Sales tracking log.

All accounts, books, internal working papers, and other records and documents necessary to form the basis for, or demonstrate the calculation of, the performance or rate of return of managed accounts or securities recommended in any notice, circular, advertisement, newspaper article, investment letter, bulletin or other communication that the Advisor circulates or distributes directly or indirectly, to 10 or more persons must be maintained for not less than 5 years from the end of the fiscal year during which the Advisor last published or disseminated, directly or indirectly, the notice, circular, advertisement, newspaper article, investment letter, bulletin or other communication, accounts, books, internal working papers and other documents identified above, the Advisor must maintain and preserve such notices, circulars, etc., in an easily accessible place.

Records relating to the most recent 2 years of the 5-year period <u>must</u> be kept at the Advisors' offices, after which time for the remainder of the period, they must be kept in any easily accessible place.

The original and copies of all books and records should be separated from each other and all measures to reasonably safeguard from loss, alteration or destruction must be taken.

### *Other Books and Records*

The Advisor shall maintain:

- Articles of incorporation, minute books, and any stock certificate books of the Advisor and of any predecessor.
- SEC registration file including, at a minimum, copies of Advisor's initial filing; amendments to Form ADV; Parts 2A and 2B of Form ADV
- All of the state registration documents for each state, in which the Advisor is registered.
- Personal Securities Trades: (See the CapWealth Code of Ethics)

These books and records must be maintained for not less than 3 years from the termination of the enterprise, the Advisor must maintain and preserve its Article of Incorporation, all amendments thereto, all

charters, minute books, stock certificate books of the Advisor and any predecessor, and any and all other foundation and/or governing documents, in the principal office of the Advisor.

The original and copies of all books and records should be separated from each other and all measures to reasonably safeguard from loss, alteration or destruction must be taken.

### 13F Filings

An institutional investment manager that uses the US mail in the course of its business, and exercises discretion over $100 million or more in Section 13(f) securities must report its holdings on Form 13F with the SEC

In general, an institutional investment manager is: (1) an entity that invests in, or buys and sells, securities for its own account; or (2) a natural person or an entity that exercises investment discretion over the account of any other natural person or entity. Institutional investment managers can include investment advisers, banks, insurance companies, broker-dealers, pension funds, and corporations. CapWealth meets this definition.

Form 13F is required to be filed within 45 days of the end of a calendar quarter. The Form 13F report requires disclosure of the name of the institutional investment manager that files the report, and, with respect to each section 13(f) security over which it exercises investment discretion, the name and class, the CUSIP number, the number of shares as of the end of the calendar quarter for which the report is filed, and the total market value.

The securities that institutional investment managers must report on Form 13F are "section 13(f) securities." Section 13(f) securities generally include equity securities that trade on an exchange (including the Nasdaq National Market System), certain equity options and warrants, shares of closed-end investment companies, and certain convertible debt securities. The shares of open-end investment companies (i.e., mutual funds) are not Section 13(f) securities.

The quarterly 13F filings are done electronically by the CCO using the SEC's EDGAR system. The file is generated from the Advent Reporting System.

### Disaster Recovery Plan / Business Continuity Plan

The Advisor's SBD policy is to safeguard employees' lives and Advisor property, make a financial and operational assessment, quickly recover and resume operations, protect all of the Advisor's books and records and allow customers to continue to transact business. In the event that we determine we are unable to continue our business, we will assure customers prompt access to account information.

The Company's plan anticipates two kinds of SBDs, internal and external. Internal SBDs affect only our Advisor's ability to communicate and do business, such as a fire in our building. External SBDs prevent the operation of the securities markets or a number of Advisors, such as a terrorist attack, a city flood, or a wide-scale, regional disruption.

The Advisor maintains its primary hard copy books and records and its electronic records at 3000 Meridian Blvd., Suite 250, Franklin, Tennessee 37067. Phoebe Venable, the Advisor's CEO, (pvenable@capwealthgroup.com, emergency number (615) 973-2066) and Ryan Hitt, (rhitt@capwealthgroup.com, emergency number (615) 879-9777), are responsible for the maintenance of these books and records.

All hard copy and electronic records are scanned or saved onto our servers in our main office. The Advisor utilizes a Barracuda Backup Server as its disaster recovery solution. This solution provides us with onsite backups for fast restore times. It also provides secure offsite storage for disaster recovery. This platform provides a copy of our data in the event of a system failure or a SBD. The Barracuda

Backup Server is deployed behind our corporate firewall and is protected by the same security measures we use to protect our primary data sources.

In the event of an internal or external SBD that causes the loss of our records, we will restore our data from the Barracuda Backup. Data can be restored by the following methods: Barracuda Backup Restore Browser, Barracuda Backup local Restore Browser, 24/7 Barracuda Technical Support restore assistance or shipment of restored data from Barracuda Networks. If our primary site is inoperable, we will continue operations from an alternate location. The Advisor has chosen the alternate location to be Timothy Pagliara's home residence, as it is close in proximity to the Advisor's main office. The VDI System will be accessed in the event of an SBD. If Mr. Pagliara's residence is not accessible, Ryan Hitt's home residence will become the alternate location.

In the event of an SBD, we will immediately identify what means will permit us to communicate with our customers, employees, critical business constituents, critical banks, critical counter-parties, and regulators. Although the effects of an SBD will determine the means of alternative communication, the communications options we will employ will include telephone voice mail and secure e-mail.

In the event of an SBD, we will determine the value and liquidity of our investments and other assets to evaluate our ability to continue to fund our operations. We will contact our critical banks and investors to apprise them of our financial status. If we determine that we may be unable to meet our obligations to those counter-parties or otherwise continue to fund our operations, we will request additional financing from our bank or other credit sources to fulfill our obligations to our customers and clients.

The Advisor now communicates with its customers using the telephone, e-mail, facsimile, U.S. mail, and in-person visits at our Advisor or at the other's location. In the event of an SBD, we will assess which means of communication are still available to us, and use the means closest in speed and form (written or oral) to the means that we have used in the past to communicate with the other party.

The Advisor now communicates with its employees using the telephone, e-mail, facsimile, and in person. In the event of an SBD, we will assess which means of communication are still available to us, and use the means closest in speed and form (written or oral) to the means that we have used in the past to communicate with the other party. We will also employ a call tree so that senior management can reach all employees quickly during an SBD. The call tree is updated annually and includes all staff home and office phone numbers.

### *Email Archiving*

CapWealth utilizes Smarsh to facilitate optical storage in accordance with SEC requirements under SEA Rule 17a-4. Smarsh provides the Advisor with a complete email archiving and retrieval solution. All incoming and outgoing email communications are captured and stored through this service. The CCO reviews 10% of emails on a weekly basis and memorializes the review in a tracking log.

## 2.6 ANNUAL REPORTING/FORMS

### *Form ADV*

The Form ADV is the initial registration form for federally RIAs. CapWealth must complete and submit the Form ADV to the SEC and/or State(s) in which it is required to be either registered or provide a notice filing. Investment Advisors must amend the Form ADV any time information provided in response to certain questions becomes inaccurate. Certain specific information must be amended "promptly" upon change, such as the Investment Advisor's name, address, location of the books and records, legal formation (corporation, partnership, etc.) disciplinary history, etc. Changes to all other information on the Form ADV must be made within 90 days after the end of the Advisor's fiscal year.

### *Secretary of State*

CapWealth Advisors is a Limited Liability Company organized in the State of Tennessee. The Advisor is required to file an annual report with the Division of Business Services on or before the first day of the fourth month following the company's fiscal year closing. The Division of Business Services automatically prepares and mails the customized annual report during the ending month of the fiscal year (December).

### *Tax Reporting*

All Internal Revenue Service and State of Tennessee tax filings are produced and submitted by the Vaden Group.

## 2.7 FIDUCIARY RESPONSIBILITIES

In accordance with Section 206 of the Advisors Act, Investment Advisor Representatives have a fiduciary responsibility and an obligation to act in the best interest of clients and to fully disclose all material facts. The Advisor and its representatives assume the following fiduciary responsibilities as they relate to an Advisor's business activities:

- *Evaluation of Client Investment Objectives and Financial Situation* – An Investment Advisor Representative must have a reasonable, independent basis for its investment advice. Representatives have a responsibility to clients to assist them in deciding on the most effective way to invest their resources to achieve financial goals. In doing so, an Investment Advisor Representative should evaluate the financial situation, investment objectives, risk tolerance and the type and current market value of any assets the client holds. The representative should assist clients in determining objectives and the financial capabilities of the client. The representative should not encourage a client to alter their investment objectives or financial situation in order to meet specific investment opportunities. In addition, purchases, both initial and subsequent, should be recommended within limits consistent with reasonable expectation that the client has the financial ability to meet such commitments.

- *Individual Portfolio Treatment* – Unless otherwise disclosed to the client, the Investment Advisor Representative should provide individual treatment for client portfolios based on the specific investment objectives and financial situation of each client. The representative should maintain an on-going consultation with clients to determine if their investment objectives or financial situation has altered recently. A change in either could require a change to the treatment of the client's individual portfolio. The representative should remain available for questions from clients regarding portfolio investments.

- *Suitability* – A representative's advisory responsibilities in relation to clients are governed by the principals of suitability as contained in various SEC anti-fraud provisions. Suitability requirements extend to all of the representative's security activities. Representatives must ensure that its investment advice is suitable to the customer's objectives, needs, and circumstances. This does not mean that legitimate sales efforts in the securities business are to be discouraged by requirements which do not take into account the variety of circumstances which can enter into the representative-client relationship. It does mean, however, that sales efforts must be judged on the basis of whether they can be reasonably said to represent fair treatment for the persons to whom the sales efforts are directed, rather than on the argument that they result in profits for the clients.

  Although this principle and interpretation appear very general and broad in scope, they have often been applied in disciplinary actions against members for specific activities judged to be fraudulent or unethical. Representatives must base their suitability determinations on the information that they have on file and cannot speculate as to the financial status and investment objectives of their clients. Suitability recommendations to clients naturally vary depending upon the clients' varying financial resources and financial objectives.

  Only offer recommendations concerning products available through CapWealth and discuss investment alternatives with the client as warranted by the information obtained. Recommendations

concerning a particular product should be based upon the suitability of the transaction for that specific client and governed by the rules and regulations concerning client suitability. These rules and regulations specify that a representative understand the client's personal and financial situation and have reasonable grounds to believe that his/her recommendations concerning the purchase of a security are appropriate for the client's needs and objectives.

**Do not guarantee results or specific performance on any investment. Do not make projections, predictions, or guarantees of performance for any security other than what is documented in the security's prospectus.**

- *Annual Discussion of Investment Objectives and Financial Circumstances* – The Investment Advisor Representative should review at least annually the investment objectives and financial circumstances with each client. This review should determine whether there were any changes that would necessitate a change in the treatment of the client's individual portfolio. It is recommended that representatives document in some fashion the annual review with clients, as confirmation of fiduciary duties.

  The Advisor acts primarily for the benefit of its customer in all matters connected with the undertaking to provide investment advisory services. The extent and nature of this fiduciary duty may vary according to the nature of the relationship between the parties and the circumstances of each case.

  Fiduciary responsibility should be thought of as the duty to place the interests of the client before that of the person providing investment advice and failure to do so may render the Advisor in violation of the anti-fraud provisions of the Advisors Act. Fiduciary responsibility also includes the duty to disclose facts significant to an investor's decision to purchase, or refrain from purchasing, a security recommended by the Advisor. The SEC has made it clear that the duty of an Investment Advisor to refrain from fraudulent conduct includes an obligation to disclose material facts to his clients whenever the failure to disclose such facts would cause or has the potential to cause financial harm to the client or prospective clients. An Advisor's duty to disclose material facts is particularly important whenever the advice given to clients involves a conflict or potential conflict of interest between the employees of the Advisor and its clients.

  Officers and employees should bear in mind these fiduciary duties in all dealings with customers. If questions arise concerning the Advisor's fiduciary duty to its customers, such questions should be directed to the CCO.

## 2.8 PROHIBITED INVESTMENT ADVISOR ACTIVITIES

The violation of any of these items may result in disciplinary action up to and including termination:

### *Front Running*

An Investment Advisor Representative is not permitted to benefit from placing his personal securities trades, or those of any associated persons, "in front of" the client's order to buy or sell thereby receiving a better price than the client. Any Investment Advisor Representative or associated person's orders being executed for the same security as that of his/her clients must document the time of entry and execution of the orders to show that no violations of the front running rule have occurred.

### *Hot Issues Restriction*

A hot issue is a newly issued stock that is in great public demand. The price of the stock usually increases because the number of shares available does not meet the demand of the public. In cases of "hot issues", it may be difficult for CapWealth to obtain the shares desired by our clients. Representatives who purchase "hot issues" may have a conflict of interest since the representative and Advisor clients may not be able to obtain the desired number of shares. In general, Investment Advisor Representatives

are prohibited from participating in IPOs (IPOs).  Any participation in an IPO must be pre-approved by the Compliance Department.

### Diverted Opportunity

Investment Advisor Representatives may not appropriate for themselves a trading opportunity that should rightfully belong to their clients.  This situation typically occurs when a limited investment opportunity, such as a thinly traded security, is purchased for the Investment Advisor Representative's personal account although the security was suitable for client accounts.  If the security appreciates in value, there may be the perception that the Investment Advisor Representative diverted the investment opportunity to his/her own account at the client's expense.  In addition to the various trading restrictions imposed on associates of CapWealth, the Compliance Department should be alert for situations where Investment Advisor Representatives may be purchasing highly speculative or thinly traded securities for their personal accounts.

### Telephone Solicitation

CapWealth and its associates do not engage in telephone solicitation (i.e., cold calling) to market its services.  If or when this policy should change, the Compliance Department will develop proper policies and procedures to ensure representatives are properly trained to understand FCC rules and the Advisor would maintain a "do not call list".

### Borrowing From, or Loaning Money to a Customer

It is a prohibited practice for representatives to borrow funds or securities from a customer.  A representative is also prohibited from loaning funds or securities to a customer.  Loaning funds could influence decisions made on behalf of the customer and create a conflict of interest due to indebtedness of the customer to the representative.

### Personal Gain on Customer Accounts

Representatives are prohibited from sharing in customer gains and losses.  The prohibition is designed to eliminate potential conflicts of interest.

### Quarterly Disclosure

On a quarterly basis, each RA must complete a Quarterly Disclosure questionnaire which includes questions related to opening and/or closing Personal Securities Accounts, obtaining MNPI and donating to political campaigns. The Advisor deploys the Quarterly Disclosure via third party vendor JotForm. All submissions are then reviewed by the CCO for any inconsistencies.

### Outside Activities

Representatives shall not own, operate, manage or otherwise engage in or be employed by any outside business or activity without written prior approval of the CCO and CEO. All RAs are required to submit an OBA Form prior to engaging in an outside activity.

### Gifts and Gratuities

Representatives shall not give nor accept any gifts totaling more than $100 in any given year from any broker/dealer, money manager, or others who transact business with the Advisor.  All gifts or benefits should be reported to the CCO for approval and tracking purposes.  Gifts of cash may never be accepted or disbursed by a representative.

### Regulation S-P

Brokers and Investment Advisors operate under a fiduciary relationship with customers. As a result of this relationship, representatives regularly obtain access to confidential customer information. Representatives are prohibited from disclosing that confidential customer information to any person outside the Advisor without express written consent of the customer. All copies of privacy agreements are maintained within client files and all representatives are required to abide by the confidentiality agreements set forth within the agreements.

### *Trustee*

Representatives may not serve as a trustee, guardian, executer, administrator to attorney-in-fact or act in a similar capacity for any client other than someone in his immediate family without prior, specific, written consent from the Compliance Department.

### *Restricted Terms*

There are several terms that are prohibited or restricted for use by an Investment Advisor and its representatives.

- *"SEC" Recommendation* – For SEC regulated advisors, use of the term SEC RIA is acceptable under Section 208(a) of the Investment Advisors Act. This act prohibits any implications that the SEC has sponsored, recommended, approved the Advisor, or that the SEC has in any way judged the qualifications of the Advisor.

- *Use of RIA or RIA Designations* – The regulators considered the use of RIA or R.I.A. as a designation after the name of an Investment Advisor to be misleading and a violation of the anti-fraud provision of the Advisors Act as the use of these terms may imply that the Advisor has achieved a license, degree or professional designation.

- *Use of "Investment Counsel" Designation* – Under Section 208c of the Investment Advisors Act, a RIA is prohibited from referring to itself as "investment counsel" unless its principal business consists of acting as an Investment Advisor and a substantial portion of its business consists of providing "investment supervisory services" (i.e.' continuous investment advice based on the individual needs of each client).

# 3. <u>Customer Accounts</u>

## 3.1 GENERAL CONSIDERATIONS FOR ACCEPTANCE OF ACCOUNTS

It is the policy of CapWealth to consider the following factors regarding a proposed customer relationship:

- Potential conflicts of interest presented by the account;
- The reputation and the legal capacity of the parties – The Advisor should not have its name and reputation used to lend credibility to an otherwise questionable party or transaction;
- The purpose of the account - If the Advisor cannot perform a service that benefits the parties involved, acceptance of the account should be declined;
- The adequacy of the fee for the time and effort necessary for proper management of the account; and
- Whether any governing instrument presents a present or foreseeable problem of construction.

### 3.2 ACCOUNT OPENING

#### *Setting up the Client Account*

Each Investment Advisor Representative should interview prospective clients, preferably in person, to discuss the various advisory services available through CapWealth and assist the client in selecting the advisory services appropriate for that client's investment needs. Prior to commencing the interview, the Investment Advisor Representative will provide the client with Part 2A and Part 2B of CapWealth's Form ADV or any other disclosure statements used to describe the Advisor's activities and other important information. The Investment Advisor Representative will also obtain all supporting documents necessary to set up the account, including trading authorization/power of attorney, joint account agreement, margin agreement (if applicable), trading restrictions, authorization to withdraw advisory fees, solicitation disclosures, etc. With respect to joint accounts, the Investment Advisor Representative will confirm that all parties to the account for who advisory services are being provided have signed the written IMA. No trading may occur in a client's account until the IMA, with supporting documents, have been completed and signed by the Investment Advisor Representative and reviewed by the authorized principal for any exceptions to CapWealth's account criteria.

#### *Determining Suitability*

In setting up the account, the Investment Advisor Representative should obtain the following basic investment information about the prospective client and record such information on the new account paperwork:

- What is the client's investment objective?
- What is the level of the client's risk tolerance? How much is the client willing to lose in any single investment in relation to his/her total portfolio over a one-year period and still be comfortable?
- What is the client's time horizon for investing? Short term trading or long-term investing?
- What are the client's income and net worth?
- What would the client like to achieve as a suitable mix of assets?

If that target mix changes as the market shifts (market rotation), should the Investment Advisor Representative reallocate the mix to fit new market realities.

- How often?
- Does the client prefer to invest only in domestic companies? Should foreign companies be part of the asset mix?
- Does the client have any restrictions on investments? Issuer? Industry? Country?

Each Investment Advisor Representative's supervisor will use the above information to monitor the ongoing activity in the client's account and ensure that such activities are in accordance with the financial requirements and investment objectives shown on the client's account paperwork. Any securities transactions that deviate from the investment objectives shown on the client's account documentation will be discussed with the Investment Advisor Representative handling the account. If it appears to the supervisor that such deviations are inconsistent with the client's stated objectives and are frequent in number, the supervisor should bring the matter to the attention of the Compliance Department who may, at his/her discretion, consult with the client to confirm the accuracy of the information on his/her documentation. If the client's objectives have changed, the Compliance Department should require updated documentation before any further trades are entered for the account. In addition to requiring updated documentation, on a client directed trade, the Compliance Department will have the authority to require that the client execute an affidavit for the purchase of any security that is totally inconsistent with the client's investment objectives. The affidavit will state, in substance, that the client understands that the security in question is inconsistent with the client's investment objectives given in the new account paperwork and that the order to purchase the security is at the client's insistence and risk.

Case 3:20-cv-01064   Document 14-1   Filed 02/11/21   Page 29 of 85 PageID #: 81

### *Required Account Opening Documents*

SEC rules require that each client receive individualized investment treatment. Evidence of individualized treatment may be shown by meeting the following provisions:

- Each client's account must be managed on the basis of the financial situation and investment objectives and any reasonable investment restrictions the client may impose;
- Sufficient client information must be obtained to be able to provide the individualized investment advice;
- The Investment Advisor Representative must be reasonably available to consult with the client;
- Each client must be able to impose reasonable investment restrictions on the management of the account;
- Each client must receive a quarterly statement with a description of all account activity; and,
- Each client must retain indicia of ownership of the securities and funds in the account, including but not limited to the ability to withdraw securities and vote securities.

In accordance with SEC regulations, you must have the following items in order to open a new advisory account with CapWealth. The following items will need to be completed by the Investment Advisory Representative and signed by the client and Investment Advisory Representative:

- *Custodian's New Account Application* – All client information such as legal name, social security number, legal address, date of birth, occupation and investment profile information must be fully completed. The investment profile information includes investment experience, investment objectives and risk tolerances, income, net worth, liquid net worth, time horizon, tax bracket and liquidity needs.
- *Custodian's Account Agreement* – Details the custodian's obligations, regulations, fees, etc.
- *IMA* – Client must complete either a discretionary or non-discretionary agreement
- *Individual Account Documentation* – The appropriate documentation must be included, such as a cop of the trust, corporate resolution, etc.
- *Proof of Identification* – In compliance with the regulations outlined in the U.S. Patriot Act, CapWealth will require that all customers provide an acceptable proof of identification. The proof of identification should be authorized photo identification. The Investment Advisory Representative will be required to confirm that the photograph is that of the customer. Accepted forms of identification will include an unexpired government-issued identification, including driver's license, passport, military identification, or other government identification with a photograph of the customer.

### *Approval of New Accounts*

It is the responsibility of the Compliance Department or other authorized principal to review and approve each client's IMA and any supporting documents to ensure that all relevant information has been obtained by the associate handling the account. No securities are to be executed in a client's account until the account and supporting documents have been reviewed and approved by an authorized principal.

### *Disclosures*

Brochure Rule (Initial Requirement) – Each new Investment Advisor account must be provided full disclosure with respect to the Advisor's services, fees to be charged, conflicts of interest, disciplinary problems of certain personal, and certain other information that the regulators deem as important to a client prior to engaging the services of an Investment Advisor. Therefore, it is imperative that the client is provided with the Advisor's most current Disclosure Brochure, an equivalent brochure of the information contained in Part 2A and Part 2B of the Form ADV.

The client should be presented the disclosure document at least 48 hours prior to the engagement (or at the time of the engagement provided that the client can terminate the engagement without penalty within 5 business days after the execution of the advisory contract).

<u>Annual and Requested Delivery</u> – The Advisor is required annually, without charge, to either delivery or make an offer in writing to deliver a current Disclosure Brochure. A record of the delivery or offer must be maintained. Any request for the Advisor's Disclosure Brochure made by clients must be responded to within seven (7) days of receipt of such request.

<u>Disciplinary Disclosure</u> – Should the Advisor or control person(s) have affirmative answers to certain disciplinary disclosures on the Form ADV, such disclosures may be required to be made available to the client in the Disclosure Brochure.

<u>Financial Disclosure</u> – An Investment Advisor who has custody or discretionary authority over client funds or securities, or who requires prepayment of fees of more than $500 per client and six months in advance, must disclose a "precarious financial condition" to those pertinent clients. The term "precarious financial condition" means a financial condition of the Advisor that is "reasonably likely to impair the Advisor's ability to meet contractual commitments to clients." This would generally include insolvency or bankruptcy.

<u>Compensation</u> – CapWealth is required to disclose the following:

- Excessive advisory fees for services rendered. This disclosure takes the form of advising clients that comparable services are available elsewhere for less.
- Any and all conflicts of interests must be fully and fairly disclosed and even then must be prohibited because they may be inconsistent with the Advisor's duties as a fiduciary.
- An Investment Advisor who is also a RR of a broker-dealer and provides investment advisory services outside the scope of his employment with the broker-dealer must disclose to his advisory clients that his advisory services are independent from his employment with the broker-dealer. Additional disclosures would be required, depending on the circumstances if the Investment Advisor recommends that his clients execute securities transactions through the broker-dealer with which the Investment Advisor is associated, or if advice is limited to products of the broker-dealer. For example, the Investment Advisor would be required to disclose fully the nature and extent of any interest the Investment Advisor would receive from his employer in connection with the transaction. In addition, the Investment Advisor would be required to inform his clients of the ability to execute recommended transactions through other broker-dealers. Finally, "an Investment Advisor must not affect transactions in which he has a personal interest in a manner that could result in preferring his own interest to that of his advisory clients."
- An Investment Advisor who structures his personal securities transactions to trade on the market impact caused by his recommendations to clients must disclose this practice to a client.
- An Investment Advisor generally also must disclose if his personal securities transactions are inconsistent with the advice given to clients.
- An Investment Advisor must disclose compensation received from the issuer of a security being recommended.

<u>Written Agreement</u> – There are three specific disclosures that, if applicable, must be contained in a written agreement for advisory services. These disclosures involve: (a) whether compensation to the Advisor is based on capital gains or appreciation in the client's account; (b) a prohibition against assignment of the contract for advisory services without notice of the clients and (c) changes in an advisor's partnership structure without notice to the clients. With respect to each of these disclosures, CapWealth's agreement will provide the following information, if applicable:

"This Agreement will bind and be for the benefit of the parties to the Agreement and their successors and permitted assigns, except that this Agreement may not be assigned (within the meaning of the Advisors Act or applicable state securities laws) by either party without the consent of the other party."

Privacy of Client Financial Information (Regulation S-P) – In late 1999, the Gram-Leach-Bliley Act was signed into law regarding the privacy requirements set forth for use of nonpublic personal information by bank, securities industry members, insurance companies, and other financial institutions. In response, the SEC issued Regulation S-P, "Privacy of Consumer Financial Information," in June 2000. Compliance with this regulation was effective November 13, 2000 on a voluntary basis and became mandatory on July 1, 2001. Regulation S-P requires CapWealth to adopt policies and procedures reasonable designed to (a) ensure the confidentiality of customer records and information; (b) protect against any anticipated threats or hazards to the security of customer records and information; and (c) protect against unauthorized access or use of customer records or information that could result in "substantial harm or inconvenience" to any consumer.

The SEC defines a "consumer" as an individual who obtains or has obtained a financial product or service from a financial institution. Typically, a consumer has no further contact with the financial institution other than the one-time delivery of products or services. In addition, the SEC defines a "customer" as a consumer who has developed a continuing relationship with a financial institution to provide products or services. Both consumers and customers must be presented with a privacy disclosure at the time of service.

The privacy provisions of Regulation S-P will apply to information that is "nonpublic personal information."

*Nonpublic information, under Regulation S-P, includes personally identifiable financial information" and any list, description, or grouping that is derived from personally identifiable financial information.*

*Personally identifiable financial information is defined to include three categories of information:*

- *Information Supplied by Client.* Any information that is provided by a client or prospective client to CapWealth in order to obtain a financial product or service. This would include information or material given to CapWealth when entering into an investment advisory agreement.
- *Information Resulting from Transaction.* Any information that results from a transaction with the client or any services performed for the client. This category would include information about account balances, securities positions, or financial products purchased or sold through a broker/dealer.
- *Information Obtained in Providing Products or Services.* Any information obtained by CapWealth from a consumer report or other outside source which is used by CapWealth to verify information that a client or prospective clients has given on an application for advisory services.

As a general policy, CapWealth will not disclose personal financial information about any client to third parties except as necessary to establish and manage the client's account(s) or as required by law. In these situations, personal financial information about a client may be provided to the broker/dealers maintaining these accounts. However, a client directing that CapWealth not provide personal financial information to third parties does not relieve the Investment Advisor Representative from obtaining such information from the client in order to establish an advisory account with CapWealth. This information will be recorded on the new account paperwork. CapWealth's "Privacy Policy" is given to all clients upon account opening and is located on the Advisor's website.

CapWealth requires that Investment Advisory Representatives provide the "Privacy Policy" to consumers and customers at the time of service in accordance with SEC Regulation S-P.

### 3.3 CUSTOMER SOLICITATION – FINDER'S FEES

In accordance with SEC Rule 206(4)-3, cash payment for client solicitations are generally prohibited, directly or indirectly, to a third party ("solicitor") unless the arrangement complies with a number of conditions. The Rule provides that a "finder's fee" may be paid if:

- There is a written agreement between the Advisor and the solicitor. The Compliance Department must ensure that the activities of any solicitor working on behalf of CapWealth be carried out

pursuant to this agreement. Also, the Compliance Department must exercise due diligence to determine that the solicitor is acting in conformity with the written agreement with CapWealth, including any specific instructions issued by CapWealth. CapWealth and the Investment Advisor Representative are required to maintain a copy of this agreement on file for inspection by regulatory bodies.

- The solicitor has to provide any prospective customer with the Advisor disclosure material.
- The prospective customer has received disclosure material from the solicitor, including all of the facts about the compensation arrangement between the Advisor and the solicitor.
- The prospective customer must verify in writing that all of the required disclosures have been made.
- A solicitor generally will not be required to register separately as an Advisor with the SEC, if they comply with the conditions of the rule. However, failure to comply with these conditions could result in liability to CapWealth under the Advisors Act anti-fraud provisions.

Currently, the Advisor has no person that is acting as a solicitor nor is anyone receiving a "finder's fee." It is the policy of the Advisor, that if it does pay a "finder's fee" to anyone, to pay a cash "finder's fee" to a person for soliciting advisory business only if all of the requirements of Rule 206(4)-3 have been met. The Advisor will adopt a solicitation agreement and disclosure acknowledgement form which must be used in all situations in which a "finder's fee" is to be paid, if necessary. All arrangements with solicitors as well as the payment of all finder's fees must be approved by the CCO before they are made. Copies of these documents will be maintained by the CCO.

Registration of a representative who solicits advisory business in the various states may be required. The CCO shall ensure that each person who solicits business on behalf of the Advisor is properly registered with each applicable state.

**The Compliance Department has an affirmative duty to ensure that the solicitor has complied (and is complying) with the terms of the written agreement and should be able to demonstrate what steps have been taken to verify the solicitor's compliance.**

### *Requirements under Rule 206(4)-3*

*Written Solicitation Agreement* – This is an agreement between CapWealth and the solicitor and is generally not given to prospective clients. It must address the following:

- The specific solicitation activities to be engaged in by the solicitor on behalf of the Investment Advisor and the compensation to be received
- An agreement by the solicitor to follow the instructions of the Advisor and to comply with the provisions of the Advisors Act
- An agreement by the solicitor to provide prospective referral clients a copy of the Advisor's ADV or other disclosure document at the time of the solicitation
- An agreement by the solicitor to give the prospective client a copy of the solicitor's separate written disclosure document at the time of the solicitation.

*The Solicitor's Written Disclosure Document* – This is a disclosure statement that is to be given to the prospective client at the time of solicitation. This must be given by the solicitor, but may also be given by the Advisor to the prospective clients at the time of entering into the advisory agreement. This document must disclose:

- The name of the solicitor
- The name of the Investment Advisor
- The nature of the relationship between the Advisor and the solicitor, (Is there any affiliation between them such as common control or ownership?)
- A statement that the solicitor is being compensated for referring the client to the Advisor
- The terms of the compensation arrangement between the Advisor and the solicitor

- Whether or not the client is going to have to pay more in fees than he/she would otherwise have to pay had there been no solicitor's compensation

*Instructions to Solicitor* – Any undertaking to compensate a solicitor for referring clients to CapWealth must be evidenced by a written agreement containing the following instructions to the solicitor. The solicitor must abide by regulatory and Advisor policies and procedures in referring clients to CapWealth. In addition, CapWealth requires the solicitor to abide by the following Advisor policies, regarding solicitation of prospective clients for advisory services provided by CapWealth for a cash fee:

Whenever the solicitor begins to solicit any client for CapWealth services, or whenever any client is referred to CapWealth, CapWealth must be furnished the name of the prospective client, in writing. This may avoid potential conflicts between other solicitors competing for the same client(s).

The solicitor must furnish the prospective clients with a copy of Form ADV Part 2A (or other written disclosure statement), a copy of Form ADV Part 2B and the solicitors written disclosure document describing the arrangement between the solicitor and CapWealth. Copies of these documents have been provided upon the execution of the written agreement.

The solicitor must obtain and deliver to CapWealth a signed and dated acknowledgement of receipt from the prospective client attesting that he/she has received from the solicitor both of the disclosure documents described above. The prospective client should sign two copies of the acknowledgement of receipt, one copy of which is for the prospective client and the other is to be delivered promptly to CapWealth.

A solicitor's activities on behalf of CapWealth should be limited to client solicitation. A solicitor is not authorized to enter into any undertaking or agreement, or render any investment advice, on behalf of CapWealth.

Failure to follow these instructions may delay any compensation otherwise due to the solicitor under the written agreement.

## 3.4 DISCLOSURE REQUIREMENTS--BROCHURE RULE

Each new CapWealth client must be provided full disclosure with respect to the Advisor's services, fees to be charged, conflicts of interest, disciplinary problems of certain personnel, and certain other information that the regulators deem as important to a client prior to engaging the services of the Advisor. Therefore, it is imperative that the client is provided with the Advisor's most current Part 2A of the Form ADV and appropriate supplements (or an equivalent brochure). Part 2B of Form ADV is the brochure supplement containing information about advisory personnel on whom clients rely for investment advice.

The client should receive disclosure documents at least 48 hours prior to the engagement (or at the time of the engagement provided that the client can terminate the engagement without penalty within 5 business days after the execution of the advisory contract). The client's acknowledgement of receipt will be evidenced by the client's execution of the written agreement.

The Advisor is required annually, to either deliver or make an offer in writing to deliver a current brochure or Part 2A of the Form ADV. A record of the delivery or the offer must be maintained. Any request for the Advisor's Form ADV Part 2A or brochure made by clients must be responded to within seven (7) days of receipt of such request. This offering is included each quarter with the client performance reports. The following statement is included on the "Disclosures" page:

**The SEC and the Investment Advisors Act of 1940 require RIAs to make available to clients at least annually a copy of Form ADV Part 2A and Form ADV Part 2B. Form ADV Part 2A is a written disclosure statement that provides information about business practices, fees, etc. Form ADV Part 2B is a supplement that contains information about advisory personnel on whom clients rely**

**for investment advice. If you would like a copy of our ADV Part 2A or Part 2B free of charge, please contact us by telephone at (615) 778-0740 or by e-mail at info@capwealthadvisors.com.**

Regardless of the method used to offer Part 2A, the Compliance Department must prepare and maintain a log or other record listing the names of clients and/or prospective clients who subsequently request Part 2A of the ADV and the date the document was actually given or mailed to those persons.

***Form ADV/Brochure Disclosure***

Under Rule 204-3, CapWealth must prepare and maintain a current Form ADV or other disclosure document that contains specific information about CapWealth and its officers and associates who are engaged in the business of providing investment advice to clients.

**Part 1 of Form ADV** is primarily for SEC, Part 1A, and state, Part 1B, registration purposes. It must provide among other things, the following information about CapWealth:

- CapWealth's address and location of its books and records;
- State(s) in which CapWealth is registered;
- Number of securities portfolios and the aggregate market value of these portfolios under management both for discretionary and non-discretionary accounts;
- Whether CapWealth has custody of client assets;
- A description of the ownership structure of CapWealth and,
- The educational, business and disciplinary (if any) background of CapWealth's officers, directors and certain employees involved in providing investment advice to clients.

**Part 2A of Form ADV** is required under the "brochure rule" (Rule 204-3) and is used primarily as a disclosure document for clients and prospective clients of CapWealth. On July 28, 2010 the SEC adopted amendments to Part 2 of Form ADV and related rules that substantially improved the quality of disclosures Advisors must provide to their clients. These changes require Advisors to provide new and prospective clients with narrative "brochures" organized in a consistent, uniform manner that include plain English disclosures of the Advisor's business practices, fees, conflicts of interest, and disciplinary information. The new brochure includes the following topics:

Advisory business - An Investment Advisor must describe its advisory business, including the types of advisory services offered, whether it holds itself out as specializing in a particular type of advisory service, and the amount of client assets that it manages

Fees and compensation - An Investment Advisor must describe in its brochure how it is compensated for its advisory services, provide a fee schedule, and disclose whether fees are negotiable. The Investment Advisor must also describe the types of other fees or expenses, such as brokerage, custody fees, and fund expenses that clients may pay in connection with the advisory services provided to them by the Investment Advisor.

Performance-based fees and side-by-side management - An Investment Advisor that accepts performance-based fees or that supervises an individual who accepts such fees are required to disclose this fact. If the Investment Advisor also manages accounts that are not charged a performance fee, the Advisor must explain the conflicts of interest that arise from the simultaneous management of these accounts and must describe how it addresses those conflicts.

Methods of analysis, investment strategies, and risk of loss - An Investment Advisor must describe its methods of analysis and investment strategies and explain that investing in securities involves risk of loss which clients should be prepared to bear. Investment Advisors must also explain the material risks involved for each significant method of analysis or strategy and particular type of security they recommend and must explain the risks in greater detail if those risks are unusual

Disciplinary information - An Investment Advisor is required to disclose in its brochure material facts about any legal or disciplinary event that is material to a client's evaluation of the advisory business or of the integrity of its management personnel. An Investment Advisor must deliver promptly to client's updated information when there is new disclosure of a disciplinary event or a material change to an existing disciplinary event.

Code of ethics, participation or interest in client transactions, and personal trading - An Investment Advisor is required to describe briefly its Code of Ethics and state that a copy is available upon request. The Advisor must also disclose whether it or an affiliate recommends to clients, or buys or sells for client accounts, securities in which the Advisor or an affiliate has a material financial interest and, if so, the conflicts of interest associated with that practice. The Advisor also must disclose whether it or an affiliate invests (or is allowed to invest) in the same securities that it recommends to clients or in related securities, such as options or other derivatives, and will have to explain the conflicts involved and how it addresses those conflicts. In addition, an Investment Advisor that trades in the recommended securities at or around the same time as the client has to explain the specific conflicts inherent in that practice and how it addresses them.

Brokerage practices - An Investment Advisor is required to describe the factors that it considers in selecting or recommending broker-dealers for client transactions and determining the reasonableness of brokers' compensation. Investment Advisors also must disclose *soft dollar practices* (research or other products or services, other than execution, provided by brokers or a third party to the Investment Advisor in connection with client transactions); *client referrals* (using client brokerage to compensate brokers for client referrals); *directed brokerage* (asking or permitting clients to send trades to a specific broker for execution); and *trade aggregation* (bundling trades to obtain volume discounts on execution costs). Investment Advisors must explain how they address the various conflicts of interest associated with these practices

**Part 2B of Form ADV** is a supplement that is required to be delivered to clients. This "brochure supplement" contains information about the advisory employees that will provide advisory services to that client. The supplement will contain brief resume like disclosures about the educational background, business experience, other business activities, and disciplinary history of the individual so that the client can assess the person's background and qualifications. It also includes the contact information for the person's supervisor in case the client has a concern about the person.

Amendments to Form ADV - With respect to when CapWealth's Form ADV should be amended to correct inaccuracies, Rule 204-1(b)(1) of the Advisors Act states, in relevant part, that CapWealth must amend the Form ADV by filing additional amendments (other than the annual amendments) promptly. The SEC has deemed "promptly" to mean within two weeks. All other changes to the ADV may be made at year end. With respect to the ADV, material inaccuracies should be considered as those facts or information which a client or prospective client would consider important on his/her decision to engage CapWealth for advisory services.

### 3.5 MONITORING AND MAINTENANCE OF CUSTOMER ACCOUNTS

It is the responsibility of each Investment Advisor Representative to devote the requisite amount of attention to professionally manage each of his/her accounts in accordance with the investment requirements and objectives of the client. In managing accounts, each Investment Advisor Representative is required to maintain regular communication with his/her clients. At a minimum these communications will include the following:

- At least annually, Investment Advisor Representatives are required to undertake a comprehensive review of each of his/her accounts to assess the client's financial situation and individual investment needs. In addition, each Investment Advisor Representative should determine whether there have been any changes in the client's investment objectives or financial circumstances. All updated information, notes and documentation will be maintained in the client's files and scanned to Laserfiche.

36

- Notwithstanding any discretionary trading authority, Investment Advisor Representatives should promptly notify their clients of each security transaction executed for their account(s) and the status, if known, of any pending or unexecuted transactions unless the client has given instructions to the contrary.

- In addition to the daily review of executed and unexecuted transactions, the Compliance Department will conduct a quarterly review of approximately 5% of accounts to determine if the account has been managed in a manner consistent with the client's investment objectives. The CCO or his designee will also look for any evidence of excessive trading or conflicts of interest between the Investment Advisor Representative and the client. The Compliance Department shall have the independent authority to discuss any questionable activities in any account with the respective client.

The Advisor and its representatives will adhere to the responsibilities described below:

- *Fiduciary Duty* - To act in the best interests of its customers and to make full and fair disclosure of all material facts, especially where conflicts of interest arise. In managing discretionary accounts, representatives will:

  - Render impartial advice;
  - Make suitable investments for customers in light of the customer's financial circumstances and objectives;
  - Ensure that adequate and accurate representations about risks are presented to customers;
  - Have an adequate factual basis for investments, representations and projections;
  - Have a reasonable basis for investment selection; and
  - Obtain best execution for customer transactions
  - Ensure mutual fund purchases and holdings are the most advantageous share class available at the time

- *Periodic Reporting to Customers* - It is a general practice for custodians to deliver a monthly or quarterly statement to each customer outlining, among other things, a record of transactions for the period and ending securities positions. Customers will also receive a confirmation, from the custodian, of each transaction.

  CapWealth will provide each client with a quarterly review and analysis of his/her account and provide any additional information on the account that may be requested by the client. It is the responsibility of each Investment Advisor Representative to keep his/her clients apprised of relevant changes in the economy, market conditions and about CapWealth's investment views and expectations for the economy and the markets.

- *Valuation of Securities* - CapWealth relies on the pricing service of the custodian to provide accurate valuation of securities. CapWealth does reserve the right to utilize a third-party service provider for the valuation of securities. For any securities not provided by the custodian or by the service provider, CapWealth will attempt to determine an accurate valuation from the sources available to CapWealth at that time. CapWealth attempts to ensure that securities reported on quarterly statements and reports are accurate. CapWealth is not responsible for reporting errors by the custodian or third-party service providers, but will make every effort to correct any inaccurate reporting provided by these entities.

- *Performance Reporting* - CapWealth will monitor and calculate (as accurately as is practical) the client's performance in an advisory account. This information will be calculated on a quarterly basis, year to date and an ongoing since inception of the account of the Advisor's performance. The performance reporting will be included in the client's quarterly statements provided by CapWealth. For accounts transferred to CapWealth, it is the responsibility of the Investment

Advisor Representative and client to provide CapWealth with the cost basis for performance reporting of existing positions within the portfolio.

- *Account Deposits and Withdrawals* - CapWealth prohibits its Investment Advisor Representatives from accepting cash payments from clients for securities transactions. An Investment Advisor Representative shall not accept a client's check made payable to the Investment Advisor Representative nor to CapWealth. All checks should be made payable to the custodian. If delivering cash or stocks via the ACATS process, it is the responsibility of the Investment Advisor Representative to follow up on the delivery with the client. The Investment Advisor Representative is responsible for verifying any investment restrictions imposed by a client on their account on the client's new account paperwork and/or IMA.

  Clients may submit request for systematic withdrawals to be directed from his/her account on a monthly, quarterly, semi-annual or annual basis. The appropriate documents must be provided to the custodian.

  Clients may also wire funds to and from their accounts. Written request must be submitted to CapWealth from the client to wire funds from their account. The request will then be forwarded to the custodian.

- *Prospectus and Proxies* - CapWealth has the ability to vote proxies if this responsibility and authority has been delegated to the Advisor by the client. If this has not been delegated to the Advisor, the custodian will provide each client with all appropriate prospectus and proxy voting materials.

- *Advice Regarding Legal Proceedings* - Investment Advisor Representatives are prohibited from providing advice regarding legal proceedings to their clients, unless specifically licensed and trained for this purpose. In addition, CapWealth will not provide advice to clients regarding legal proceedings, including proceedings relevant to his/her investment portfolio. It will be the responsibility of the client to contact an attorney regarding legal advice in relation to his/her investment portfolio. Thereby, the client will be responsible for any and all cost associated with receipt of legal advice.

- *Amending the Client Agreement* - CapWealth reserves the right to amend the client agreement at any time. The agreement cannot be modified unless the modification is in writing and is signed by the CEO or President of CapWealth. The amendment will be provided to all applicable clients in writing by CapWealth.

- *Offering of Annual Disclosure Documents to Clients* - The disclosure brochure or Part 2A of Form ADV and Part 2B will be offered, without charge, to existing clients at least annually and the Compliance Department will maintain a record of the offer. To meet the annual "offer provision, the following statement will be included on the "Reporting Disclosures" statement that is included in the quarterly statement:

  **The SEC and the Investment Advisors Act of 1940 require RIAs to make available to clients at least annually a copy of Form ADV Part 2A and Form ADV Part 2B. Form ADV Part 2A is a written disclosure statement that provides information about business practices, fees, etc. Form ADV Part 2B is a supplement that contains information about advisory personnel on whom clients rely for investment advice. If you would like a copy of our ADV Part 2A or Part 2B free of charge, please contact us by telephone at (615) 778-0740 or by e-mail at info@capwealthadvisors.com.**

Following the annual offer, the Compliance Department will maintain a log or other record which lists the clients requesting the ADV, the date(s) the requests were received, and those clients to whom the ADV was actually sent as required under Rule 204-2(a)(14).

- *Notices to Clients* - Address changes should be made only upon the instructions of the client. Care should be exercised that the new legal address is not a post office box, the address of another client or an associate of the Advisor. A notification of the change will be sent by the custodian to the old and new address, asking that the Advisor be contacted in the event that there is a discrepancy.

  If a client wishes all mail to be held, a written request must be made by the client and forwarded to the Compliance Department and the custodian.

- *Arbitration* - The client account agreement provided by the custodian has an important, required disclosure called the client arbitration. The pre-dispute arbitration clause and various other disclosures to the client are included for the protection of the Investment Advisor Representative, the Advisor and the client. Neither the client nor the Advisor/Investment Advisor Representative are harmed by the use of arbitration. The results are comparable to those achieved through litigation, in a more expeditious manner and potentially at lower costs to all parties (in particular, attorney fees). The client arbitration is provided on pages three (3) and four (4) of the client account agreement. All clients are required to sign the client account agreement that contains the pre-dispute arbitration agreement. CapWealth will not accept business from a client who does not, or will not, accept the pre-dispute arbitration agreement.

- *Death of a Client* - Upon notification of a death of a client, the Investment Advisor Representative should immediately notify the custodian and title the client account from the name of the client to the estate of the client for individual accounts. The Investment Advisor Representative is prohibited from placing any trades in the account of a client's estate. Any discretionary authority or Power of Attorney given by the client immediately terminates upon his or her death. The Investment Advisor Representative should forward the necessary paperwork to the custodian. After review of the account, the account will be titled from estate to the appropriate title. After this is completed, the account may be traded upon instructions from the appropriate party.

### 3.6 CUSTOMER RECORDKEEPING

#### *Documentation of New Account Information*

All new accounts require documentation of the following information at the time they are established:

- Inception date,
- Directed brokerage instruction (should be in writing and signed by the customer),
- Investment advisory agreement, and
- Other miscellaneous account information.

#### *Contracts*

The Advisor will maintain in its customer files all contracts made between the Advisor and its customers, a copy of all custodial agreements between the customer and the custodian, and, in cases where the customer account is covered by ERISA, the Advisor will obtain and retain a copy of the Master Trust agreement from the customer's Master Trustee.

CapWealth will provide advisory services to clients only upon the execution of a written agreement between the Advisor and the client. No securities transactions are to be executed in a client's account until the complete written agreement has been reviewed and approved by a principal of CapWealth. The signature of the authorized officer on the written agreement will evidence such review and approval.

Upon approval by the authorized officer, the original copy of the written agreement will be placed in the client's file.

*Discretionary Client Records* – CapWealth manages client accounts on both a discretionary and non-discretionary basis. In order to meet the requirements of Rule 204-2(a)(3), the Compliance Department will maintain a list of all accounts managed by CapWealth on a discretionary basis. Discretionary accounts are defined as the ability to:

- Select the security to be purchased or sold;
- Determine the amount of the security (dollars or shares);
- Select the time a transaction will take place; and
- Determine the unit price that is paid or received.

Trades for securities may be entered for execution only if CapWealth has received prior written authorization from the client for such transactions. Evidence of CapWealth's authority to manage a client's account on a discretionary basis will be documented by the client's signature on the appropriate written agreement. All written authority granted to CapWealth will be restricted to "limited trading authority", giving the Investment Advisor Representative the power to only purchase and sell securities for the account. At no time will CapWealth or any of its associates enter into any written or verbal agreement or understanding with a client that gives the associate "full trading authority" over the account since that term may be interpreted as granting authority to withdraw funds and securities from a client's account. Investment Advisor Representatives are not permitted to enter any order for the purchase or sale of securities for any non-discretionary account without first consulting with and receiving the client's approval for such transaction. Failure to obtain the client's approval before entering a trade may result in the Investment Advisor Representative having to personally absorb any loss to the account if the trade is later canceled. Moreover, it is CapWealth's policy to closely monitor the occurrences of such breaches of policy and Investment Advisor Representatives who execute such unauthorized trades may be subject to significant disciplinary action, including termination.

*Advent* – CapWealth utilizes the APX to manage client portfolios. APX is used to manage portfolio positions, portfolio activity, unrealized gains and losses, realized gains and losses and performance. Position, activity and price files are downloaded each day from the custodian into APX. All portfolio positions in APX are reconciled against the custodial positions. All discrepancies are researched and corrected in a timely manner.

*GIPS (GIPS)* – CapWealth claims compliance with the GIPS. The Advisor has been independently verified. This verification assessed whether:

- The Advisor has complied with all the composite construction requirements of the GIPS on a Advisor-wide basis
- The Advisor's policies and procedures are designed to calculate and present performance in compliance with the GIPS.

### 3.7 PROTECTION OF CUSTOMER INFORMATION

CapWealth is committed to safeguarding the use of our clients' personal information that we have as an Investment Advisor. CapWealth protects the security and confidentiality of the personal information we have and make efforts to ensure that such information is used for proper business purposes in connection with the management or servicing of our client accounts. CapWealth does not sell non-public personal information about our clients to anyone. Nor does CapWealth provide such information to others except for discrete and proper business purposes in connection with the servicing and management of our client accounts.

Much of the personal information comes directly from the client. Clients disclose this information during the course of their business relationship through account forms, telephone, e-mail or regular mail.

CapWealth will use this personal information for investment purposes or to help the client with their overall investment program. Personal information may also be used to communicate to clients about products or investments that the client has expressed an interest in or that we believe may be of interest to the client.

The protection of customer information by a RA involves three fundamental propositions:

- The Advisor has an affirmative obligation to protect the confidentiality of consumer information and must adopt policies and practices to meet that obligation;

- Every consumer is entitled to a notice from the Advisor regarding:

  o The kinds of consumer information a broker/dealer, fund or RA collects,
  o The nonaffiliated third parties to whom that information may be disclosed, and
  o The policies and procedures that have been adopted to protect consumer information collected by a broker/dealer, fund or RA.
  o Every consumer has the right to direct the Advisor that personal financial information not be shared with nonaffiliated third parties, subject to certain specific exceptions relating to joint marketing programs, outsourcing to service providers and legal and regulatory disclosure.

- The Advisor will provide a clear and conspicuous initial notice that accurately reflects its privacy policies and practices to its customers not later than the time the customer relationship is established. In addition to the initial notice provided at the time the customer relationship is established, the Advisor will provide its customers with an annual notice that accurately reflects its privacy policies and practices at least once in any period of 12 consecutive months during which the customer relationship exists. The annual privacy statement will be distributed to clients in the year end statement.

### *Safeguarding Information*

The Advisor has established appropriate standards relating to administrative, technical and physical safeguards for customer records and information and adopted procedures reasonably designed to:

- Ensure the security and confidentiality of customer records and information;
- Protect against any anticipated threats or hazards to the security or integrity of customer records and information;
- Protect against unauthorized access to or use of customer records or information that could result in substantial harm or inconvenience to any customer.

The Advisor will promptly investigate any client concerns and correct any inaccuracies.

CapWealth takes our client privacy expectations seriously. CapWealth restricts access to nonpublic personal information about our clients to those employees who need to know that information to provide products or services to our clients. Employees are educated on the importance of maintaining the confidentiality of customer information.

CapWealth maintains physical, electronic and procedural safeguards which comply with federal standards to guard our clients' nonpublic personal information. As technology continues to advance, CapWealth will continue to evaluate security standards to protect our client information from access by unauthorized persons. All desktop computers, laptop computers and servers are all equip with user sign on password requirements. Employees should never use another employee's user ID or password to access any of the Advisor's systems. User ID's and passwords should be protected at all times to prevent unauthorized access to computerized systems and/or electronic files. It is expressly prohibited for employees to utilize equipment that is assigned to another employee without express authorization to do so.

All customer files are maintained in a secure location. Access to customer files will be limited to the staff that has duties relating to those original books and records of the Advisor.

### Third Parties to Whom We Disclose Information

CapWealth does not sell or disclose any personal information regarding current or former clients to companies or organizations not affiliated with CapWealth that would use the information to contact any client about products or services. Information is shared with companies working on behalf of CapWealth. CapWealth is highly selective in choosing vendors and service companies that assist in providing quality products and services to our clients. CapWealth may share certain customer information with these third parties to facilitate the offering, administration, collection and delivery of these products and services under controlled circumstances designed to protect our clients' privacy. CapWealth requires third parties to comply with strict standards regarding security and confidentiality of such information. They are not permitted to release, use for their own purposes, or sell any customer information we share with them to any other party.

## 3.8 CUSTODY

### SEC Definition of Custody

The term "custody' is not specifically defined. However, there is a broad test that will be applied to determine if an Advisor has "custody" of client assets – if the Advisor has any direct access to the assets of the client. In addition, to obvious cases of custody, the following practices may constitute custody of client assets:

- Where an Advisor receives the proceeds from the redemption of client securities;
- Where an Advisor has signatory power over a client's checking account;
- Where an affiliate of the Advisor acts as agent for the Advisor and holds client assets, unless the affiliate is acting as an independent contractor;
- Where an Advisor holds client securities in the Advisor's name or in bearer form.

The Advisor may have custody of client funds if it sends the bills for its services directly to the custodian who then automatically pays the Advisor. However, the automatic payment of advisory fees is permitted where:

- The client authorizes the arrangement in writing;
- The Advisor sends the bill to both the client and the custodian at the same time;
- The bill shows the amount of the fee, how it was calculated, and the value of the assets on which the bill is based; and
- The custodian notifies the client at least quarterly of how much has been paid to the Advisor.

It is the intention of CapWealth to fall within the above stipulations in order to not be deemed to have custody of client assets, except for the authority granted to them by clients to deduct management fees.

### Withdrawal of Advisory Fees from Clients' Accounts

The broker/dealer, bank, or other custodian handling the account will physically hold securities and cash in each client's account. At no time will CapWealth ever intentionally hold client cash and securities. However, CapWealth may enter into an arrangement for automatic deduction of CapWealth advisory fees from any clients account provided the following conditions are met:

- The client authorizes the automatic withdrawal of advisory fees in writing. This authorization will be shown on the client's IMA or on a separately signed document. Unless otherwise agreed,

CapWealth advisory fees will be based on a percentage of the value of the client's assets under management.

- Prior to, or contemporaneously with, instructions given to the custodian that the account is to be debited for CapWealth advisory fee, the client will be notified in writing that an advisory fee will be deducted from his/her account. This notice will also show the basis on which the fee was calculated. It is not necessary that the basis of the calculation be submitted to the account broker/custodian. However, if it is not, the written advice to the client must contain the statement: "*Client is responsible for verifying fee computations since custodians are not typically asked to perform this task.*"

- The account broker/custodian must provide the client, at least quarterly, a written statement that shows the amount of the advisory fee deducted from his/her account. The fee shown as deducted from the client's account should be identified as "management fee", "advisory fee", or other terms of similar meaning.

### *Annual Examination*

In accordance with SEC Rule 206(4)-2(a)-5, all such funds and securities of clients are verified by actual examination at least once during each calendar year by an independent public accountant at a time that shall be chosen by such accountant without prior notice to the Advisory Advisor.

### *SEC Rule 206(4)-2 Annual Examination Exceptions*

The SEC included an exception in its ruling as it pertains to the annual "surprise exam" by a public accountant for all RAs with custody of client assets. The SEC determined that the surprise examination would not provide materially greater protection to advisory clients when the RA has custody of client assets solely because of its authority to deduct advisory fees from client accounts. So, the SEC included an exception for such Advisors in the Amendments. The SEC recommended that RAs adopt appropriate internal policies and procedures regarding their fee deduction practices.

Since CapWealth has custody of client assets solely because of its authority to deduct advisory fees from client accounts, it qualifies for this exception to the annual surprise examination.

### *Client Checks Received*

CapWealth is not a qualified custodian. The Advisor does not accept cash, currency or checks not made payable to the custodian. All checks received for deposit must be made payable to the custodian only. CapWealth cannot accept checks made payable to CapWealth, the client, or any other name. **There will not be any exceptions.** Check deposit procedures are as follows:

- All checks are delivered to the designated person;
- The designated person must ensure that the checks are made payable to the custodian;
- The designated person must ensure that the account number is indicated and that any special deposit coding (this pertains to proper IRA codes) has been provided;
- All checks must be deposited that day or no later than noon the following business day;
- The designated person will login to remitpro (software provided by the custodian) and create a new deposit batch. The checks must be counted and totaled;
- Once the batch has been created, the designated person may begin the scanning process. All checks must be scanned and accepted;
- After scanning all checks, the designated person will provide a copy of the daily summary report and a copy of each check to the CCO; and
- The CCO will review and approve the deposit each day. He will also maintain the records of all daily deposits.

Any check received that is not made payable to the custodian will be returned to the client the same day received or no later than within twenty-four hours of receipt. A designated person will prepare a letter to include with the check to notify the client that the Advisor cannot accept any check if it is not made

payable to the custodian.  The designated person will maintain a file for all retuned checks.  A copy of the letter and check will be kept on file.

*Insurance*

CapWealth maintains errors and omissions (E & O) coverage.  E & O coverage protects the Advisor when financial harm is caused to a client because of mistake or error.

## 3.9 FEES AND OTHER CHARGES

### *Advisory Fees Based on Assets under Management*

Fees for advisory services are set forth in CapWealth's Form ADV Part 2A which will be given to each client and prospective client prior to entering an advisory relationship.  In addition, the client will execute an IMA that explains the fees and the manner in which the fees will be computed.  If the fee is to be shared with other parties, the manner in which the fee is allocated among the parties will be explained in the IMA.  If the fees are to be automatically deducted from the client's account, the client must provide written authorization for such withdrawals as provided in the IMA or by a separate written agreement which permits the fee to be paid directly from the client's account.

The fee will be payable on a continuing basis to CapWealth, if applicable, that the fact that such payments are made and the basis for their computation will be disclosed to the client, and that those payments will not be contingent upon or in consideration of the representatives recommendations to the client as to whether or not to continue to participate with the selected investment advisory services.

### *Performance Based Fees*

It is the Advisors policy not to enter into advisory relationships with performance-based compensation without the prior approval of the CCO.  All relationships with performance-based fees must be in compliance with Rule 205-3 under the Advisors Act**.**

In addition, to the required disclosures contained in its Form ADV, CapWealth must disclose to the client all material information regarding the advisory arrangement before entering into the advisory contract. These disclosures include the following:

- That the performance fee arrangement may create an incentive for CapWealth to recommend investments that are more speculative than would be made under a different fee arrangement;

- That CapWealth may receive increased compensation from unrealized appreciation as well as realized gains in the client's account;

- The periods which will be used to measure investment performance and their significance in the computation of the fee;

- The nature of any index which may be used to measure investment performance, the significance of the index, and the reason CapWealth believes the index is important; and

- In the situation where CapWealth's compensation is based in part on the unrealized appreciation of securities for which market quotations are not available, disclosure must be made as to how the securities will be valued and to the extent to which valuation will be determined independently.

CapWealth does retain the ability to charge performance-based fees.

### *Fee Calculation*

Quarterly management fees are billed in advanced. The fee is billed as a percentage of assets under management. The fees are calculated as follows:

- *Annual Fee = Quarter Ending Market Value * Fee%*
- *Daily Fee = Annual Fee / 365 Days*
- *Quarterly Fee = Daily Fee * Number of Days in the Quarter*

### *Fee Deduction*

Quarterly fees are charged to each account (or separate account if instructed by the client) the first month of each quarter – January, April, July and October. Fees will also be deducted on additional funds deposited during the quarter.

### *Other Fee Information*

CapWealth does impose an annual minimum account fee of $1,000.00. This fee can be waived at the discretion of the CEO or President.

CapWealth also imposes a $200.00 annual administrative fee per account. The fee helps to cover the cost associated with the performance software and the quarterly account statements.

The fee set forth in the client's IMA will continue until 30 days after CapWealth has notified the client in writing of any change in the amount of the fee applicable to the client's account. At such time, the new fee will become effective unless the client notifies CapWealth that the account will be closed.

When a non- traded asset is present in a client portfolio and Capwealth bills on the market value of that asset, it will be listed on schedule B of the IMA and the valuation process will be listed for fee billing purposes. Each asset will be reviewed separately and valued in accordance to the best interest of the client.

## 3.10 CLOSING CUSTOMER ACCOUNTS

Every client will have the right to terminate his/her advisory agreement with CapWealth at any time upon written notice.

### *Termination by Client within Five Days*

Pursuant to paragraph (b)(1)(ii) of the Brochure Rule [17 CFR 275.204-3(b)(1)(ii)], an Investment Advisor may delay delivering its written disclosure statement to prospective clients until the time of entering into an advisory contract, if the client has a right to terminate the contract "without penalty" within five business days. In accordance with federal and state regulations, CapWealth has provided the client with the right to terminate the contract "without penalty" within five business days.

### *Pro Rata Refund of Fees*

Inasmuch as advisory fees are billed in arrears for services previously rendered, client accounts will be charged for earned but unpaid advisory services prorated on a daily basis at the same percentage rate as that used to determine their quarterly advisory fee. In accordance with the Investment Advisor Act of 1940, any pre-paid advisory fees will be prorated to the date of termination in a timely fashion and any unearned advisory fees will be promptly returned to the client.

### *Termination Fees*

In accordance with the written agreement, the client will pay CapWealth for their services on a quarterly basis in advance in accordance with the fee schedule identified in the fee section of the written agreement. Until paid, client fees and expenses shall be entitled to a lien on the assets of a client's

account. Upon termination, it shall be the client's responsibility to issue instructions in writing regarding any assets held in the account. Under the written agreement, the client authorizes all fees or costs accruing prior to the liquidation of the account to be deducted from the proceeds of the account before the proceeds are delivered to the client.

### *Brokerage Transactions after Termination*

CapWealth does not permit transactions to occur in a client's account after receipt of written termination notification. For accounts being transferred, any transaction by the client must be completed with the replacing party.

### *Delivery of Securities/Liquidation*

Promptly thereafter written notification, the client will have the right to receive (or otherwise direct the custodian to deliver) the securities and cash balances held in such client's accounts, or the client may elect to have his/her account liquidated and the proceeds thereof returned.

### *Account Transfers*

Promptly thereafter written notification, the client will have the right to request a transfer of the securities and cash balances held in such client's account to another qualified party. The client should request the transfer of securities and cash balances through the replacing party. Upon receipt of the completed authorized request, the custodian will transfer securities and cash balances in accordance with the client's request.

# 4.  Trading and Brokerage Policies

## 4.1 SECURITIES TRADING

Generally, purchase and sale orders are executed on a first-in/first-out basis. Purchase or sale orders for the same security which are received at approximately the same time may be blocked or aggregated at the direction of the Investment Advisor Representative for more efficient execution. When block trades are processed, the price is to be averaged among the accounts participating in the transaction if the order is executed at more than one price.

The Advisor does not execute trades itself but relies on the trading department at the custodian to execute transactions.

### *Orders Designated to a Broker*

The Advisor allows, but does not encourage, a customer to designate a broker for the execution of orders in the customer's account providing no fiduciary standards are violated by the designation. Orders designated to a broker will be considered market orders.

### *Directed Transactions*

Some customers may reserve the right to direct security investments in their accounts. Directed transactions will be considered market orders. Limit orders are permitted but discouraged. Although day orders may be accepted, the minimum time period preferred is a limit order of five business days; the maximum is ten business days.

## 4.2 BEST EXECUTION

It is the policy of the Advisor to obtain the "best execution" of its customers' securities transactions on a best efforts basis since the Advisor does not control trade execution. CapWealth reviews best execution as the most favorable, quality execution possible while considering the broker's services, research

provided, commission charges, volume discounts offered, execution capability, reliability and responsiveness of the broker-dealer.

The Advisor, through the trading department at the custodian, will cause each customer's securities transactions to be executed in such a manner that the customer's total cost or proceeds in each transaction is the most favorable under the circumstances. Commission rates paid on securities transactions must, as a matter of policy, reflect both competitive conditions and the value of execution and research services provided by the brokers.

The Advisor executes trades through Schwab. To ensure best execution Schwab reviews serval metrics, including execution price and speed, trading characteristics of the security including market depth and order size, liquidity and the cost of executing orders. Schwab employs a non-directed equity order routing process to ensure CapWealth's clients receive the best price available.

A uniform commission schedule will be established for trades of listed securities. A good faith determination will be made that the commissions paid are reasonable in relationship to the value of the services received. The commission schedule will be reviewed periodically and changes to the commission schedule shall be approved by the CCO.

The CCO will review a sample of transactions on a daily basis to ensure best execution. A daily log will be maintained to evidence this review and note any trends found. Additionally, the CCO will conduct a monthly best execution review by randomly selecting transactions to review. This review will also be signed and memorialized in a tracking log. Any trends which appear unfavorable to the Advisor's clients will be notated and investigated. Based upon the findings, further research with the custodian may be necessary.

The advisor will determine on occasion when F-1 share class purchases are in the best interest of the client when the expense ratio cost is lower than the $15 transaction cost for no fee F-3 shares. On an annual basis, conversions will be made once breakpoints in expense ratios outweigh transaction costs. For example:

Generally, when using American Funds, we will use the F-3 share class, which offers our clients the lowest expense ratio but have a $15 trading fee.

The exception to this is when we have periodic investment purchases ("PIPs") under $5,000. In these cases, it would be more cost effective for the client to buy F-1 shares which do not have a transaction cost from Charles Schwab and then convert to F-3 shares when the amount is at or above $5,000.

We will review accounts on annual basis for conversion that fall under these circumstances

On a daily basis the CCO reviews trade blotters to ensure mutual fund share class purchases are in the best interest of the client and are accordance with policies.

## 4.3 BROKER REVIEW - QUALIFICATION OF BROKERS

In trying to obtain "best execution", each Investment Advisory Representative or trader must consider the following factors in placing securities transactions with a broker-dealer:

*Execution Capability* – Brokers may have different execution capabilities with respect to different types of orders and securities. For example, some brokers may have good execution capability with respect to large exchange listed equity block positions, while others are more efficient in the execution of difficult orders in the over the counter market, transactions in derivatives, or fixed income securities.

*Commission Rates* – CapWealth's consideration of the commissions charged by a broker is an integral part of its evaluation of order execution. Commission rates are a function of the size of the order, the price of the security, CapWealth's transaction volume with that broker, and whether the receipt of products or services is involved.

*Responsiveness and Financial Responsibility* – In the execution of transactions, CapWealth may consider the broker's responsiveness to requests for trade data and other financial information. Responsiveness includes such factors as the willingness and ability of a broker to take financial risks in the execution of large block orders or how accommodating the broker is to the trading requirements of CapWealth.

*Other Factors for Determining Best Execution* – The SEC's Office of Compliance Inspections and Examinations has suggested the following factors for Advisors to consider when determining best execution. It will be the responsibility of the CCO to evaluate each of these factors to ensure CapWealth is realizing the most favorable cost and brokerage services for its clients under the circumstances.

- The amount of business with each broker-dealer and the justification for directing trades to those broker-dealers;
- Gross compensation paid to each broker-dealer;
- Competitiveness of commission rates and spreads, including the documentation to support such competitiveness, i.e. comparison of "standard" commissions rates or "minimum" transaction costs between broker-dealers offering comparable products and services;
- Statistics or other information by independent consultants on relative quality of executions/financial services by broker-dealers;
- Financial strength (net capital) of broker-dealers;
- Ability to respond promptly to investor/Advisor inquiries during volatile markets;
- Availability of IPO's to Investment Advisors for subsequent allocation to clients;
- The ability of the broker-dealer to handle a mix of trades, i.e. block trades and odd lots;
- The willingness and ability of a broker to "work" large or difficult trades for the Advisor's client so as to obtain best executions;
- Whether advisory clients may be inconvenienced or ill-served by the geographical distribution of the broker-dealer offices;
- Whether the broker-dealer is equipped to handle electronic trade entry and reporting links with the Advisor;
- The value of privacy considerations, liquidity, price improvement, and lower commissions rates on electronic communications networks (ECNs);
- Opportunity costs, i.e., the cost associated with the opportunity to work with a major broker-dealer who may offer a wide variety of products and services. Opportunity cost might also be associated with "boutique" Advisors which only deal with specialized products;
- Adequacy of broker-dealers back office staff to efficiently handle trading activity, especially in volatile or high-volume markets;
- Statistics on securities executions and that of trading errors;
- Comparison of transaction costs between directed and non-directed client accounts;
- The volume of securities directed to broker-dealers who are active in selling shares of funds sponsored or managed by the Advisor; and,
- The overall responsiveness of broker-dealers, i.e., how well the broker-dealer serves the Advisor and its clients.

## 4.4 DIRECTED BROKERS

Directed brokerage is defined when a client "directs" CapWealth to utilize a certain broker-dealer for execution of trades. It is the policy of the Advisor to require that all customer instructions to direct transactions in customer accounts to a specific broker-dealer be in written form including the following disclosures:

- CapWealth may not be authorized under these circumstances to negotiate commissions with and may not be able to obtain volume discounts or best execution for transactions placed with the broker-dealer I have designated; and
- There may be a disparity between the commissions charged to transactions I am directing to the broker I have designated on this form and the commissions charged to transactions otherwise placed by or on behalf of other customers of CapWealth.

All such written directions shall be maintained in the customer file. It shall be the Investment Advisor Representative's responsibility to indicate such direction on each trade ticket. The client may at any time change such instructions by giving written notice to CapWealth.

### 4.5 BLOCK TRADING / TRADE ALLOCATION

Advisors have used the practice of combining purchase or sale orders ("bunching" or "blocking" trades) for many years, but its use has been accelerated recently. In many circumstances, Advisors manage many accounts in an identical manner and desire to minimize variations in performance among these accounts. Blocking helps to accomplish this goal. Blocking, if used properly, can benefit both the client and the Advisor. However, blocking can also be used to disguise practices that may favor certain clients to the disadvantage of other clients or to favor proprietary accounts to the detriment of client accounts. The SEC has taken the position that an Advisor can block orders for clients, whether they are individual, institutional or other so long as all accounts participating are "treated fairly". The term "treated fairly" is subjective, but for purposes of this compliance manual it means the clients receive the best execution under the circumstances and that no client is intentionally favored over another.

CapWealth authorizes combining purchase or sale orders for more than one account where blocking the trades appears to be potentially advantageous for each participating account. These reasons include:

- Avoiding the time and expense of simultaneously entering similar orders for many individual accounts that are managed similarly;
- Ensuring that all accounts managed in a particular style obtain the same execution to minimize differences in performance; and
- To obtain a more favorable transaction price .

The Advisor will aggregate transaction orders only if it believes that the aggregation is consistent with the Advisor's duty to seek best execution for customer trades and is consistent with the terms of the investment advisory agreement with each customer whose trades are being aggregated. When block trades are done for a new issue or secondary market trade in an equity security, the Advisor shall adhere to the following objectives:

- Fairness to all participating customers;
- Timely and efficient allocation to the participating accounts; and
- Creation of detailed records reflecting the execution of the trades and the allocations made to the participating customers in compliance with the Advisor's procedures.

*Fiduciary Concerns and Considerations in Blocking Trades* – Blocking and related allocation practices must be performed appropriately. The following list identifies and describes a number of potential problems in blocking trades. The Compliance Department must be aware of these possibilities and watch for indications of their presence while reviewing trades.

*Accounts participating in a trade do not receive the average price paid* - Securities purchased at the lowest price or sold at the highest price are allocated to favored clients.

*An order memorandum lists neither the accounts participating in each trade nor the extent of their participation* - The Investment Advisor waits until later in the day, or in extreme situations, until the next day to decide how the trade is to be allocated based on subsequent market movement. The result is that

49

favored clients (or a proprietary account) may get the instrument if price movement is (un)favorable. This practice is known as "cherry picking".

*Changes in accounts participating in a trade or the extent of their participation from the stated order ticket are not documented and the reasons for such changes are not stated* - Investment Advisor or Investment Advisor Representatives substitute other accounts depending on market action during the day to favor particular clients or groups of clients.

*Allocation instructions are not given to executing brokers on trade date* - This practice is possible when bunched trades are executed through omnibus accounts. The Investment Advisor can use price movement in the investment subsequent to trade date to determine how the shares will be allocated among accounts and favor certain accounts to the detriment of others.

*When proprietary accounts participate with client accounts in bunched trades, the proprietary accounts get benefits based on the volume of client trading* - Joint participation may make it easier for the Advisor to skew allocations to favor proprietary accounts and may cause the execution of the trade to be less favorable than would otherwise be the case. CapWealth does not include proprietary or personal accounts in block trades.

*Trade Allocation Procedures for Blocked Trades* – Consistent with CapWealth's obligation to seek best execution, Investment Advisor Representatives should aggregate client orders whenever possible. The procedures outlined below have been designed to ensure that purchase and/or sell orders which have been blocked are allocated fairly among clients so that, over time, all clients are treated fairly, consistent with their investment objectives. These procedures also seek to meet the best execution criteria discussed above.

An order filled through a series of executions through the same broker on the same terms (e.g., market or limit order) on the same day should generally be allocated using an average price. Once an order is filled, however, subsequent orders for the same security on the same day will not be averaged with the orders already filled.

Investment Advisor Representatives should make a preliminary allocation before execution. As a general policy, the allocation should be finalized no later than the close of business on trade day. Any change made to the initial allocation must be fully supported by documentation and audit trail.

When an aggregated order is filled in its entirety, the order should be allocated to participating accounts in accordance with the preliminary allocation schedule. The Investment Advisor Representative must document deviations from the preliminary allocation and the justification for such in writing. An order will be deemed to be "filled in its entirety" even if it takes more than a single day to complete the entire transaction, so long as there is a reasonable expectation that the order will be filled within a reasonable period. In such cases, the portion of the order completed each day ordinarily will be allocated in accordance with the preliminary allocation schedule.

When an aggregated order is only partially filled (and there is no reasonable expectation that the entire transaction will be completed within a reasonable period), the order will, generally, be allocated among the participating clients on an objective basis.

When the portion of a partially filled order that may be allocated to a participating account is such that after the allocation, the account's holdings of the security would fall below the account's target weighting, the account will not be allocated any portion of the order. In the event that allocation of a partially filled order would cause holdings for all participating accounts to fall below target weighting, the entire order may be allocated to a single account. The account that receives such an allocation will be rated so as to achieve equity in distribution over time.

In the case of securities in markets with low trading volume, it may be difficult to fill an order in the course of a single day. Filling an order over the course of two or more days may result in increased transaction

cost and variable execution prices. If an aggregated order that involves both large accounts and small accounts takes longer than a single day to fill, a portion of the order acquired on the first day will be allocated to smaller accounts first so that the accounts do not incur additional costs. An alternative method that takes into account transaction cost may also be considered only if the method achieves a degree of fairness to all participating clients over time, and the allocations are appropriately documented.

_Private Securities_ – Allocation of private placement securities begins with a determination of which accounts are suitable under the terms of the offering circular to participate in the private placement. Thereafter, the principles of the general allocation procedures will apply to all eligible accounts for which Investment Advisor Representatives, and/or clients have expressed an interest.

_IPOs_ – In the case of IPOs, demand for shares often exceeds the supply available for distribution. In addition, the amount of the issue allocated to CapWealth and the price may not be known at the time an initial allocation to client accounts would normally be made. For these reasons, final allocation may not be feasible until after CapWealth determines the amount and price of the shares allocated to CapWealth by the underwriters. Because of the limited supply of IPOs, allocation based on order size may not be appropriate. In such cases, asset size and target weighting must be considered in the allocation process.

_Other Factors in Determining Allocation Methodology_ – In addition to the above procedures for allocation of blocked trades, the Investment Advisor Representative should also consider the following other factors in determining allocation methodology:

- Account-specific investment restriction;
- Undesirable position size;
- Need to restore appropriate balance to a client portfolio;
- Client sensitivity to turnover;
- Client tax status;
- Regulatory restrictions;
- Common sense adjustments that lead to cost savings or other transactional efficiencies; and
- Investments may not be suitable for, or consistent with, known client investment objectives and goals

## 4.6 USE OF BROKERAGE

It is the policy of the Advisor not to place security trades through any brokerage company which is an affiliate of the Advisor without having obtained written consent from the customer approving the placement of trades through any such affiliated brokerage company. In the event that consent is obtained by the customer, the Advisor will provide disclosures to such customer of the Advisor's relationship to the broker as required by law.

## 4.7 TRADING ERRORS

Upon discovery of a trade error, the representative should contact the Trading Manager, CCO or designated associate. The Trading Manager or CCO will review the trade to determine the type of error on the account (i.e., duplicate trade, bought versus sold, incorrect shares, etc.). The trade will be corrected on a case-by-case basis by the necessary method in accordance with the type of trading error.

If the Advisor makes a trading error, the Advisor bears any loss. The cost of a trade correction can be charged against the commissions of the representative. If the broker-dealer makes a mistake, then the broker-dealer should bear the loss.

CapWealth does not "post-allocate" trades. If CapWealth mistakenly sells more shares/par value than the Advisor owns in an account or buys more shares/par value than the Advisor intended, it would be improper to allocate these shares to another account after the fact, and thus such activity is not permitted.

Trading errors are corrected either by selling the security in the Advisor's trade errors account and using the proceeds to offset the funds posted to the effected account to make it whole or by purchasing the required security in the Advisor's trade errors account and posting it to the effected account. When a security is sold to correct a trading error and a gain is realized, the gain is retained by the broker-dealer in the trade errors account and netted against losses, if any, realized from the Advisor correcting other trading errors. When a security is sold to correct a trading error and a loss is realized, the loss is borne by the Advisor in its trade errors account.

Upon discovery of a trading error, the trade should be reversed as soon as possible in order to minimize exposure to an adverse market price change.

Trade errors shall be corrected by the broker-dealer of record in accordance with the following procedures:

- In all circumstances where CapWealth is aware that a trade error has occurred, CapWealth shall notify the broker-dealer and the broker-dealer shall be responsible for correcting the error in the Trading Errors Account either by selling the security and remitting the appropriate funds to the effected account or by purchasing the required security and posting it to the effected account.

- No errors shall remain outstanding for a period of more than 120 days without written approval from the CCO.

# 5. Conflicts of Interest

## 5.1 PERSONAL INVESTMENTS AND INSIDER TRADING

CapWealth owes its clients the highest duty of trust and fair dealing. As a fiduciary, CapWealth places client's interest ahead of its own and holds the fundamental principle that CapWealth personnel and access persons should not take inappropriate advantage of their positions.

### *Trading Restrictions*

Personal securities transactions by Advisor Representatives who manage discretionary accounts are subject to the following trading restrictions:

- *Pre-Clearance of Transactions* – No Advisor Representative who manages discretionary accounts of CapWealth, may purchase or sell any non-exempt security without obtaining clearance from the Compliance Department. For this purpose of the rule, the term "exempt securities" means securities that are direct obligations of the United States. The Compliance Department may refuse to approve any proposed trade by an Advisory Representative that: (a) involves a security that is being purchased or sold by CapWealth on behalf of any advisory client or is being considered for purchase or sale; (b) is otherwise prohibited under any internal policies of CapWealth; (c) breaches the Advisor Representative's fiduciary duty to an advisory client; (d) is otherwise inconsistent with applicable law, including the Advisors Act, the Investment Company Act and the Employment Retirement Income Security Act of 1974; or (e) creates a conflict of interest or an appearance thereof.

- *Black-Out Periods* – No Advisory Representative may purchase a security if he/she knows that a client of CapWealth is selling that security or a related security, or has sold such security within the past five (5) business days. No Advisory Representative may sell a security if he/she knows that a client of CapWealth is purchasing that security or a related security, or has purchased such a security within the past five (5) business days. In cases where the Compliance Department believes it would not adversely affect the client's execution, the trade may be allowed.

- *Short Term Trading* – For securities covered by CapWealth, no Advisory Representative of CapWealth may purchase and subsequently sell (or sell and purchase) the same security within

any 60-day period, unless such transaction is approved in advance in writing by the Compliance Department, or unless such transactions is necessitated by an unexpected special circumstance involving the Advisory Representative. "Special circumstances" might include medical expense, or other serious but unforeseen obligations. The Compliance Department shall consider the totality of the circumstances, including whether the trade would involve a breach of any fiduciary duty, whether it would otherwise be inconsistent with applicable laws and CapWealth's policies and procedures, and whether the trade would create an appearance of impropriety. Based on his/her consideration of these issues, the compliance department shall have the sole authority to grant or deny permission to execute the trade.

- *Active Trading by Advisory Representatives for their Own Accounts* – In order to avoid any potential conflict of interest between CapWealth and its clients, securities transactions for the accounts of Advisory Representatives of CapWealth in the same security as that purchased/sold for advisory accounts should be entered only after completion of all reasonably anticipated trading in that security for those accounts on any given day. If after completion of all anticipated trading for advisory accounts, an Advisory Representative trade is executed on that same day at a price better than that received by the advisory client, the access person must notify the Compliance Department who will prepare a memorandum detailing the circumstances of the transaction. If after reviewing the transaction, the Compliance Department determines that a potential conflict of interest exists he/she shall have the authority to make any necessary adjustments, including canceling and re-billing the transaction to such other account(s) as appropriate. Such memoranda and any corrective action taken will be recorded and maintained with the daily trade blotter or in the daily trade file.

### Personal Securities Transactions

Because CapWealth and its associates have a fiduciary relationship to clients, there is an affirmative duty not to overreach or disadvantage any client or otherwise take unfair advantage of his/her trusts. With respect to personal securities transactions, clients may be disadvantaged when an associate executes a personal trade ahead of pending client transactions in the same security or when as associate purchases an over-subscribed IPO rather than distributing the shares to client accounts.

It is the policy of CapWealth to report personal investment transactions in accordance with the provisions outlined in the Code of Ethics (the "Code"). Rule 204A-1, requires Investment Advisors to establish, maintain and enforce a written Code of Ethics. Provisions within the Code require that all access persons report on a quarterly basis all personal securities transactions and holdings. All personnel subject to the Advisor's Code shall be required to review the Code on at least an annual basis, and provide the CCO with signed written certification that the Code and Policy has, and will continue to be complied with. The Code Administrator shall be entrusted with the day-to-day oversight of the Advisor's compliance with the Code and Policy.

The trading records required under Rule 204-2(a)(13) are intended as a means of bringing inappropriate trading practices to light. For this reason, the Compliance Department will monitor the personal securities transactions of all CapWealth associates to ensure that such persons are fulfilling their fiduciary responsibilities to CapWealth clients. In addition to monitoring securities transactions, the Compliance Department will take all reasonable steps to determine that all associates of CapWealth comply with the trading restrictions specified above.

*Quarterly Personal Securities Trading Reports* – Rule 204-2(a)(13) requires generally that any partner, officer or director of an Advisor or any associate who makes, participates in making, or whose activities relate to making any recommendation as to the purchase and/or sale of securities must report his/her personal securities transactions to a designated principal of the Advisor not later than thirty calendar days following the end of each calendar quarter. Such persons are collectively defined as "Advisory Representatives" under paragraph (A) of the Rule. This reporting requirement also applies to any associate of CapWealth who in the course of his/her duties is in a position to obtain any information about securities that are to be recommended to clients of CapWealth. The Personal Securities Transaction and

Holdings Report will be submitted to the Compliance Department not later than thirty calendar days following the end of each calendar quarter. Each report must contain the following information:

- Name of Representative
- Name of the securities purchased or sold, including the number of shares or principal amount if fixed income securities
- Date and nature of the transaction that was affected
- Price at which the transaction was affected
- Name of the broker/dealer or bank through whom the transaction was affected

Following submission of the Personal Securities Transaction and Holdings Report, the Compliance Department will review each report for any evidence of improper trading activities or conflicts of interest by the reporting person. After reviewing each report, the Compliance Department will sign and date the report attesting to his/her review.

In lieu of manually listing each securities transaction on the Personal Securities Transaction and Holdings Report, an associate may affix copies of the trade confirmations, account statements or account history to his/her report.

_Negative Reports_ – Although the Rule does not require negative reports (reports with no activity), it is the policy of CapWealth that the Personal Securities Transaction and Holdings Report be submitted quarterly by all Advisory Representatives whether or not securities transactions have occurred in their accounts during the period. Those associates having no securities transactions to report must indicate this fact in his/her quarterly report. The report must then be dated, signed and submitted to the Compliance Department for review.

_Reports by Executing Broker/Dealers_ – All Advisors are only permitted to hold outside accounts with Charles Schwab. Each Advisor must ensure that the account is established so that duplicate copies of trade confirmations and monthly account statements are submitted directly to CapWealth by the broker/dealer.

### _Insider Trading_

Section 204A of the Advisors Act requires that Investment Advisors establish, maintain and enforce written policies and procedures reasonably designed to prevent the misuse of material, non-public information by the Advisor or any person associated with the Advisor. In light of the increased focus on insider trading and increased penalties, it is important for CapWealth to implement the necessary policies and procedures in order to protect itself against the significant monetary penalties and damage in reputation that may result from an insider trading violation.

The Compliance Department of CapWealth is responsible for overseeing compliance with insider trading guidelines and providing a resource for giving guidance and answering employee questions. This insider trading policy applies to all employees who have any knowledge of the securities being traded or access to confidential information.

All CapWealth employees are expected to read and be familiar with the following examples of insider trading and responses to the receipt of material, non-public information. By way of example, violations of the insider trading rule occurred when persons traded on nonpublic information that:

- A company had made a rich ore find;
- A company had cut its dividend;
- A company had sustained its fist and unexpected loss;
- Earnings projections showed a substantial increase
- Earnings projections showed a substantial decrease; or
- A tender offer was to be made for a company's securities above the market price.

Legal sanctions have been applied to:

- Persons inside a company who traded the stock;
- Persons outside the company who traded the stock;
- Persons inside the company who told person's outside the company who traded the stock; and
- Persons outside the company who told other persons outside the company who traded the stock

If an employee of CapWealth, regardless of position, receives information at any time he believes is material non-public information, he must convey such information to the Compliance Department. The Compliance Department will then make a judgment as to the handling of such information in order to prevent possible charges of 204A insider trading violations. Failure of the employee to disclose such information to the Compliance Department in a timely manner may result in termination of the employee.

In meeting the requirement to enforce the provisions of Section 204A, every employee of CapWealth will quarterly sign a disclosure statement attesting to his/her understanding of his/her duties and responsibilities regarding the use and/or dissemination of insider information. The Compliance Department will maintain copies of each employee's signed disclosure statement.

The following procedures have been established to assist CapWealth employees in avoiding violations of the insider trading provisions of Section 204A of the Advisors Act. Every employee of CapWealth must follow these procedures or risk being subject to the sanctions described above. If an employee has any questions about these procedures, he/she should bring such questions immediately to CapWealth's Compliance Department.

### *Identifying Insider Information*

Questions to consider:

- Is the information material?
- Is this information an investor would consider important in making an investment decision?
- Would disclosure of this information substantially affect the market price of the security?
- Is the information non-public?
- To whom has this information been provided?
- Has the information been effectively communicated to the marketplace through publication in any magazine or newspaper of general circulation, or through some other media available to the public?

*In after considering of the above, the employee believes that the information may be material and non-public, he/she should take the following action:*

- Report the matter immediately to the CapWealth Compliance Department, disclosing all information, which the employee believes, may be relevant on the issue of whether the information is material and non-public.

- Refrain from purchasing or selling any security about which such information has been received. This prohibition applies to the employee's personal securities account(s) or any account(s) in which he/she any have a beneficial interest or any client account managed by CapWealth.

- Do not communicate the information to anyone outside the Advisor or within the Advisor, other than the CapWealth Compliance Department.

- After reviewing the information, the Compliance Department will determine whether such information is material and non-public and will advise the employee accordingly of the appropriate course of action.

Case 3:20-cv-01064   Document 14-1   Filed 02/11/21   Page 55 of 85 PageID #: 107

The Compliance Department is critical to the implementation and enforcement of CapWealth's procedures against insider trading. The supervisory procedures set forth below are designed to prevent insider trading by CapWealth's employees and to detect such trading if it occurs and to provide appropriate sanctions for violations of these procedures.

### Steps to Prevent Insider Trading

- Every new employee of CapWealth will be provided with a copy of these procedures regarding insider trading, receipt of which will be acknowledged in writing.
- The Compliance Department will enforce the applicable Personal Trading Restrictions.
- The Compliance Department will, on a regular basis, conduct training to familiarize employees with CapWealth's insider trading procedures. Such training may be held more often, as necessary, for those employees working in areas where they are more likely to receive inside information in the course of their duties.
- The Compliance Department will be available to assist CapWealth's employees on questions involving insider trading or any other matters covered in CapWealth's compliance manual.
- The Compliance Department will resolve issues whether information received by an employee of CapWealth is material or non-public.
- The Compliance Department will review on a regular basis and update as necessary CapWealth's compliance manual and procedures related thereto.
- Whenever it has been determined that an employee of CapWealth has received material non-public information, the Compliance Department will:
  - implement measures to prevent dissemination of such information;
  - place such security on a restricted trading list; and
  - immediately advise all employees of the inclusion of the security on the restricted list

### Steps to Detect Insider Trading

To detect insider trading, the Compliance Department will:

- Review all personal securities transactions by employees to ensure that such activities are in compliance with the applicable personal securities trading restrictions and the Code of Ethics of CapWealth's compliance manual.
- Review the trading activities in the client accounts managed by CapWealth
- Conduct such investigation, as necessary, when the Compliance Department has reason to believe that any employee of CapWealth has received and acted (traded) on inside information or has disseminated such information to other persons.

## 5.2 PURCHASE OF SHARES OR OBLIGATIONS OF CAPWEALTH OR AFFLIATES

In no event may funds held by CapWealth in discretionary accounts be used to purchase or otherwise acquire stock or obligations of CapWealth or its affiliates (CapWealth Obligations). Funds held in non-discretionary accounts may be used to purchase or otherwise acquire CapWealth Obligations, provided that (i) CapWealth may not vote proxies with respect to CapWealth Obligations and (ii) CapWealth has received prior written direction from the party exercising appropriate authority over the account.

## 5.3 EXECUTING SECURITIES TRANSACTIONS THROUGH AFFILIATES

It is the policy of the Advisor to not purchase securities for accounts where it has discretionary investment responsibility directly from or through CapWealth, or any CapWealth affiliate; provided, however, that this policy shall not apply to (i) non-discretionary accounts, (ii) accounts where the customer has agreed in writing that the Advisor may purchase from an affiliate, and, (iii) subscription orders for new U.S. Treasury issues.

## 5.4 PURCHASE OF NEWLY ISSUED SECURITIES FROM CAPWEALTH OR ITS AFFILIATES

It is the policy of the Advisor not to purchase securities for its customers' accounts from CapWealth or any of its affiliates which is a member of a divided underwriting syndicate. Purchase of securities from other members of the divided syndicate is permitted so long as the syndicate member is limited to its own commitment and there is no agreement between members to purchase each other's commitments.

In addition, it is the policy of the Advisor not to directly purchase securities for its customers' accounts from any member of an undivided underwriting syndicate of which CapWealth or any of its affiliates is a member until the syndicate closes and the issue is in the free market. If such securities are purchased within 60 days of the creation of the free market for such issue, CapWealth must be able to rebut the presumption of self-dealing. All such proposed transactions must be pre-cleared with the Compliance Department or his designee prior to execution.

This policy shall not be applicable where a person has the power to direct investments in an account and such person, with knowledge that CapWealth or affiliate of CapWealth is a member of the syndicate, directs in writing the purchase of such securities during the syndication period specifying the number of securities to be purchased, the price to be paid, and the broker through whom the securities shall be purchased. This policy does not preclude the Advisor from offering issues to its customers as a selling group member where appropriate.

## 5.5 PURCHASES AND SALES FOR CUSTOMERS OF CAPWEALTH

CapWealth will not arrange for execution of orders for its customers, officers or employees, or any such persons' relatives or friends unless the transaction is for an advisory account with the Advisor.

It is the policy of the Advisor to only engage in agency transactions where it acts as agent on behalf of its customers. The Advisor shall not engage in transactions in which it acts as principal for its own account.

## 5.6 CHINESE WALL

### *Corporate Finance Department*

The purpose of the Chinese Wall is to prevent the passage of material non-public information between CapWealth and the corporate finance functions of affiliate companies in violation of securities laws and regulations; it is the policy of the Advisor to prohibit access by advisory personnel to corporate finance records and files of all public companies.

CapWealth personnel may not attend meetings of committees having direct responsibility for investment banking or security underwriting decisions when such credit or underwriting decisions are being made.

### *Unaffiliated Individual(s)*

If an unaffiliated individual(s) utilizes office space leased or owned by CapWealth, it is the policy of the Advisor to prohibit the sharing or distributing of information between CapWealth and the unaffiliated individual(s). The Chinese Wall is an ethical barrier between the entities to avoid any and all conflicts of interest.

CapWealth must ensure that client records and Advisor records are properly secured at all times and cannot be accessed by any unaffiliated individual(s). Access to any client file or Advisor document to an unaffiliated individual(s) is strictly prohibited. These individual(s) are also prohibited from any access to the Advisor's network server. The Advisor's Privacy Policy demands this protection and the fiduciary duty

owed to all of CapWealth's clients sets the standards by which client and Advisor information must be protected.

Not only does the wall prohibit the access of CapWealth information from any unaffiliated individual(s), it also prevents the flow of material non-public information between any unaffiliated individual(s) and CapWealth.  It is the policy of the Advisor to prohibit access by any CapWealth personnel to the records and files of any unaffiliated individual(s).

If CapWealth provides office space to an unaffiliated individual(s) that has access to non-public information, it must maintain and enforce certain internal policies and controls to prevent the misuse of material, non-public information by its employees.  In order to ensure compliance with the Insider Trading and Securities and Fraud Enforcement Act of 1988, CapWealth has established the following elements:

- Quarterly review of employee trading
- Personal Trading Procedures
- Substantive supervision of inter-departmental communication
- Physical separation

The CCO or his designee will review all interdepartmental communications between CapWealth and any unaffiliated individual(s).  Any mention of material non-public information or client information would be in direct violation of the Advisor's policies.  An investigation into the breach of the Chinese Wall will be launch immediately.

### Breach of the Chinese Wall

For any breach of Chinese Wall protocol, CapWealth will be required to keep sufficient documentation to re-create the events leading up to the breach, the ensuing investigation and the disposition of the investigation.  The documentation should be sufficient to create a timeline of events through the close of any internal investigations, as well as the normal surveillance of Chinese Wall procedures.

Prior to any arrangement, all employees will receive additional education and training in the proper handling of client and Advisor information, material non-public information, proper separation with an unaffiliated individual(s), Chinese Wall procedures as well as ramifications of breaching these procedures.

## 5.7 IMPARTIAL TREATMENT OF ACCOUNTS

It is the policy of the Advisor that all accounts under its management be treated impartially in the allocation of investment information, expertise, and timing of investment executions.

It is the fiduciary responsibility of CapWealth and its associates to treat each client fairly and to avoid preferential treatment of clients.  CapWealth utilizes various policies and procedures to ensure that specific clients are not given preferential treatment.

## 5.8 TRANSACTIONS BETWEEN ACCOUNTS

Section 206(3)-2 of the Advisors Act generally prohibits an Investment Advisor from knowingly purchasing any security from a client, or selling any security to a client out of its own inventory (a "principal transaction"), or effecting a transaction for its client if the Advisor acts as a broker on both sides of the transaction (an "agency cross transaction").  An "agency-cross transaction" is when an Advisor acts as broker for both the client and the person on the other side of the transaction. If the Advisor knowingly engages in any of these activities, the Advisor, before completion of the transaction, shall ensure that the following conditions are satisfied:

- The client must prospectively authorize the transaction in writing;

- The Advisor must disclose to the client in writing the capabilities in which it will act and the possibility conflicting division of loyalty and responsibility it may face in an agency transaction;
- Each agency cross transaction must be confirmed in writing;
- The Advisor must provide the client with an annual summary of all agency cross transactions; and
- All client statements must disclose that the client may terminate the agency cross transaction authority at any time by written notice to the Advisor.

If an Investment Advisor Representative executes a cross trade before obtaining the clients' consent, the Investment Advisor Representative must advise the clients that they (clients) are under no obligation to consent to the transaction. If, after executing a cross trade, a client withholds consent, the Investment Advisor Representative must restore the position to the client's account and advise the Compliance Department of the circumstances of the transaction. Any cost associated with restoring the position, will be assessed against the Investment Advisor Representative and not the client.

No asset may be purchased or sold with, or between, any accounts subject to ERISA.

In certain instances, assets held by one account may be sold directly to another account if the transaction is fair to both accounts and if such a transaction is not prohibited by the instrument governing either of the accounts. All such transactions must include timely, fair and fully documented pricing.

### 5.9 PAY TO PLAY POLICY

Pay to play is the practice of making campaign contributions and related payments to elected officials in order to influence the awarding of lucrative contracts for the management of public pension plan assets and similar government investment accounts. The SEC has adopted rules that include prohibitions intended to capture not only direct political contributions by Advisors, but also other ways that Advisors may engage in pay to play arrangements.

*Background*

The Rule contains three fundamental prohibitions:

- It prohibits an Advisor from providing investment advisory services for compensation to a government entity for two years after a contribution to an official of the government entity is made by the Advisor or the Advisor's covered associates. These restrictions can apply to the activities of covered associates for the two years before they became covered associates of Advisor. However, for covered associates who are not involved in soliciting clients or investors, the look-back period is six months instead of two years.

  There is an exception available from the prohibition above for contributions from covered associates who are natural persons who make contributions to any official that do not in the aggregate exceed $350 per election if the covered associate was entitled to vote for the official at the time or $150 per election if the covered associate was not entitled to vote for the official at the time (the "*De Minimis* Exception"). For purposes of this exception, primary and general elections are considered separately.

- The Rule prohibits an Advisor or its covered associates from providing or agreeing to provide payment to any person to solicit government entities for advisory services on behalf of the Advisor, unless the solicitor is an SEC RIA or Broker-Dealer subject to similar pay to play restrictions.

- The Rule prohibits an Advisor and its covered associates from coordinating or soliciting any person or PAC to make (i) any contribution to an official of a government entity to which Advisor is providing or seeking to provide advisory services, or (ii) any payment to any state or local political party where the Advisor is seeking to provide advisory services to a government entity.

This prohibition is intended to prevent advisors from circumventing the Rule by making indirect contributions through political organizations or "bundling" smaller employee contributions that are permitted under the rule.

The prohibitions of the Rule apply not only to direct advisory relationships with government entities but also to "covered investment pools" for which the Advisor serves as Investment Advisor and in which a government entity invests or is solicited to invest.

The Rule also prohibits the Advisor and its covered associates from doing anything indirectly that, if done directly, would violate the provisions of the Rule.

### *Definitions*

A "government entity" means any state or political subdivision of a state, including:

- any agency, authority, or instrumentality of the state or political subdivision;
- a pool of assets sponsored or established by the state or political subdivision or agency;
- a plan or program of a government entity; and
- officers, agents or employees of the state or political subdivision or agency.

**"Contribution"** means any gift, subscription, loan, advance or deposit of money or anything of value. A charitable donation made to a tax-exempt organization would not generally be considered a contribution (even if solicited by a government official) and donation of time by an individual would not be considered a contribution if the Advisor did not solicit the individual's efforts and Advisor's resources (such as office space and telephones) were not used.

An **"official"** is any person (including any election committee of the person and any political action committee) who was, at the time of the contribution, an incumbent, candidate or successful candidate for elective office of a government entity, if the office:

- is directly or indirectly responsible for, or can influence the outcome of, the hiring of an Investment Advisor by a government entity, or
- has authority to appoint any person who is directly or indirectly responsible for, or can influence the outcome of, the hiring of an Investment Advisor by a government entity. "Influence" should be construed broadly.

A **"covered associate"** means:

- any general partner, managing member or executive officer, or other person with a similar status or function;
- any employee who solicits a government entity for the Advisor and any person who supervises, directly or indirectly, such employee; and
- any political action committee controlled by the Advisor or by any person described in (i) or (ii) above.

A **"covered investment pool"** means:

- any investment company registered under the Investment Company Act of 1940 that is an investment option of a plan or program of a government entity (*e.g.*, a Section 529 plan, 403(b) plan or 457 plan); or
- any company that would be an investment company but for the exclusion provided by Section 3(c)(1), 3(c)(7) or 3(c)(11) of the 1940 Act (*e.g.*, many hedge funds, private equity funds, venture capital funds and collective investment trusts).

### *Policy and Procedures*

CapWealth is mindful of the privacy interests of its employees and applicants for employment, and therefore has sought to design the preclearance aspects of this Policy in a way that solicits only the information the Advisor deems reasonably necessary to satisfy its obligations under the Rule.

Notwithstanding the definition of "covered associate," as a general matter CapWealth intends that all of the Advisor's employees, officers (and any PAC or entity affiliated with such persons) will be subject to this Policy (collectively, "Covered Persons").

Accordingly, CapWealth and its Covered Persons shall be required to observe the following:

- Political contributions by CapWealth or its Covered Persons to politically connected individuals or entities with the intention of influencing such individuals or entities for business purposes are strictly prohibited.

Prior to making any political contribution to any state or local government entity, official, candidate, political party, or PAC, a Covered Person (including any PAC or entity affiliated with the Covered Person) must seek pre-clearance from the CCO or his or her designee. The CCO or his or her designee will consider whether the proposed contribution is consistent with restrictions imposed by the Rule and the Policy, and to the extent practicable, the CCO will seek to protect the confidentiality of all information regarding each proposed contribution.

CapWealth does not currently make any political contributions.

To the extent that CapWealth engages third-party solicitors in connection with investments by government entities, the Advisor will seek to structure them to comply with the Rule.

The CCO or his designee will meet with any individuals who are expected to become Covered Persons to discuss their past political contributions. The review will address the prior six months for potential Covered Persons who will have no involvement in the solicitation of Clients; contributions for all other potential Covered Persons will be reviewed for the past two years.

### *Recordkeeping*

**As required by the Rule, CapWealth is required to keep the following records relating the political contributions of the Advisor and its Covered Persons:**

- The names, titles and business and residence addresses of all Covered Persons of CapWealth.
- All government entities to which CapWealth provides or has provided investment advisory services, or which are or were investors in any "covered investment pool" to which CapWealth provides or has provided investment advisory services, as applicable, in the past five years, but not prior to September 13, 2010.
- All direct or indirect contributions made by CapWealth or any of its Covered Persons to an official of a government entity, or direct or indirect payments to a political party of a state or political subdivision thereof, or to a PAC.
- The name and business address of each regulated person to whom CapWealth provides or agrees to provide, directly or indirectly, payment to solicit a government entity for investment advisory services on its behalf, in accordance with the Rule.
- Records relating to the contributions and payments described above must be maintained
- listed in chronological order and indicate: (i) the name and title of each contributor; (ii) the name and title (including any city/county/state or other political subdivision) of each recipient of a contribution or payment; (iii) the amount and date of each contribution or payment; and (iv) whether any such contribution was the subject of the exception for certain returned contributions.

# 6.  Miscellaneous

## 6.1 COMMUNICATIONS WITH THE PUBLIC

### *Customer Correspondence*

Rule 204-2(a)(7) of the Advisors Act requires generally that CapWealth maintain the originals of all written communications received and copies of all written communications sent to any party, including persons who are not clients of CapWealth relating to the business of providing investment services.  These records include:

- *Outgoing Customer Correspondence* – All outgoing correspondence, including letters, memos and handwritten notes pertaining to the solicitation or execution of securities transactions must be reviewed and approved by the Compliance Department prior to mailing, unless pre-approved in writing by the Compliance Department.  Such correspondence also includes form letters and generic sales literature.  With respect to form letters, the person causing the material to be mailed must maintain a list of the addressees and the date(s) the material was mailed.  Copies of correspondence addressed to specific customers should be included in *Customer Correspondence.*

- *Incoming Correspondence* – All incoming correspondence, including personal letters addressed to associates of CapWealth, will be opened and reviewed by the associate's supervisor before being distributed to the associate.

  In the event that a client files a written complaint or makes an inquiry that requires response and resolution, it is the Compliance Department's responsibility to promptly discuss the substance of the matter with the client's Investment Advisor Representative.  The original complaint and copies of all letters and memoranda relating to the compliant will be retained in a special file titled *Customer Complaints.*

- *Electronic Advertising and Correspondence* – Any advertising or communication (email) by CapWealth, its representatives, its employees or affiliates on the Internet/World Wide Web or other equivalent system must be reviewed and approved by CapWealth Compliance Department before it is placed into circulation on the Internet.  Any existing site, ad or other communication must be re-approved after any material changes to the site or when CapWealth's or regulators' guidelines change.

  Internet advertising, due to its widespread dissemination, must be of a general nature.  It must not offer for sale of any products or provide any investment advice.  This should be accomplished by first not using words such as "buy", "sell", "recommend", or "advise".  Second, a disclosure statement that **"this is not an offer to sell or buy any securities products, nor should it be construed as investment advice or investment recommendations"** should be present.  In addition, the Investment Advisor Representative must always completely disclose his/her affiliation with CapWealth in an approved disclosure statement provided by the Compliance Department on each page of a web site or ad.

  Since Internet ads (web sites) can be viewed all over the world, each Investment Advisor Representative must disclose the states in which he or she is licensed/registered to do business, or state clearly that proper state registration and/or applicable licenses must be obtained prior to further communication.  This is a statement of general guidelines for Internet, World Wide Web or equivalent electronic systems-based communication for any Investment Advisor Representative or affiliate of CapWealth.  These guidelines will change frequently, so please consult the

CapWealth Compliance Department for further detailed information. Only by exception, may these guidelines differ.

In addition, Investment Advisor Representatives must maintain compliance with CapWealth Email policy as stated below:

Significant correspondence is defined as "written or electronic communication between an Investment Advisor Representative and customers, other securities professionals, regulators and all other persons or agencies, the subject of which communication is the company's securities business, regulation of the company's securities business and all other issues that relate in any way to compliance by the Investment Advisor Representative with: the rules and regulations of the SEC; and all self-regulatory organizations, the rules and regulations which relate to the company's business; and the rules and well-being of the company." Such communications include, but are not limited to: orders to buy or sell securities, recommendations to buy or sell securities, customer complaints, etc.

Email that is not significant is classified by CapWealth as conversations and as such need not be reported to nor reviewed by the Compliance Department. However, in the event that an email conversation becomes significant while in progress, the Investment Advisor Representative will print the email and deliver the resulting printout to the CCO for review and approval as if it were written mail. This policy also applies to any mail sent from a home computer or a portable computer device.

- _Customer Presentations, Lectures, Seminars, Radio and Television_ – The Compliance Department is responsible for reviewing the content and manner of presentation for all lectures, seminars and media appearances by associates of CapWealth where the purpose of such communications is to provide investment advice or explain the services offered through such communications is to provide investment advice or explain the services offered through CapWealth. This would include charts, graphs, statistics, etc. that are created for such presentations. An outline of any speech or lecture to members of the public that discusses investments in general or specific securities currently recommended by CapWealth will be submitted to the Compliance Department prior to presentation. Copies of the presentation will be retained for three years, the period required under Rule 204-2(e). In addition, any advertising that will be utilized before, during and after seminars must also be approved prior to use. At seminars, promotional literature should be displayed on a "pick up" or a "request only" basis, as opposed to a general distribution of the materials to the entire audience.

    Associates making appearances on radio or television programs as representatives of CapWealth are prohibiting from recommending any specific security unless such security is currently approved by CapWealth Compliance Department. In situations where an associate is asked his/her opinion on the investment merits of a security not on CapWealth's recommended list, the associate should make it clear to his audience that the opinion is that of his own and not necessarily that of CapWealth.

### Advertising and Sales Literature

Rule 206(4)-1 of the Advisors Act defines the term "advertisement" to include any notice, circular, letter or other written communication addressed to more than one person, or any notice or other announcement in any publication or by radio or television which offers:

- An analysis or report concerning securities, the buying or selling of securities; or
- Any graph, chart, formula or other device effecting securities decisions; or
- Any other investment advisory service with regard to securities.

This broad definition generally encompasses any form letter and includes the standardized written material in booklets used by advisors for presentation to prospective clients.

*Rule 206(4)-1 does not require that an advisor submit an advertisement to the SEC for approval. As a matter of policy, the SEC will neither review specific advertising material nor will the staff approve or disapprove any advertisement prior to its dissemination to the public. Note: Under more narrow definitions of advertising certain states may require submission of advertising material for review and approval. It is the responsibility of the Compliance Department to determine the requirements of each state prior to publishing any advertisement in that state or sending any advertisement to a resident of that state.*

Rule 206(4)-1 of the Advisors Act prohibits the use of certain types of information in any "advertisement". CapWealth prohibits any advertising or marketing materials that may be misleading, fraudulent, deceptive and/or manipulative. The SEC considers the following to be false and misleading:

- *Performance Based Advertising* – Distributing any advertisement which refers to past specific recommendations that were or would have been profitable unless the advisor offers at the same time to furnish a list of all recommendations made within the immediately preceding year. If a separate list is provided it must contain:

  o The name of each security recommended by the advisor; the date and nature of the recommendation (buy, sell or hold)
  o The market price of the security at the time of recommendation, the market price at the time of execution and the most recent market price
  o The following cautionary legend: "**It should not be assumed that recommendations made in the future will be profitable or will equal the performance of the securities on this list."**

- *Model Portfolio Disclosures* – The following disclosures must be included with any presentation that includes model portfolio performance:

  o There are inherent limitations in model results, particularly the fact that such results did not represent actual trading and that they may not reflect the impact that material economic and market factors might have had on the adviser's decision making if the adviser were actually managing clients' money;
  o Model portfolios contain no actual client performance data;
  o While most of clients have invested their portfolio in accordance with one or combination of our Model Portfolios, some clients have customized portfolios, which contain securities and/or positions that differ from what is portrayed in our Model Portfolios. This may result in performance figures materially different from the figures portrayed in the model;
  o Model portfolios do not reflect the deductions of advisory fees, trading commissions or any other expense that a client would have paid;
  o Past performance does not guarantee future results. Performance of clients invested in accordance with the Model Portfolios will vary from the posted performance due to advisory fees, timing of the deduction of the advisory fee, market fluctuations, trading costs, portfolio cash flows, custodian fees, and frequency and precision of rebalancing; and
  o As with any other investment, there is potential for profit as well as the possibility of loss investing in our Model Portfolios.

- *Exaggerated Statements* – Distribution of any graph, chart, formula or other device which claims can be used to determine which security to buy or sell, or when to buy or sell, or will assist an investor in making such decisions for himself, without prominently disclosing the limitations and difficulties of using such devices, formulas, etc.

- *Offer of Free Reports or Services* – Distributing an offer to provide any report, analysis or other service without charge unless such service or material actually is or will be furnished **entirely free and without any condition or obligation**, directly or indirectly.

- *Misleading Statements* – Distributing any untrue statement of a material fact, or which is otherwise false or misleading
- *Testimonials* – A testimonial generally includes any statement by a former or present advisory client endorsing the Advisor or referring to the client's favorable investment experience with the Advisor. Testimonials are prohibited, as they are likely to create a perception that all of the advisor's clients will experience the same favorable results of the client providing the testimony.

- Advertising may also be deemed misleading, if it implies something about the competence of an Advisor, or the investment experience (success) of advisory clients or suggest that similar investment strategies would be beneficial to prospective clients about whom the advisor may have little or no information as to investment objectives or financial circumstances.

- The SEC has said that the use of such words as "superior" and "excellent" may also be misleading because "such superlatives may lead investors to believe that the Advisor is the only one capable of providing adequate advisory services or infer something about future investment results that may not be warranted and may lead to prospective investors to conclude erroneously that comparable opportunities cannot be found elsewhere."

- Remarks paraphrased by a newspaper article about the Advisor are not ordinarily subject to the advertising rules, unless the article was planted by the Advisor as a disguised advertisement to solicit new clients. "Planted material" may fall under the anti-fraud provisions of Section 206. Investment advisory material that promotes advisory services for the purposes of inducing potential clients to subscribe to those services is considered advertising material within the Rule.

- All advertising or sales literature developed by the Advisor must be submitted to the CCO for approval prior to use. The CCO must determine that it complies with the provisions or Rule 206(4)-1 and to ensure that the advertising does not violate any of the anti-fraud provisions of Section 206 of the Advisors Act. While an advertisement may accentuate positive facts about CapWealth, the Compliance Department should be prepared to document the accuracy of such claims if required by regulatory authorities. The Advisor will review such materials for compliance with applicable provisions of the Advisor Act, including but not limited to:

  - Statements which are promissory, exaggerated, or contained unwarranted statements;
  - Unsubstantiated recommendations;
  - Projections or predictions as to future results; and
  - Sales literature or advertisements which do not meet the Advisor's standards.

Listed below are examples of advertising or sales materials that may be frequently used by the Advisor, but must be approved prior to use by the CCO include:

- *Office Bulletins* - Instructions, bulletins and other communications from senior management may not be used in sales activities unless approved in advance by the designated Supervisor. This includes any material marked "For Internal Use Only".

- *Phone Book Listings* - All yellow-page listings must comply with advertising requirements and be approved in advance by the CCO.

- *Reprints* - Reprints of published articles or other third party material may not be used in conjunction with investment advisory activities unless they are approved in advance by the Compliance Department.

- *Stationery and Business Cards* - Stationery and business cards other than the established standard for the Advisor are prohibited for use by Representatives.

### *Customer Complaints*

It is the responsibility of the CCO or his designee to respond to each complaint promptly and to retain any subsequent correspondence from the client on the matter.

All written complaints (or copies of these complaints) should be kept in their respective customer files. Additionally, copies of all such complaints should be forwarded to the CCO for review and kept in a central file.

An Investment Advisory Representative's primary responsibility in handling any complaint that may be made concerning one of his/her client's accounts is to cooperate fully and honestly with the principals investigating the complaint. If a client makes a complaint, the Investment Advisory Representative should immediately refer the complaint to the Compliance Department, which will require the Investment Advisory Representative to provide a written statement concerning the transaction. Any Investment Advisory Representative or associate of CapWealth who receives any material verbal complaint from a client must immediately notify his/her supervisor of the nature of the complaint. The supervisor investigating the complaint should ensure that the client has also been asked to make a written statement about the complaint. If the client refuses, it is the responsibility of the Investment Advisory Representative or associate to document to the best of his/her ability the events leading up to the client's complaint. The term "material" in this context means any matter that could adversely affect the reputation of CapWealth or has a potential likelihood of regulatory or legal action against CapWealth or any of our associates. Any doubt on the materiality of a complaint should be referred to the CCO for resolution.

The Investment Advisory Representative should make no payment to settle the claim but refer the matter to CapWealth for any investigation into whether a settlement or adjustment is warranted. CapWealth's policy and industry regulations prohibit an Investment Advisory Representative or a financial institution from making private settlements with clients. Such settlements, which might involve reimbursement of bank charges, lost interest, sales or surrender charges and price-per-share adjustments, must be determined and processed by CapWealth. If the Investment Advisory Representative disagrees with the initial determination of the CCO, he/she should review the transaction with the CEO.

Investment Advisory Representative's may not bind the Advisor nor enter into any agreements, promissory notes or contracts, either written or oral, in the name of or on behalf of CapWealth. Investment Advisory Representatives are not authorized to incur expenses on behalf of the Advisor, nor may Investment Advisory Representatives remit billings to the Advisor for any expense incurred unless specific, advance permission has been obtained in writing from the CEO.

### *Customer Complaint Notification Requirements*

An Investment Advisory Representative must refer immediately any communication or other matter involving the SEC and SIPC or any state agency to the CapWealth Compliance Department. All responses and other correspondence will be the responsibility of the CCO or legal counsel. The Investment Advisory Representative should make no statements to any individual associated with a regulatory agency unless specifically authorized to do so.

An Investment Advisory Representative must immediately notify the Compliance Department if he/she is:

- The subject of any investigation or inquiry by any governmental agency or self-regulatory organization;

- Requested formally or informally to testify before or provide documents to any regulatory agency;

- A defendant or respondent in any litigation, proceeding or arbitration alleging violation of any law, rule or regulation of any regulatory or law enforcement agency. Investment Advisory Representatives are required to provide the CCO with a written explanation, including support documentation, of the facts and circumstances surrounding the action and an amended Form U-4 (if applicable) disclosing the matter. While this generally does not apply to misdemeanor traffic violations (e.g. parking, speeding, etc.), it does require disclosure of any offense related to driving under the influence or that results in incarceration;

- The subject of any censure, injunction, suspension, fine, cease-and-desist order or other disciplinary action by any regulatory agency;

- The subject of any bankruptcy or contempt proceeding;

- The subject of any oral or written complaint by a client, or a claim for damages filed by a client;

- The subject of any arrest, summons, arraignment, indictment, conviction or guilty pleas to any criminal offense (other than minor traffic violations);

- An associated person of a broker, dealer, investment company, investment advisor, underwriter or insurance company which is suspended, expelled or has its registration denied or revoked by any regulatory agency; or is associated in such capacity with a bank, trust company or other financial institution which is convicted of or pleads no contest to any felony or misdemeanor; or

- Someone who becomes an officer, director, control person or an affiliate of a publicly traded corporation. Proper disclosure must be made to all clients of CapWealth with respect to transactions in the securities of that issuer that amendments are filed with respect to the Investment Advisory Representative's Form U-4.

***Media***

Only the CEO of CapWealth can respond to inquiries from the public or media. On occasion, the CEO may grant this authority to another Advisor principal to respond to media inquiries. The CEO maintains a log to memorialize any instance in which another principal is designated to respond to media inquiries.

## 6.2 PROXY VOTING POLICY

Under Rule 206(4)-6 of the Investment Advisers Act, registered investment advisers with discretion may not vote proxies for a client without first adopting written policies and procedures reasonably designed to ensure they are voted in the client's best interest.

CapWealth has the ability to vote proxies if this responsibility and authority has been delegated to the Advisor by the client. This policy is included under Section 12 of the IMA. If a client wants to delegate this authority to CapWealth, the indicated box must be marked on the Agreement. If a client does not want to delegate this authority to CapWealth, the indicated box must be marked on the Agreement. If neither box is marked, CapWealth will assume the delegation to vote has been granted by the client.

As an investment adviser that has been granted the authority to vote on portfolio proxies, CapWealth owes a fiduciary duty to its clients. As a fiduciary with respect to that responsibility, CapWealth must ensure that all proxy votes for portfolio securities are made in the best interest of CapWealth's clients.

These procedures set forth the proxy voting policies, procedures and guidelines to be followed by the Advisor in voting portfolio proxies relating to securities that are held in the portfolios of clients for which the Advisor has been delegated such proxy voting authority.

### *Proxy Voting Agent*

CapWealth has retained ISS' to provide legal oversight, in depth analysis and recommendations on all proxy matters. ISS is nationally recognized as one of the leading independent providers of corporate governance information. ISS has the capacity and competency to adequately analyze proxy voting issues.

Unless instructed otherwise by CapWealth, ISS, will vote each portfolio proxy in accordance with their established guidelines.

### *Voting Guideline*

CapWealth has adopted the following procedures to assist in the review of proxies, the voting of these proxies in accordance with Advisor policy, the implementation of the Advisor's policy and to monitor and ensure the Advisor's policy is observed, implemented properly and amended or updated as appropriate. As a general principle, CapWealth's proxy voting policy is designed to ensure that CapWealth is voting in the best interests of the client in terms of the potential economic return on the client's investment. In addition, this policy and the ISS guidelines are based on the premise that good corporate governance ultimately results in increase shareholder value.

CapWealth uses ISS to implement its proxy voting process. ISS has been retained to provide proxy voting analysis and record keeping services. ISS votes all proxies based on their recommendations and underlying voting guidelines and policies. CapWealth shall instruct each of the custodians for its client's accounts to forward all proxy materials to ISS for processing.

In making the proxy voting decision, there are two overriding considerations: first, the economic impact of the proposal; and second, the best interest impact of a proposal if it were to pass or not pass, as the case may be. ISS performs company-by-company analysis, which means that all votes are reviewed on a case-by-case basis and no issues are considered routine. Each issue is considered in the context of the company under review.

All proxies will be automatically forwarded to ISS whose responsibilities will include:

- Perform ballot-to-account reconciliations to ensure all ballots have been received. Any discrepancies will be noted and resolved by communications between ISS and CapWealth.
- Implement designated voting policies and vote recommendations based on the application of such policies
- Transmit the voted proxies to issuer
- Record how each proxy was voted
- Maintain appropriate proxy voting records
- CapWealth has reviewed and approved the ISS guidelines on how ISS votes on particular issues.
- In addition, CapWealth investment personnel are generally aware of the proposals that are being submitted to shareholders of the companies invested in by CapWealth. ISS shall vote the received proxies in accordance with its guidelines, unless other instructions are given to ISS by CapWealth to vote a different way. CapWealth maintains copies of all proxy voting records and, upon request will provide clients with information on the voting of all proxies on their behalf.

CapWealth will continual monitor ISS recommendations, to ensure that they were made based upon materially accurate information.

### *Proxy Voting Committee*

The Advisor will maintain an internal proxy voting committee that is responsible for monitoring the proxy voting agent. CapWealth's internal voting committee is responsible for overseeing the proxy voting process and ensuring that CapWealth meets its regulatory and corporate governance obligations in voting

of portfolio proxies.  The Committee shall oversee the proxy voting agent's compliance with these Policies and Procedures, including any deviations by the proxy voting agent from the proxy voting guidelines outlined in this policy.

CapWealth performs an annual review of the ISS voting guidelines and policies to confirm that they are consistent with the best economic interests of the Advisor's clients.

CapWealth and the Committee bear ultimate responsibility for how portfolio proxies are voted.

### *Conflicts of Interest*

CapWealth will generally follow ISS's recommendation and will not use its discretion in the proxy voting decision.  For this reason, client proxies are voted in the client's best interest, in accordance with a predetermined policy based upon recommendations of an independent third party, and are not affected by any potential or actual conflict of interest of CapWealth.

If the Committee decides not to follow ISS's recommendation and use CapWealth's discretion in the proxy voting decision, CapWealth must vote portfolio proxies without regard to any other business relationship between CapWealth and the company to which the portfolio proxy relates.  CapWealth seeks to ensure that all votes are free from unwarranted and inappropriate influences.  When voting proxies, CapWealth must consider the interest of its clients and not its own interests.  CapWealth recognizes that potential or actual material conflicts may arise between the interests of CapWealth and its clients that must be properly addressed and resolved before CapWealth votes.  To address these concerns, CapWealth's CCO  identifies conflicts of interest and resolves them in order to avoid any impropriety or the appearance of impropriety.

### *Amendments to these Procedures*

The Committee shall periodically review and update these Policies and Procedures as necessary.  Any amendments to this manual (including the Guidelines) shall be provided to senior management for review and approval.

## 6.3 INVESTMENT POLICIES

*Client Restrictions* – Investment Advisor Representatives must uphold any client restrictions, either imposed in documents or by the client.  Restrictions contained in documents may include the investment style, such as large cap equities.  In this case, a representative should not purchase small cap equity in the client portfolio because it was not in accordance with the written agreement.  In addition, clients may impose certain restrictions involving socially conscious companies.  This would entail that the client would not want to invest in any companies involved in the production of items such as tobacco, alcohol or warfare.  Representatives should make reasonable efforts to avoid companies that are involved in the manufacturing or production of these items for the client portfolio.

*Mutual Funds* – Due to increasing growth of advisory services, many mutual fund companies are offering multiple share classes. CapWealth determines the best share class available for the client.

In recommending to a non-discretionary client the purchase, sale or exchange of any security, an Investment Advisor Representative shall have reasonable grounds for believing that the recommendation is suitable for such client upon the basis of the facts.  These facts are disclosed by the client as to his/her security holdings and as to his/her financial situation and needs.  In addition, there may be tax consequences for switching funds, such as short-term capital gain taxes.

*Investment of Cash Balances* – CapWealth does not allow Investment Advisor Representatives to receive advisory fees for client accounts established to only hold cash balances.  Cash balances can be placed in

money market funds and represent the liquid portion of the portfolio. CapWealth and its representatives are prohibited from receiving advisory fees where a service has not been provided to the client.

*Investment Committee (IC)* – The IC serves as a review and decision-making board, evaluating investment ideas, assessing economic and market trends and determining investment decisions. The IC meets regularly to discuss proposed investment opportunities and review previous ones. During these meetings, information on new opportunities are presented and debated within the IC. The IC also reviews the current state of recommended investment options to ensure their continued alignment with the goals and objectives of the Advisor's clients and is appropriate in the context of current market conditions. All minutes from IC meetings are recorded, maintained and available to all attendees.

## 6.4 UNREGISTERED ENTITY CONSIDERATIONS

### *UnRIA*

Many of the provisions of the Advisors Act apply to both registered and unRIAs. Key provisions of the Advisor Act, including, in particular, the books and records requirements and the anti-fraud provisions apply to all persons who hold themselves out to be "Investment Advisors", whether or not they are registered. Moreover, Section 204 of the Advisors Act may subject such persons to the inspection authority of the SEC. For this reason, it is the policy of CapWealth that no associate is permitted to hold himself out as providing personal investment or financial advice to clients or prospective clients except through his/her employment with CapWealth. Failure to make such distinction may subject the associate to the registration provisions of Section 203 of the Advisors Act since he/she may be deemed to be operating as an unRIA.

### *Unregistered Investment Company*

Rule 3a-4 of the Investment Company Act addresses the potential problem where CapWealth may be deemed to be operating as an unregistered investment company where its client accounts are managed on a discretionary basis and each client's portfolio is structured essentially the same as all the other portfolios. Since some of CapWealth's client accounts are managed on a discretionary basis with many accounts holding the same securities, Investment Advisory Representatives must take steps to avoid any potential violations of Rule 3a-4. To lessen the possibility of a violation of the rule, the Investment Advisory Representatives must ensure their client accounts are structured and managed in such a way that:

- The client has all "indicia of ownership" with respect to his/her account such as the right to pledge securities as collateral and the right to vote proxies. In meeting this requirement, it is the policy of CapWealth that all advisory accounts are to be registered / established in the client's name with the respective broker/custodians. At no time will any account be established jointly with CapWealth or any associate of CapWealth without the written prior approval of the Compliance Department.

- The client's financial needs and investment objectives are assessed initially and updated periodically.

- The clients have ready access to their respective Investment Advisory Representative. Investment Advisory Representatives are not required to be available to unscheduled or unannounced visits by clients. However, Investment Advisory Representatives are expected to periodically meet with clients and should generally be available to take client telephone calls on advisory related matters.

Securities transactions are executed in the name of each client and the broker / dealer or other custodian tracks ownership of securities on a client-by-client basis. Although securities transactions for client accounts may be aggregated in execution, it is the policy of CapWealth that securities purchased or sold

in a block order are to be allocated to the respective client accounts as soon as practicable, but in no case later than the close of business on the trade date.

Although CapWealth has Investment Advisory Representatives who exercise discretionary authority over some client accounts, the client has the ability to place limitations and restrictions on securities purchased or sold in his/her accounts, e.g., no tobacco stocks, no defense industry related stocks, etc.  Any such restrictions should be documented on the written agreement.

It is the responsibility of each Investment Advisory Representative's supervisor to ensure that Investment Advisory Representatives establish and manage their clients' accounts so as to comply with all of these conditions.

### *Monitoring by Compliance Department*

To ensure that CapWealth and its associates are not inadvertently engaging in any course of business which could be considered as acting as an unregistered broker / dealer, Investment Advisor or investment company, the Compliance Department will consider the following internal control procedures:

- Based on discussions with advisory personnel, determine that such persons know the basis of what constitutes an unregistered entity.

- Review the manner in which CapWealth conducts its advisory business to reveal the presence of any person or entity that operates as an Investment Advisor but is not registered under the Advisors Act; If CapWealth is affiliated with such person or entity, determine why it is not registered.

- Review transaction record to detect any trades that were placed through any Advisor or individual who is not registered as a broker / dealer or serves as a RR of a registered broker / dealer.

- Review client accounts and order tickets to reveal the existence of interest in "investment pools" or transactions by such pools; if yes, determine if the pool is registered as an investment company.

## 6.5 WHISTLEBLOWING POLICY

The Dodd-Frank Act contains provisions that protect whistleblowers who report fraudulent activities at financial services Advisors.  Section 922 of the Dodd-Frank Wall Street Reform and Consumer Protection Act provides that the SEC shall pay awards to eligible whistleblowers that voluntarily provide the SEC with original information that leads to a successful enforcement action yielding monetary sanctions of over $1 million. The award amount is required to be between 10 percent and 30 percent of the total monetary sanctions collected in the Commission's action or any related action such as in a criminal case.

The Dodd-Frank Act also expressly prohibits retaliation by employers against whistleblowers and provides them with a private cause of action in the event that they are discharged or discriminated against by their employers in violation of the Act.

In accordance with the Act, CapWealth has adopted the following procedures for handling the whistleblower reporting requirements:

All employees shall report evidence of the following to the CCO:

- A material violation of any federal or state securities laws;
- Material breach of fiduciary duty arising under any federal or state laws; and

- A similar material violation of any federal or state law by the Advisor or any of its officers, directors, employees or agents.

Upon receipt of any such reports, the CCO will report the matter to the Chairman. The Chairman shall inform the Advisor's legal counsel of the report and determine whether an investigation is necessary.

If it is determined that an investigation is necessary after considering the report, the CCO shall initiate an investigation, which may be conducted by the CCO or outside legal counsel. The Advisor may also retain additional experts if the CEO deems necessary.

At the conclusion of any such investigation, the CCO shall:

- Recommend that the Advisor implement an appropriate response to the findings of a material violation;

- Inform the Chairman and legal counsel of the results of the investigation and the appropriate remedial measures to be adopted; and

- Inform the whistleblower of the findings of the investigation as well as any remedial actions recommended, if any, to ensure that the activities as corrected.

The President shall monitor the status of the whistleblower to ensure that he or she is not retaliated against due to his or her reporting of the improper activities. The President is responsible for communicating to all of the whistleblowers superiors that they are prohibited in any way from retaliating against the whistleblower for bringing the activities in question to the attention of the CCO.

The CEO shall take all other actions that it deems appropriate in the event that the Advisor fails in any material respect to implement an appropriate response that has been recommended.

# 7. ANTI-MONEY LAUNDERING POLICY

### *Patriot Act*

On October 26, 2001, the President signed the *United and Strengthening of America Act by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001* (PATRIOT Act). Title III of the PATRIOT Act, referred to as the *International Money Laundering Abatement and Anti-Terrorist Financing Act of 2001*, imposes obligations on various "covered financial institutions" under new AML provisions and amendments to the existing BSA requirements.

The PATRIOT Act applies to a broad range of financial institutions, collectively referred to as "covered financial institutions." All covered financial institutions are required to comply with the Act and its sections; however, in certain sections the requirements are such that a covered financial institution's actions and procedures are commensurate with the level of risk of money laundering to that covered financial institution.

Currently, registered investment advisers are not considered a covered financial institution. There are proposed AML Rules for Investment Advisers that would extend AML Program and SAR (SAR) requirements to certain investment advisers. CapWealth has designed an AML program in anticipation of becoming a covered financial institution in the future.

The AML Program should be designed to:

- Develop internal policies, procedures, and controls to deter or identify money laundering activities;
- Designate an AMLCO;

- Conduct ongoing employee training programs; and
- Perform independent audit functions to test programs.
- The Advisor does not currently and will not in the future issue any monetary instruments. The Advisor also does not extend credit to its clients.

An individual or outside consultant will be designated as the independent auditor for purposes of the program to perform an annual audit for testing purposes. The AMLCO shall be responsible for taking any corrective action deemed necessary as a result of the previous year's audit of the Advisor's AML Program.

### AMLCO

The AMLCO is responsible for monitoring compliance with the Advisor's AML Procedures, overseeing AML communication, reviewing the program annually and training for all employees and ensuring the Advisor complies with all recordkeeping requirements. The AMLCO shall also be responsible for the monitoring of section 311 of the USA Patriot act, the BSA and any SEC rulings, for any additions or changes to rules, and any notices regarding sanctioned correspondents, or countries.

The Advisor's AMLCO shall be an associated person of the Advisor that has understanding of the BSA, USA Patriot Act, and the Code of Federal Regulations relating to AML and the BSA.

The AMLCO of the Advisor is Phoebe Venable.

### Policy Statement

The Advisor has developed internal policies, procedures, and controls to ensure compliance with the AML laws. The procedures for AML reflect the Advisor's statement of policy prohibiting money laundering and its efforts to detect, deter, and prevent any such violations. The following is the Advisor's statement of policy:

"CapWealth Advisors, LLC will not tolerate money-laundering activity to transpire through the Advisor or its employees. Advisor management has created and strongly enforces these AML procedures to detect, deter, and punish terrorists in the United States and abroad and to enhance law enforcement investigation. Consequences for not following these procedures may include but would not be limited to:

- Additional training and supervision,
- Possible suspension,
- Termination, and
- Possible criminal and/or regulatory actions.

Based on the severity of the violation of procedure and past history of the employee in deciding which actions to take, the Advisor's AMLCO will determine the appropriate corrective or disciplinary action(s) to take."

Upon hire, all employees will be given a copy of this AMLCP, located within the Policies and Procedures Manual and they must certify through an attestation that they have read, understand his/her role and responsibilities, and will abide by the Advisor's policies, procedures, controls, and training for AML. This will be kept as part of the evidence of the representatives' and other employees' understanding of their roles in the Advisor. This attestation shall happen annually thereafter during the Firm's Annual Compliance Meeting as part of the Advisor's employee training sessions which incorporates AML training.

The AMLCO will be responsible for the preparation, delivery and necessary recordkeeping of the Annual Compliance Meeting. For each meeting, the AMLCO will maintain the following materials for five years:

- Date, time and location of the meeting;

73

- List of all attending associated persons;
- Copies of all material(s) used in connection with the training program; and
- Records of who conducted the training program session(s)

In addition to the Annual Compliance Meeting, each IA is required to complete coursework on an annual basis. The coursework deployed is based on the IA's role and responsibilities and includes AML training. The CCO tracks and logs completion of coursework for each IA. The number of sessions will depend on the AMLCO's perceived need for employee training regarding the Advisor's risks for AML.

### *Third Parties*

There may be certain AML-related functions the Advisor is responsible for handling that it may outsource to another party. At all times, it is the responsibility of the Advisor to ensure that it observes all AML-related rules and regulations. This responsibility does not change when the Advisor uses another party to perform or assist in performing certain of the Advisor's AML-related requirements.

In the event that the Advisor engages an outside party to perform or assist in performing such duties, the AMLCO shall prepare a record addressing the following elements:

- Name of the outside party;
- Primary contact person (as well as name and all contact information) at the outside party;
- Function to be performed by the outside party;
- Date such function(s) shall begin to be performed by the outside party;
- A description of the due diligence efforts (and results) initiated by the Advisor to establish the other party's proficiency at performing such functions/duties;
- A description of the other party's internal processes/procedures related to the performance of such functions;
- A description of the other party's Business Continuity Plan; and
- An acknowledgement of the other party's awareness and understanding of the privacy concerns related to any personal, non-public client information provided to it in connection with such functions.

The Advisor will communicate with and work closely with the custodian to detect money laundering.

### *Customer Due Diligence*

Prior to the enactment of the Money Laundering Abatement Act, many financial institutions already had significant obligations to gather information about their customers in order to, among other things, "know their customers." Current regulations and law require certain covered financial institutions and their associated persons to obtain information from their customers when opening accounts. The "pieces" of information that are required to be gathered may vary depending on both the type of account and "who" or on whose behalf the account is being opened. The following are some important definitions.

**Account –** a formal relationship with customer established to effect transactions in securities. These may include but would not be limited to the following:

- Accounts to purchase or sell;
- Securities loaned and borrowed activity;
- Holding of securities or other assets for safekeeping or as collateral;
- Cash accounts;
- Margin accounts;
- Prime brokerage accounts that consolidate trading done at a number of Advisors;
- Accounts for repurchase and commodity loan transactions;
- Subscription Agreements for investors will be seen as accounts; and
- Corporate financing, mergers and acquisitions customers will be seen as accounts.

Customer – shall refer any person who begins a new relationship with the Advisor.

**Person –** shall include natural persons, corporations, partnerships, trusts or estates, joint stock companies, associations, syndicates, joint ventures, any unincorporated organizations or groups, Indian Tribes, and all other entities cognizable as legal entities.

**U.S. Person –** shall include all legal citizens of the U.S., including non-natural persons such as entities properly organized under the laws of the U.S., including the laws of a State within the U.S.

**Non-U.S. Person –** shall include any natural person or entity not included in the preceding definition of "U.S. Person."

The AMLCO will review all new accounts when received, comparing the data from each account to the above bulleted list of definitions to discern if the account meets the definition of customer account.

### *CIP*

Upon the creation of a new account application the associated person shall follow the customer identification procedures contained in Section 3 Customer Accounts of the Policies and Procedures Manual, depending on the type of account being opened. The documents required by these sections should be kept in the customer files. Additionally, Schwab conducts identity verification on all new clients, further satisfying the requirements of the PATRIOT Act.

### *Inability to Identify Customer*

Through the custodian, transactions are restricted if identify cannot be verified in a new account. In the event that the Advisor is unable to satisfactorily verify the identity of a customer within five (5) business days of opening the account, the Advisor will not maintain the account.

All records related to any accounts rejected or closed by the Advisor due to an inability to confirm the customer's identity shall be retained by the AMLCO in the appropriate customer file.

### *CIP Notification*

At the time of the acceptance of a new account application from a customer, the Advisor shall provide each applicant with an explanation of the Advisor's "Customer Identification Program." Such notice can be an oral notification, a physical document delivered to the client, or an electronic notification.

In the course of performing due diligence a representative shall contact the AMLCO, who shall immediately contact Federal law enforcement by telephone in appropriate situations as described below:

- A customer is listed on the OFAC list;
- A customer's legal or beneficial account owner is listed on the OFAC list;
- A customer attempts to use bribery, coercion, undue influence, or other inappropriate means to induce a representative or principal to open an account or proceed with a suspicious or unlawful activity or transaction; and
- Any other situation that the Advisor reasonably determines requires immediate intervention by the government or other regulatory bodies.

The AMLCO shall immediately contact federal law enforcement and then the custodian in order to freeze the transaction and hold captive the assets until a federal investigation has taken place. The AMLCO shall maintain evidence of all situations in order to satisfy compliance with this procedure as well as all other procedures related to the Advisor's AML procedures. Any such records shall be maintained for the required time period. Records shall be kept in accordance with 31 CFR 103.35(b). The Financial Institutions Hotline is 1-866-556-3974.

Case 3:20-cv-01064   Document 14-1   Filed 02/11/21   Page 75 of 85 PageID #: 127

### *Individual Accounts*

Prior to the enactment of the Act, many covered financial institutions already had significant obligations to gather information about their customers in order to, among other things, "know their customers." These rules require representatives of certain covered financial institutions to obtain information from their customers when opening accounts, including the following:

- Customer's name and physical address;
- Date of birth;
- If the customer was a corporation, partnership, or other legal entity, the names of any persons authorized to transact business on behalf of the entity;
- Customer's employment status; and
- Tax identification number
- In an effort to establish and verify the identity of a customer, the associated person shall perform certain confirmatory activities regarding the information presented by the prospective customer. Such activities may include the following.
- Review a current unexpired photo on a government-issued identification (such as a driver's license, passport, military identification, or other current, valid government identification with a photograph of the customer) and visibly compare the photograph with the customer to confirm that the photograph is that of the customer. Copy and maintain the official number of this document or a photocopy of the document;
- Utilize an information verification process that specifically verifies the information provided by the customer, such as a credit report;
- Inquire and document the conversation about the source of the customer's assets and income so it may be determined whether the inflow and outflow of money and securities is consistent with the customer's financial status; and
- Gain an understanding of what the customer's likely trading patterns will be, so any deviations from the patterns can be detected.
- All identifying information obtained from a customer will be maintained within the client files in addition to any notes of discrepancy found during the verification process and methods used to verify client.

On an ongoing basis, client files will be monitored to determine if any client identification documents have expired or are approaching expiration. A valid identification document must be obtained from the client prior to expiration and maintained within the client files. Prior to expiration, a letter will be sent to the client requesting a current identification document. If the client doesn't submit the required documentation, a second letter will be issued. If the client still does not comply, a copy may be obtained during an onsite meeting with the representative. If noncompliance with this policy continues, the account could be restricted.

Schwab also conducts ongoing monitoring and maintenance of client accounts in regard to name, address and adding features to an account including power of attorney.

### *Business Accounts*

Upon the creation of a business/corporate or institutional new account the associated person shall obtain the customer information that needs to be verified. The associated person shall gather:

- Business name;
- Business address (Cannot be a P.O. Box, or other Non-street Address);
- Tax identification number of the business;
- Legal entity (Sole Proprietor, C-Corporation, S-Corporation, LLC, LP, trust);
- Date of formation;
- Names of persons authorized to transact business on behalf of the entity ("account controller");

- Ownership information for the business (publicly held, number and/or entity of owner of privately-owned business);
- Principal place of business operations  (including: city/town, state/province, country);
- For identify verification purposes for business accounts, the associated person shall:
- Obtain a copy of the business' statement of formation confirming its registration/filing with the state/jurisdiction in which it was domestically formed;
- Obtain a copy of the business' certificate or articles of incorporation/organization or other business structure documentation; and/or
- Obtain a financial statement (which may be certified) regarding the business.

### *Review for known or suspected terrorist connections*

Schwab's OFAC program includes policies and procedures to effectively monitor OFAC's list of SDN and blocked persons. In the event a match is made between a CapWealth client and blocked person, Schwab will restrict transactions and notify the AMLCO. The monitoring of  accounts against OFAC lists is done at the account opening stage and ongoing thereafter.

Instances in which an IA conducts their own due diligence, they will utilize the OFAC Search Tool.
For names that are checked against the OFAC list where the names do not appear on the list, the AMLCO will keep in the new account file, a copy of the screen print indicating that the name did not match information on the SDN list.

Also, accounts that originate from nationals of the non-cooperative countries will be denied.

For the most recent list of non-cooperative countries and territories, visit the following web address: http://www.fatf-gafi.org.  Daily, in the course of performing due diligence, account review, or during the opening of an account a representative shall contact the AMLCO, who shall immediately contact Federal law enforcement by telephone in appropriate situations as described below:

- A customer is listed on the OFAC list;
- A customer's legal or beneficial account owner is listed on the OFAC list;
- A customer attempts to use bribery, coercion, undue influence, or other inappropriate means to induce a representative or principal to open an account or proceed with a suspicious or unlawful activity or transaction; and
- Any other situation that an Advisor reasonably determines requires immediate government intervention.

The AMLCO shall immediately speak with federal law enforcement and then the custodian in order to freeze the account and hold captive the assets until a Federal investigation has taken place.  The AMLCO shall maintain evidence of all situations in order to satisfy compliance with this procedure as well as all other procedures related to the Advisor's AML procedures.  Any such records shall be maintained for the required time period.

### *Future Updates to OFAC List*

In the event the OFAC list is updated, the custodian shall compare the Advisor's customer list against the updated OFAC list. The purpose of such reviews will be to determine if any existing customers have been added to the OFAC list since becoming a customer of the Advisor or since the last time the custodian reviewed the customer list against the updated OFAC list.

The following two sections shall address the steps the DP shall take whether an individual is or is not found to be included on the OFAC list.

### *Names not found on OFAC List*

For names that are checked against the OFAC list where the names do not appear on the list, the AMLCO will keep in the customer file, a copy of the screen print indicating that the name did not match information on the SDN list.

### *Names found on OFAC List*

If a current or prospective client/investor's name appears to be a match with a name located on the OFAC list, the AMLCO shall do the following:

- Contact OFAC to attempt to verify if the match is legitimate;
- If the apparent match is confirmed:
  - The AMLCO shall ensure that a SAR is filed by the custodian;
  - The AMLCO shall notify the FBI and any other appropriate law enforcement official or other regulatory body;
  - Terminate the relationship with the individual within ten (10) days of confirming the match.

The AMLCO shall immediately speak with federal law enforcement and then the custodian in order to freeze the account and hold captive the assets until a Federal investigation has taken place. The AMLCO shall maintain evidence of all situations in order to satisfy compliance with this procedure as well as all other procedures related to the Advisor's AML procedures. Any such records shall be maintained for the required time period.

### *Non-Documentary Forms of ID Verification*

When verification of the customer's identity may not be accomplished through documentary methods, the Advisor must utilize non-documentary methods. The following items describe situations when non-documentary methods may be used:

- An individual is unable to present a current government-issued identification document that bears a photograph or similar safeguard;
- The Advisor is not familiar with the documents presented;
- The account is opened without obtaining documents;
- The customer opens the account without appearing in person at the Advisor; and
- Where the Advisor is otherwise presented with circumstances that increase the risk that the Advisor will be unable to verify the true identity of a customer through documents.

Due to the prevalence of identity theft and because identification documents may be obtained illegally and be fraudulent, Advisors are encouraged to use non-documentary methods even when a customer has provided identification documents.

Non-documentary procedures for verification of ID may permit the associated person to:

- Contact the customer;
- Obtain financial statements;
- Check references with other financial institutions;
- Compare customer identification with fraud and bad check databases or third-party sources such as a credit report from a consumer reporting agency; or
- Search the Internet to verify information such as whether or not the address exists or if the zip code matches the city.

Records related to CIP matters shall be retained for five (5) years after an individual ceases to be a customer of the Advisor.

### *Wire Orders and Transfers*

The receipt of wire transfer orders can be done as an accommodation for existing customers. Upon the receipt of wire instructions from the customer, the associated person shall require the customer to provide the name and address of the transmitter and recipient, the amount of the transmittal order, the identity of the recipient's financial institution, and the account number of the recipient.

Each wire is approved prior to submission to the custodian by the CEO and AMLCO or designee. If the Advisor receives wire instructions via e-mail, the CEO, AMLCO or designee will perform a call back to the client to ensure that the request was not fraudulent. Also, prior to submission to the custodian, the investment advisor representative or designee will approve the request. Once all approvals have been performed the request may be submitted to the custodian. The AMLCO or designee will enter each wire request into the "Wire Log". A copy of each wire request will be attached to the wire log. Any documentation related to the wire request will be included with the wire log. The AMLCO shall review and initial the wire log each day and shall maintain copies for five (5) years.

Fund transmittals or transfers of funds, including wire fund transfers, of $3,000 generally require Advisors to retain and record on the transmittal order, the following information:

- Name and address of the transmitter and recipient;
- The amount of the transmittal order;
- The identity of the recipient's financial institution; and
- The account number of the recipient.

Associated persons are not allowed to accept wire order instructions from entities that are not established customers of the Advisor. With this policy in place, neither the associated persons nor the AMLCO would have to verify the identity of transmitters and recipients. Should it be found that wires were sent between un-verified parties or non-existing customers, the associated person initiating the order shall be subject to disciplinary action.

Before wire instructions are relayed to the custodian, outgoing wire transfer instructions should be reviewed to ensure that:

- Neither intermediary banks nor banks of beneficiaries appear on OFAC's SDN list;
- The funds are not destined for Myanmar (Burma), Nauru, or Nigeria; and
- The beneficiary is not otherwise blocked (to determine whether a beneficiary is blocked, apply the same criteria as those found in the OFAC Customer Assessment Checklist).
- All client fund transfers and transmittals will be handled by the custodian. As such, the Advisor will rely on the custodian to review for and process any necessary reports resulting from wire transfers or other fund transfers that are subject to the BSA.

Schwab follows its own policies and procedures in regard to wires to ensure there are no discrepancies within client accounts. All wires are supervised by a representative to confirm authorization and timely processing. Internal systems review wire requests for risk and fraud. To confirm all transfers are processed timely, incoming ACAT and Non-ACAT transfers are manually reviewed for accuracy. All outgoing ACAT transfers are processed automatically and reviewed for completeness. Outgoing Non-ACAT transfers are reviewed manually for accuracy.

### *Red Flags*

Investment Adviser Representatives, principals, and employees need to look for signs of suspicious activity that suggest money laundering. If anyone suspects "red flags," they should perform additional due diligence before proceeding with the transaction. If the associated person detects a "red flag" or, after conducting additional due diligence, believes there may be a money laundering issue, the associated person should contact the AMLCO immediately. Red flags that signal possible money laundering or terrorist financing include, but are not limited to the following:

**Customers – Insufficient or Suspicious Information**

- Provides unusual or suspicious identification documents that cannot be readily verified.
- Reluctant to provide complete information about nature and purpose of business, prior banking relationships, anticipated account activity, officers and directors or business location.
- Refuses to identify a legitimate source for funds or information is false, misleading or substantially incorrect.
- Background is questionable or differs from expectations based on business activities.
- Customer with no discernible reason for using the Advisor's service.

**Efforts to Avoid Reporting and Recordkeeping**

- Reluctant to provide information needed to file reports or fails to proceed with transaction.
- Tries to persuade an employee not to file required reports or not to maintain required records.
- "Structures" deposits, withdrawals or purchase of monetary instruments below a certain amount to avoid reporting or recordkeeping requirements.
- Unusual concern with the Advisor's compliance with government reporting requirements and Advisor's AML policies.

**Certain Funds Transfer Activities**

- Wire transfers to/from financial secrecy havens or high-risk geographic location without an apparent business reason.
- Many small, incoming wire transfers or deposits made using checks and money orders. Almost immediately withdrawn or wired out in manner inconsistent with customer's business or history. May indicate a Ponzi scheme.
- Wire activity that is unexplained, repetitive, unusually large or shows unusual patterns or with no apparent business purpose.

**Certain Deposits or Dispositions of Physical Certificates**

- Physical certificate is titled differently than the account.
- Physical certificate does not bear a restrictive legend, but based on history of the stock and/or volume of shares trading, it should have such a legend.
- Customer's explanation of how he or she acquired the certificate does not make sense or changes.
- Customer deposits the certificate with a request to journal the shares to multiple accounts, or to sell or otherwise transfer ownership of the shares.

**Certain Securities Transactions**

- Customer engages in prearranged or other non-competitive trading, including wash or cross trades of illiquid securities.
- Two or more accounts trade an illiquid stock suddenly and simultaneously.
- Customer journals securities between unrelated accounts for no apparent business reason.
- Customer has opened multiple accounts with the same beneficial owners or controlling parties for no apparent business reason.
- Customer transactions include a pattern of receiving stock in physical form or the incoming transfer of shares, selling the position and wiring out proceeds.
- Customer's trading patterns suggest that he or she may have inside information.

**Transactions Involving Penny Stock Companies**

- Company has no business, no revenues and no product.
- Company has experienced frequent or continuous changes in its business structure.
- Officers or insiders of the issuer are associated with multiple penny stock issuers.
- Company undergoes frequent material changes in business strategy or its line of business.
- Officers or insiders of the issuer have a history of securities violations.
- Company has not made disclosures in SEC or other regulatory filings.
- Company has been the subject of a prior trading suspension.

**Transactions Involving Insurance Products**

- Cancels an insurance contract and directs funds to a third party.
- Structures withdrawals of funds following deposits of insurance annuity checks signaling an effort to avoid BSA reporting requirements.
- Rapidly withdraws funds shortly after a deposit of a large insurance check when the purpose of the fund withdrawal cannot be determined.
- Cancels annuity products within the free look period which, although could be legitimate, may signal a method of laundering funds if accompanied with other suspicious indicia.
- Opens and closes accounts with one insurance company then reopens a new account shortly thereafter with the same insurance company, each time with new ownership information.
- Purchases an insurance product with no concern for investment objective or performance.
- Purchases an insurance product with unknown or unverifiable sources of funds, such as cash, official checks or sequentially numbered money orders.

**Activity Inconsistent with Business**

- Transactions patterns show a sudden change inconsistent with normal activities.
- Unusual transfers of funds or journal entries among accounts without any apparent business purpose.
- Maintains multiple accounts, or maintains accounts in the names of family members or corporate entities with no apparent business or other purpose.
- Appears to be acting as an agent for an undisclosed principal, but is reluctant to provide information.

**Other Suspicious Customer Activity**

- Unexplained high level of account activity with very low levels of securities transactions.
- Funds deposits for purchase of a long-term investment followed shortly by a request to liquidate the position and transfer the proceeds out of the account.
- Law enforcement subpoenas.
- Large numbers of securities transactions across a number of jurisdictions.
- Buying and selling securities with no purpose or in unusual circumstances (*e.g.*, churning at customer's request).
- Payment by third-party check or money transfer without an apparent connection to the customer.
- Payments to third-party without apparent connection to customer.
- No concern regarding the cost of transactions or fees (*i.e.*, surrender fees, higher than necessary commissions, etc.).

The above-listed money laundering "red flags" are not exhaustive; however, an awareness of the "red flags" will help ensure employees can identify circumstances warranting further due diligence.

### *Independent Testing*

Although RIAs are not required to test AML programs, CapWealth has adopted the policy of independently reviewing the program on an annual basis. The Advisor will undertake testing by hiring an independent party to review the procedures, the employee's compliance with the procedures, and this program. As an alternative to employing an outside party to perform this review, the Advisor may use an internal person to perform this independent review, if necessary.

The test shall at a minimum be structured to review the Advisor's policies and procedures, test its systems and implementation of such, evidence that reports (all required) are prepared and filed when necessary, employee training is adequate and occurs, and that all records are maintained in accordance with the requirements of the BSA. The AMLCO will assess the independent parties review methodology and scope to ensure these items are reviewed thoroughly.

The results of the test shall be reported to senior management. Senior management shall review and comment on the report of the independent reviewer, and create a schedule for implementation of the suggestions. In the written comments the senior management may cross-examine the suggestions made by the independent party. All communication as well as the supporting documentation should be maintained as evidence of contention.

Corrective and disciplinary actions should be taken for suggestions or recommendations made by the independent party concerning individuals. All individuals that have been identified as knowingly not complying with this program or the Advisor's procedures are subject to termination and reporting to the authorities. Other sanctions will stem from an investigation of the individual's negligence and be appropriately handed down. These sanctions could take the form of dollar fines, suspension of trading and sales, and termination. A memorandum of all investigations, findings and disciplinary actions shall be documented and signed by the AMLCO and maintained in the employee file.

### *Record Keeping*

Particular to AML laws and rules, the AMLCO will ensure that all records, reports, working papers and other applicable documents required to be maintained under the BSA, U.S. Patriot Act, and other applicable regulatory rules for a period of time not less than five (5) years following the close of the account.

### *FinCen*

On a quarterly basis, the AMLCO shall review FinCEN's web site for indications that the following items/elements have been designated as primary money laundering concerns as well as any special measures that have been imposed in relation to such matters:

- Foreign jurisdictions
- Institutions
- Classes of transactions
- Types of accounts
- Areas to be reviewed by the AMLCO may include, but would not be limited to, the following:
- Section 311 – Special Measures;
- Advisories/Bulletins/Rulings/Fact Sheets; and
- Federal Register Notices.

As a supplement to this periodic review, the AMLCO may sign up to receive automatic email notifications from FinCEN regarding all of the above-named areas of FinCEN's web site. The DP shall keep a copy of each such email.



## <u>SENIOR MANAGEMENT APPROVAL</u>

These written policies and procedures were approved by CapWealth's Chief Compliance Officer. These procedures are effective from the date approved until the date of their authorized revision, update or replacement.

**Date of WSP approval:** _____

**Name and title printed:** _____

**Signature:** _____

**Date signed:** _____

**Note:  To be filed with the record of the Advisor's Policies and Procedures Manual and all**

**subsequent revisions.**

Case 3:20-cv-01064   Document 14-1   Filed 02/11/21   Page 83 of 85 PageID #: 135



## <u>AMLCP SENIOR MANAGEMENT APPROVAL</u>

This AMLCP was approved by CapWealth's Chief Compliance Officer. These procedures are effective from the date approved until the date of their authorized revision, update or replacement.

**Date of AMLCP approval**: _____

**Name and title printed**: _____

**Signature**: _____

**Date signed**: _____

**Note:  To be filed with the record of the Advisor's AMLCP and all subsequent revisions.**

Case 3:20-cv-01064   Document 14-1   Filed 02/11/21   Page 84 of 85 PageID #: 136



# ATTESTATION OF RECEIPT AND REVIEW OF THE POLICIES AND PROCEDURES MANUAL INCLUDING THE AMLCP

I hereby attest that I have received and reviewed the Policies and Procedures Manual including the Advisor's Anti-Money Laundering Program from CapWealth Advisors, LLC.

I declare that the above statement is true and accurate to the best of my knowledge.

**Name:** _____

**Signature:** _____

**Date:** _____

Case 3:20-cv-01064   Document 14-1   Filed 02/11/21   Page 85 of 85 PageID #: 137