

By the Office of Compliance Inspections and Examinations[*]  　　　　　　July 11, 2018

## Compliance Issues Related to Best Execution by Investment Advisers

**In this Alert:**

*Most Frequent Best Execution Issues Cited in Adviser Exams:*

- Not performing best execution review;
- Not considering relevant factors during best execution review;
- Not seeking comparisons from other brokers;
- Disclosure issues;
- Soft dollar issues; and
- Weak policies and procedures.

### I. Introduction

The Office of Compliance Inspections and Examinations ("OCIE") is issuing this risk alert to provide investment advisers ("advisers"), investors and other market participants with information concerning many of the most common deficiencies that the staff has cited in recent examinations of advisers' compliance with their best execution obligations under the Investment Advisers Act of 1940 (the "Advisers Act").[1]

The Advisers Act establishes a federal fiduciary standard for investment advisers.[2] As a fiduciary, when an adviser has the responsibility to select broker-dealers and execute client trades, the adviser has an obligation to seek to obtain "best execution" of client transactions, taking into consideration the circumstances of the particular transaction. An adviser must execute securities transactions for clients in such a manner that the client's total costs or proceeds in each transaction are the most favorable under the circumstances.[3] In directing brokerage, an adviser should consider the full range and quality of a broker-dealer's services including, among other things, the value of research provided as well as execution capability, commission rate, financial responsibility, and responsiveness to the adviser. As the Commission has stated, "the determinative factor [in an adviser's best execution analysis] is not the lowest possible commission cost but whether the transaction represents the best qualitative execution for the

---

[*] The views expressed herein are those of the staff of OCIE. The Securities and Exchange Commission (the "SEC" or the "Commission") has expressed no view on the contents of this Risk Alert. This document was prepared by SEC staff and is not legal advice.

[1] This Risk Alert reflects issues identified in deficiency letters from over 1,500 adviser examinations.

[2] *See e.g., Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 17 (1979) ("[Section] 206 establishes federal fiduciary standards to govern the conduct of investment advisers." (quotation marks omitted)); *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 191 (1963) ("The Investment Advisers Act of 1940 thus reflects a congressional recognition of the delicate fiduciary nature of an investment advisory relationship." (quotation marks omitted)).

[3] *Interpretive Release Concerning the Scope of Section 28(e) of the Securities Exchange Act of 1934 and Related Matters*, Exchange Act Rel. No. 23170 (Apr. 28, 1986); *see also Commission Guidance Regarding Client Commission Practices under Section 28(e) of the Securities Exchange Act of 1934*, Exchange Act Rel. No. 54165 (July 18, 2006).

managed account."[4] Advisers should therefore periodically and systematically evaluate the execution quality of broker-dealers executing their clients' transactions.[5]

An adviser's assessment of best execution may also be impacted by the adviser's receipt of brokerage and research services ("soft dollar arrangements"). Under Section 28(e) of the Securities Exchange Act of 1934 (the "Exchange Act"), an adviser may pay more than the lowest commission rate in soft dollar arrangements without breaching its fiduciary obligation, provided that certain specified conditions are met. Where a product or service obtained with client commissions also serves other functions that are not related to the making of investment decisions ("mixed use"), an adviser should make a reasonable allocation of the costs of the product or service according to its use and keep adequate books and records concerning such allocation. Advisers must disclose soft dollar arrangements and must provide more detailed disclosure when the products or services they receive do not qualify for Section 28(e)'s safe harbor.[6]

## II. Compliance Issues Relating to Best Execution[7]

Below are examples of many of the most common deficiencies associated with advisers' best execution obligations identified by OCIE staff.[8]

- *Not performing best execution reviews.* The staff observed advisers that could not demonstrate that they periodically and systematically evaluated the execution performance of broker-dealers used to execute client transactions. For example, the staff observed advisers that did not conduct an evaluation of best execution when selecting a broker-dealer to execute transactions or were unable to demonstrate, through documentation or otherwise, that they performed such an evaluation.

- *Not considering materially relevant factors during best execution reviews.* The staff observed advisers that did not consider the full range and quality of a broker-dealer's services in directing brokerage. For example, the staff observed:

    o Advisers that, as part of their best execution reviews, did not evaluate any qualitative factors relating to a broker-dealer including, among other things, the broker-dealer's execution capability, financial responsibility, and responsiveness to the adviser.

    o Advisers that, as part of their best execution reviews, did not solicit and review input from the adviser's traders and portfolio managers.

---

[4] *Id.*

[5] *See, e.g.*, *id.*; *Compliance Programs of Investment Companies and Investment Advisers*, Advisers Act Rel. No. IA-2204 (Dec. 17, 2003).

[6] See Part 2A of Form ADV, Item 12.A.1.

[7] This Risk Alert does not address all types of deficiencies related to best execution.

[8] The SEC has brought enforcement actions in this area. *See, e.g.*, *In the Matter of KMS Fin. Servs., Inc.*, Advisers Act Rel. No. 4730 (July 19, 2017) (settled order) (finding a violation of Section 206(2) of the Advisers Act when the adviser failed to address introducing, clearing, and execution brokerage costs charged to advisory clients as part of the adviser's overall best execution analysis).

- *Not seeking comparisons from other broker-dealers.* The staff observed advisers that utilized certain broker-dealers without seeking out or considering the quality and costs of services available from other broker-dealers. For example, the staff observed:

    o   Advisers that utilized a single broker-dealer for all clients without seeking comparisons from competing broker-dealers initially and/or on an ongoing basis to assess their chosen broker-dealer's execution performance.

    o   Advisers that utilized a single broker-dealer based solely on cursory reviews of the broker-dealer's policies and prices.

    o   Advisers that utilized a broker-dealer based solely on that broker-dealer's brief summary of its services without seeking comparisons from other broker-dealers.

- *Not fully disclosing best execution practices.* The staff observed advisers that did not provide full disclosure of best execution practices. For example, the staff observed advisers that did not disclose that certain types of client accounts may trade the same securities after other client accounts and the potential impact of this practice on execution prices. In addition, the staff observed advisers that, contrary to statements in their brochures, did not review trades to ensure that prices obtained fell within an acceptable range.

- *Not disclosing soft dollar arrangements.* The staff observed advisers that did not appear to provide full and fair disclosure in Form ADV of their soft dollar arrangements.[9] For example, the staff observed:

    o   Advisers that did not appear to adequately disclose the use of soft dollar arrangements.

    o   Advisers that did not disclose that certain clients may bear more of the cost of soft dollar arrangements than other clients.[10]

    o   Advisers that did not appear to provide adequate or accurate disclosure regarding products and services acquired with soft dollars that did not qualify as eligible brokerage and research services under the Section 28(e) safe harbor."[11]

- *Not properly administering mixed use allocations.* The staff observed deficiencies related to mixed use allocations. For example, the staff observed advisers that did not appear to make a reasonable allocation of the cost of a mixed use product or service according to its use or did not produce support, through documentation or otherwise, of the rationale for mixed use allocations.

---

[9]   *See* Part 2A of Form ADV, Item 12.A.1 ("Research and Other Soft Dollar Benefits. If you receive research or other products or services other than execution from a broker-dealer or a third party in connection with client securities transactions ("soft dollar benefits"), disclose your practices and discuss the conflicts of interest they create.").

[10]  *See* Part 2A of Form ADV, Item 12.A.1.d ("Disclose whether you use soft dollar benefits to service all of your clients' accounts or only those that paid for the benefits. Disclose whether you seek to allocate soft dollar benefits to client accounts proportionately to the soft dollar credits the accounts generate.").

[11]  *See* Part 1A of Form ADV, Item 8.G.(1)-(2).

- *Inadequate policies and procedures relating to best execution.* The staff observed advisers that appeared to have inadequate compliance policies and procedures or internal controls regarding best execution. For example, the staff observed:

  o Advisers that did not have any policies relating to best execution.

  o Advisers with insufficient internal controls because the advisers failed to monitor broker-dealer execution performance.

  o Advisers with policies that did not take into account the current business of the adviser, including the type of securities traded by the adviser.

- *Not following best execution policies and procedures.* The staff observed advisers that did not follow their policies and procedures regarding best execution. For example, the staff observed:

  o Advisers that did not follow their own policies regarding best execution review, including seeking comparisons from competing broker-dealers to test for pricing and execution.

  o Advisers that did not allocate soft dollar expenses in accordance with their policies.

  o Advisers that did not follow their internal policies regarding the ongoing monitoring of execution price, research, and responsiveness of their broker-dealers.

### III. Conclusion

The examinations within the scope of this review resulted in a range of actions. In response to the staff's observations, some advisers elected to amend their disclosures regarding best execution or soft dollar arrangements, revise their compliance policies and procedures, or otherwise change their practices regarding best execution or soft dollar arrangements.

In sharing the information in this Risk Alert, OCIE encourages advisers to reflect upon their own practices, policies, and procedures in these areas and to promote improvements in adviser compliance programs.

*This Risk Alert is intended to highlight for firms risks and issues that OCIE staff has identified. In addition, this Risk Alert describes risks that firms may consider to (i) assess their supervisory, compliance, and/or other risk management systems related to these risks, and (ii) make any changes, as may be appropriate, to address or strengthen such systems. Other risks besides those described in this Risk Alert may be appropriate to consider, and some issues discussed in this Risk Alert may not be relevant to a particular firm's business. The adequacy of supervisory, compliance and other risk management systems can be determined only with reference to the profile of each specific firm and other facts and circumstances.*