# Appendix 2

**Before the Enforcement Division of the Securities and Exchange Commission**

| |
|---|
| **In the Matter of CapWealth Advisors, LLC** |

SEC File No. A-03907-A

EXPERT REPORT OF JONATHAN R. MACEY

June 13, 2020

# TABLE OF CONTENTS

I.      Introduction ........................................................................................................... 1

        A.      Qualifications .......................................................................................... 1

        B.      Scope of Engagement ............................................................................. 2

        C.      Information Considered .......................................................................... 3

II.     Summary of Opinions ........................................................................................ 3

III.    Background Facts and Context ........................................................................ 4

IV.     Support of Opinions ........................................................................................... 8

        A.      Support for my Opinion One that any alleged failure to disclose was
                not material.  The record indicates, and for purposes of this Report I
                have assumed, that CapWealth's investment advisors generally selected
                the share class for its clients that offered the best overall terms of
                execution available.   CapWealth's management practices as they
                related to fees deprived investment advisors of any incentive to guide
                clients towards high fee share classes because CapWealth discounted
                its standard advisory fee (or provided other discounts) to off-set any
                12b1 fee imposed by a fund that was imposed, such as in cases where
                only a share class that paid a 12b-1 fee was available to a particular
                investor.   This fact differentiates CapWealth from other advisors who
                may have faced these sorts of conflicts because such other advisers had
                a financial incentive to select a higher cost share class that paid a 12b-1
                fee.  This substantive difference makes disclosure immaterial in this
                context. ................................................................................................... 8

        B.      Support for Opinion Two that the SEC has long taken a practical,
                holistic approach to disclosure.  Here the appropriate disclosures were
                made in a variety of ways (prospectus, confirmation and in in-person
                conversations with clients).  Any decision to insist that disclosure is
                only proper and appropriate if it is contained in Form ADV Part 2A is
                inconsistent with long-standing SEC disclosure policies that provide
                significant benefits to investors. ........................................................... 9

        C.      Support for Opinion Three that the duty of best execution requires that
                customers receive the most favorable terms commercially available for
                their trades.  Here the record indicates that CapWealth customers who
                paid 12b-1 fees received best execution of their trades. ....................... 13

        D.      Support for Opinion Four that the Record shows that CapWealth's
                corporate governance and culture was directed at instilling a culture of
                compliance in the firm.  This indicates that a lack of scienter or
                intention to engage in wrongdoing .................................................... 15

V.      Conclusion ........................................................................................................ 15

Case 3:20-cv-01064   Document 15-3   Filed 02/11/21   Page 2 of 47 PageID #: 232

# I. Introduction

## A. Qualifications

1.     I am the Sam Harris Professor of Corporate Law, Corporate Finance, and Securities Law at Yale Law School, and a Professor at the Yale School of Management. I am also a member of the Provost's Standing Advisory & Appointments Committee for the Yale School of Management, and Chair of the Yale University Advisory Committee on Investor Responsibility. I serve on the Executive Committee of the Yale Law School Center for the Study of Corporate Law. I am also a member of the European Corporate Governance Institute. I serve on the Members Consultative Group for the American Law Institute's Restatement of the Law/Corporate Governance Project. I teach courses on Business Organizations, Corporate Governance, Corporate Finance, and Banking and Financial Institutions Regulations. Additionally, I have authored more than 100 articles and more than half a dozen books on topics including corporate governance, the regulation of the financial services industry, and the economic role of reputation in corporate finance and investment banking.[1]

2.     Prior to joining the Yale faculty in 2004, I taught at Cornell University as the J. DuPratt White Professor of Law from 1991 to 2004. I was also a tenured law professor at the University of Chicago from 1990 to 1991 and Cornell University from 1987 to 1990. I have been a visiting professor at several universities including Harvard, the Stockholm School of

---

[1] These publications include, in addition to articles focused on the law and economics of best execution and on conflicts of interest cited herein, "Macey on Corporation Laws" (two volume treatise) (originally published in 1998, updated annually, Wolters Kluwer Law & Business, 2019); "Cases and Materials on Corporations Including Partnerships and Limited Liability Companies" (Thomson*West, thirteenth edition, 2017) (with Robert Hamilton and Douglas Moll); "The Law of Banking and Financial Institutions" (Aspen Law & Business, sixth edition, 2017) (with Richard Cornell and Geoffrey P. Miller); "The Death of Corporate Reputation: How Integrity Has Been Destroyed on Wall Street," (The Financial Times Press, 2013); "Corporate Governance: Promises Kept, Promises Broken" (Princeton University Press, 2008); "Classics in Corporate Law and Economics," Jonathan Macey, editor (Edward Elgar Publishing, 2008); "Iconic Cases in Corporate Law," Jonathan Macey, editor (Thomson*West, 2008); and "The Value of Reputation in Corporate Finance and Investment Banking (and the Related Roles of Regulation and Market Efficiency)," 22 Journal of Applied Corporate Finance, 18-29 (2010).

Economics, the University of Tokyo, and the University of Virginia. Outside of academics, I serve as a member of the Economic Advisory Board of the Financial Industry Regulatory Authority (FINRA).

3.      I have more than 30 years of experience in the research and study of corporate governance, financial institutions, and securities regulation, including disclosure policy, conflicts of interest and the duty of best execution from the perspective of economic and public policy. My expertise also includes knowledge of the policies underlying the regulation of mutual funds. In the course of my research, I have also extensively reviewed corporate filings, including SEC filings by mutual funds and public companies, and corporate governance documents. My complete curriculum vitae, which includes a list of my publications, is attached as **Appendix A** to this Report.

4.      I am being compensated at my current standard rate of $1,250 per hour for my time and reimbursed for my out-of-pocket expenses in connection with my review of the record, preparation of this Report, and provision of testimony. My compensation is not dependent on the content of my Report or testimony or the outcome of this investigation or any subsequent litigation. My prior testimony over the past four years is provided in **Appendix B**.

**B.      Scope of Engagement**

5.      I have been retained by Leader, Bulso & Nolan, PLC, and Cahill, Gordon Reindel LLP counsel for the CapWealth Advisors LLC parties,[2] ("CapWealth Advisors") to analyze the imposition and disclosure of certain 12b-1 fees paid by CapWealth clients from a public policy and economic perspective. Specifically, I analyze the materiality of any alleged non-disclosure

---

[2] The CapWealth Advisors LLC parties include CapWealth Advisors, LLC, Timothy J. Pagliara, and Timothy R. Murphy.

of such fees from the perspective of ordinary and customary investment advisor behavior. I also analyze the appropriateness and quality of the disclosures that were made. Finally, I analyze the trades involving 12b-1 fees from the point of view of investment advisers' duty of best execution of customers' orders, to the extent that such a duty applies in this context.[3]

### C. Information Considered

6. In forming my opinions, I have drawn upon my education, experience, and knowledge acquired through decades of teaching, research and writing in the economics and public policy of disclosure, best execution of trading orders, corporate governance, economics, law and economics, finance, and other areas of expertise.

7. I reserve the right to modify or supplement the opinions expressed in this Report, including in response to the review of new evidence, in response to opinions or arguments by any expert that the Commission may retain, and in response to any ruling by a Court or administrative judge.

## II. Summary of Opinions

8. Below are summaries of the four (4) opinions that I have formulated in this matter. I hold these opinions to a high degree of certainty. I discuss and provide support for these opinions in the sections that follow.

- Any alleged failure to disclose was not material. The record indicates, and for purposes of this Report I have assumed, that CapWealth's investment advisors generally selected the mutual fund share class for its clients that offered the best overall terms of execution available. CapWealth's management and governance practices as they related to fees deprived investment advisors of any incentive to guide clients towards higher fee share classes because CapWealth discounted its standard advisory fee (or provided other

---

[3] See Part IV. C., *infra* for a discussion of the interaction of Rule 22c-1's forward pricing obligation with the duty of best execution.

discounts) to off-set any 12b-1 fee imposed by a fund, such as in cases where only a share class that paid a 12b-1 fee was available to a particular investor, or when paying a 12b-1 fees and deducting the fee from the standard advisory fee was best for the client for the tax reasons discussed below.[4]  This fact differentiates CapWealth from other advisors who may have faced conflicts because they had a financial incentive to select a higher cost share class that paid a 12b-1 fee.  This substantive difference makes disclosure immaterial.

- The SEC has long taken a practical, sensible, holistic approach to disclosure.  Here appropriate disclosures of 12b-1 fees were made in a variety of ways, including by prospectus, confirmation and actual in-person conversations with clients.  Any decision to insist that disclosure is only proper and appropriate if it is contained in Form ADV Part 2A is inconsistent with long-standing SEC disclosure policies that provide significant benefits to investors.

- To the extent that the duty of best execution applies in this context, it requires brokers and investment advisers to provide their customers the most favorable terms commercially available for their trades.  Here the record indicates that CapWealth customers who paid 12b-1 fees received best execution of their trades, even if the definition of best execution is expanded to include the post-execution fees for expenses imposed by a mutual fund.

- The Record shows that CapWealth's corporate governance was directed at instilling a culture of compliance in the firm.  This culture of compliance, which included hiring expert advisors to guide the 12b-1 disclosure process, indicates that a lack of scienter or intention to engage in wrongdoing

## III.  Background Facts and Context

9.  Recently, the Securities and Exchange Commission ("Commission") has filed numerous actions in cases in which an investment adviser failed to make certain disclosures relating to its selection of mutual fund share classes that paid the adviser (as a dually registered broker-dealer) or its related entities or individuals a fee pursuant to Rule 12b-1 of the Investment

---

[4] See *infra* footnote 42.  The term "12b-1 fee" is used to describe the fees charged to customers for the costs of marketing, distributing and account servicing.  This fee includes the fees paid to compensate brokers who sell fund shares. FINRA rules dictate that 12b-1 fees cannot exceed 1.00%. 12b-1 payments are mainly used "to compensate sales professionals for advice and assistance given to buyers of fund shares." John D. Rea & Brian K. Reid, *Trends in the Ownership Cost of Equity Mutual Funds,* INV. CO. INST. PERSPECTIVE, Nov. 1998, at 1. Such payments have been justified on the ground that they are assessed "not only to encourage growth, but also to stimulate improved shareholder service."  Krinsk v. Fund Asset Mgmt., Inc., 715 F. Supp. 472, 490 n.37 (S.D.N.Y. 1988).

4

Company Act of 1940 ("12b-1" fee) when a lower-cost share class for the same fund was available to clients.[5]

10.     The levying of 12b-1 fees began in the 1980s when the SEC formally recognized that mutual funds could pass distribution costs directly to shareholders.[6]  While such fees are controversial in some circles,[7] properly used, they provide a valuable mechanism for incentivizing brokers and investment advisers to educate unsophisticated clients about the benefits of mutual funds and diversified equity investing.  Such fees provide an avenue by which certain clients appropriately can add equity investments to asset portfolios that might otherwise consist entirely of bank accounts of various kinds. Put simply, the fees associated with mutual funds are socially desirable and efficient when properly used because they allow the financial system to achieve the ultimate goal of mutual funds, which is to "allow those with relatively little wealth, education or information to invest in securities."[8]

---

[5]  February 12, 2018, United States Securities and Exchange Commission, Announcement, "Share Class Selective Disclosure Initiative," https://www.sec.gov/enforce/announcement/scsd-initiative (hereinafter SCSDI); See also, SEC Press Release, 2018-15, "SEC Launches Share Class Selection Disclosure Initiative to Encourage Self-Reporting and the Prompt Return of Funds to Investors," https://www.sec.gov/news/press-release/2018-15

[6] 17 C.F.R. § 270.12b-1 (1999).  Shortly after the adoption of Rule 12b-1 thousands of mutual funds adopted rule 12b-l plans. Joel H. Goldberg & Gregory N. Bressler, Revisiting Rule 12b-1 Under the Investment Company Act, 31 SEC. & COMMODITIES REG. REV. 147 (1998).  Rule 12b-1 fees provide a means by which pricing and distribution could be reordered through the imposition of conditional deferred sales loads.  Terry R. Glenn et al., *Distribution in Mid-Decade: Coping with Success and Other Problems, in* INVESTMENT COMPANIES 1986, at 84  (PLI Corp. Law Practice Course, Handbook Series No. B4-6746m 1986).

[7] John C. Bogle, Mutual Fund Industry Practices and their Effect on Individual Investors, Statement before the U.S. House of Representatives, Subcommittee on Capital Markets, Insurance, and Government Sponsored Enterprises of the Committee on Financial Services (Mar. 12, 2003).

[8] John Coates and Glenn Hubbard, Competition in the Mutual Fund Industry: Evidence and Implications for Policy, at 46 http://www.law.harvard.edu/programs/olin_center/papers/pdf/Coates_592.pdf .  In addition to competing on price, mutual funds also compete on the basis of equity mutual funds compete on non-price factors such as service quality and scope, reputation of fund managers, breadth of fund complex, and, most importantly, performance returns to shareholders. U.S. General Accounting Office, Mutual Fund Fees: Additional Disclosure Could Encourage Price Competition, GAO/GGD-00-126 (Washington, D.C.: June 7, 2000).

5

11.     On February 12, 2018, the Commission announced its Share Class Selective Disclosure Initiative (SCSD Initiative).[9]  In the SCSD Initiative, the Division of Enforcement announced that it would recommend that the Commission accept favorable settlement terms for investment advisers that self-report to the Division possible securities law violations relating to their failure to make necessary disclosures concerning mutual fund share class selection.[10]

12.     The SCSD Initiative targets Investment advisers "that did not explicitly disclose in applicable Forms ADV (i.e., brochure(s) and brochure supplements) the conflict of interest associated with the 12b-1 fees the firm, its affiliates, or its supervised persons received for investing advisory clients in a fund's 12b-1 fee paying share class when a lower-cost share class was available for the same fund."[11]   In announcing its SCSD Initiative, the Division of Enforcement recommended that investment advisors who had not disclosed the relevant information related to 12b-1 fees "should consider self-reporting to the Division," because in doing so they would be able to "take advantage of the SCSD Initiative, pursuant to which the staff might recommend that the Commission accept favorable settlement terms for self-reporting investment advisers."[12]

13.     It appears clear that there are two public policy concerns at the heart of the Commission's efforts related to mutual fund class selection and disclosures.  These concerns relate to the obligations to disclose conflicts of interest, and the obligation to seek best execution of customer orders that stem from the fiduciary duties of care and loyalty that investment advisers

---

[9]     United States Securities & Exchange Commission, Share Class Selection Disclosure Initiative, https://www.sec.gov/enforce/announcement/scsd-initiative.
[10] *Id*.
[11] *Id*.
[12] *Id*

6

owe to their clients.[13]   As such it seems clear that investment advisers, such as those at CapWealth, that have eliminated conflicts of interest by rendering such conflicts of interest immaterial by lowering its standard (one (1) percent) advisory fee to offset entirely any 12b-1 fees paid by customers the conflicts of interest have been eliminated and best execution has been achieved.

14.     From a governance perspective, the most fundamental insight is that when dealing with conflicts of interest, fiduciaries' first goal should always be to work to avoid such conflicts in the first place whenever possible.  It is only if conflicts of interest cannot be avoided that they have to be ameliorated or mitigated through disclosure or other means.[14]

15.     In the case of CapWealth, the conflicts of interest posed by the sale of mutual funds with multiple classes were avoided altogether because CapWealth's investment advisers, unlike all of the other investment advisers whose disclosures have been targeted in this enforcement initiative, had no financial incentive to select a higher cost share class that paid a 12b-1 fee, since those very fees were returned to the customer in the form of a reduction in the standard (one percent) advisory fee charged to the customers paying the 12b-1 fees.

---

[13] Jaqueline M. Hummel,  "Why the SEC is Obsessed with Mutual Fund Share Class Selection and Disclosure (and why you should be too)," April 30, 2019, https://www.hardincompliance.com/wp-content/uploads/2018/05/share-class-selection-process-4-30-2018.pdf  (accessed June 2, 2020).

[14] Thomas L. Carson, Conflicts of Interest, 13 J. BUS. ETHICS 387, 387 (in ordinary cases it is wrong, all things considered, to allow- an avoidable conflict of interest to occur).  See also id,  at 392 ("no moral disapprobation ought to attach to agents in unavoidable conflicts of interest."); Jonathan R. Macey and Geoffrey Miller, An Economic Analysis of Conflict of Interest Regulation, 82 IOWA L. REV. 966 (1997); John Boatright, "Conflict of Interest: An Agency Analysis," *in Ethics and Agency Theory,* Norman Bowie and R. Edward Freeman, eds. (Oxford, 1992), pp. 187-203.

7

## IV.  Support of Opinions

    **A.**    **Support for my Opinion One that any alleged failure to disclose was not material.  The record indicates, and for purposes of this Report I have assumed, that CapWealth's investment advisors generally selected the share class for its clients that offered the best overall terms of execution available. CapWealth's management practices as they related to fees deprived investment advisors of any incentive to guide clients towards high fee share classes because CapWealth discounted its standard advisory fee (or provided other discounts) to off-set any 12b1 fee imposed by a fund, such as in cases where only a share class that paid a 12b-1 fee was available to a particular investor or where paying a 12b-1 fee and offsetting that fee by a reduction in the investment advisory fee was the most efficient cost structure for the client. This fact differentiates CapWealth from other advisors who may have faced these sorts of conflicts because such other advisers had a financial incentive to select a higher cost share class that paid a 12b-1 fee.  This substantive difference makes disclosure immaterial in this context.**

16.    Any 12b-1 fees paid by CapWealth customers were offset by reductions in the standard advisory fees charged by CapWealth.[15]  As such, the net effect on a customer of incurring 12b-1 fees, when accompanied by an offsetting deduction in the standard advisory fee, was zero.

17.    Thus, due to this offsetting of fees, the particular 12b-1 fees paid by CapWealth clients were immaterial because an ordinarily prudent, rational investor would not consider such fees to be important or even relevant to his or her investment decision.

18.    In the case of CapWealth, the conflicts of interest that ordinarily exist when 12b-1 fees are collected by advisers were avoided altogether because CapWealth's investment advisers, unlike other investment advisers whose disclosures have been targeted in this enforcement initiative, had no financial incentive to select a higher cost share class that paid a

---

[15] Phoebe Venable, Deposition Before the U.S. Securities & Exchange Commission, April 30, 2020, at 118, 132, (when a fund with 12b-1 fees was selected, "we had made concessions on the fee for the client to take into consideration that we were receiving the 12b-1 fee."). *See also Id*. at page 141 (same).

12b-1 fee, since those very fees were returned to the customer in the form of a reduction in the advisory fees charged to the customers paying the 12b-1 fees.

19.     Ms. Phoebe Venable confirmed that when clients were placed in a share class that paid a 12b-1 fee, CapWealth's 1% advisory fee was correspondingly reduced.  As established in her deposition, her receipt of 12b-1 fees "was fully disclosed to the clients.  The clients knew that it was in our --that it was part of our business model, that it helped us provide small investors and small accounts with a very cost effective way to access our services and we disclosed it."

20.     Thus, CapWealth, in order to offset the 12b-1 fees, would provide clients paying such fees with an economic benefit in the form of a corresponding reduction in other fees that they were paying.  Such fees would, as Ms. Venable testified "get deducted out of the account as opposed to paid to us from the mutual fund."[16]

**B.      Support for Opinion Two that the SEC has long taken a practical, holistic approach to disclosure.  Here the appropriate disclosures were made in a variety of ways (prospectus, confirmation and in in-person conversations with clients).  Any decision to insist that disclosure is only proper and appropriate if it is contained in Form ADV Part 2A is inconsistent with long-standing SEC disclosure policies that provide significant benefits to investors.**

21.     Mutual funds typically disclose their corporate governance structures and business models and pricing strategies in various filings, including pre-purchase sales materials (brochures), prospectuses, registration statements, annual reports, proxy statements and post-sale confirmations.

22.     The two fundamental elements of the SEC disclosure framework are: (1) all material information must be disclosed; (2) when a particular disclosure is made, sufficient

---

[16] *Id*. at 117-118; 140-141

additional disclosures must be made, if necessary, in order to make such particular disclosures not misleading.

23.    Here the record indicates that the 12b-1 fees were disclosed.  For example, as Timothy Pagliara, a registered representative and the principal owner of CapWealth, testified at his deposition before the Securities and Exchange Commission, he would explain to clients any receipt of 12b-1 fees verbally and how such fees flowed to him in his role as a registered representative or as an owner of CapWealth.[17]

24.    Similarly, Phoebe Venable testified that she discussed with her clients who were investing in a mutual fund that had 12b-1 fees, the nature of those fees verbally.  These explanations included a discussion that the 12b-1 fees factored into negotiating a discount on advisory fees. Ms. Venable also explained to her clients that many of the funds in which they were invested had lower cost share classes that did not have 12b-1 fees for which they were eligible.[18]  When a specific mutual fund share class was selected Ms. Venable also informed her clients of whether they were eligible for lower cost share classes of the same fund.[19]

25.    These disclosures, of course, are the very same ones that the SEC claims should have been made, but in the Form ADV, rather than in actual conversation.

26.    Importantly, there are qualitative differences in disclosures, both in terms of the format of such disclosures and in terms of the substance of such disclosures.  Specifically, disclosures written with significant jargon or tucked away in a footnote likely will not have the

---

[17] Timothy Pagliara, Deposition Before the U.S. Securities & Exchange Commission, May 1, 2020, at 107.
[18] Venable Deposition, *supra*, at 139-141.
[19] *Id*.

10

same force and effect as a disclosures that are written in plain English and featured prominently in disclosure forms, or are carefully explained in-person to a client.

27.     Here, in my opinion, the disclosures made here were of the highest quality because they were delivered orally, in an interactive format.

28.     From a public policy point of view, it would be misguided to pursue enforcement policies that discourage or diminish the value and importance of in-person disclosures such as those that occurred here.

29.     It is well-settled that disclosures can be accomplished in a variety of ways.  It does not make sense from a public policy point of view to discourage or diminish one method of disclosure such as oral disclosures, particularly where the alternative disclosure approach likely provides retail clients with more and better information as well as with the opportunity for asking questions and for other interaction.

30.     It is well established that investors typically do not read the disclosure documents such as Annual Reports, proxy statements, mutual fund prospectuses, or mutual fund shareholder reports, with which they are supplied by brokers, investment advisers and others.[20]  Moreover, it also is widely understood that the primary and dominant source of information for individual investors are communications from their investment adviser or broker.[21]  Following investment advisers and brokers as sources of information were the internet, friends and family, magazines, newspapers, with prospectuses ranking barely above television, and only five percent of respondents reporting prospectuses as their main source of information about investments.[22]

---

[20] Abt SRBI, Mandatory Disclosure Documents Telephone Survey, https://www.sec.gov/pdf/disclosuredocs.pdf
[21] *Id*. at page 4, Figure 3.
[22] *Id*.

11

31.     Specifically with regard to mutual fund prospectuses, an empirical research study using survey methodology specifically directed at mutual fund prospectuses, reported that nearly most investors who received mutual fund prospectuses either "rarely (28%)," "very rarely" (14%),  or "never" (12%) read them.[23]

32.     In other words, the oral communication of 12b-1 fees by investment advisers that was done by CapWealth was a *superior* mode of disclosure to the alternative, written disclosure that the SEC advocates in its recent SCSD enforcement initiative. By orally communicating the fee information, the advisers made sure that the relevant information actually was conveyed and was not lost inside of some unread document. Moreover, advisers making oral disclosures of 12b-1 fees had the opportunity to make sure that clients fully understood the fees that were being disclosed because such oral disclosure was, by its very nature, interactive, allowing the opportunity for questions and answers, and increasing the odds that such disclosures would be fully internalized by clients.

33.     Other cases brought by the SEC presented a different set of facts than the fact pattern presented here.  Specifically, in other cases, the SEC brought enforcement actions against respondents who "failed to disclose in their Forms ADV *or otherwise* its conflicts of interest related to (a) their receipt of 12b-1 fees, and/or (b) their selection of mutual fund share classes that pay such fees."[24]  Here, in stark contrast, the issue is not the complete lack of disclosure, or

---

[23] *Id*. at p. 56

[24] In the Matter of Wells Fargo Clearing Services, LLC and Wells Fargo Advisors Financial Network, LLC, Investment Advisers Act of 1940, Release No. 5199 / March 11, 2019, Administrative Proceeding File No. 3-19102, Order Instituting Administrative and Cease-and-Desist Proceedings, Pursuant to Sections 203(e) And 203(k) of the Investment Advisers Act of 1940, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order, at 2 (*emphasis supplied*).  *See also*, In the Matter of Merrill, Lynch, Pierce, Fenner & Smith, Incorporated, Investment Advisers Act of 1940  Release No. 5479 / April 17, 2020, Administrative Proceeding File No. 3-19753, Order Instituting Administrative and Cease-and-Desist Proceedings, Pursuant to Sections 203(e) And 203(k) of the Investment Advisers Act of 1940, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order,

even inadequate disclosure, but rather the fact that the disclosures were made orally, and in writings other than in Form ADV, which, apparently, now is the SEC's preferred vehicle for making this particular disclosure. Clearly, a firm such as CapWealth that has been disclosing its 12b-1 fees, albeit in a non-preferred format, should not be subject to the same sanctions as Merrill Lynch or Wells Fargo that were making either inadequate disclosures or no disclosures whatsoever.

**C. Support for Opinion Three that the duty of best execution requires that customers receive the most favorable terms commercially available for their trades. Here the record indicates that CapWealth customers who paid 12b-1 fees received best execution of their trades.**

34. The duty of best execution that applies to brokers and investment advisers requires that customers receive the most favorable terms commercially available for their trades.[25] Here the testimony was clear and unequivocal that if a mutual fund had more than one share class and some classes featured 12b-1 fees, but and other classes were not, the investment advisers used the class with the lower fees as long as such a class was available.[26]

35. Moreover, as discussed above, when 12b-1 fees were charged, the investment adviser's standard compensation of one percent or less was reduced to offset such fees.

---

at 3 ("At times during the Relevant Period, Respondent did not disclose adequately to its clients either in its Forms ADV or otherwise its conflicts of interest related to (a) its receipt of 12b-1 fees, and/or (b) its selection of mutual fund share classes that pay such fees.").

[25] Jonathan Macey and Maureen O'Hara, The Law & Economics of Best Execution, J. FINANCIAL INTERMEDIATION 6, 188-223, (1997). The legal duty of best execution is widely recognized under securities laws and exchange rules. For example, in establishing NASDAQ, Congress declared its purpose to be assuring ''the practicability of brokers executing investors' orders in the best markets' Courts have noted that "(t)he relationship between a broker/dealer and its customer gives rise to 'certain fiduciary obligations," and that one of these "obligations is a duty to execute the customer's order at the best available price." In re Merrill Lynch, 911 F. Supp. 754, 760 (1995) (cited in In re E.F. Hutton & Co., Securities Exchange Act Release No. 25887, (1988 Transfer Binder) Fed. Sec. L. Rep. (CCH) ¶ 84303, 89326 at 89326 (July 6, 1988); Restatement (Second) of Agency ¶ 1 (1957)). Merrill Lynch at *760 (citing Payment for Order Flow, Exchange Act Release No. 34902 (1994 Transfer Binder) Fed. Sec. L. Rep. (CCH) ¶ 85444, 85849 at 85854 n. 28. Order Execution Obligations, Exchange Act Release No. 34-37619A, 60 Fed. Reg. 48290, 48322.

[26] Deposition of Timothy Murphy before the Securities & Exchange Commission, May 19, 2020, at 83-84.

13

36.     The practices followed by CapWealth in purchasing mutual funds on behalf of clients are precisely what an investment adviser's fiduciary duties require and are consistent with best industry practices.

37.     I note that under the forward pricing rule (22c-1),[27] trades in U.S.-based, open-end mutual funds are required to be priced at the next net asset value per share (NAV) calculated after an order is placed.   The vast majority of mutual funds calculate their NAVs once per day, usually sometime after 4 p.m. Eastern time.  This means that all orders that are placed before 4 p.m. must be priced at the current-day NAV as calculated after the market closes.[28]  As such, taking account of rule 22c-1, the duty of best execution for mutual fund trades requires simply that those buying or redeeming mutual fund shares receive the NAV next calculated after the mutual fund receives their order.[29]   Costs not related to trade execution, such as soft dollar arrangements and 12b-1 fees present distinct issues entirely separate and apart from best execution.

38.     However, as the analysis here shows, to the extent that the concept of best execution is expanded by the SEC in its enforcement actions to include the imposition of post-execution mutual fund fees, such as 12b-1 fees, all fiduciary duties, including the expanded duty of best execution were met.

---

[27] The forward pricing rule is Investment Company Act Rule 22c-1, 17 CFR 270.22c-1(a), pursuant to which underwriters, and dealers must sell and redeem fund mutual fund shares at the price determined by the net asset value ("NAV") for the funds's shares that is next computed after receipt of an order to buy or redeem such shares.  The rule also requires that funds calculate their NAV at least once a day, which is typically after the major markets close at 4:00pm eastern time.

[28] Eric Zitzewitz, How Widespread Was Late Trading in Mutual Funds? 96 AMER. ECON. REV. 284 (2006).

[29] See also Deposition of Timothy Pagliara, *supra*, at 123-125 (making this point).

14

**D. Support for Opinion Four that the Record shows that CapWealth's corporate governance and culture was directed at instilling a culture of compliance in the firm. This indicates that a lack of scienter or intention to engage in wrongdoing.**

39.     CapWealth used independent consultants to craft the disclosures in its Form ADV Part 2A, and in other disclosure documents. The purpose of retaining such consultants was to ensure that the firm's disclosures met all applicable regulatory disclosure requirements. In particular, as Ms. Venable attested in her deposition the firm hired two outside consultants to help with disclosure issues: "We've had two (consultants). For a number of years it was BrightHouse and the principal there was Howard Landers. And then subsequent to that is Asgard and the principal there is Jon Hurd."[30]

## V.     Conclusion

40.     CapWealth's investment advisors generally selected the share class for its clients that offered the best overall terms of execution available. CapWealth's management practices, as they related to fees, deprived investment advisors of any incentive to guide clients towards high fee share classes because CapWealth discounted its standard advisory fee (or provided other discounts) to off-set any 12b-1 fee imposed by a fund, such as in cases where only a share class that paid a 12b-1 fee was available to a particular investor or in cases in which paying a 12b-1 fee and then offsetting that fee by a reduction in the investment advisory fee was the most efficient cost structure for the client. This fact completely differentiates CapWealth from other advisors who may have faced conflicts because they had a financial incentive to select a higher cost share class that paid a 12b-1 fee. This important substantive difference makes disclosure immaterial.

---

[30] Deposition of Phoebe Venable, *supra,* at 122.

41.    The SEC has long taken a practical, holistic approach to disclosure.  In particular, fulsome disclosure is encouraged, so long as information necessary in order to make fulsome disclosure not misleading also is made.   And corrective disclosure is encouraged, as are disclosures in formats appropriate for investors.  Here the appropriate disclosures were made in a variety of ways (prospectus, confirmation and in-person).  Any decision to insist that disclosure is only proper and appropriate if it is contained in Form ADV Part 2A represents a conflict with long-standing SEC disclosure policies that provide significant benefits to investors. The fees were disclosed in the mutual fund prospectuses and in the confirmations sent to customers purchasing.  It would be bad public policy to diminish the other disclosures.

42.    Further with respect to overall execution quality and customer experience, CapWealth's method for executing trades in funds with 12b-1 fees was in the best interests of its clients when viewed from a tax planning perspective.  Having a client first pay the 12b-1 fees associated with a fund and then having the amount of the advisory fee returned to the client through a reduction in the annual advisory fees by an offsetting amount preserved the deductibility of such fees.   This is because the advisory fees are not fully deductible, while the 12b-1 fees are treated as a necessary and ordinary business expense and are deductible from the net gains of the fund.[31]

43.    The duty of best execution that applies to brokers and investment advisers provide their customers the most favorable terms commercially available for their trades.  Here the record indicates that CapWealth customers who paid 12b-1 fees received best execution of their trades.

---

[31] Section 11045 of the Tax Cuts and Jobs Act of 2017 eliminated the deductibility of all miscellaneous expenses, including investment advisory fees, subject to the 2 percent limitation for the years 2018 through 2026.  But the 12b-1 distribution and service fees a mutual fund pays to investment advisors continue to be deductible under 26 U.S.C. §162.

16

I attest to holding the opinions discussed in the above Report to a high degree of certainty.

Respectfully submitted,

Jonathan Macey
June 13, 2020

17

**Appendix A**

**Curriculum Vitae**

<u>Name</u>:  Jonathan R. Macey

<u>Address</u>:  Yale Law School
127 Wall Street
New Haven, CT 06511
(courier)

P.O. Box 208215
New Haven, CT 06520-8215
(post)

<u>Telephone</u>:  (203) 432-7913

Fax:  (203) 432-4871

<u>e-mail</u>:  jonathan.macey@yale.edu

<u>Education</u>:  J.D. Yale Law School; Article and Book Review Editor, <u>Yale Law Journal</u>, 1982;
A.B., <u>cum laude</u> (economics), Harvard College, 1977.

<u>Current Positions</u>:

- Sam Harris Professor of Corporate Law, Finance, and Securities Regulation, Yale University
- Professor, Yale School of Management
- Chair, Yale University Advisory Committee on Investor Responsibility (ACIR)
- Chair, Yale Faculty Committee on Athletics
- Executive Committee, Yale Law School Center for the Study of Corporate Law
- Provost's Standing Advisory and Appointment Committee (SAAC) for the Yale School of Management
- Economics Advisory Board, Financial Industry Regulatory Authority, (FINRA)
- Member, European Corporate Governance Institute (ECGI)

<u>Subjects</u>:  Business Organizations (Corporations and Other Business Associations); Corporate Finance; Corporate Governance; Banking and Financial Institutions Regulation; the Economics of Regulation

<u>Other</u>:  Ph.D. (Law) *honoris causa* Stockholm School of Economics, 1996

D.P. Jacobs prize for the most significant paper in volume 6 of the <u>Journal of Financial Intermediation</u> for "The Law & Economics of Best Execution" (co-authored with Maureen O'Hara) (1997)

Paul M. Bator Award for Excellence in Teaching, Scholarship and Public Service awarded by the University of Chicago Law School Chapter of the Federalist Society, 1995

Bipartisan Policy Center (BPC) Financial Regulatory Reform Initiative's Working Group on Capital Markets

Fellow, Columbia Law School and Columbia Business School, Program in the Law & Economics of Capital Markets

Founding Member, CCH/Aspen Wolters Kluwer Law & Business, Banking and Securities Editorial Board

<u>Books</u>:

"Cases and Materials on Corporations Including Partnerships and Limited Liability Companies" (Thomson*West, Thirteenth Edition 2017) (with Robert Hamilton and Douglas Moll)

"The Law of Banking and Financial Institutions" (Aspen Law &Business, sixth edition, 2017) (with Richard Cornell and Geoffrey P. Miller)

"Macey on Corporation Laws" (2 volume treatise), originally published in 1998, updated annually, Wolters Kluwer Law & Business, 2017 (updated annually)

"The Death of Corporate Reputation: How Integrity Has Been Destroyed on Wall Street," The Financial Times Press, (2013)

"Corporate Governance: Promises Kept, Promises Broken" (Princeton University Press 2008)

"Classics in Corporate Law and Economics," Jonathan Macey, editor, (Edward Elgar Publishing, 2008)

"Iconic Cases in Corporate Law," Jonathan Macey, editor, (Thomson*West, 2008)

"Costly Policies:  State Regulation and Antitrust Exemption in Insurance Markets" (with Geoffrey P. Miller, The AEI Press 1993)

"Svensk Aktiebolags Rätt I Omvandling: En Rättsekonomisk Analys" (Swedish Corporate Law in Transition:  A Law and Economics Analysis (published in Swedish and English by SNS Förlag 1993)

"Third Party Legal Opinions:  Evaluations and Analysis" (Prentice Hall Law and Business, 1992)

"Insider Trading:  Economics, Politics, and Policy" (The AEI Press, 1991)

1

"An Introduction to Modern Financial Theory" (The American College of Trust and Estate Council Foundation (1991)

Articles, Chapters in Books, Book Reviews:

"Extended Shareholder Liability for Systemically Important Financial Institutions," 69 American University Law Review 967 (2020)

"Comment on 'A Stream That Rises Above Its Source: Judicial Review from a Public Choice Perspective,'" 26 Supreme Court Economic Review 61 (2019)

"Citizens United as Bad Corporate Law," 2019 Wisconsin Law Review 451 (2019) (with Leo Strine)

"Asking the Right Question: The Statutory Right of Appraisal and Efficient Markets," 74 Business Lawyer 1015 (2019) (with Joshua Mitts)

"Error and Regulatory Risk in Financial Institution Regulation," 25 Supreme Court Economic Review 155 (2018)

"*Martoma* and *Newman*: Valid Corporate Purpose and the Personal Benefit Test," 71 Southern Methodist University L. Rev. 869 (2018)

"Vertical and Horizontal Problems in Financial Regulation and Corporate Governance," *in* The Oxford Handbook of Corporate Law and Governance," Jeffrey Gordon and Wolf-Georg Ringe,editors, (Oxford University Press 2018)

"Recovering the Promise of the Orderly and Fair Stock Exchange," 42 The Journal of Corporation Law 778 (2017) (with David Swensen)

"Beyond the Personal Benefit Test: The Economics of Tipping by Insiders," 2 University of Pennsylvania Journal of Law & Public Affairs 24 (2017)

"Their Bark is Bigger than Their Bite: An Essay on W*ho Bleeds When the Wolves Bite*," The Yale Law Journal Forum, April 26, 2017 http://heinonline.org/HOL/Page?handle=hein.journals/yljfor126&div=44&g_sent =1&casa_token=&collection=journals

"A Public Choice Approach to the Unequal Treatment of Securities Market Participants and Home Borrowers," 3 Russell Sage Foundation Journal of the Social Sciences 94-101 (2017)

"The Genius of the Personal Benefit Test," 69 Stanford Law Review Online 17 (2016)

2

"Bank Corporate Governance: A Proposal for the Post-Crisis World," 22 Economic Policy Review 85-105 (2016) (Publication of the Federal Reserve Bank of New York) (with Maureen O'Hara)

"Finding Order in the Morass: The Three Real Justifications for Piercing the Corporate Veil," 100 Cornell L. Rev. 99 (2014)

"Are Any Creditors 'Particularly Deserving'?: On the Enduring Attraction of the Ring-Fence Approach to Cross-Border Insolvencies of Financial Institutions, 31 Yale J. on Reg. 695 (2014)

"Theories of Regulatory Risk: The Surprise Theory, The Arbitrage Theory and the Regulatory Mistake Theory, *in* Risk Management in Financial Institutions, Shahin Shojai and George Feiger, editors (Euromoney Books, 2013)

"Sublime Myths: An Essay in Honor of the Shareholder Value Myth and the Tooth Fairy," 91 Texas Law Review 911 (2013) (book review)

"The Regulator Effect in Financial Regulation," 98 Cornell Law Review 591 (2013)

"Enforcing Self-Regulatory Organizations' Penalties and the Nature of Self-Regulation," 40 Hofstra Law Review 963 (2012) (with Caroline Novogrod), *reprinted in* 55 Corporate Practice Commentator 279-313 (2013)

"It's All Shadow Banking, Actually," 31 Rev. Banking & Fin. L. 593 (2011-2012)

"Reducing Systemic Risk: The Role Money Market Mutual Funds as Substitutes for Federally Insured Bank Deposits," 17 Stanford Journal of Law, Business & Finance 131 (2011)

"Failure is an Option: An Ersatz-Antitrust Approach to Financial Regulation," 120 Yale Law Journal 1368 (2011) (with James Holdcroft)

"How Big Banks Fail and What to Do about It," 49 Journal of Economic Literature 750 (2011) (review essay)

"The Value of Reputation in Corporate Finance and Investment Banking (and the Related Roles of Regulation and Market Efficiency)," 22 Journal of Applied Corporate Finance 18-29 (2010).

"Process as Currency With the Courts: Judicial Scrutiny of Directors' Decisions," 4 International Journal of Corporate Governance 337 (2009 (published June, 2010) (with Geoffrey Miller)

3

"The Demise of the Reputational Model in Capital Markets: The Problem of the 'Last Period Parasites,'" 60 <u>Syracuse Law Review</u> 427 (2010)

"The Distorting Incentives Facing the U.S. Securities and Exchange Commission," 33 <u>Harvard Journal of Law and Public Policy</u> 641 (2010)

"Helping Law Catch Up to Markets: Applying Broker-Dealer Law to Subprime Mortgages," 34 <u>The Journal of Corporation Law</u> 790 (2009) (with Geoffrey Miller, Maureen O'Hara, and Gabriel Rosenberg).

"Regulation and Scholarship: Constant Companions or Occasional Bedfellows?" 26 <u>Yale Journal on Regulation</u> 89 (2009) with Maureen O'Hara

"Judicial Review of Class Action Settlements" <u>Harvard Journal of Legal Analysis</u> Winter 2009: Volume 1, Number 1 peer-edited Harvard Law School publication, pp. 1-40 (available at https://ojs.hup.harvard.edu/index.php/jla/article/view/6/21 2009) (2009) with Geoffrey Miller

"Down and Out in the Stock Market: The Law and Economics of the Delisting Process," 51 <u>Journal of Law and Economics</u> 683 – 713 (2008) with Maureen O'Hara

"A Close Read of an Excellent Commentary on *Dodge v. Ford*," 3 <u>Virginia Law & Business Review</u>, 177 (2008)

"Introduction to Iconic Cases in Corporate Law," *in* "Iconic Cases in Corporate Law," pp. i – x (Thomson*West, 2008)

"Judicial Review of Corporate Decisions: Kamin v. American Express Company," *in* "Iconic Cases in Corporate Law," pp. 120-138 (Thomson*West, 2008)

"Out With the Bathwater: Erosion of Shareholders' Takeover Review," *in* "Iconic Cases in Corporate Law," pp. 209-239 (Thomson*West, 2008)

"Getting the Word Out About Fraud" A Theoretical Analysis of Whistleblowing and Insider Trading" 105 <u>Michigan Law Review</u> 1899 (2007), *reprinted in* "Retaliation and Whistleblowers," Wolters Kluwer, 2009, p 439

Too Many Notes and Not Enough Votes: Lucian Bebchuk and Emperor Joseph II Kvetch about Contested Director Elections and Mozart's *Seraglio*," 93 <u>Virginia Law Review</u> 759 (2007)

"Executive Branch Usurpation of Power: Corporations and Capital Markets," 115 <u>Yale Law Journal</u> 2416 (vol. 9, 2006)

4

"The Nature of Conflicts of Interest Within the Firm," 31 The Journal of Corporation Law 613 (2006)

"The Politicization of American Corporate Governance," 1 Virginia Law & Business Review 10 (2006) (revised in volume 2, #2, Virginia Law & Business Review)

"Government as Investor: Tax Policy and the State," 23 Social Philosophy & Policy (2006)

"Commercial Banking and Democracy: The Illusive Quest for Deregulation," 23 Yale Journal on Regulation 1 (2006)

"Occupation Code 541110: Lawyers, Self-Regulation, and the Idea of a Profession," 74 Fordham Law Review 1079 (2005)

"From Markets to Venues: Securities Regulation in an Evolving World," 58 Stanford Law Review 563 (2005) (with Maureen O'Hara)

"Comment – The Limits of Legal Analysis: Using Externalities to Explain Legal Opinions in Structured Finance," 84 Texas L. Rev. 75 (2005)

"Delaware: Home of the World's Most Expensive Raincoat," 33 Hofstra L. Rev. 1131 (2005)

"Stock Transfer Restrictions and Issuer Choice in Trading Venues," 55 Case Western Reserve L. Rev. 587 (2005) (with Maureen O'Hara)

"Institutional and Evolutionary Failure and Economic Development in the Middle East," 30 The Yale Journal of International Law 397 (2005) (with Ian Ayres)

"Positive Political Theory and Federal Usurpation of the Regulation of Corporate Governance: The Coming Preemption of the Martin Act," 80 Notre Dame Law Review 951 (2005)

"Best Execution Regulation: From Orders to Markets," 13 Journal of Financial Transformation 1 (2005)

"Legal Scholarship: A Corporate Scholar's Perspective," 41 San Diego Law Review 1759 (2004)

"Wall Street in Turmoil: Federal State Relations Post Eliot Spitzer," 70 Brooklyn Law Review 117 (2004)

"Was Arthur Andersen Different? An Empirical Examination of Major Accounting Firm Audits of Large Clients," <u>Journal of Empirical Legal Studies</u>, July 2004, vol. 1, issue. 2, pp. 263-300(38) (with Ted Eisenberg);

"Monitoring, Corporate Performance: The Role of Objectivity, Proximity and Adaptability in Corporate Governance," <u>Cornell Law Review</u>, 2004, vol. 89, issue 2, pp. 356-393 (with Arnoud Boot) (reprinted (in English and Portuguese) in Direito Empresarial: Aspectos atuais de Direito Empresarial brasileiro e comparado, pp. 416-441 (English); 442-470 (Portuguese) (2005)

"Efficient Capital Markets, Corporate Disclosure and Enron," <u>Cornell Law Review</u>, 2004, vol. 89, issue 2, pp. 394-422

"Regulatory Globalization as a Response to Regulatory Competition," 52 <u>Emory L. J.</u> 1353 (2003)

"A Pox on Both Your Houses: Enron, Sarbanes-Oxley and the Debate Concerning the Relative Efficiency of Mandatory Versus Enabling Rules," 81 <u>Washington University Law Quarterly</u>, 329 (2003)

"Observations on the Role of Commodification, Independence, Governance, and the Demise of the Accounting Profession," 48 <u>Villanova Law Review</u> 1167 (2003) (with Hillary Sale)

"The Corporate Governance of Banks," 9 <u>Economic Policy Review</u> 91 (2003) (Publication of the Federal Reserve Bank of New York) (with Maureen O'Hara)

"Solving the Corporate Governance Problems of Banks: A Proposal," 120 <u>The Banking Law Journal</u> 309 (2003) (with Maureen O'Hara)

"The Economics of Stock Exchange Listing Fees and Listing Requirements," 11 <u>Journal of Financial Intermediation</u> 297 (2002) (with Maureen O'Hara)

"Displacing Delaware: Can the Feds Do a Better Job Than the States in Regulating Takeovers?" 57 <u>The Business Lawyer</u> 1025 (2002)

"Smith v. Van Gorkom: Insights About C.E.O.s, Corporate Law Rules, and the Jurisdictional Competition for Corporate Charters," 96 <u>Northwestern Law Review</u> 607 (2002)

"Cynicism and Trust in Politics and Constitutional Theory," 87 <u>Cornell Law Review</u> 280 (2002)

"Creditors Versus Capital Formation: The Case Against the European Legal Capital Rules," 86 <u>Cornell Law Review</u> 1165 (2001), rewritten in Italian as "Raccolta di Capitale di Rischio e Tutela dei Creditori: Una Critica Radicale alle

6

Regole Europee sul Capitale Sociale" (Capital Formation and Creditor Protection: A Radical Critique of the European Legal Capital Rules), 57 <u>Rivista delle Società</u> 78 (2002) (with Luca Enriques)

"Regulatory Competition in the US Federal System: Banking and Financial Services" in <u>Regulatory Competition and Economic Regulation: Comparative Perspectives</u>, edited by Daniel C. Esty and Damien Geradin (Oxford University Press 2001), pp. 95-110

"The 'Demand' for International Regulatory Cooperation: A Public Choice Perspective" in <u>Transatlantic Regulatory Co-operation: Legal Problems and Political Perspectives</u>" edited by George A. Bermann, Matthias Herdegen, & Peter L. Lindseth (Oxford University Press 2000), pp. 147-166

"US and EU Structures of Governance as Barriers to Transatlantic Regulatory Cooperation" in  <u>Transatlantic Regulatory Co-operation: Legal Problems and Political Perspectives</u>,  edited by George A. Bermann, Matthias Herdegen, & Peter L. Lindseth (Oxford University Press 2000) at pages 357-372;

"The Business of Banking: Before and After Gramm-Leach-Bliley," 25 The Journal of Corporation Law 691 (2000)

"Securities Trading: A Contractual Perspective," 50 <u>Case Western L. Rev.</u> 269 (1999)

"Information and Transaction Costs as the Determinants of Tolerable Growth Levels," 155 <u>Journal of Institutional and Theoretical Economics</u> 617 (1999) (with Enrico Colombatto)

"Fiduciary Duties as Residual Claims: Obligations to Non-shareholder Constituencies from a Theory of the Firm Perspective," 84 Cornell L. Rev. 1266 (1999)

"Globalization, Exchange Governance, and the Future of Exchanges," Brookings Wharton Papers on Financial Services 1999, the Brookings Institution (with Maureen O'Hara)

"Regulating Exchanges and Alternative Trading Systems: A Law and Economics Perspective," 28 <u>Journal of Legal Studies</u> 17 (1999 with Maureen O'Hara)

"Lawyers in Agencies: Economics, Social Psychology, and Process," 61 <u>Law & Contemporary Problems</u> 109 (1998 (published in January, 1999))

"The Legality and Utility of the Shareholder Rights Bylaw," 26 <u>Hofstra Law Review</u> 835 (1998)

7

"Wall Street Versus Main Street: How Ignorance, Hyperbole, and Fear Lead to Regulation," 65 <u>The University of Chicago Law Review</u> 1487 (1998)

"Professor Simon on the Kaye Scholer Affair: Shock at the Gambling at Rick's Place in Casablanca," 23 <u>Law and Social Inquiry</u> 323 (1998)

"Winstar, Bureaucracy and Public Choice," 6 <u>Supreme Court Economic Review</u> 173 (1998)

"On the Failure of Libertarianism to Capture the Popular Imagination," 15 <u>Journal of Social Philosophy</u> 372 (1998)

"Regulation and Disaster: Some Observations in the Context of Systemic Risk," 1998 <u>Brookings-Wharton Papers on Financial Services</u> 405

"Public Choice and the Legal Academy" (reviewing Mashaw, Greed, Chaos and Governance), 86 Georgetown Law Journal 1075 (1998)

"Italian Corporate Governance: One American's Perspective," 1998 <u>Columbia Business Law Review</u> 121 (1998)

"Measuring the Effectiveness of Different Corporate Governance Systems: Toward a More Scientific Approach," 10 <u>Journal of Applied Corporate Finance</u> 16 (1998)

"The Legality of the Shareholder Rights By-Law in Delaware: Preserving the Market for Corporate Control," 10 <u>Journal of Applied Corporate Finance</u> 63 (1998)

"The Law and Economics of Best Execution," 6 <u>Journal of Financial Intermediation</u> 188 (1977, published in 1998, with Maureen O'Hara)

"An Economic Analysis of Conflict of Interest Regulation," 82 <u>Iowa Law Review</u> 965 (1997, published in 1998, with Geoffrey P. Miller)

"Law and the Social Sciences," 21 <u>Harvard Journal of Law & Public Pol'y</u> 171 (1997)

"Flexibility in Determining the Role of the Board of Directors in the Age of Information," 19 <u>Cardozo Law Review</u> 291 (1997 with Enrico Colombatto)

"Public and Private Ordering and the Production of Legitimate and Illegitimate Legal Rules," 82 <u>Cornell Law Review</u> 1123 (1997)

8

"Lessons from Transition in Eastern Europe: A Property-Right Interpretation," 1 International Bulletin of the Institute of Macroeconomic Analysis and Development 10 (1997 with Enrico Colombatto)

"Manipulation on Trial: Economic Analysis and the Hunt Silver Case," 35 Journal of Economic Literature 162 (1997) (book review)

"A Public Choice Model of International Economic Cooperation and the Decline of the Nation State," 18 Cardozo Law Review 925 (1996 with Enrico Colombatto)

"Externalities and the Matching Principle: The Case for Reallocating Environmental Regulatory Authority," 23 Yale Law & Policy Review/Yale Journal on Regulation Symposium: Constructing a New Federalism 25 (1996)

"Exchange-Rate Management in Eastern Europe: A Public-Choice Perspective," 16 International Review of Law and Economics 195 (1996 with Enrico Colombatto)

"Derivative Instruments: Lessons For the Regulatory State," 21 The Journal of Corporation Law 69 ((1995) published in 1996)

"Public Choice, Public Opinion, and the Fuller Court," 49 Vanderbilt Law Review 373 (1996) (book review);

"Originalism As An 'Ism,'" 19 Harvard Journal of Law & Public Policy 301 (1996)

"Exchange-Rate Management in Eastern Europe:  A Public Choice Perspective," 6 Journal des Economistes et des Etudes Humanines 259-275 (1995 with Enrico Colombatto)

"Reflections on Professional Responsibility in a Regulatory State," 63 George Washington Law Review 1105 (1995 with Geoffrey P. Miller)

"Corporate Governance and Commercial Banking:  A Comparative Examination of Germany, Japan, and the United States," 48 Stanford Law Review 73 (1995) (with Geoffrey P. Miller) reprinted in 9 Journal of Applied Corporate Finance 57 (1997)

"Public Choice Theory and the Transition Market Economy in Eastern Europe: Currency Convertibility and Exchange Rates," 28 Cornell Journal of International Law 387 (1995) (with Enrico Colombatto)

"The Regulation of Corporate Acquisitions: A Law and Economics Analysis of European Proposals for Reform," 1995 <u>Columbia Business Law Review</u> 495 (1995) (with Clas Bergström, Peter Högfeldt and Per Samuelsson)

"A Market Approach to Tort Reform via Rule 78," 80 <u>Cornell Law Review</u> 909 (1995) (with Geoffrey P. Miller)

"Language and Self-Interest: Preliminary Notes Towards a Public Choice Approach to Legal Language," in Northwestern University/Washington University Law and Linguistics Conference, 73 <u>Washington University Law Quarterly</u> 1001 (1995)

"The Limited Liability Company: Lessons for Corporate Law," in F. Hodge O'Neal Corporate and Securities Law Symposium: Limited Liability Companies, 73 <u>Washington University Law Quarterly</u> 433 (1995)

"Path Dependence, Public Choice, and Transition in Russia: A Bargaining Approach," 4 <u>Cornell Journal of Law and Public Policy</u> 379 (1995) (with Enrico Colombatto)

"A Rejoinder," 16 <u>Cardozo Law Review</u> 1781 (1995)

"Deposit Insurance, the Implicit Regulatory Contract, and the Mismatch in the Term Structure of Banks' Assets and Liabilities," 12 <u>Yale Journal on Regulation</u> 1 (1995) (with Geoffrey P. Miller)

"Towards a Regulatory Analysis of Deposit Insurance," in Prudential Regulation of Banks and Securities Firms (Guido Ferrarini, editor, 1995) (with Geoffrey P. Miller)

"Packaged Preferences and the Institutional Transformation of Interests," 61 <u>University of Chicago Law Review</u> 1443 (1994)

"Health Care Reform: Perspectives from the Economic Theory of Regulation and the Economic Theory of Statutory Interpretation," 79 <u>Cornell Law Review</u> 1434 (1994)

"Judicial Preferences, Public Choice, and the Rules of Procedure," 23 <u>Journal of Legal Studies</u> 627 (1994)

"Property Rights, Innovation and Constitutional Structure," 11 <u>Social Philosophy and Policy</u> 181 (1994)

"A Public Choice View of Transition in Eastern Europe," 2-3 <u>Economia delle Scelte pubbliche</u> 113 (1994) (with Enrico Colombatto)

"Chief Justice Rehnquist, Interest Group Theory, and the Founders' Design," 25 <u>Rutgers Law Review</u> 577 (1994)

"Comment: Confrontation or Cooperation for Mutual Gain?" 57 <u>Law and Contemporary Problems</u> 45 (comment on Moe & Wilson, Presidents and the Politics of Structure 1994)

"Administrative Agency Obsolescence and Interest Group Formation: A Case Study of the SEC at Sixty," 15 <u>Cardozo Law Review</u> 909 (1994)

"The Pervasive Influence of Economic Analysis on Legal Decisionmaking," 17 <u>Harvard Journal of Law and Public Policy</u> 107 (1994)

"Civic Education and Interest Group Formation in the American Law School," 45 <u>Stanford Law Review</u> 1937 (1993)

"Corporate Law and Corporate Governance: A Contractual Perspective," 18 <u>The Journal of Corporation Law</u> 185 (1993)

"Thayer, Nagel and the Founders' Design: A Comment," 88 <u>Northwestern Law Review</u> 226 1993)

"The McCarran-Ferguson Act of 1945: Reconceiving the Federal Role in Insurance Regulation," 68 <u>New York University Law Review</u> 13 (with Geoffrey P. Miller 1993)

"The Transformation of the American Law Institute," 61 <u>George Washington Law Review</u> 1412 (1993)

"Corporate Stakeholders: A Contractual Perspective," 43 <u>University of Toronto Law Journal</u> 401 (with Geoffrey P. Miller 1993)

"Double Liability of Bank Shareholders: A Look at the New Data," 28 <u>Wake Forest Law Review</u> 933 (1993)

"The Inevitability of Universal Banking," 19 <u>Brooklyn Journal of International Law</u> 203 (1993)

"Congress, the Court, and the Bill of Rights," 23 <u>Cumberland Law Review</u> 93 (Comment at Sixth Annual Federalist Society Symposium 1993)

"Kaye, Scholer, Firrea, and the Desirability of Early Closure: A View of the Kaye, Scholer Case From the Perspective of Bank Regulatory Policy," 66 <u>Southern California Law Review</u> 1115 (with Geoffrey P. Miller 1993)

"Representative Democracy," 16 Harvard Journal of Law & Public Policy 49 (1993)

"The Community Reinvestment Act:  An Economic Analysis," 79 Virginia Law Review 291 (with Geoffrey P. Miller 1993);

"Auctioning Class Action and Derivative Litigation:  A Rejoinder," 87 Northwestern Law Review 458 (with Geoffrey P. Miller 1993)

"Bank Failure:  The Politicization of a Social Problem," 45 Stanford Law Review 289 (with Geoffrey P. Miller 1992)

"Implementing the FDIC Improvement Act of 1991," in Rebuilding Public Confidence Through Financial Reform, Conference Proceedings Volume, Ohio State University Business School, June 25, 1992

"Nondeposit Deposits and the Future of Bank Regulation," 91 Michigan Law Review 237 (with Geoffrey P. Miller 1992)

"Judicial Discretion and the Internal Organization of Congress," 12 International Review of Law and Economics 280 (1992)

"Mandatory Pro Bono:  Comfort for the Poor or Welfare for the Rich?" 77 Cornell Law Review 1115 (1992)

"The End of History and the New World Order:  The Triumph of Capitalism and the Competition Between Liberalism and Democracy," 25 Cornell International Law Journal 277 (with Geoffrey P. Miller 1992)

"Separated Powers and Positive Political Theory:  The Tug of War Over Administrative Agencies," 80 Georgetown Law Journal 671 (1992)

"Organizational Design and the Political Control of Administrative Agencies," 8 Journal of Law, Economics & Organization 93 (1992)

"The Canons of Statutory Construction and Judicial Preferences," 45 Vanderbilt Law Review 647 (with Geoffrey P. Miller 1992)

"Some Causes and Consequences of the Bifurcated Treatment of Economic Rights and 'Other' Rights Under the U.S. Constitution," 9 Social Philosophy and Policy 141 (1992)

"Double Liability of Bank Shareholders:  History and Implications," 27 Wake Forest Law Review 31 (with Geoffrey P. Miller 1992 Symposium)

"Origin of the Blue Sky Laws," 70 Texas Law Review 347 (with Geoffrey P. Miller 1991)

"Toward Enhanced Consumer Choice in Banking: Uninsured Deposit Facilities as Financial Intermediaries for the 1990's," 1991 New York University Annual Survey of American Law 865 (with Geoffrey P. Miller 1991)

"The Fraud-on-the-Market Theory Revisited," 77 Virginia Law Review 1001 (with Geoffrey P. Miller 1991)

"Lessons From Financial Economics: Materiality, Reliance, and Extending the Reach of Basic v. Levinson," 77 Virginia Law Review 1017 (with Geoffrey P. Miller, Mark L. Mitchell and Jeffry M. Netter 1991)

"The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform," 58 University of Chicago Law Review 1 (with Geoffrey P. Miller 1991)

"The Glass-Steagall Act and the Riskiness of Financial Intermediaries," 14 Research in Law and Economics 19 (with M. Wayne Marr and S. David Young 1991)

"Agency Theory and the Criminal Liability of Corporations," 71 Boston University Law Review 315 (1991 Symposium)

"State and Federal Regulation of Corporate Takeovers: A View From the Demand Side," 69 Washington University Law Quarterly 383 (1991)

"America's Banking System: The Origins and Future of the Current Crisis," 69 Washington University Law Quarterly 769 (1991 Symposium)

"An Economic Analysis of the Various Rationales for Making Shareholders the Exclusive Beneficiaries of Corporate Fiduciary Duties," 21 Stetson Law Review 23 (1991 Symposium)

"Politics, Bureaucracies, and Financial Markets: Bank Entry into Commercial Paper Underwriting in the United States and Japan," 139 University of Pennsylvania Law Review 369 (with David G. Litt, Geoffrey P. Miller and Edward L. Rubin 1990)

"The Role of the Democratic and Republican Parties as Organizers of Shadow Interest Groups," 89 Michigan Law Review 1 (1990)

"Federal Deference to Local Regulators and the Economic Theory of Regulation," 75 Virginia Law Review 265 (1991)

13

"Good Finance, Bad Economics: An Analysis of the Fraud on the Market Theory," 42 <u>Stanford Law Review</u> 1059 (with Geoffrey P. Miller 1990)

"The Stock Exchange as a Firm: The Emergence of Close Substitutes for the New York and Tokyo Stock Exchanges," 76 <u>Cornell Law Review</u> 1007 (with Hideki Kanda 1990)

"Auction Theory, MBO's and Property Rights in Corporate Assets," 25 <u>Wake Forest Law Review</u> 85 (1990 Symposium)

"Firm-Specific Human Capital Investments and Hegelian Ethics: A Comment on Cornell and Posner," 11 <u>Cardozo Law Review</u> 505 (1990)

"Courts and Corporations: A Comment on Coffee," 89 <u>Columbia Law Review</u> 1692 (1990)

"Macey Responds to Lubet," 75 <u>Cornell Law Review</u> 959 (1990)

"The Fraud on the Market Theory: Some Preliminary Issues," 74 <u>Cornell Law Review</u> 923 (1989)

"Restrictions on Short Sales: An Analysis of the Uptick Rule and its Role in View of the October 1987 Stock Market Crash," 74 <u>Cornell Law Review</u> 799 (with Mark Mitchell and Jeffry Netter 1989)

"Externalities, Firm-Specific Capital Investments, and the Legal Treatment of Fundamental Corporate Changes," 1989 <u>Duke Law Journal</u> 173 (1989)

"The Political Science of Regulating Bank Risk," 49 <u>Ohio State Law Journal</u> 1277 (1989)

"The Myth of 'Re-Regulation': The Interest Group Dynamics of Regulatory Change in the Financial Services Industry," 45 <u>Washington & Lee Law Review</u> 1275 (1989)

"Public Choice: The Theory of the Firm and the Theory of Market Exchange," 74 <u>Cornell Law Review</u> 43 (1989)

"How Separation of Powers Protects Individual Liberties," 41 <u>Rutgers Law Review</u> 813 (1989)

"The Chicken Wars as a Prisoners' Dilemma: What is in a Game?" 64 <u>Notre Dame Law Review</u> 447 (1989) (review of John A.C. Conybeare, <u>Trade Wars: The Theory and Practice of International Commercial Rivalry</u>)

"The Dangers of Pop Thinking About Japan," 22 Cornell Journal of International Law 623 (1989) (review of Daniel Burstein, Yen! Japan's New Financial Empire and its Threat to America)

"The Internal and External Costs and Benefits of Stare Decisis," 65 Chicago-Kent Law Review 93 (Special Symposium Issue on Post-Chicago Law and Economics, 1989)

"Trans Union Reconsidered," 98 Yale Law Journal 127 (with Geoffrey P. Miller 1988)

"The Missing Element in the Republican Revival," 97 Yale Law Journal 1673 (1988)

"Bank Failures, Risk Monitoring and the Market for Bank Control," 88 Columbia Law Review 1153 (with Geoffrey P. Miller 1988)

"The Myth of Competition in the Dual Banking System," 73 Cornell Law Review 677 (with Henry N. Butler 1988)

"State Anti-Takeover Statutes: Good Politics, Bad Economics," 1988 Wisconsin Law Review 467 (1988)

"Ethics, Economics and Insider Trading: Ayn Rand Meets the Theory of the Firm," 11 Harvard Journal of Law and Public Policy 785 (1988)

"Alan Bloom and the American Law School," 73 Cornell Law Review 1038 (1988) (review of Alan Bloom, The Closing of the American Mind)

"The Private Creation of Private Trusts," 37 Emory Law Journal 295 (1988)

"From Judicial Solutions to Political Solutions: The New, New Direction of the Rules Against Insider Trading," 39 Alabama Law Review 355 (1988 Symposium); reprinted 30 Corporate Practice Commentator 459 (1989)

"Transaction Costs and the Normative Elements of the Public Choice Model: An application to Constitutional Theory," 74 Virginia Law Review 471 (1988 Symposium)

"Market Discipline by Depositors: A Summary of the Theoretical and Empirical Arguments," 5 Yale Journal on Regulation 215 (with Elizabeth H. Garrett 1988)

"Regulation on Demand: Special Interest Groups and Insider Trading Law," 30 Journal of Law and Economics 311 (with David D. Haddock 1987)

"Competing Economic Views of the Constitution," 56 George Washington Law Review 50 (1987 Symposium)

"Regulation 13D and the Regulatory Process," 65 Washington University Law Quarterly 131 (with Jeffry M. Netter 1987 Symposium)

"Takeover Defensive Tactics and Legal Scholarship:  Market Forces vs. the Policymaker's Dilemma," 96 Yale Law Journal 342 (1987)

"A Coasian Model of Insider Trading," 88 Northwestern Law Review 1449 (with David D. Haddock 1987)

"Toward An Interest Group Theory of Delaware Corporate Law," 65 Texas Law Review 469 (with Geoffrey P. Miller 1987)

"Property Rights in Assets and Resistance to Tender Offers," 73 Virginia Law Review 701 (with David D. Haddock and Fred S. McChesney 1987)

"Promoting Public-Regarding Legislation Through Statutory Interpretation:  An Interest Group Model," 86 Columbia Law Review 223 (1986)

"ESOP's and Market Distortions," 23 Harvard Journal on Legislation 103 (with Richard L. Doernberg 1986)

"From Fairness to Contract:  The New Direction of the Rules Against Insider Trading," 14 Hofstra Law Review 6 (1985 Symposium); reprinted in 18 Securities Law Review (1986)

"A Theoretical Analysis of Corporate Greenmail," 95 Yale Law Journal 13 (with Fred S. McChesney 1985)

"Controlling Insider Trading in Europe and America:  The Economics of the Politics" (with David D. Haddock) (1986); in Law and Economics and the Economics of Regulation 149 (International Studies in Economics and Econometrics, Volume 13, Kluwer Academic Publishers)

"Shirking at the SEC:  The Failure of the National Market System," University of Illinois Law Review 315 (with David Haddock 1985)

"Special Interest Groups Legislation and the Judicial Function:  The Dilemma of Glass-Steagall," 33 Emory Law Journal 1 (1984); reprinted in 17 Securities Law Review 401 (1985)

"Toward a New Pedagogy" (Review of Loss, Fundamentals of Securities Regulation) 93 Yale Law Journal 1173 (1984)

<u>Miscellaneous</u>
<u>Publications</u>:

"Behind the SEC's War on Freedom of Speech," <u>BNN Bloomberg</u>
<u>Newswire/Opinion</u>, https://www.bnnbloomberg.ca/behind-the-sec-s-war-on-freedom-of-
speech-1.1398605, March 2, 2020

"Investigation Into Rebates for Brokers Much Needed," <u>The Financial Times</u>,
https://www.ft.com/content/0619f7ca-32c3-11ea-a329-0bcf87a328f2, January 12, 2020

"Wall Street Profits by Putting Investors in the Slow Lane," <u>The New York</u>
<u>Times</u>, https://www.nytimes.com/2017/07/18/opinion/wall-street-brokers-rebates
kickbacks.html?mcubz=2 July 18, 2017 (with David Swensen)

"As IPOs Decline, The Market is Becoming More Elitist," <u>The Los Angeles</u>
<u>Times</u>, http://www.latimes.com/opinion/op-ed/la-oe-macey-ipo-democracy-
20170110-story.html  January 10, 2017

"Corporations: The Short-Termism Debate," Panel Transcript from 2014 National
Lawyers Convention: Millennials, Equity and the Rule of Law, 85 Mississippi
Law Journal 697, 711-714 *inter alia* (2016)

"In Defense of Athletics," <u>The Yale Daily News</u>,
http://yaledailynews.com/blog/2016/11/18/macey-in-defense-of-athletics/,
November 18, 2016

"Obama's Pitch to Ban Non-Compete Agreements Would Make the Rich Richer,"
<u>Fortune Magazine</u>, http://fortune.com/2016/11/03/obama-non-compete-
agreements/, November 3, 2016

"Insider Trading and the Supreme Court," <u>Defining Ideas</u>, A Hoover Institution
Journal, http://www.hoover.org/research/insider-trading-and-supreme-court,
September 29, 2016

"The Rise of Crony Capitalism," <u>Defining Ideas</u>, A Hoover Institution Journal,
http://www.hoover.org/research/rise-crony-capitalism, February 11, 2016

 "Beware of Banking Animus," <u>Defining Ideas</u>, A Hoover Institution Journal,
http://www.hoover.org/research/beware-banking-animus, January 5, 2016
(reprinted in Hebrew in the Tel Aviv newspaper Haaretz)

"One Way to Unrig Stock Trading," <u>The New York Times</u>, December 24, 2015
(with David Swensen)

"Fannie and Freddie Are Making Lots of Money – But Not for Their Shareholders," The National Review, September 3, 2015 (with Logan Beirne)

"The Cure for Stock-Market Fragmentation: More Exchanges," The Wall Street Journal, June 1, 2015 (with David Swensen)

"Commissioner Gallagher's and Professor Grundfest's Wrongful Attack on the Shareholder Rights Project," Harvard Law School Forum on Corporate Governance and Regulation, May 18, 2015

"Injustice at the SEC," Defining Ideas, A Hoover Institution Journal, http://www.hoover.org/research/injustice-sec, May 14, 2015

"Professor Grundfest's Latest Reply Flip-Flops Allegations and Further Demonstrates that He and Commissioner Gallagher Wrongfully Accused the SRP," The Harvard law School Forum on Corporate Governance and Financial Regulation, January 6, 2015

"Professor Grundfest's Reply Demonstrates that He and Commissioner Gallagher Wrongfully Accused the SRP," The Harvard law School Forum on Corporate Governance and Financial Regulation, December 21, 2014

"SEC Commissioner, Law Professor Wrongfully Accuse SRP of Securities Fraud," The Harvard law School Forum on Corporate Governance and Financial Regulation, December 15, 2014

"An Insider-Trading Watershed," The Wall Street Journal, December 12, 2014

"Argentina's Disturbing New Low," National Review OnLine, October 31, 2014

"Did Fannie and Freddie Recover After the Collapse? Read the Report," The National Law Journal, (with Logan Beirne), September 8, 2014

"Congress Is Stealing Fannie and Freddie, Real Clear Markets," (with Logan Beirne), May 14, 2014

"It's Perfectly Fine For Herbalife Short-Sellers To Lobby The Government," Forbes.com, April 24, 2014

"How Argentina's Default Could Be New York's Loss: The Commercial Capital Depends On U.S. Courts to Hold Governments to Their Promises," The Wall Street Journal, April 20, 2014

"3 Justifications for Piercing the Corporate Veil," LexisNexis Law 360, April 1, 2014

"On Divestment," The Yale Daily News, November 15, 2013

"Using Disclosure to Silence Corporate America: The Soros-funded CPA-Zicklin Index' is Merely A Weapon Against Business," The Wall Street Journal, October 22, 2013

Jonathan Macey, Opinion analysis: "That which does not kill the SEC may make the agency stronger," SCOTUSblog (Feb. 28, 2013, 12:04 PM), http://www.scotusblog.com/2013/02/opinion-analysis-that-which-does-not-kill-the-sec-may-make-the-agency-stronger/

Jonathan Macey, Argument recap: "We're from the government and we're here to win," SCOTUSblog (Jan. 15, 2013, 10:50 AM), http://www.scotusblog.com/2013/01/argument-recap-were-from-the-government-and-were-here-to-win/

Jonathan Macey, Argument Preview: "Too bad both sides can't lose this one," SCOTUSblog (Jan. 7, 2013), http://www.scotusblog.com/2013/01/argument-preview-too-bad-both-sides-cant-lose-this-one/

"Is Mitt Romney at Risk from the Department of Justice?" Politico, August 16, 2012

"Libor: Three Scandals in One," Foreign Affairs, (foreignaffairs.com), July 20, 2012

"The Feds' New Mortgage Disclosures Are a Bust," The Wall Street Journal, July 18, 2012

"J.P. Morgan Lost $2 billion. They'll Learn From Experience. Regulators Rarely Do," The Wall Street Journal, May 14, 2012

"The Right Lessons of JPMorgan Fiasco," Politico, May 14, 2012

"An End to the Regulatory State," Politico, March 22, 2012

"How Private Equity Works," The Wall Street Journal, January 13, 2012

"Congress's Phony Insider-Trading Reform," The Wall Street Journal, December 13, 2011

"Tackling the Power of the 1%," Politico.com, November 29, 2011

"Buffett BofA Buy No Seal of Approval," Politico.com, August 28, 2011

19

"Will Court Short-Circuit Dodd-Frank," <u>Politico.com</u>, (with Elaine Buckberg and James Overdahl), August 16, 2011

"Reform Still Lets Banks Play Roulette," <u>Politico.com</u>, May 5, 2011

"Deconstructing the Galleon Insider Trading Trial," <u>The Wall Street Journal</u>, April 19, 2011

"Uncle Sam and the Hostile Takeover," <u>The Wall Street Journal</u>, March 21, 2011

"The Governor's Power Grab," <u>New York Law Journal</u> March 7, 2011

"Did Egypt's Rising Economy Lead to Hosni Mubarak's Fall?" <u>Politico.com</u>, February 18, 2011.

"The SEC's Facebook Fiasco," <u>The Wall Street Journal</u>, January 20, 2011

"Who wants to watch 'Bank Bailout 2'?" <u>Politico.com</u>, October 28, 2010

"Slouching Toward Financial Reform," <u>Politico.com</u>, June 17, 2010

"Break Up the Wall Street Banks. Now," <u>RealClearPolitics.com</u>, April 20, 2010

"Dodd Bill Too Opaque," <u>Politico.com</u>, April 19, 2010

"Financial Reform: It's the Politics," <u>Politico</u>, February 3, 2010

"Obama's Financial Reform Falls Short," <u>Politico</u>, January 22, 2010

"Obama and 'Fat Cat Bankers'" <u>The Wall Street Journal</u>, January 12, 2010

"Washington's Plans May Result In Even Higher Executive Pay," <u>The Wall Street Journal</u>, October 25, 2009

"Advice and Consent: The Biggest Danger Is That The Governance Model Transforms Too Radically and Directors Become a Threat To, Rather Than a Resource For, Management," (with Steven Seiden) Directors and Boards Magazine, 2009.

"Say on Pay and Other Bad Ideas: A Ban on Golden Parachutes Will Entrench Management," <u>The Wall Street Journal</u>, April 14, 2009

"Holding CEOs Accountable: Corporate Boards Are Often Last to See What's Wrong," <u>The Wall Street Journal</u>, December 9, 2008

"The Government Is Contributing to the Panic," <u>The Wall Street Journal</u>, October 11, 2008

"Wall Street-Main Street Power Game," <u>The Washington Independent</u>, October 17, 2008 (with James Holdcroft)

"Regulation and Scholarship: Constant Companions or Occasional Bedfellows?" 25 <u>Yale Journal on Regulation</u> 305-313 (2008) (speech delivered on the occasion of the 25th Anniversary of the Yale Journal on Regulation).

"Yale Invests Responsibly," <u>Yale Daily News</u>, Friday, November 21, 2008

"Bear Stearns Too Big to Fail?" <u>The Washington Independent</u>, http://washingtonindependent.com/view/bear-stearns-too-big, May 21, 2008

"Brave New Fed," <u>The Wall Street Journal</u>, Monday, March 31, 2008, at A19

"Regulatory McCarthyism," <u>The Wall Street Journal</u>, Tuesday, October 24, 2006 at A17

"From Orders to Markets: Who Should Decide What is 'Best Execution'" <u>Regulation</u>, Vol. 28, No. 2, Summer 2005.

"A Misguided Proposal to Regulate Risk-Taking" (letter) <u>The Wall Street Journal</u>, Tuesday, April 5, 2005

"A Risky Proposition" (book review) <u>The Wall Street Journal</u>, Tuesday, March 15, 2005

"How Does the SEC Arrive at its Fines Against Corporate Wrongdoers," <u>Forbes</u>, June 21, 2004

"Securities and Exchange Nanny," <u>The Wall Street Journal</u>, Tuesday, December 29, 2003, A10;

"Public Choice and the Law," In *The New Palgrave Dictionary of Economics and the Law, Vol. 3*. P. Newman, ed. New York: Stockton (1998)

"A Poison Pill That Shareholders Can Swallow," <u>The Wall Street Journal</u>, Monday, May 4, 1998

"A Critical Test of Corporate Governance," <u>The Los Angeles Times</u>, Sunday, February 22, 1998, M2

"Shareholder Rights Will Be Next Battleground," <u>The National Law Journal</u>, Monday, February 16, 1998

"Will Euro's Heat Make U.S. Firms Wilt?" <u>The National Law Journal</u>, Monday, September 1, 1997

"Banking; A Reform Plan that Leaves Consumers Out," <u>The Los Angeles Times</u>, Sunday, May18, 1997

"Fed Does End Run on Glass-Steagall," <u>The National Law Journal</u>, Monday, April 28, 1997

"Blame Managers, Not Derivatives," <u>The National Law Journal</u>, Monday, August 26, 1996

"Wealth Creation as a 'Sin'," XVII <u>The Journal of Corporate Governance</u> 12 (1996), reprinted in <u>Independent Policy Report</u>, Independent Institute (1996)

"Appeals Court Decision Validates Shady Deals," <u>The National Law Journal</u>, Monday, September 25, 1995

"The Court Gets It Half Right on Firrea," <u>The Wall Street Journal</u>, Wednesday, September 13, 1995;

"The Lowdown on Lending Discrimination," <u>The Wall Street Journal</u>, Wednesday, August 9, 1995

"The '80s Villain, Vindicated," <u>The Wall Street Journal</u>, July 18, 1995

"A Poison Pill to Destroy Banking Reform," <u>The Wall Street Journal</u>, Wednesday, June 7, 1995

"Banking by Quota," <u>The Wall Street Journal</u>, Wednesday, September 7, 1994;

"Mutual Banks Take Your Money and Run" <u>The Wall Street Journal</u>, Wednesday, December 29, 1993;

"Porkbarrel Banking," <u>The Wall Street Journal</u>, Monday, July 19, 1993

"Not All Pro Bono Work Helps the Poor," <u>The Wall Street Journal</u>, Wednesday, December 30, 1992

"Naderite Mossbacks Lose Control Over Corporate Law," <u>The Wall Street Journal</u>, Wednesday, June 24, 1992

"Needless Nationalization at the FDIC," <u>The Wall Street Journal</u>, Friday, February 14, 1992

"The SEC Dinosaur Expands its Turf," The Wall Street Journal, Wednesday, January 29, 1992

"Don't Blame Salomon, Blame the Regulators," The Wall Street Journal, Monday, August 19, 1991

"In Wake of Bailout, Why are we Rewarding Banks?" The Los Angeles Times, Sunday, July 14, 1991

"While Politicians Fiddle Banking Crises Explode," The Los Angeles Times, Sunday, September 23, 1990

"S&L Bailout Plan Victim of Hysteria," The Wall Street Journal, Monday, June 25, 1990

"A Good Idea Gone Sour: Can Bank Insurance Fail?" The Los Angeles Times, Sunday, June 24, 1990

"It's Time for Bush to Pay the Piper on the S&L Bailout," The Los Angeles Times, Sunday, April 22, 1990

"The Politics of Denying an S&L Crisis," The Los Angeles Times, Sunday, December 10, 1990

"Savings and Loan Regulations Create 'Win-Win' Situation for Risk Takers," The Los Angeles Times, Sunday, February 5, 1989

"The SEC's Insider Trading Proposal: Good Politics, Bad Policy," Cato Institute Policy Analysis No. 101, March 31, 1988

"Market for Corporate Control," The Wall Street Journal, Friday, March 4, 1988

"Senators Would Shoot SEC Messengers," The Wall Street Journal, Thursday, September 10, 1987

"SEC Vigilant Against Insider Trading - But is it Within Law? Too Strict a Crackdown Will Harm Markets," The Wall Street Journal, Wednesday, May 28, 1986

"Financial Planners - A New Professional Cartel?" The Wall Street Journal, Tuesday, October 31, 1985

"Conservative Judgment Time," The Wall Street Journal, Friday, August 23, 1985

"Introduction" to Volume V (1989) of the Banking Law Anthology

23

Remarks at Symposium on the First Amendment and Federal Securities Regulation, 20 Connecticut Law Review (assorted pages) 1988

Remarks at Colloquium on the ALI Corporate Governance Project, 71 Cornell Law Review. (assorted pages) (1986)

"A Conduct Oriented Approach to the Glass-Steagall Act," 91 Yale Law Journal 102 (1981) (published as a student)

Recent Testimony

"Measuring the Systemic Importance of U.S. Bank Holding Companies," Senate Banking Committee Hearing, July 23, 2015

Current Activities:

Member, American Law Institute;

Members Consultative Group for American Law Institute's Restatement of the Law/Corporate Goverance Project;

Editorial Board, Journal of Accounting, Finance and Law;

Academic Advisory Board Committee, the Banking Law Anthology;

Academic Advisory Board, The Social Philosophy and Policy Center;

Board of Editors, Journal of Banking and Finance;

Board of Editors, Journal of Banking Law;

Board of Editors, Journal of Financial Crime;

Board of Editors, Corporate Practice Commentator;

Guest Contributor, Harvard Corporate Governance Blog

Employment History:

Sam Harris Professor of Corporate Law, Securities Law and Corporate Finance, Yale University, 2004 – present;

Visiting Professor, Bocconi University, Milan, Italy, fall 2012;

Visiting Professor of Law, Yale University, 2003-2004;

J. DuPratt White Professor of Law, Cornell Law School, 1991-2004;

Visiting Professor of Law, Harvard Law School, 1998-1999;

Visiting Professor, Faculty of Law, Stockholm School of Economics, fall, 1993;

Research Fellow, International Centre for Economic Research, Turin Italy, winter, 1993, spring, 1994;

Professor of Law (with tenure), University of Chicago, 1990-1991;

Professor of Law, (with tenure), Cornell University, 1987-1990;

Visiting Professor of Law, The University of Chicago, fall quarter, 1989-1990;

Visiting Professor, University of Tokyo Faculty of Law, summer, 1989;

Visiting Associate Professor of Law, University of Virginia, 1986-1987;

Assistant to Associate Professor of Law, Emory University, 1983-1986;

Law Clerk to the Honorable Henry J. Friendly, United States Court of Appeals, Second Circuit, 1982-1983 term of court;

Consultant, Municipal Finance Department, Lloyd Bush & Associates, New York, NY (consultant representing municipalities and investment banks before credit rating agencies (1978-1979));

Municipal Bond Trader, Bankers Trust Company, New York, NY (1977-1978);

Member, Board of Directors, Telxon Corporation, 1998-1999 (appointed as dissident director in settlement of proxy contest dispute); Member, Board of Directors, WCI Communities, Inc., 2007-2009; Member, Board of Directors, Shred-It Connecticut, 2007-2010; Alternative Director nominee for Illumina, Inc., 2012, Hess Corporation; 2015; Director nominee Rexene Corporation, 1999, Circon Corporation, 1998, Arvin Meritor, Inc. 2004, Wynn Resorts, Ltd. 2012, Family Dollar Stores, 2014 (among others).

Current consulting rate: $1,250.00 per hour.

Case 3:20-cv-01064   Document 15-3   Filed 02/11/21   Page 45 of 47 PageID #: 275

# Appendix B

| Year | Case Name | Court | Testimony Given |
|------|-----------|-------|-----------------|
| 2015 | New York v. Maurice Greenberg | Supreme Court of the State of New York, County of New York | Deposition Testimony |
| 2015 | State of Connecticut v. The McGraw Hill Companies, and Standard & Poor's | Superior Court, Judicial District of Hartford, Hartford, CT | Deposition Testimony |
| 2015 | George L. Miller, Chapter 7 Trustee, v. Kirkland & Ellis | United States Bankruptcy Court, District of Delaware | Deposition Testimony |
| 2015 | In the Matter of Office of the Comptroller of the Currency v. James E. Plack | U.S. Department of the Treasury, Office of the Comptroller of the Currency | Deposition Testimony |
| 2015 | Paolo Moreno v. SFX Entertainment, Inc. | United States District Court for the Central District of California, Western Division | Deposition Testimony |
| 2015 | Future Select v. Tremont Group Holdings | Superior Court for the State of Washington for King County | Deposition Testimony |
| 2015 | Panattoni Development Company, Inc. v. Scout Funds 1-A, LP and 1-C, LP | Supreme Court of the State of New York, County of New York | Deposition Testimony |
| 2016 | Crystal Good, et al. v. American Water Works Company, Inc., et. al | United States District Court for the Southern District of West Virginia | Expert Report |
| 2016 | CaremarkPCS Health, L.L.C. v. Walgreen Co. | American Arbitration Association, Phoenix, AZ | AAA Arbitration Hearing Testimony |
| 2017 | SLSJ, LLC v. Kleban | United States District Court for the District of Connecticut | Expert Report |
| 2017 | Robinson Mechanical Contractors, Inc. v. PTC Group Holdings Corp. | United States District Court for the Eastern District of Missouri, Southeastern Division | Deposition Testimony |
| 2017 | Vikas Goel v. American Digital University, Inc. | Supreme Court of the State of New York, County of Westchester | Expert Report |
| 2018 | In the Matter Of NewSat Limited (In Liquidation | Federal Court of Australia District Registry: Victoria Division: General | Joint Expert Witness Statement |

2

| 2018 | United States of America v. AT&T Inc., DirecTV Group Holdings, LLC, and Time Warner, Inc. | United States District Court for the District of Columbia | Deposition Testimony |
|------|------|------|------|
| 2018 | Blueblade Capital Opportunities LLC, v. SciQuest, Inc. | Court of Chancery of the State of Delaware | Deposition Testimony |
| 2019 | Deere & Company v. Hitachi Construction and Machinery Co., Ltd. v. Hitachi Construction and Machinery Co., Ltd | International Chamber of Commerce International Court of Arbitration, Paris, FR | Expert Report |
| 2019 | Maurice Greenberg v. Eliot L. Spitzer | Supreme Court of the State of New York, County of Putnam | Deposition Testimony |
| 2019 | In Re: National Prescription Opiate Litigation | U.S. District Court for the Northern District of Ohio | Deposition Testimony |
| 2019/ 2020 | Party City Corporation v. Cayan LLC | American Arbitration Association | Deposition Testimony/ AAA Arbitration Hearing Testimony |
| 2020 | In re; ASHINC Corporation, et. al, debtors, Catherine Youngman Litigation Trustee v. Black Diamond Opportunity Fund II, LP | United States Bankruptcy Court for the District of Delaware | Deposition Testimony |
| 2020 | A.O.A. *et al.* v. Doe Run Resources Corporation, *et. al.* | United States District Court for the Eastern District of Missouri, Eastern Division | Deposition Testimony |
| 2020 | Wai Chun Shek v. Luckin Coffee Inc., | United States District Court for the Southern District of New York | Expert Report |
| | | | |

a