UNITED STATES SECURITIES AND EXCHANGE COMMISSION


In the Matter of:          )

                           ) File No.  A-03907-A

CAPWEALTH ADVISORS, LLC  )


WITNESS:  Timothy Pagliara

PAGES:    1 through 163

PLACE:    Securities and Exchange Commission

          950 East Paces Ferry, NE

          Suite 900

          Atlanta, Georgia 30326

DATE:     Friday, May 1, 2020


     The above-entitled matter came on for hearing via

WebEx, pursuant to notice, at 9:35 a.m.


Diversified Reporting Services, Inc.

(202) 467-9200

Case 3:20-cv-01064   Document 26-1   Filed 03/10/21   Page 1 of 163 PageID #: 333

1    APPEARANCES:

2

3    On behalf of the Securities and Exchange Commission:

4         BRIAN BASINGER, ESQ.

5         STEPHEN E. DONAHUE, ASSISTANT REGIONAL DIRECTOR

6         KRISTIN MURNAHAN, ESQ.

7         Division of Enforcement

8         States Securities and Exchange Commission

9         950 E Paces Ferry Road, Suite 900

10        Atlanta, Georgia 30326

11        (404) 842-5748

12        basingerb@sec.gov

13

14   On Behalf of the Witness:

15        EUGENE "GINO" BULSO, ESQ.

16        Leader, Bulso & Nolan, PLC

17        414 Union Street

18        Suite 1740

19        Nashville, Tennessee 37219

20        (615) 780-4110

21

22

23

24

25

```
 1                    C O N T E N T S

 2

 3  WITNESS:                            EXAMINATION

 4  Timothy Pagliara                             4

 5

 6  EXHIBITS:      DESCRIPTION              IDENTIFIED

 7  CAP-20    March 11, 2020 subpoena            4

 8  CAP-21    Background Questionnaire           4

 9  CAP-22    Form ADV Part II B Brochure        4

10            Supplement for Timothy J. Pagliara

11  CAP-23    Form ADV Uniform Application for   4

12            Investment Adviser Registration

13  CAP-24    February 12, 2018 press release     4

14

15

16

17

18

19

20

21

22

23

24

25
```

1              P R O C E E D I N G S

2                        (SEC Exhibit Nos. CAP-20

3                        through CAP-24 were marked for

4                        identification.)

5              MR. BASINGER:  So, we are on the record

6   at 9:35 a.m. on Friday, May the 1st of 2020.

7              For the record, today's testimony is

8   being conducted remotely via WebEx in light of the

9   Coronavirus Pandemic.

10             Mr. Pagliara, do you consent to me

11  swearing you in now remotely?

12             MR. PAGLIARA:  Yes, I do.

13             MR. BASINGER:  Would you please raise

14  your right hand.

15             Do you swear to tell the truth, the

16  whole truth and nothing but the truth?

17             MR. PAGLIARA:  I do.

18  Whereupon,

19                   TIMOTHY PAGLIARA

20  was called as a witness and, having been first

21  duly sworn, was examined and testified as follows:

22                   EXAMINATION

23             BY MR. BASINGER:

24      Q    You may put your hand down.  Thank you.

25             Please state and spell your name for the

1   record, including your middle name.

2       A    Timothy Jude Pagliara.  Last name is

3   spelt P-A-G-L-I-A-R-A.

4       Q    And is the middle name J-U-D-E?

5       A    Yes, sir.

6       Q    Please state your date of birth.

7       A    ███████████████████.

8       Q    Please state and spell your home address

9   where you are -- your primary residence I should

10  say.

11      A    ███████████████████,

12  ████████████████████, Franklin, Tennessee,

13  37067.

14      Q    And for the record, are you at that

15  location today for testimony?

16      A    No, I am not.

17      Q    Where are you present today?

18      A    I am at ████████████████████

██  ██████████████████.

20      Q    Thank you.  Is that another residence of

21  yours?

22      A    Yes.

23      Q    Is it a vacation home?

24      A    It's a second home.

25      Q    Okay, thank you.

1              My name is Brian Basinger and I'm an

2       Officer of the Commission for the purpose of

3       today's proceeding.  Also joining us today via

4       WebEx are Stephen Donahue and Kristin Murnahan who

5       also are officers for the purpose of today's

6       proceeding.

7              This is an investigation by the United

8       States Securities and Exchange Commission In The

9       Matter of CapWealth Advisors, LLC, Case Number

10      A-3907, to determine whether there have been

11      violations of certain provisions of the Federal

12      Securities Laws.  The facts developed in this

13      investigation -- investigation, however, might

14      constitute violations of other federal or state,

15      civil or criminal laws.

16             For the record today we are using WebEx

17      technology to hear and see -- hear and see each

18      other.  I will be displaying exhibits during the

19      course of the testimony today using the WebEx

20      technology by sharing Adobe Acrobat from my laptop

21      computer.

22             Now, what we're going to do at this

23      point, Mr. Pagliara, is I'm going to open a

24      different document.  I do have Exhibit 1 already

25      open which is the SEC Form 1662.  And we'll talk

1    about that in a few minutes, but the first thing I

2    want to show you is what's known as the Formal

3    Order of Investigation in this matter.  This is

4    not something that you've seen before.  It's a non

5    public order issued by the Commission.  And what

6    I'm going to do is I'm going to scroll down and

7    give you time to look at it, but before I do much

8    with the scrolling, just to explain to you, this

9    is the Formal Order that the staff obtained from

10   the Securities and Exchange Commission that

11   empowers us to conduct our investigation.

12          What it does is it identifies the name

13   of the investigation, it identifies CapWealth

14   Advisors, LLC and it also names Steve Donahue,

15   Kristin Murnahan and myself, along with others at

16   the SEC, as officers for the purpose of the

17   investigation, including the ability to issue

18   subpoenas and take testimony.

19          So, I'm going to scroll down to let you

20   look at it.  And you let me know when you're ready

21   for me to keep scrolling.  It's about two pages

22   long.  So, take your time and let me know when you

23   want me to scroll further down.

24        A    You can scroll down further.

25             (The witness examined the document.)

1      A     You can scroll down.

2      Q     I'm going to go to the second page now;

3    is that okay?

4      A     Yes.

5            (The witness examined the document.)

6      A     Who is Dabney O'Riordan?  That's another

7    person identified.

8      Q     Yeah.  Catherine Dabney O'Riordan and

9    Adam Anderson are the two co-chiefs of the Asset

10   Management Units for the SEC's Division of

11   Enforcement.  They're not on the call today.

12   Justin Jeffries is the Associate Director of

13   Enforcement for the Atlanta Regional Office where

14   Kristin, Steve and I are based.

15           John Farinacci and Daniel Pine are two

16   of the subject matter experts that work in the

17   Asset Management Unit, but neither of them is on

18   the call today either, but these are all

19   individuals, including Steve and myself, who are

20   on this Formal Order that are named as officers

21   for the purpose of the investigation.  If I scroll

22   down, you'll see that includes the empowerment to

23   administer oaths, subpoena witnesses, take

24   testimony, etc.

25     A     Thanks.  You can go to the next page.

1      Q      Okay.  This is the bottom of the first

2   page.  What I'm going to do now is I'm just going

3   to show you there's a Supplemental Formal Order

4   I'm going to open.  What that does is it also

5   names some additional staff to the investigation

6   and I'm going to scroll down.  This is it right

7   here. It added Graham Loomis and Kristin Murnahan.

8   Kristin is a senior trial counsel in the Atlanta

9   office who is on the line today.  And then, Graham

10  Loomis, who is also named as her supervisor, who

11  is the regional trial counsel for the Atlanta

12  office.

13     A      Thank you.

14     Q      Do you have -- have you had an

15  opportunity now to review the Formal Order and the

16  Supplemental Formal Order?

17     A      Yes.

18     Q      Do you have any questions about those

19  documents?

20     A      No.

21     Q      I'm going to close them now, but if you

22  have any questions about them or would like to see

23  them again during the testimony today you're

24  welcome to ask to see them again.

25     A      Thank you.

1      Q    Mr. Pagliara, are you represented by --

2    oh, actually, let me back up.  Let's go over

3    Exhibit 1 here.

4              So, now I'm displaying Exhibit No. 1.

5    And for the purpose of today, exhibits we're going

6    to show, as a shorthand we're using -- we're

7    calling them CapWealth exhibits.  So, I'm using a

8    shorthand as C-A-P followed by the exhibit number.

9    So, you'll see Exhibit 1, CAP-1, has already been

10   marked.  And this is the Form 1662 of the SEC.  It

11   was previously sent to you via an attachment to

12   your subpoena testimony -- testimony subpoena, as

13   well as, the document subpoenas that have been

14   sent out before in the case.

15             Have you had a chance to look over

16   Exhibit No. 1 before, the 1662?

17     A    Yes.

18     Q    Do you have any questions about Exhibit

19   No. 1?

20     A    No.

21     Q    Okay, thank you.

22             Mr. Pagliara, are you represented by

23   counsel today?

24     A    Yes.

25             MR. BASINGER:  Would counsel please

1   identify himself for the record, including his

2   name and his firm's name.

3           MR. BULSO:  Good morning, Brian. This is

4   Gino Bulso, B-U-L-S-O, with Leader, Bulso and

5   Nolan, PLC in Nashville, Tennessee.

6           MR. BASINGER:  And, Mr. Bulso, are you

7   representing Mr. Pagliara as his counsel today?

8           MR. BULSO:  We are, yes.

9       Q   Mr. Pagliara, do you understand that Mr.

10  Bulso and his firm are also representing CapWealth

11  Advisors, as well as, Phoebe Venable and maybe

12  others in this investigation?

13      A   Yes.

14      Q   And are you comfortable proceeding with

15  today's testimony knowing that?

16      A   Yes.

17      Q   I'm going to now display via my screen

18  what has been marked as CAP Exhibit No. 20, which

19  is a subpoena issued on March 11th, 2020 to

20  Timothy Pagliara.  You'll note this was originally

21  calling for testimony to take place on April 3rd,

22  2020, but in light of the pandemic we agreed to

23  postpone by four weeks the testimony date until

24  today, May 1st, 2020.

25          Mr. Pagliara, have you seen this

1    document before?

2        A    Yes.

3        Q    What I'm going to do is I'm just going

4    to click through it.  You'll see there's the

5    second page that has my signature on it, on the --

6    the letter.  And then on the next page is the

7    original subpoena.  And then, after that is a copy

8    of the 1662 which we just saw as Exhibit No. 1.

9            And then there is an e-mail after that

10   between me and Mr. Bulso on April 13 of 2020 in

11   which Mr. Bulso confirms that we were agreeing to

12   reschedule today's testimony until May 1st for

13   you.

14           Is this the subpoena, as modified by the

15   e-mail exchange, pursuant to which you are

16   appearing here today, Mr. Pagliara?

17       A    Yes.

18       Q    Do you have any questions about it?

19       A    No.

20       Q    Okay.  I'm going to go ahead and close

21   Exhibit 20.

22           I'm going to go over a few preliminary

23   matters today.  Mr. Pagliara, you are under oath

24   here today and you should make every effort to

25   give the best, most complete and honest answers to

1    our questions today.  Mr. Pagliara, do you

2    understand this?

3         A    Yes.

4         Q    Would it be possible for you to adjust

5    your camera view so we could see you a little bit

6    better because right now all we can see is the top

7    of your hat.

8         A    How is that?

9         Q    That's a little better.  Thank you. Just

10   because all we could see before was your hat. So,

11   to the extent when giving answers you can look up

12   a little so we can see you that will be helpful.

13        A    I hope you guys aren't Braves fans. This

14   could be very painful.

15        Q    I understand.  I'll note for the record

16   you're wearing a baseball CAP -- is that for the

17   Cardinals?  I'm trying to see.

18        A    Yes, sir.

19        Q    The St. Louis Cardinals, okay.

20        A    Yes.

21        Q    Just to back up.  Mr. Pagliara, you do

22   understand that you're under oath today and you

23   should make every effort to give honest, complete

24   answers, correct?

25        A    Yes.

1     Q    Mr. Pagliara, is there any reason you

2   are unable to give accurate testimony today?

3     A    No.

4     Q    If you do not understand a question

5   today, please let us know and we can try to

6   rephrase it.

7          If you don't understand a question, will

8   you let us know?

9     A    Yes.

10    Q    If you need to take a break for any

11  reason, please let us know and we can consider

12  instructing the court reporter to go off the

13  record. As long as there's not a question pending

14  that should not be a problem, but we may want to

15  try to finish the question and answer session that

16  we're on at that time before taking a break.  The

17  court reporter will only go off the record at the

18  request of the SEC.

19         Mr. Pagliara, if you need a break today

20  will you let us know?

21    A    Yes.

22    Q    When responding during testimony today

23  for the benefit of the court reporter, please make

24  sure to give verbal answers as opposed to nodding

25  or shaking your head.  It's okay if you do

1   initially do that, but we may jump in and tell

2   you, pardon us, but you're -- you're shaking your

3   head. It looks like you're trying to answer.  Can

4   you give us a verbal response.  Sometimes people

5   do that and they don't realize they're not saying

6   a verbal reply.

7         We also urge you to try to say yes or no

8   as responses as opposed to uh-huh or hu-huh

9   because sometimes those types of responses can be

10  hard to decipher.  And we want to make sure for

11  your benefit and ours, there's a clean, clear

12  record. Does that make sense?

13     A   Yes.

14     Q   And we'll try not to talk over each

15  other today.  So, we'll ask you to try to let us

16  make sure we get our question out before you start

17  answering.  You might see me hold my hands up like

18  this if I feel you're starting to interject before

19  I've finished my question just to make sure you

20  understand I'm still trying to get the question

21  out before I want you to start trying to answer.

22        Because testimony is occurring remotely,

23  we're not all in the same room today. However,

24  this testimony does remain a confidential, non

25  public event.  No other individual should be

1   participating or observing today's testimony other

2   than the SEC staff, the court reporter, the

3   witness and witness counsel.

4          Mr. Pagliara, are you alone in the room

5   from which you are participating today?

6   A    Yes.

7   Q    Is anybody else nearby who is listening?

8   A    No.

9   Q    Mr. Pagliara, do you promise that during

10  today's testimony you will refrain from making any

11  recordings of the testimony?

12  A    Yes.

13  Q    And do you promise you will refrain

14  today from taking any screen shots of the screen

15  that we are using?

16  A    Why would I?  If you're showing me an

17  exhibit -- I guess, no, I've already got the

18  exhibit.  So, no.  I -- yes, I will refrain from

19  doing that.  I don't know that I would do it

20  anyway, but --

21  Q    Understood.

22          MR. BASINGER:  Mr. Bulso, are you making

23  any audio or video recording of today's testimony?

24          MR. BULSO:  Brian, this is Gino. There's

25  nobody here.  I'm not making any screen shots.

1    I've got no plans to do that.  We're not recording

2    anything.  We're proceeding today the same way we

3    did yesterday.

4            MR. BASINGER:  Thank you.

5        Q    During the course of the proceeding

6    today we're going to ask you, Mr. Pagliara,

7    questions about things that happened or may have

8    happened in the past.  Obviously time has gone by

9    since those events and you may have a better

10   recollection of some events than others.  We do

11   want to hear about all of your recollections today

12   though.  So, if some thing is 100 percent certain,

13   feel free to make that clear to us that you

14   remember something clearly.  And if something is

15   less clear and you have a hazy recollection, feel

16   free to make clear that the recollection is hazy

17   or less than certain.  Does that make sense?

18       A    Yes.

19       Q    I also want to make clear for the

20   record, and I'll repeat this today if needed,

21   we're not asking for information from you that's

22   protected by the attorney-client privilege or

23   attorney work product doctrine.  Do you understand

24   this?

25       A    Yes.

1    Q    Do you have any questions for us about

2    these preliminary matters?

3    A    No.

4    Q    Apart from communicating with Mr. Bulso

5    as your counsel, have you told anybody else about

6    the fact that you received a testimony subpoena

7    from the SEC in this investigation?

8    A    Yes.

9    Q    Who else have you told?

10    A    People on my staff.

11    Q    Can you name anybody specifically that

12    you have told?

13    A    Phoebe Venable, Ryan Hitt, Allen Boland,

14    Traci Olive, those -- Stacy Yancy.

15    Q    What was the last name again?

16    A    Yancy, Y-A-N-C-Y.  They have all been

17    involved in gathering material related to the

18    subpoena and the investigation.

19    Q    And I'm just asking you to repeat the

20    name of the last person just because I couldn't

21    hear it very well, the full name.

22    A    Stacy Yancy, Y-A-N-C-Y.

23    Q    And is Stacy spelled with a C-Y, a C-I

24    or something else?

25    A    C-Y.

1      Q     Okay.  So, S-T-A-C-Y?

2      A     Yes.

3      Q     Did any of those individuals help you

4   prepare to give testimony today?

5      A     No.

6      Q     I'm going to now display Exhibit 21

7   which is a background questionnaire.  You may --

8   do you have paper copies of some of the exhibits

9   in front of you, Mr. Pagliara?

10     A     No.

11     Q     Okay.  So, we're going to be showing you

12  today everything via the screen; is that correct?

13     A     Yes.

14     Q     Okay.  Can you see Exhibit 21 at this

15  point?

16     A     Yes.

17     Q     Okay.  I'm going to -- you'll see it's

18  marked at the bottom already as CAP Exhibit 21.

19  I'm going to zoom in a little make it a little bit

20  bigger.

21           Can you identify what Exhibit 21 is?

22     A     The background questionnaire that I've

23  prepared prior to this deposition.

24     Q     And are its contents accurate?

25     A     Yes.

1      Q     Okay.  We're going to go over some of

2      the portions of it now verbally.  So, it's going

3      to be a little bit redundant since you've already

4      filled this out, but I'm going to advance to the

5      page where your educational background is

6      contained, but if you could go ahead and start

7      with anything after high school telling us about

8      your educational background in terms of degrees

9      you've received, where you've studied starting

10     from furthest back in history to the most current.

11     A     Can you repeat that question?

12     Q     Sure.  If you could just tell us your

13     education background in sequential order.

14     A     In sequential order starting from high

15     school to the present?

16     Q     No, you can skip high school.  You can

17     skip high school.  You can start after high

18     school?

19     A     I have an undergraduate degree in

20     philosophy from St. Louis University and a law

21     degree from St. Louis University and attended

22     various different institutes as part of my

23     training in the industry.

24     Q     And have you ever practiced as an

25     attorney?

1     A    I've done expert witness testimony and

2   some minor things back in early part of my career.

3     Q    After you graduated from law school did

4   you sit for a bar exam?

5     A    Yes.

6     Q    And did you pass?

7     A    Yes.

8     Q    Have you been sworn in to any state bars

9   before?

10    A    Yes.

11    Q    Which ones?

12    A    In Tennessee.  I'm a member of the

13   Tennessee Bar Association.

14    Q    You're currently an active member?

15    A    Actively inactive.  I don't practice

16   law, but I have that designation.

17    Q    So, are you a dues paying member who has

18   an inactive status?

19    A    That's how I'd characterize it, yes.

20    Q    Okay.  So, you do not currently practice

21   law for any clients, correct?

22    A    That's correct.

23    Q    Okay.  Do you have any other

24   professional licenses besides your attorneys

25   license?

1      A      No.

2      Q      Let me rephrase maybe.

3             Do you have any securities related

4      designations or licenses?

5      A      I've got -- the only designation I still

6      have is Series 65.  I have no FINRA licenses.

7      Those were all terminated when we closed our

8      broker-dealer.  There may be one or two other

9      supervisory designations with the SEC.  I don't

10     believe so.

11     Q      Do you think your FINRA Series 65 is

12     still active?

13     A      No.

14     Q      But you think -- you know you've held 65

15     in the past?

16     A      I did, yes.

17     Q      Okay.  And just for the record, when you

18     say FINRA, you're talking about the Financial

19     Industry Regulatory Authority?

20     A      Yes.

21     Q      Okay.  I'll try to spell out acronyms

22     today if you or I or anyone else uses them without

23     first introducing what they stand for.

24            Now, I'd like to just talk about your

25     employment history.  What is your -- I'll advance

1    to that section of the document, but if you could

2    tell us, after you left law school what was your

3    first job after law school?

4         A    I was actually employed while I was in

5    law school and that employment extended to after I

6    graduated from law school.  It's Edward Jones and

7    Company, St. Louis, Missouri.

8         Q    What was your initial position at Edward

9    Jones when you started there?

10        A    I was an intern.  I wrote the Series 7

11   training program that they used for licensing

12   their representatives.

13        Q    And so that was the training program

14   used for new representatives that were being

15   trained to join Edward Jones?

16        A    Yeah, that were taking Series 7.

17        Q    What -- what specifically were the types

18   of training materials you were preparing?

19        A    It was all the preparation for the

20   Series 7 examination.

21        Q    So, they were examination preparation

22   materials?

23        A    Yes, sir.

24        Q    What else did you do in that position

25   when you were there?

1        A      After I completed my assignment with

2     preparing the Series 7 program I was part of a

3     team with a -- a partner that created their

4     financial planning department.

5        Q      And was that the full scope of what you

6     did in that role?

7        A      Yes.  And I had various different

8     assignments that they would give me everything

9     from evaluating leases on buildings that they were

10    acquiring to working with representatives and

11    helping them establish goals and objectives for

12    their clients.

13       Q      I was going to ask just a quick

14    technological question.  On your view on your

15    screen are the video feeds of us at the top or the

16    bottom?

17       A      At the very top.

18       Q      Okay.  I just wanted to make sure

19    they're towards the top.  I found for everybody

20    it's easier for us to see folks if they're looking

21    at the video if it's up toward the top of the

22    screen and closer towards the cameras.

23       A      No.  My view right now is right on your

24    document.

25       Q      Okay.  So, if you could tell us what --

1    did you hold any other positions while you were at

2    Edward Jones?

3         A    I took Series 7 and actually started

4    working with clients as well while I was there.

5         Q    So, maybe what would help me is to back

6    up a little and talk about the chronology.

7              If I direct your attention to Exhibit 21

8    and I go back a couple of pages, I think we saw

9    that you were in law school from '79 to '83 and I

10   just wondered, when we go back to the Edward Jones

11   job description, it lists the position of limited

12   partner from 1980 to '89, but did you start

13   working there in your initial role working on

14   preparing the Series 7 exam prep materials earlier

15   than 1980?

16        A    No.  No.  It was in my second year of

17   law school.  I was going to join the MBA program.

18        Q    So, limited partner was -- was limited

19   partner a position that you later had after you

20   joined?

21        A    That was the last title that I held

22   before I left the firm in 1989.

23        Q    Okay.  I just wanted to clarify when you

24   held that position, okay.

25             So, when do you -- what year do you

1   think you started actually seeing clients while

2   you were at Edward Jones?

3         A     After I passed the Series 7.  I think it

4   may have been in early 1981.

5         Q     And tell us about the types of clients

6   that you served in that role?

7         A     Mainly retirees, people working on

8   pensions -- with pensions.  It was part of, you

9   know, the process of Edward Jones to understand

10  those clients.

11        Q     At that time period around 1981 do you

12  recall approximately in terms of a ballpark range

13  how many clients you were serving directly?

14        A     No, I don't.  It was under -- under

15  five.

16        Q     Did that grow over time?

17        A     Yes.

18        Q     Tell us about how your client base grew

19  over time at Edward Jones.

20        A     Well, I left the home office in 1982 and

21  moved to Franklin, Tennessee to open the Franklin,

22  Tennessee office of Edward Jones.

23        Q     Were you the initial staff member to do

24  that?

25        A     Yes.

1      Q    Did anybody else go with you?

2      A    No.

3      Q    How long did you work in that position

4 in Franklin, Tennessee as the sole person in the

5 office?

6      A    In 1982 to -- or 1983 'til 1989.

7      Q    So, you were the only registered

8 representative working in that office during that

9 time period?

10     A    Yes.

11     Q    Did you have any support staff working

12 with you in the office physically?

13     A    About six months after I established the

14 office I did, yes.

15     Q    Okay.  But were there ever any other

16 advisory representatives that came and worked out

17 of that office with you?

18     A    No.

19     Q    At that point once you were in that

20 office is that when you had the title of limited

21 partner?

22     A    I became a limited partner I believe in

23 either 1986 or 1987.

24     Q    Okay.  And did that change, the -- the

25 nature of your job, once you became a limited

1  partner in terms of your responsibilities and your

2  role at Edward Jones?

3      A    No.  It was an acknowledgment of some of

4  the responsibilities that they gave me.  I was

5  involved -- continued my involvement in the

6  training process and actually, you know, hired

7  representatives for them.

8      Q    Did you continue to serve mostly retiree

9  clients?

10     A    Yes.

11     Q    What types of -- I guess, what were

12 the -- as far as you recall, the clients you

13 served at that time period, what were their usual

14 investment objectives?

15     A    It was -- you know, they were equity

16 income.  They needed growth and income.  Some of

17 them needed some growth.  It was a broad range of

18 objectives.  Every client was different.

19     Q    In serving your Edward Jones clients,

20 how did you generally make investment decisions

21 for them?

22     A    Based upon the feedback that they gave

23 me about what their goals and objectives were and

24 uniqueness of their situation.

25     Q    Were most of those clients in

1    discretionary accounts?

2         A    No.   There were no discretionary

3    accounts in that -- during that time period.

4         Q    Well, let me actually back up and ask

5    you a couple of questions.

6              Were you serving as both an advisory

7    representative to these clients as well as a

8    registered representative?

9         A    No.  No.  It was not an advisory

10   relationship.  It was purely brokerage.

11        Q    Okay.  I should have asked that first, I

12   apologize.

13             So, this was -- your time period through

14   1989 at Edward Jones is purely brokerage

15   customers?

16        A    Yes.

17        Q    Okay.  And why did you leave Edward --

18        A    Exclusively brokerage.

19        Q    Why did you leave Edward Jones?

20        A    I was working with higher net worth

21   clients than what they were typically comfortable

22   with working on and I had a -- a great business

23   opportunity to join Hilliard Lyons.

24        Q    And where was that?  Was that also

25   joining them by staying in Franklin?

1    A    Both Franklin and Nashville.  The firm

2  was headquartered in Louisville, Kentucky.

3         MR. BASINGER:  I'll note for the record,

4  I've advanced Exhibit 21 to page ten to reflect

5  the page where Mr. Pagliara describe his time at

6  Hilliard Lyons, which is, H-I-L-L-I-A-R-D,

7  L-Y-O-N-S.

8    Q    Mr. Pagliara, can you define the title

9  that you've listed for us on page ten which looks

10  like an acronym for your job there?

11    A    My last position was senior vice

12  president.

13    Q    What was your first position when you

14  joined Hilliard Lyons?

15    A    Vice president.  Vice president branch

16  manager.

17    Q    Tell us about your first position at

18  Hilliard Lyons and whether you were serving

19  clients in that role.

20    A    I opened an office in Franklin for

21  Hilliard Lyons and I took over the management of

22  their office in Nashville.  So, I was in a dual

23  role of branch management and the -- you know,

24  client -- and servicing clients at the same time.

25    Q    Did that branch offer both advisory and

1    brokerage services?

2        A    No.

3        Q    What services did it offer?

4        A    Just brokerage.  We had a trust company

5    that was separate from the -- the firm.  It was

6    set up as a separate entity, but we were able to

7    offer trust services apart from the brokerage

8    side.

9        Q    And you remained at Hilliard Lyons until

10   the year 2000?

11       A    Yes.

12       Q    While you were at Hilliard Lyons did you

13   ever provide advisory services to customers?

14       A    Not that I was compensated for.  I

15   always viewed what I was doing was advisory

16   service, but we weren't compensated that way.

17       Q    Well, let me rephrase.

18            Were you -- you were acting as a

19   registered representative of Hilliard Lyons,

20   correct?

21       A    Yes.

22       Q    Were you also registered as an

23   associated person of any advisory service offered

24   through Hilliard Lyons?

25       A    No.

1  Q Okay.  So, Hilliard Lyons was not acting

2 as an investment adviser in terms of the branch

3 where you were working?

4  A No.

5  Q Was your first position working as an

6 associated person of an investment advisor with

7 CapWealth Advisors, LLC?

8  A I don't remember the exact timing.  I

9 may have taken 65 towards the very last part of my

10 career at Hilliard Lyons.  I'm not -- I don't

11 recall, but somewhere between 19 -- say 1999 and

12 2000 that's where it started.

13  Q Tell us about -- did you go directly

14 from Hilliard Lyons to working at CapWealth?

15  A I actually worked at -- I was part of --

16 it was called CAP Trust, LLC.  They were the

17 umbrella organization that handled all of the

18 advisory work that we did.

19  Q And let me jump in real quick.  So, is

20 that name is that CAP Trust, C-A-P, T-R-U-S-T?

21  A Yes, LLC.

22  Q Okay.  Go ahead and continue describing

23 what CAP Trust, LLC is.

24  A It was a very short-natured -- it was a

25 venture of IJL Wachovia that provided a platform

1    that allowed us to run our businesses

2    independently with the umbrella of them providing

3    regulatory and compliance and all those different

4    services.

5         Q    Did that end up becoming CapWealth, LLC?

6         A    Eventually the CAP Trust, LLC went out

7    of business with the merger of IJ -- they -- they

8    merged it into Wachovia and First Union.  So, it

9    ceased to exist in the format that it was when I

10   joined them in, I believe, it was February of

11   2000. And so, after it merged into the entity of

12   First Union and Wachovia I transferred the

13   regulatory burden of whatever, you know, and the

14   clearing and all of that to NBC Securities.

15        Q    So, let's back up a little bit just to

16   kind of work through the chronology of your

17   employment.

18             Were you recruited by someone in

19   particular to go to CAP Trust?

20        A    I was actively seeking employment away

21   from Hilliard Lyons following their merger with

22   PNC Bank throughout 1999.  And so, I -- I actively

23   persuade CAP Trust and a number of opportunities,

24   evaluated all of them in the Fall of 1999 and then

25   joined CAP Trust in, I believe, it was February of

1    2000.

2       Q    I think just for the record you said you

3    were evaluating the options in 1989.  Did you mean

4    1999?

5       A    1999, that's correct.

6       Q    Sure.  So, how did -- how did CapWealth

7    Advisors come to exist?

8       A    After the experience with CAP Trust in

9    2000, the short nature of that, then I chose to go

10   to NBC Securities, but still operated as -- as

11   CapWealth Advisors.  The NBC Securities did a

12   merger with RBC Securities and they were

13   attempting to change our business model again

14   and -- and -- and put us into the RBC platform.

15   And so, it was at that point that we established

16   our own broker-dealer and our own registered --

17   independent registered investment advisory

18   organization.

19      Q    And what were the names -- I asked, what

20   were the names of those entities?

21      A    CapWealth Investment Services and

22   CapWealth Advisors.

23      Q    So, CapWealth Investment Services or

24   CWIS, that was the broker-dealer, correct?

25      A    Yes.

1    Q    And then CapWealth Advisors, LLC is the

2    advisory firm?

3    A    Yes.

4    Q    And were you both a registered

5    representative of CWIS and an associated person of

6    CapWealth Advisors, LLC?

7    A    Yes.

8    Q    When those were formed did you do that

9    on your own or was there any other owner or

10   business, you know, partner that was participating

11   in that -- formation of those two entities?

12   A    It was just me.

13   Q    So when CapWealth Advisors and CWIS were

14   initially --

15        (Reporter asks for clarification.)

16   A    I was 100 percent owner of both CWIS and

17   CWA.  There were no partners in those instances.

18   Q    And that was going to be my next

19   question about ownership percentages.  So that

20   answered my next question.

21        Did the ownership -- had the ownership

22   for CapWealth Advisors changed over time?

23   A    We now have a holding company with

24   CapWealth Group and I have a profit interest

25   partnership in which I have made grants of

1  ownership in the parent company to various members

2  of my team. So, they're on a schedule to vest in

3  the grants that I've given them over a ten-year

4  time and it's part of a plan of succession. So

5  that after I retire I will have transferred the

6  ownership of the firm to them.

7      Q    How much ownership do you have today in

8  CapWealth Group, LLC?

9      A    It would be over 80 percent.

10     Q    And what year would you anticipate

11 having fully transferred all of the ownership away

12 from yourself to others?

13     A    I don't know. I haven't put that on a

14 schedule yet.

15     Q    The vesting though of ownership stakes

16 to some degree has started already in other people

17 though?

18     A    Yes.

19     Q    Can you run through, as far as you best

20 recall, who owns the other 20 percent of CapWealth

21 Group as of today?

22     A    Phoebe Venable owns 15 percent and she

23 was just granted five. Her vesting to five years

24 into a ten-year vesting schedule.

25     Q    Let me jump in real quick though. She

1    currently has five percent that has vested, but it

2    will continue to increase over time?

3          A    It will increase over time.

4          Q    And as you go through her answer -- go

5    ahead.

6          A    I was going to say, I don't want to

7    speculate on that.  We've got a detailed schedule

8    of each one of the -- the people that have

9    ownership and their vesting schedule.  The vesting

10   schedule is -- there's no vesting for three years

11   and then it starts.  And so, if you were going to

12   ask me specific questions about the ownership, I

13   would rather just submit those documents to you on

14   a supplemental basis because I don't -- all I'm

15   going to be doing is guessing and I'll be wrong.

16         Q    Understood.

17         A    I can -- I can -- I can tell you who has

18   some interest.  I cannot tell you what their

19   vested interest is at this point.  And I can

20   approximate it if that would be helpful.

21         Q    So, we're only asking you today to tell

22   us what you do recall.  And if something is not

23   certain, just let us know that.  The best thing --

24   we will ask Mr. Bulso -- through Mr. Bulso for a

25   copy of that vesting schedule, but why don't you

1    go ahead now and just, as far as you can best

2    recall, tell us who the other individuals are that

3    have a ownership stake in CapWealth Group.  And if

4    you could identify what their work roles are if

5    they also work for some part of CapWealth Group,

6    such as -- starting with Ms. Venable.  If you can

7    identify what their current roles are.

8         A    Phoebe Venable has approximately five

9    percent -- 15 percent interest in the firm.  She

10   is chief executive officer.  Ryan Hitt owns one

11   percent -- has a one percent interest in the firm

12   and he is chief technology officer and compliance

13   officer -- executive vice president, chief

14   technology and compliance officer.  Traci Olive is

15   executive vice president and head of client

16   services.  She has a one-and-a-half percent

17   interest.

18              Jennifer Pagliara is an executive vice

19   president and client services representative. She

20   has a five percent interest.  Travis Pagliara, a

21   trust that I own, has a -- Travis Pagliara is the

22   beneficial -- has a beneficial interest in has a

23   three percent interest in the firm.  And best of

24   my recollection, that's the ownership structure of

25   the firm.

1     Q     Is Travis Pagliara a relative of yours?

2     A     He's my son.

3     Q     Does Travis Pagliara work in any way

4  with CapWealth Group or CapWealth Advisors?

5     A     Not presently.

6     Q     Did he in the past?

7     A     I employ him as a consultant from time

8  to time to help me evaluated on some very complex

9  medical drug situations and companies that we were

10  evaluating.  Travis is a doctor, an MD, a surgeon,

11  who has a biomedical engineering degree, a math

12  degree, masters degree in finance.  And his

13  insight on some of the assignments I gave him and

14  helping me evaluate drug protocols and things like

15  that were helpful, but he's employed full-time now

16  as a surgeon and is not employed by us.

17     Q     So, he does not currently work in the

18  securities industry?

19     A     No.  He's never worked in the securities

20  industry.

21     Q     Okay.  What positions do you currently

22  hold yourself at CapWealth Advisors?

23     A     I am chairman and chief investment

24  officer.

25     Q     During your time at CapWealth -- I'm

1  sorry, go ahead.

2      A    And I work individually with clients,

3  directly with clients.

4      Q    Understood.  Apart from those roles,

5  have you ever held any other roles at CapWealth

6  Advisors during your time working there?

7      A    I think I've worn just about every hat

8  in the organization at one point in time from

9  compliance to -- virtually every -- every title.

10  As the firm's grown, you know, I've hired people

11  and designated them as being responsible for those

12  particular aspects of -- of -- of operating the

13  firm.

14      Q    As far as you can recall, at what time

15  period did you have a compliance role with

16  CapWealth Advisors?

17      A    I don't understand the question. Could

18  you repeat it?

19      Q    I can rephrase.

20          Was there a specific time period in

21  terms of certain years where you were serving as a

22  compliance officer for CapWealth Advisors?

23      A    Well, initially I would have considered

24  myself a compliance officer and I would have held

25  that role and been involved in that role, I guess,

1    since the -- the start of -- of the firm.

2              Now, the official designation of that

3    role, the change probably occurred some time in --

4    I don't remember exactly when I designated Phoebe

5    chief executive officer, but, you know, we were

6    both actively involved in that in our -- from 2015

7    on -- I mean 2014 on.

8        Q    Is it correct that Ms. Venable joined

9    the firm around 2011?

10       A    I don't remember, but I thought more

11   recently.  I think that's probably accurate, but I

12   don't remember the specific date she joined the

13   firm.

14       Q    Did you assume the chief compliance role

15   for CapWealth Advisors from 2000 until Ms. Venable

16   arrived around 2011?

17       A    Well, I -- I had Scott Roland -- by 2011

18   Scott Roland was the chief compliance officer of

19   CapWealth.  And so, Ms. Venable didn't have

20   anything to do with compliance when she first

21   joined the firm.  Her role was to -- was to assist

22   me with client services and working with clients

23   to handle the overflow peak in service and meet

24   with clients.

25       Q    And did Scott Roland join prior to Ms.

1  Venable?

2      A    Yes.

3      Q    Do you recall approximately what years

4  Scott Roland joined the firm?

5      A    I believe he went on payroll in 2008.

6      Q    Was there ever a formal compliance

7  officer at the firm before Mr. Roland arrived?

8      A    No, that was handled by the -- by NBC

9  Securities and -- and CAP Trust prior to that.

10  The official designation of a compliance officer

11  occurred when we set up CWIS and CWA some time in

12  I think it was 2009-2010.  I don't recall the

13  exact date.

14      Q    Okay.  How many clients do you directly

15  serve today?

16      A    You know, at some point in time I worked

17  with all of them.  I work with the advisors and

18  helping them.  I would say that as far as just

19  direct responsibility where, you know, I interface

20  recently with the client it's probably 30

21  families -- 30 to 50 families.

22      Q    30 to 50 families today?

23      A    Yes.

24      Q    And the firm has about how many clients

25  overall today in terms of advisory clients?

1       A     We look at it as families and, you know,

2    at least somewhere around 600 families.

3       Q     And do most of those families have more

4    than one account?

5       A     Yes.

6       Q     So, I think on the most recent Form ADV

7    for the firm I've seen there's over 1,000 clients

8    reported.  Does that mean there's more than 1,000

9    client accounts?

10      A     Yeah, there's more than 1,000 client

11   accounts.

12      Q     Are most of your clients that you serve

13   discretionary accounts?

14      A     Yes.

15      Q     Would you characterize the number of

16   advisory accounts that you serve which are

17   discretionary as being higher than 90 percent

18   discretionary?

19      A     Yes.

20      Q     Has that been consistent since 2009?

21      A     Yes.

22      Q     And I -- I say 2009 because that was I

23   think the year that CWIS was created as the

24   affiliated broker-dealer, correct?

25      A     Yes.  And CWA was created during the

1    same time period simultaneously.

2        Q    Tell us about the mix of clients that

3    you serve in terms of their objectives and

4    whatever mix of objectives you generally deal with

5    for those clients.

6        A    Could you be more specific on the

7    question?

8        Q    Sure.  I mean, before we were talking

9    about your clients in your prior position.  Are

10    you continuing to serve mostly retirees or is

11    there a different mix of clients that you now

12    serve at CapWealth Advisors?

13        A    You know, I have people that are retired

14    and that doesn't, you know, typically designate

15    someone that's over the age of 65.  I've got

16    people that have sold businesses that are retired

17    can be as young as 35.  I've got entertainers that

18    are working, but essentially retired and living

19    off of assets they've accumulated.

20            I have clients that are actively

21    planning for retirement and saving money.  I've

22    got clients that are inheriting wealth.  I've got

23    clients that are actively working that we help

24    them manage their 401Ks.  So, we've got, you know,

25    a broad range of services.

1           You know, I -- we work with the children
2    of clients that are in their 20s and 30s helping
3    them with their objectives.  So, it's a -- it's a
4    very broad range of -- of objectives and clients
5    that we work with.
6        Q    And that's what I'm trying to tease out
7    is just to learn a little bit more about the types
8    of clients and the ones you serve directly. So,
9    I'll just -- I'll say, it's my understanding the
10   firm does have high net worth clients, but also
11   other types of clients such as you just described
12   including children of high net worth clients that
13   might have smaller accounts; is that correct?
14       A    Yes.
15       Q    Do you tend to -- with the clients you
16   directly serve and advise, do you tend to mostly
17   work with only high net worth clients?
18       A    Yes, but we probably should define what
19   you mean by high net worth before we go any
20   further.  How do you define that?
21       Q    Well, what -- what would you define as a
22   higher net worth client yourself?
23       A    Over 15 million.
24       Q    Would you characterize most of the
25   advisory clients you directly serve as having more

1    than 15 million in assets at CapWealth Advisors?

2        A    The clients that I work with, yes.

3        Q    Most of them would fall into that

4    category?

5        A    Yes.

6        Q    Do you, however, also serve any of their

7    client -- any of their children with smaller

8    accounts as well?

9        A    Yes.

10       Q    Does CapWealth -- well, let me rephrase

11   the question.

12            Who's the CapWealth current

13   broker-dealer that's used for advisory clients

14   accounts?

15       A    We don't have a broker-dealer.  We

16   switched -- we custody at Charles Schwab in their

17   RIA program.

18       Q    So, there's -- there's not any

19   affiliated broker-dealer today, correct?

20       A    No, there's no affiliated broker-dealer.

21       Q    CWIS ended operations in the past,

22   correct?

23       A    Yes.

24       Q    When was that?

25       A    It officially closed I believe in June

1    of 2018.  We submitted the form to shut it down,

2    you know, earlier than that, but it effectively

3    was shut down completely and everybody's

4    registration terminated with FINRA I believe in

5    June of 2018.

6         Q    Did CWIS or CapWealth Advisors ever have

7    any type of revenue sharing arrangement with any

8    other broker-dealer?

9         A    No.

10        Q    I want to move on now to the topic of

11   12b-1 fees.

12             Mr. Pagliara, do you know what 12b-1

13   fees are?

14        A    Yes.

15        Q    What do you understand 12b-1 fees to be?

16        A    From a historical perspective or -- or

17   just -- you know, I can give you a historical

18   perspective of how they started in the industry --

19        Q    No.  No.  No.

20        A    -- if that makes sense.

21        Q    We'll start simple.  What do you

22   understand them to be in terms of today?

23        A    They are reimbursement by the mutual

24   fund companies for services that were performed in

25   an advisory and administrative role in helping

1  them assist their clients with their goals and

2  objectives.

3      Q    In other words, does that mean they are

4  generated by purchases of mutual fund shares?

5      A    They can be, but they -- that's one way

6  of -- of generating a 12b-1 fee.

7      Q    And is it your understanding do they

8  continue to be incurred as an individual or entity

9  holds mutual fund shares?

10     A    It depends on the class of shares,

11 but -- but yes.  So, if they're in a class of

12 shares that there's a 12b-1 fee, yes.

13     Q    So you understand that a fund can have

14 multiple share classes, correct?

15     A    Yes.

16     Q    And you understand that some share

17 classes of a fund may charge 12b-1 fees while

18 other shares classes of a fund may not?

19     A    Yes.

20     Q    How long have you had that understanding

21 about the distinction of mutual fund share

22 classes?

23     A    I don't know, since 1986, 1987 when

24 12b-1 fees were created.

25     Q    So, 12b-1 fees were something that you

1   became familiar with while you were working at

2   Edward Jones?

3        A    Yes.

4        Q    Did you ever receive 12b-1 fees when you

5   were working as a registered representative at

6   Edward Jones?

7        A    I believe they were just starting when I

8   left maybe in 1989.

9        Q    And what -- so, did you ever receive

10  12b-1 fees while you were working at Hilliard

11  Lyons?

12       A    I believe so, yes.

13       Q    And have you received them while working

14  through CapWealth when CWIS was in existence?

15       A    Yes.

16       Q    Do you understand that 12b-1 fees

17  typically have a range in terms of the amount of

18  basis points that they cost a client?

19       A    As they've evolved, yes.

20       Q    And what do you understand the usual

21  or -- or ordinary range of 12b-1 fees to be

22  approximately?

23       A    I don't know now because we have -- you

24  know, we terminated that part of our business in

25  June of 2018 and we don't -- you know, we don't

1   own share classes of 12b-1 fees.

2        Q    When CWIS came into existence in 2009

3   did it start receiving 12b-1 fees through client

4   investments in mutual fund share classes at that

5   time?

6        A    Yes.

7        Q    And did that continue until CWIS ceased

8   operations in 2018?

9        A    Yes.

10       Q    Did the firm -- did CWIS between 2015 to

11  2017 typically bring in around $200,000.00 or so

12  annually in 12b-1 fees?

13       A    I don't recall that number -- the exact

14  number.

15       Q    Does that number sound like that would

16  be within the realm of the approximate amount of

17  12b-1 fees that you recall coming in through CWIS

18  in 2015 to 2017?

19       A    It may have been accurate in the front

20  part of that date range, but, you know, it was

21  tailing off significantly I think towards the end.

22       Q    Walk us through, for 12b-1 fees that

23  came in through a CapWealth advisory client's

24  investment, how those 12b-1 fees were received as

25  compensation by CWIS and/or any registered

1    representatives of CWIS such as yourself.

2            And let me -- and what I can do to

3    clarify the question is, did you personally

4    receive a portion of the 12b-1 fees and did CWIS

5    retain and keep any portion of the 12b-1 fees?

6    A    Well, any of the 12b-1 fees that were

7    collected in CWIS were -- were paid -- they were

8    designated as revenue and -- and they were paid to

9    us from CWIS.

10    Q    Well, that's what I'm trying to

11    understand.  So, who were the registered

12    representatives that would have been receiving the

13    12b-1 fees as compensation at CWIS?

14    A    It would have been me, Tim Murphy and

15    Mark Willoughby.

16    Q    And is there a distinction in terms of

17    the amount of the 12b-1 fee compensation that Mr.

18    Murphy, Mr. Willoughby or you received depending

19    on whose client was generating the 12b-1 fee?

20    A    It would have been they came in in a

21    lump sum and they were designated to the rep that

22    owned -- that had the -- the funds in their

23    particular client base.

24    Q    For example, for Mr. Murphy, did he get

25    100 percent of the 12b-1 fees that came in from

1  his client investments?

2      A    Yes.  Well, subject to whatever revenue

3  sharing arrangement existed for his portion of the

4  expenses related to occupancy and other things

5  with CWIS, yes.

6      Q    So, there was an arrangement between Mr.

7  Murphy and CWIS?

8      A    I don't remember if it was directly

9  between Mr. Murphy and CWIS.  It was -- it was

10  related to the total revenue that he generated

11  from CWIS and CWA.

12      Q    And I'm not trying to ask any trick

13  questions here.  I'm just trying to understand as

14  best you recall how the 12b-1 fee came in as

15  compensation through CWIS and who ultimately

16  received any portions of those dollars from 12b-1

17  fees.

18          So, how about we start with just talking

19  about 12b-1 fees that you ended up receiving.  Did

20  you receive any of them specifically as

21  compensation that you personally took home?

22      A    My compensation was from my clients and

23  the profitability of the firm.  So, yes.

24      Q    So, walk us through if a 12b-1 fee came

25  in from a client's investment -- an advisory

1    client's investment, but who had a brokerage

2    account through CWIS, where did that 12b-1 money

3    go to? Would it come in from the fund to CWIS and

4    then it would be split up in some way between you

5    and CapWealth Investment Services?  Or how did it

6    work out in terms of the flow of the 12b-1 fee

7    money?

8         A    It was paid to me subject to -- you

9    know, as it was collected.

10        Q    Okay.  Was any portion of the 12b-1 fees

11   from your client account maintained by CapWealth

12   Investment Services or CapWealth Group?

13        A    Can you repeat that question?

14        Q    Was any portion of the 12b-1 fees that

15   was generated by your client's investments kept in

16   any way by the firm as opposed to being paid out

17   to you as compensation?

18        A    Well, it would be like any dollar of

19   revenue, a portion of it is always retained to

20   cover expenses.

21        Q    And how is that calculation determined

22   in terms of how much is kept by the firm for

23   expenses?

24        A    Well, it was whatever net profits were

25   after expenses was paid out to me.

1    Q    Okay.  So, there was no set amount in

2  terms of a percentage that you were getting of

3  12b-1 fees?  It was the left over net profit after

4  expenses?

5    A    Yes.

6    Q    And did you personally receive money

7  from CapWealth Group when -- in terms of

8  compensation that was brought in and then figuring

9  out net profit after expenses, was that through

10  CapWealth Group that you received your

11  compensation?

12    A    All of my compensation was consolidated

13  through CapWealth Group and paid to me.

14    Q    That was my question.

15    A    So, again -- okay, good.

16    Q    Are you familiar though, as far as the

17  other registered representatives, Mr. Murphy and

18  Mr. Willoughby, was their compensation determined

19  by some type of compensation grid?

20    A    Repeat the question, please.

21    Q    Was there a compensation grid that was

22  used to determine how much compensation the other

23  registered representatives, Mr. Willoughby and Mr.

24  Murphy, received?

25    A    Yes.

1    Q    Tell us about that compensation grid and
2    how you understand that it worked.
3    A    In a very general way, without having it
4    in front of me, it was an attempt to -- a dollar
5    of revenue that they generated would have costs
6    associated with it.  We would deduct those costs,
7    and not in a very specific way, but just as a
8    percentage of revenue, and then they were paid the
9    difference.
10    Q    Okay.  And I understand you're saying
11    you don't have the compensation grid in front of
12    you, correct?
13    A    That's right.
14    Q    Okay.  So, we're going to -- we
15    essentially already asked for it, but we'll make
16    sure we follow-up to get that so we can,
17    ourselves, look at it and we'll let you know if we
18    have follow-up questions later.
19         Turning to your clients that you serve
20    directly through CapWealth.  How did you choose
21    mutual fund share classes for your clients?
22    A    Now, initially in 2000 we chose F1
23    shares, no commission, F1 shares for our clients.
24    Q    And why -- why -- when you say F1
25    shares, why were you choosing F1 shares?

1      A      The majority of our business was done

2   with Capital Research and Management and American

3   Funds and that's what they had designated

4   available for advisory accounts.

5      Q      And how did you understand that's what

6   was available?

7      A      That's all it was available.  If we

8   wanted to provide our clients -- they were --

9   initially they were, you know, low weight -- they

10  had low weight A shares where you would just get a

11  12b-1 fee.  And then they formally designated that

12  with F1 shares where you were only compensated for

13  the 25 basis point reimbursement for your help in

14  administering the account.

15     Q      And when you say you typically were

16  choosing F1 shares, did you arrive at that

17  decision yourself by looking at a prospectus for

18  each fund or was there some other way that you

19  actually chose the shares you recommended and

20  chose for a client?

21     A      Those were in the prospectus, yes.  I

22  mean, by prospectus that's how they were

23  designated. And we had -- the industry was going

24  through changes.  I felt like the commission model

25  was broken and the advisory model with the

1  collection of those servicing fees, as I believe

2  they were at the time, was the -- was the future.

3      Q    Well, when you say you believed the

4  commission model was broken, what do you mean by

5  that?

6      A    Well, in -- in 1987 when 12b-1 fees were

7  created, they were done at a tremendous amount of

8  study with Peter Drucker who was the -- you know,

9  widely regarded as one of the top management

10  experts of our time and the Securities

11  Administration Association.  And he -- he said you

12  are paying clients -- clients are paying you for

13  things that -- it's really not the value you add

14  and it's not fair to them.

15           And so, the industry went from a model

16  where mutual funds were eight-and-a-half to nine

17  percent, they cut the commission to

18  five-and-three-quarters percent, plus the 25 basis

19  point trail.  By 2000 when I established

20  CapWealth, you know, I didn't even think that was

21  fair because what I was paying clients for, as Mr.

22  Drucker had indicated in his analysis back in the

23  late '80s, I was giving them advice.  I was paying

24  them and the industry was -- the whole

25  compensation in the industry was over

1    transactions.

2           And, you know, as I discussed it with

3    clients when I changed my business model in 2000,

4    I said, you know, if I charge you a

5    five-and-three-quarters percent commission that's

6    like you paying the guy that cuts your grass five

7    years in advance for the advice that he's going to

8    provide you.  And so, I thought that the advisory

9    business with that 12b-1 fee was a more equitable

10   way of reflecting the value that I was adding to

11   their, you know, goals and objectives and

12   achieving and maintaining financial security and

13   what the industry had to offer at the time.

14        Q    You mentioned Mr. Drucker with a D?

15        A    Yes.

16        Q    Can you spell that name for the record?

17        A    D-R-U-C-K-E-R.

18        Q    And what was --

19        A    Peter.

20        Q    Peter, P-E-T-E-R?

21        A    Yes.

22        Q    Going back to CapWealth clients though.

23   Once CWIS was in existence, so, basically, the

24   last decade or so from 2009 until CWIS ended in

25   2018, how did you specifically for your clients

1    look through and decide which share classes of

2    which funds you were going to choose for a client

3    to invest in?

4         A    I would buy the share class that was

5    available that reflected the F -- that reflected

6    the advisory relationship that I had with the

7    client.

8         Q    Well, I feel like we're missing a step

9    here.  So, let's -- let's back up a little.

10            Were there models that you looked at at

11   CapWealth that looked at potential funds to

12   consider for them to invest in, for clients to

13   invest in?

14        A    The majority of my business was done

15   with Capital Research and Management.  And that

16   was the model that they had and that's what I

17   used.

18        Q    So, tell us a little more about Capital

19   Research and Management.  What is that?

20        A    Well, it's one of the largest asset

21   management firms in the world.  I believe they

22   manage almost $2 trillion worth of assets.  They

23   have a very unique style in managing assets.

24   They're very, very client friendly.  I respect

25   their investment management process.  And they've

1    been my business partner essentially since I

2    started in the industry and was first licensed.

3    I've worked with their funds for, you know, 38

4    years -- 38 plus years.

5        Q    Well, tell us about the relationship.

6    You said -- you used the term partner, what do you

7    mean by that?  Is there an actual written

8    agreement between CapWealth and that entity?

9        A    There's a broker-dealer arrangement that

10   allows me to sell their funds, but when I consider

11   them a parter, you know, one of the things that's

12   important to me when I look at the landscape, you

13   have to be dealing with people that you can trust.

14   You have to be dealing with process.  You've got

15   to be dealing with, you know, what's fair and --

16   and I felt like that they have been kind of a

17   beacon of -- of consistency in the industry.

18   And -- and so, I -- you know, I -- I work with

19   them.  I like that, you know.  They -- they have a

20   very cost effective structure for my clients.

21       Q    Just so I can make sure I'm clear.  This

22   is the investment company that has the American

23   Funds?

24       A    Yes.  Capital Research and Management is

25   the parent company -- is the holding company of

1    the American Funds Group.

2         Q    And so you're saying -- is it correct to

3    say you typically have invested clients into

4    American Funds?

5         A    Yes.

6         Q    How did you choose which specific funds

7    you would invest clients in?

8         A    You know, towards -- as we developed

9    more of our internal capabilities and success, you

10   know, with individual securities, mutual funds

11   became a -- a much smaller percentage of our total

12   revenue from 2000 on.  So, we used Capital

13   Research and Management for accounts that were too

14   small to own individual securities.  And we used

15   some of their funds to supplement client accounts

16   in areas where we didn't have specific expertise

17   like international investing or some other type of

18   investment that was specific to a fund that they

19   managed.

20        Q    Were there certain types of American

21   Funds -- and I'm not getting to the share class

22   level yet, but just the specific type of funds

23   that you tended to use over and over for multiple

24   clients?

25        A    Yes.

1        Q     Did you collect or keep track of those

2   in any way such as a fund model or a fund menu

3   that you used internally at CapWealth?

4        A     Eventually we did.  We did eventually

5   create fund models.

6        Q     Tell us about when you recall the models

7   starting to be created.

8        A     It would have been some time probably

9   2014 maybe.

10       Q     And did the models go to the level of

11  recommending share classes of the specific funds?

12       A     That would have been -- yes, that would

13  have been in the model.

14       Q     And were 12b-1 fees, were they a factor

15  in terms of choosing which share classes were

16  listed on the model?

17       A     No.

18       Q     Did 12b-1 fees factor at all into the

19  share classes that you did ultimately recommend

20  and choose for clients?

21       A     No.

22       Q     You were receiving 12b-1 fees though

23  from client investments on a regular basis though,

24  correct?

25       A     Yes.

1      Q    So, if the 12b-1 fees didn't factor into

2    the analysis why choose the share classes that had

3    12b-1 fees?

4      A    Well, they were there.  I mean, 12b-1

5    fees were present in -- were present at that time.

6    And you have to go back into the period 2000 to

7    2009-2010.  If -- if I've got F1 shares at Charles

8    Schwab and I didn't collect those 12b-1 fees,

9    Charles Schwab was collecting them.  They were

10   there.  It is -- you know, they weren't paid to me

11   directly.  They were paid to the custodian, the

12   broker-dealer.  And so, the clients incurred those

13   costs regardless.  And that's when the industry

14   started changing.  In 2015 there was a

15   proliferation of different share classes.

16     Q    Are you familiar with American Funds and

17   the F2 share class?

18     A    Yes.

19     Q    What do you understand the F2 share

20   class to be as compared to the F1 share class for

21   American Funds?

22     A    The F2 share class was something that

23   they created that eliminated the 12b-1 fees that

24   were paid to an adviser.  And they paid 20 basis

25   points, I believe, or some compensation to the

1  custodian like Charles Schwab.

2      Q    And do you remember how far back F2

3  shares were generally available through American

4  Funds?

5      A    No.  Somewhere in the time frame of

6  2015.

7      Q    Did you generally review and look at

8  prospectus materials for funds to see if F2 shares

9  were available as opposed to F1 shares for

10  American Funds?

11      A    I believe I would have, yes.

12      Q    And is that something you did as far

13  back as 2009 when CWIS was created?

14      A    Yes.

15      Q    If there was a class -- or let me say,

16  if there was a fund you were looking at for

17  clients that you thought was an appropriate

18  recommendation for clients and it offered both an

19  F1 share and an F2 share in 2015, did you

20  typically choose the F1 share?

21      A    We were starting to migrate to F2 shares

22  at that point.

23      Q    And why was that?

24      A    That were available.  Probably because

25  they provided lower costs for the client.

 1    Q   Well, let's -- let's stop there. Before

 2   you talk about migrating, before 2015 was

 3   CapWealth and you, were you typically -- if you

 4   were making a mutual fund selection to the F1

 5   share over the F2 shares?

 6    A   I don't remember.  You're attempting to

 7   play a game of gotcha here that started with a

 8   process that made this industry, and continues to

 9   make this industry, better for clients.  And so,

10   why don't we just cut to the chase of what you're

11   trying to get to instead of asking these questions

12   about what was done 15 years ago or five years ago

13   that no one would remember.  What is it that

14   you're getting after?

15    Q   Well, Mr. Pagliara, I'm not playing a

16   game.  I'm simply conducting an investigation and

17   we're trying to work through what the business

18   model was and understand the business model at

19   CapWealth as it existed years ago when CWIS first

20   came into affect.  And we want to understand how

21   it changed over time.  And we're trying to make

22   sure we don't skip steps and understand what

23   changed and what was the process in terms of how

24   things were selected.

25           So, we're not playing any type of gotcha

1    game.  We're simply trying to ask questions and

2    make sure we give you a fulsome chance to explain

3    the business model, how it changed over time.  And

4    if I'm asking lots of questions it's because I

5    want to make sure I don't put words in your mouth.

6    I want to make sure I fully give you a chance to

7    explain things as we move through the time

8    continuum that we're investigating.  Does that

9    make sense?

10        A    I disagree with your characterization of

11   that, but go ahead, continue to ask your

12   questions.

13        Q    Why don't we -- we'll move on to a

14   different topic, but we'll still be able to talk

15   about the F1 and the F2 shares through this.

16             So, is there an investment committee at

17   CapWealth?

18        A    There's an investment policy committee,

19   yes.

20        Q    Tell me about the investment policy

21   committee in terms of who is on it and what it

22   does.

23        A    The investment policy committee consists

24   of me, Phoebe Venable, Ryan Hitt, Grant Stark,

25   Drew O'Connell, Jennifer Paglia, and Hunter

1    Yarbrough.

2        Q    So, there's a couple of names that I

3    don't think I've encountered before.  So, if I

4    could go over those.

5             Brad Stark is the first one.  Could you

6    spell the last name for us?

7        A    Grant Stark, S-T-A-R-K.  He joined my

8    firm as director of research March 1st.

9        Q    Of 2020?

10       A    Yes.

11       Q    And then I think the next name that you

12   provided was Drew O'Connell.

13       A    Yes.

14       Q    And is that O apostrophe C-O-N-N-E-L-L?

15       A    Yes.

16       Q    And who is Drew O'Connell?

17       A    Drew O'Connell joined the firm in March

18   of 2020 and he's a chartered financial analyst

19   just like Grant Stark is.  And they're there to

20   beef up research and -- that is necessary as part

21   of our investment policy committee.

22       Q    And the other name I was not familiar

23   with was Hunter Yarbrough.  Could you spell the

24   last name for us?

25       A    Y-A-R-B-R-O-U-G-H.

1     Q     And who is Hunter Yarbrough?

2     A     Hunter Yarbrough is executive vice

3  president and a client services adviser.  He owns

4  the same designation -- same position that

5  Jennifer Pagliara has.

6     Q     How often does the investment policy

7  committee meet?

8     A     Every two weeks.

9     Q     Are there minutes or notes created by

10  the meeting?

11     A     Yes.

12     Q     And who makes those notes?

13     A     Depends on who's at the meeting.

14     Q     Is there a secretary assigned for that

15  committee?

16     A     There's a secretary assigned for the

17  meeting.

18     Q     Are the notes regularly maintained in

19  any manner, such as, through a -- a shared server

20  or somewhere where people who are on the committee

21  can access them and see the notes from each

22  meeting?

23     A     Yes, as well as, the research on the

24  companies that we -- that we maintain.

25     Q     Walk us through what generally happens

1    at one of the regular investment policy committee

2    meetings.

3         A    Typically we talk about the individual

4    companies, its latest earnings reports, how they

5    might specifically meet the objective of a client,

6    how they're integrated into one of the three

7    models that we maintain, which would be an equity

8    income model, a growth and income model and a

9    growth model.

10        Q    And does the committee typically, as

11   part of its work, does it consider and look at

12   mutual funds as potential things to recommend for

13   clients?

14        A    No.  The mutual fund portion of what we

15   have is generally not discussed in that meeting.

16        Q    Going back to when CWIS was in

17   operation.  So, let's go back five years ago.  Did

18   the investment policy committee exist then?

19        A    I think we started it, yeah, about that

20   time on a more regular basis, yes.

21        Q    Did the committee consider and look at

22   and review mutual fund options at that point?

23        A    No, because we had a very limited menu.

24   You know, American Funds was our primary -- our

25   primary partner in what we did with mutual funds.

1      Q    Was there ever a mutual fund model that

2  was used by CAP Wealth?

3      A    No, because it's different for each --

4  every client was different and we were -- you

5  know, if you looked at our -- our investment

6  strategy for a client, about 80 percent of what we

7  did was with individual stocks.  Mutual funds was

8  a small portion of it.

9      Q    So, why don't we take a ten-minute

10  break.  I think now is a good point to do that.

11  And we'll stop now.

12          MR. BASINGER:  We're off the record at

13  10:59 a.m.

14          (A brief recess was taken.)

15          MR. BASINGER:  So, we are back on the

16  record at 11:11 a.m. on Friday, May the 5th, 2020.

17          BY MR. BASINGER:

18      Q    Mr. Pagliara, can you confirm that while

19  we were off the record that we did not continue

20  having substantive discussions of this matter.

21      A    We did not have any discussions on this

22  matter off the record.

23      Q    Thank you.

24          I'm going to close Exhibit 21 and I am

25  now going to open what was previously marked as

1   CAP Exhibit No. 5 which is an investment

2   management agreement.  And I'm going to scroll to

3   the bottom of the page and show the stamp that was

4   previously placed upon this document as CAP-5.

5   And I'll note for the record, the Bates stamp on

6   the first page is CW 000910.  I'm going to scroll

7   back to the top and I'm just going to ask --

8       A    Can I correct?  You that's 901.

9       Q    Did I say 910?

10      A    Yes.

11      Q    I apologize.  So, I'll say it again. So,

12  its CW 0000901.  Thank you.

13          I'm going to scroll back to the top of

14  Exhibit 5 and I'll just ask as a starting point,

15  Mr. Pagliara, can you identify what this document

16  is?

17      A    It's our investment management agreement

18  for discretionary accounts.

19      Q    And are you familiar with this document?

20      A    Yes.

21      Q    What do you understand this document to

22  be and how is it used?

23      A    It describes our relationship with our

24  clients and, you know, our responsibilities on

25  managing their accounts.

1      Q      Has CapWealth used a similar document

2   since 2009?

3      A      Yes.

4      Q      How did CapWealth first come to draft or

5   prepare an investment management agreement like

6   this?

7      A      I believe we did it with the help of an

8   outside consulting firm.

9      Q      Did you, yourself have, any role in

10  drafting the content of the IMA?

11     A      I reviewed it, yes, and would have had

12  some input into it, yes.

13     Q      I'm going to go to the second page of

14  the document.  And there is a section here at the

15  top of page two called, Section Five, with the

16  subtitle of, Management Fees.  And you'll see

17  there's the -- there's the second paragraph which

18  reads, quote, Client understands that account

19  assets invested in shares of mutual funds or other

20  investment companies, quote, funds, end quote,

21  will be included in calculating the value of the

22  account for purposes of computing advisors fees

23  and the same assets will also be subject to

24  additional advisory and other fees and expenses as

25  set forth in the prospectuses of those funds paid

1    by the fund, but ultimately borne by the investor,

2    end quote.

3            Mr. Pagliara, are you familiar with this

4    language in the IMA?

5        A    Yes.

6        Q    What do you understand this language to

7    mean?

8        A    That the client acknowledges that's how

9    we're going to be paid and that there may be

10   additional funds and -- additional fees and

11   expenses as set forth in the prospectus of those

12   funds paid by the funds but ultimately borne by

13   the investor.

14       Q    For the phrase, quote, Additional

15   advisory and other fees and expenses as set forth

16   in the prospectuses of those funds, end quote, do

17   you have any understanding as to what those types

18   of advisory and other fees and expenses are with

19   any more specificity?

20       A    They refer specifically, I believe, to

21   the 12b-1 fees that are at the heart of this

22   investigation.

23       Q    Is there anything else that you

24   understand falls into the category of the advisory

25   and other fees and expenses noted here in the IMA?

1     A    No.

2     Q    So, your personal understanding as you
3  understand that that's a reference to the 12b-1
4  fees incurred from certain mutual fund
5  investments; is that correct?

6     A    Other fees and expenses could -- you
7  know, they could incorporate legal, accounting,
8  the management fees of those particular funds.
9  So, it's kind of an all encompassing thing.  So,
10  yes, it would be all of those.  I'll correct my
11  previous answer.

12     Q    You do understand it though in part as
13  including 12b-1 fees, correct?

14     A    Yes.

15     Q    Do you know who drafted this specific
16  sentence for the IMA?

17     A    No.

18     Q    Has it been used, as far as you can
19  recall, during the last five years or so in the
20  IMA?

21     A    Yes.

22     Q    Have you ever considered why it does not
23  go to the level of spelling out the fact that
24  12b-1 fees are included in what you understand to
25  be that phrase, advisory and other expenses?

1      A     Could you repeat the question?

2      Q     Let me rephrase the question.

3            Do you feel that this language as it's

4   written in the IMA in this paragraph is clear

5   enough for clients to understand that it

6   encompasses 12b-1 fees?

7      A     Yes.

8      Q     Why is that?

9      A     Because this was a topic of extensive

10  discussion with the Securities and Exchange

11  Commission during their initial audit of our firm

12  in 2011 in which we discussed in great detail the

13  relationship between CWIS and CWA.  They were in

14  my office for two weeks.  They had, I believe, at

15  one time as many as eight examiners.  We had a

16  very colloquial discussion about our business

17  model, the disclosures that we made to our clients

18  and this agreement is the basis upon which we have

19  done business since 2009 and 2011 after those

20  substantial discussions with your representatives

21  during the first field audit of my firm.

22      Q    So, I'll just note for the record, I'm a

23  part of the Division of Enforcement.  I think the

24  examination you're referring to is from a

25  different part of the SEC called The Office of

1   Compliance, Inspections and Examinations.  I just

2   want to note that this enforcement investigation

3   today is not related to or part of that Office of

4   Compliance, Inspections and Examinations.

5           So, you're saying there was a prior on

6   site examination of the firm that took place, not

7   in 2019, but in a prior year?

8       A    2011.  And you've been furnished a copy

9   of that audit and the findings from that audit.

10      Q    And what specifically do you recall from

11  that exam that touched upon 12b-1 fees in 2011?

12      A    That we discussed our business model,

13  how we used the 12b-1 fees.  The purpose of

14  CapWealth Investment Services was to reduce fees

15  for clients.  The question came up, Why don't you

16  just clear at a firm like Charles Schwab?  Why

17  even have a broker-dealer?  And the discussion

18  centered around it was our intent to be more cost

19  effective in how we set up our advisory agreement

20  and how we were compensated in our relationship

21  with our clients.

22          During those discussions we discussed

23  the three different areas that we received in

24  compensation and the expenses that a client

25  incurred.  And we went into each one of those in

1  detail and why we did what we did, why it was

2  unique, why it resulted in overall lower fees to

3  clients.  And they were very satisfied with that.

4      Q    Is there anything else you recall from

5  that specific examination concerning 12b-1 fees?

6      A    I can go into detail on all three

7  aspects of it if you'd like.

8      Q    Well, my specific question is just

9  about, is there anything else about 12b-1 fees.

10  And this IMA is really what I'm focusing on right

11  now. Was there anything else concerning the

12  investment management agreement and 12b-1 fees

13  that you recall discussing with the SEC's exam

14  staff in 2011?

15      A    Yes.  There was a collateral -- also

16  examined CapWealth Investment Services.  And there

17  was substantial discussion between the

18  relationship with both and the disclosures it

19  would make in collecting those 12b-1 fees.  And

20  they opined on the adequacy of that, that if they

21  were -- we satisfied them.

22          They had some questions about the

23  disclosure of the trading fees that the

24  commission -- or transaction fee as it was

25  described.  The transaction fees that we had of

1  14.95 and the relationship that we had with our

2  broker-dealer and the disclosure of that.  And we

3  updated the disclosure based upon their

4  recommendations and followed exactly what they

5  asked of us as a follow-up to that audit.

6        Q    Is it okay for me to proceed with my

7  other questions about this document now?

8        A    You were never kept from doing that.

9  It's your deposition to proceed.

10        Q    Oh, no.  I'm not inferring you were

11  preventing me.  I just wanted to make sure you had

12  a chance to tell us what you wanted to tell us

13  about that exam, the prior exam.

14        A    You asked a question and I answered it.

15        Q    Okay.

16        A    I'm ready to answer your next question.

17        Q    Okay.  Turning back to page two of

18  Exhibit No. 5 here in this IMA for CapWealth.  The

19  paragraph we're looking at there in section five,

20  it doesn't specifically use the term 12b-1 fees,

21  correct?

22        A    No.

23        Q    Did you ever consider updating the IMA

24  to include that term in this portion of the

25  document?

1       A    No.

2       Q    And is there a reason for that?

3       A    I relied on the guidance and discussions

4  that I had during the field examination with the

5  Securities and Exchange Commission in 2011.

6       Q    This portion of the document in the IMA

7  does not identify 12b-1 fees as a conflict of

8  interest, correct?

9       A    No.

10      Q    And if I scroll down to section eight

11 there is a paragraph that reads -- and I'm going

12 to highlight it for you.  Can you see that

13 paragraph?

14      A    Yes.

15      Q    It reads, quote, Conflicts of interest

16 may arise in the allocation of investment

17 opportunities among accounts that adviser advises.

18 Adviser will speak to allocate investment

19 opportunities believed appropriate for clients

20 accounts and other accounts advised by adviser

21 among such accounts equitably and in a manner

22 consistent with the best interest of all accounts

23 involved, but there can be no assurance that a

24 particular investment opportunity that comes to

25 the attention of adviser will be allocated in any

1    particular manner, end quote.

2            Now, did you have any role in drafting

3    this language about conflicts of interest for the

4    IMA?

5        A    I don't remember, but I -- no.  I don't

6    remember.

7        Q    That's fair.  We only ask for you to

8    tell us what you do recall.

9            This specific language about conflicts

10   of identify does not identify 12b-1 fees in any

11   way, does it?

12       A    No.

13       Q    Did you ever consider whether this

14   section needed to be amended to address 12b-1 fees

15   in any way?

16       A    No.

17       Q    I'm going to turn to, or flip forward I

18   should say, in the document that's being

19   displayed, Exhibit 5, to page five which is

20   titled, Schedule A Investment Advisory Accounts,

21   Investment Management Agreement.

22           Mr. Pagliara, can you identify this

23   schedule A and if it has a specific use in terms

24   of -- or a relationship to the custodian that's

25   named in this document?

1    A    Yes.

2    Q    What do you understand to be the

3    specific use for this version of schedule A of

4    this the document?

5    A    It was attached to the investment

6    management agreement that you referred to.

7    Q    Do you see section two of the document

8    where it says, Custody of Account Assets?

9    A    Yes.

10   Q    The name of the custodian listed is,

11   Sterne Agee Clearing, Inc.  What do you understand

12   Sterne Agee Clearing, Inc. to be?

13   A    Sterne Agee Clearing, Inc. was the --

14   and I don't know the -- the technical side of it.

15   We were an introducing broker-dealer that had

16   nothing to do with the actual custody of the

17   documents and they had the full responsibility for

18   custody -- custody and clearing and where those

19   accounts resided.

20   Q    And was there more than one custodian

21   that was used by CapWealth for its clients over

22   the course of the last five years?

23   A    We changed -- we -- we added BNY

24   Mellon/Pershing in 2015.

25   Q    And was that the migration you were

1    referencing a little bit earlier today of certain

2    accounts?

3         A    Yes.

4         Q    Tell us a little bit more about the

5    reason CapWealth was migrating certain clients

6    over to Pershing for custody of their assets?

7         A    Sterne Agee had been involved in a -- a

8    pretty serious scandal that involved embezzlement

9    by their chairman and extended all the way into

10   the office of general counsel.  The chairman,

11   chief -- chairman, chief executive officer and

12   chief operating officer, as well as, the general

13   counsel of the firm were removed by the

14   shareholders.  And it had become clear as a result

15   of that that they had a lot of financial issues

16   and a lot of turmoil. And, as such, they were our

17   primary clearing firm and in the best interest of

18   our business and our clients, we aggressively

19   started a process to leave them and remove our

20   assets from Sterne Agee.  And Pershing was the

21   firm that we picked to -- to do that.

22        Q    And did that impact in any way

23   CapWealth, or its registered representatives that

24   worked there, receipt of 12b-1 fees once client

25   accounts were moved over to Pershing?

1     A     Yes.

2     Q     How did it impact their receipt of 12b-1

3   fees for those accounts?

4     A     As part of the process of moving to

5   Pershing it was our intention to move everything

6   to Pershing and to eliminate CapWealth Investment

7   Services, just to shut it down.  We saw that the

8   trends in the industry were giving clients more

9   choices and we wanted to be able to align ourself

10  with that.  And so, this was the first part of the

11  move to -- to get them aligned with Pershing.

12  Pershing was just a custody firm similar to

13  Charles Schwab and we were in the process of

14  moving to a pure RIA platform.

15    Q     And so, by doing that for accounts that

16  moved to Pershing, did that mean that CWIS and its

17  registered representatives could no longer receive

18  12b-1 fees through clients assets that were at

19  Pershing?

20    A     That's correct.

21    Q     What specifically happened -- let me

22  back up.

23          Did you have any clients yourself that

24  were part of that initial migration to Pershing in

25  2015?

1     A    Most of them were my clients.

2     Q    And which clients were moved, as far as

3  you recall? Was there a certain criteria used to

4  select those that were part of that migration?

5     A    It was generally the higher net worth

6  clients and the clients that we had the best

7  relationships with that could withstand some of

8  the confusion that goes along with, you know, the

9  account transfer process account by account and --

10  and setting up new checking and new deposit and

11  ACH relationships and all of that. So, we wanted

12  to move our -- you know, our clients with the best

13  relationships first and -- and get a feel through

14  the learning process that accompanies a -- a huge

15  undertaking like that administratively to get it

16  done.

17     Q    Did any of those clients, as far as you

18  recall, hold mutual funds that were charging 12b-1

19  fees such as through an F1 share class?

20     A    Yes.

21     Q    When the client assets were moved to

22  Pershing did they stay in the F1 share class or

23  did the share class change for those clients?

24     A    I don't remember specifically. I think

25  we were attempting to move those, but I -- I don't

1   remember.

2       Q    Do you recall if at any point while your

3   clients were at Pershing they were able to convert

4   their share classes to F2 share classes that had

5   no 12b-1 fees?

6       A    I don't remember.  Our intent -- our

7   intent was to convert everybody to F2 shares.  And

8   my recollection was that Pershing was such a

9   disaster from what they promised us to what they

10  could deliver for the specific needs of our client

11  base that we never got to the point where we could

12  do a system wide conversion, which is a very

13  detailed process when you're converting share

14  classes.  We never got to that point.  It was a --

15  it was a bad experience.

16      Q    When you talk about there was a -- the

17  terminology you used -- if you want to use a

18  different term, that's fine, but I thought you

19  said you had an intention of converting everyone

20  to F2 share classes at some point; is that

21  correct?

22      A    Our intent was to shut down the

23  broker-dealer so that we wouldn't collect any

24  12b-1 fees and our intent was with the second wave

25  of clients that we were going to move to Pershing,

1   which were typically our smaller accounts, to

2   execute the fee increase and to eliminate

3   CapWealth Investment Services completely.

4        Q    Why not go ahead while -- let me ask the

5   question though.

6             Why not go ahead in 2015 when clients

7   still had assets at Sterne Agee and convert them

8   to F2 share classes first while trying to figure

9   out whether Pershing was going to work or not?

10       A    Thirteen days after we started the

11  execution of moving accounts to Pershing, Stifel

12  Nicolaus did what we knew was going to happen

13  because of the financial problems that Sterne was

14  having, they bought Sterne Agee.  Stifel Nicolaus

15  is a publicly traded broker-dealer, an advisory

16  firm, an investment banking and research firm.

17  They had a custodial platform.  And everything

18  stopped at Sterne Agee.  It was absolute chaos.

19  And executing a transaction where you converted

20  shares from one share class to another was

21  impossible.  They were cutting staff and the firm

22  was getting held together, basically, with baling

23  wire as they went through that process that always

24  occurs when you're buying a distressed firm and a

25  firm with the kinds of problems that they had.

1    We were a -- we were the largest

2    independent registered investment adviser that

3    they had, but it was a stepchild to the problems

4    that existed within that firm.  So, it wasn't even

5    a -- it wasn't even a possibility during that time

6    frame.

7         Q    Before Stifel made its acquisition of

8    Sterne Agee were F2 shares available for purchase

9    for new clients through -- that -- that had their

10   assets custodied at Sterne Agee?

11        A    Yes.

12        Q    Did CapWealth ever choose F2 shares to

13   clients and buy them before the Stifel acquisition

14   of Sterne Agee?

15        A    Yes.

16        Q    In what situations did that take place?

17        A    A variety of accounts.  I had accounts

18   with F1 shares.  I had accounts with F2 shares.

19   In January of 2016 or some time earlier in '17

20   American Funds announced that they were going to

21   have F3 shares.  You know, it was a very difficult

22   period given the specific things that we had to

23   deal with with Sterne Agee and Stifel and the

24   problems that we associated with Pershing that we

25   had with Pershing.

1    Q    Once Stifel did acquire Sterne Agee did

2    there come a point when new purchases were able to

3    be made again of mutual fund share classes?

4    A    They were always available.

5    Q    So, it wasn't even in that transition

6    phase that CapWealth was unable to make new

7    purchases for client accounts?

8    A    Could you repeat that question?  I don't

9    understand it.

10    Q    Sure.  I'll give you -- sure.  Sure.

11         So, it sounded like before, you tell me

12    if I'm understanding correctly, you were

13    testifying that there were not conversions being

14    made for clients whose assets were custodied at

15    Sterne Agee when Stifel took over Sterne Agee

16    because there seemed to be a lot of technological

17    and other issues going on that made things

18    problematic.  That's the way I understood that.

19    If you want to rephrase it, feel free.

20    A    That's correct.

21    Q    My question is, after Stifel did make

22    that acquisition, were you able to buy share

23    classes within a certain amount of time after that

24    acquisition was finalized?  I'm just trying to

25    understand if there was a point where you couldn't

1   make any fund share class purchases at all?

2       A    No.  We could still purchase mutual

3   funds during that period.

4       Q    So, you -- you could have for clients --

5   or let me ask, did you after the Stifel

6   acquisition make F1 purchases for clients?  New

7   purchases that is.

8       A    We probably did, yes, but I can't give

9   you any specific examples.

10      Q    Do you think you also probably made any

11  F2 purchases through Stifel?

12      A    Yes.

13      Q    So, it sounded like earlier were you

14  talking about, there were problems that prevented

15  conversions from taking place for clients that

16  already held F1 shares that could have been moved

17  over to F2 shares?

18      A    Yes.

19      Q    Okay.  So, that's what I was just trying

20  to just clarify what you were describing before in

21  terms of the situation as it was when Stifel took

22  over Sterne Agee.  So -- go ahead.

23      A    I'll wait for your question.

24      Q    Is it fair to say you believed there

25  were issues at Stifel in terms of process, or what

1   have you, that made making share class conversions

2   for clients not something you saw as possible to

3   do at that time in 2015?

4        A    Yes.

5        Q    Okay.  The new purchases for clients did

6   continue once Stifel had acquired Sterne Agee?

7        A    Yes.

8        Q    Okay.  Going back to page five of

9   Exhibit No. 5, section three shows an advisory fee

10  schedule.  Are you familiar with that advisory fee

11  schedule that's listed in section three?

12       A    Do you -- are you putting it up on the

13  screen here?  I don't see it on the screen.

14       Q    Is this down here -- are you able to see

15  the PDF right now?

16       A    Yeah.  Now I see it.  So, you're

17  referring to section three?  Yes.

18       Q    Correct.

19       A    Yes.

20       Q    Do you understand is that an advisory

21  fee schedule or do you call it something else?

22       A    Yes.  No, that would be an advisory fee

23  schedule.

24       Q    Okay.  It's my understanding, you know,

25  the document as it was produced didn't have a date

1   on it, but this is one of the ones that was given

2   to us.  Looking at the fee schedule can you

3   identify approximately what year this might have

4   been in effect for CapWealth?

5        A    It would have been in effect I think

6   during the entire period we were at Sterne.

7        Q    So, prior to June of 2018?

8        A    I believe so.

9        Q    Okay.  Did you typically use this

10  schedule with your clients?

11       A    Yes.

12       Q    Did you ever make any discounts for

13  clients in terms of the advisory fee in light of

14  12b-1 fees you were receiving for mutual fund

15  investments?

16       A    Yes.

17       Q    Tell us about that process and how you

18  would have calculated or determined a advisory fee

19  discount in light of 12b-1 fees.

20       A    For example, I've got one client that

21  has $10 million invested with me.  They actually

22  operate off of a discount from our fee schedule.

23  And then, they have four children.  Each of their

24  four children now have at least two children.  So,

25  you have four and eight's 12.  That client

1    individually has four different accounts.  They've

2    got a trust account, they've got two joint

3    accounts -- they actually had more than that.

4    They have a SEP account and they have an

5    individual retirement account.  And then each of

6    the children and each of the grandchildren have a

7    separate trust account that receives gifting money

8    that funds an irrevocable life insurance trust.

9    And each one of those accounts is set up

10   differently.

11           So, those accounts -- those -- the

12   children's accounts and the trust accounts and the

13   grandchildren's accounts, and I think we're up to

14   maybe 15 or 20 at this point, none of those are

15   subject to the advisory fee.  They hold a variety

16   of mutual funds from American Funds Group.  And

17   those accounts at that time would have been F1

18   shares so that we were receiving a 25 basis point

19   trail for administering those accounts and

20   providing services to those accounts.

21       Q    So, would each of those clients have

22   filled out a investment management agreement for

23   each one of those accounts similar to the one we

24   see displayed here in Exhibit 5?

25       A    Yes.

1    Q    And if you determined you were going to

2    offer a discount or no advisory fee, how would

3    that be memorialized on that individual client's

4    investment management agreement?

5    A    Well, if it was no investment advisory

6    fee -- and if you scroll down, there's a --

7    there's a -- another section --

8    Q    On the next page?

9    A    On the next page, yeah, the schedule.

10   Q    Unfortunately, this is the way the

11   document came to me.  So, it may not be what

12   you're expecting to see.  It's looks like kind of

13   the same thing over and over.  It's the family

14   schedule.

15   A    Yeah.  There would be a big family

16   schedule and it would show zero or whatever the

17   fee was, you know, and whatever the discount was.

18   Consolidated investment advisory fees and then you

19   can see there's a space in there where you could

20   put a discount in.  Most of those accounts that I

21   just referenced, they would not have been subject

22   to an annual administrative fee.  So, all of that

23   would have been spelled out.

24   Q    Would you have done that in ink on the

25   paper document?

1       A    Yes, and had the client initial it.

2       Q    So, for example, if it was a -- a -- one

3   of the children's accounts would you have struck

4   through the administrative fee here?

5       A    Yes.

6       Q    And then would you have written -- what

7   would you have done if you were going to charge no

8   advisory fee on the child's account?  Would you

9   write out, No fee charged, or just crossed out

10  this section or what would you do?

11      A    It would have been zero there, but then

12  it would have been noted in our billing system

13  that there was no fee -- no administrative fee for

14  that particular account.  So, it wouldn't -- it

15  wouldn't be collected.

16      Q    I'm going to go back to page five real

17  quick.

18           So, for a schedule such as this one

19  where it has kind of tiered fee rates for

20  different asset levels, how would you

21  memorialize -- how would you memorialize which fee

22  you were going to charge a client using a version

23  of the agreement schedule like this?

24      A    We would have written it in.  You know,

25  back down to that percentage, that -- that

1   previous section that we just looked at where

2   there was a percentage option.  So, some accounts

3   might be four tenths of one percent flat across

4   the board. It would be what we negotiated with the

5   client.

6       Q    And did you ordinarily write that down

7   in ink as well?

8       A    Yes.

9       Q    And then you said it would be

10  memorialized in -- did you say in the billing

11  system?

12      A    Yes.  Then that would be reflected in

13  the billing system as well.

14      Q    And which billing system is that that

15  you're referring to?

16      A    It's the Advent billing system that we

17  use.  It's a -- it's part of the Advent system.

18          MR. BASINGER:  Steve, or, Kristin, did

19  you have any more questions on Exhibit No. 5

20  before I move on?

21          MS. MURNAHAN:  I do not.

22          MR. DONAHUE:  I do not.  Thank you.

23          MR. BASINGER:  I'm going to close

24  Exhibit 5 and I'm going to launch Exhibit No. 6.

25  And Exhibit No. 6 was previously marked yesterday

1    as CAP Exhibit No. 6.  It is the Form ADV Part II

2    A Brochure for CapWealth Advisors with a date of

3    February 8, 2016.

4         Q    I'll zoom in in a minute to make it

5    easier to read, but as a starting point, Mr.

6    Pagliara, are you familiar with Exhibit No. 6?

7         A    Yes.

8         Q    What did you understand this document to

9    be?

10        A    Form ADV Part II.

11        Q    And how is this document typically used

12   by CapWealth?

13        A    It is handed to the clients and it's on

14   the website I believe of the SEC.

15        Q    What do you generally understand this

16   document's content to include?

17        A    It's a general discussion and

18   disclosure, you know, as required by the

19   regulatory -- by, you know, the regulator.

20        Q    Do you recall any more specifically the

21   subsections of content that are within the

22   brochure?

23        A    Not without looking at them.

24        Q    Do you recall if the brochure typically

25   talks about the services provided by the firm to

1    clients?

2         A    I'm sure it does, but I don't have any

3    specific --

4         Q    Okay.  Did you ever work on any editing

5    or review of this document on an annual basis

6    during your time at CapWealth?

7         A    I would have been made aware of it. Now,

8    again, more actively involved with it in 2001,

9    2002 than I would have been in 2016.

10        Q    Who, in the last five years or so, in

11   2015, who regularly had responsibility for

12   reviewing and updating this document on an annual

13   basis at CapWealth?

14        A    Scott Roland, Ryan Hitt and Phoebe

15   Venable.

16        Q    Is it fair to say that the

17   responsibility of reviewing and updating this

18   document during the last five years generally fell

19   to the individual assigned as the chief compliance

20   officer at the firm?

21        A    Yes.

22        Q    Would that -- let me rephrase the

23   question.

24             Who generally would file this document

25   with the SEC each year?

1        A     It would have been Scott Roland until he

2   left his position, I believe, in December of 2017.

3        Q     And then, who took over after that?

4        A     Then it was Phoebe Venable.

5        Q     And how long did Ms. Venable hold that

6   role as far as you recall?

7        A     She's held it probably 'til 2019. And

8   we've now designated Ryan Hitt and we've hired an

9   outside compliance consultant to help us and

10  review it.

11       Q     Who is the outside compliance consultant

12  that's been hired?

13       A     Hold on, let me check.

14             Jon Hurd is his name.  I think it's -- I

15  just don't remember the name of his firm.

16       Q     And that's -- is it H-U-R-D?

17       A     Yes.  It's J-O-N, H-U-R-D.  He did a

18  complete review of all of our documents when we

19  became part of Charles Schwab.

20       Q     That would have been around the -- that

21  would have been around the 2018 to 2019 time

22  period that Mr. Hurd conducted that review?

23       A     Yes.

24       Q     Okay.  So, going back to the version of

25  the brochure that I have displayed from February

1   of 2016.  Were there any other outside compliance

2   consultants that you're aware of that worked on

3   this version of the firm brochure around 2016?

4        A    Yes.

5        Q    What consultant was that?

6        A    The first name is Howard Landers and I

7   think it's BridgeHouse Consulting.  I believe.  I

8   don't remember the name of his company either, but

9   I think it was BridgeHouse.

10       Q    Who would have been the person that at

11  CapWealth that would have most regularly

12  associated with Mr. Landers concerning his

13  consulting work on behalf of CapWealth?

14       A    Scott Roland and Phoebe Venable.

15       Q    Did you, yourself, regularly communicate

16  with Mr. Landers about compliance needs of the

17  firm?

18       A    Yes, but in a limited way.

19       Q    What ways do you recall interacting with

20  Mr. Landers concerning compliance needs at

21  CapWealth?

22       A    Well, I specifically talked to him about

23  industry trends, where the industry was going, the

24  things that we needed to be aware of.  You know, I

25  discussed, you know, my intent.  At one point he

1   was trying to get me to buy a broker-dealer and --

2   and, you know, I said, I'm more inclined to shut

3   it down.  And finally convinced him that the shut

4   down was appropriate.  And -- and -- so, just --

5   just general things.  Nothing specific like it

6   would have been with Scott Roland where you were,

7   you know, doing documents or Phoebe where they

8   were, you know, reviewing and signing off on

9   documents.

10      Q    I'm going to advance -- I'm going to

11  zoom in and I'm going to advance to page seven of

12  this document.  And at the top of page seven

13  you'll see this is the beginning of a section

14  called, Fees and Compensations.  Can you see that,

15  Mr. Pagliara?

16      A    Yes.

17      Q    Okay.  I'll zoom in a little bit more

18  too.  Is that better?

19      A    Yes.

20      Q    Okay.  I'm going to scroll down.  So,

21  lower in the section on the next page at the

22  bottom of page eight.  And do you see the very

23  last paragraph that starts at the beginning of

24  page eight and continues onto the top of page

25  nine?  Can you see that okay?

1        A      Yes.

2        Q      Okay.  I'm going to read that paragraph

3    for the record.  It reads, quote, Most of the

4    investment professionals at CapWealth are also

5    registered with CWIS.  It is not mandatory that

6    clients open an account with CWIS.  Compensation

7    may be received by the principals at CapWealth

8    when certain portfolio transactions are effected

9    on behalf of investment advisory clients.

10   Therefore, the principals of CapWealth may receive

11   compensation as a result of acting in one or both

12   capacities, including the receipt of 12b-1

13   distribution payments from certain funds, end

14   quote.

15           Mr. Pagliara, are you familiar with this

16   paragraph that I just read?

17       A      Yes.

18       Q      Do you know how long it has been in the

19   CapWealth Part II A brochure?

20       A      No.

21       Q      Do you think it was in their prior to

22   2016, the version that we're looking at?

23       A      I don't know.

24       Q      Do you know who authored this section

25   that I just read into the record?

1      A    No.

2      Q    Did you, yourself, ever have any role in

3   editing or proposing revisions for this language

4   that I just read?

5      A    No.

6      Q    Do you have any understanding as to who

7   might have had a hand in drafting this in terms of

8   Scott Roland or anybody else?

9      A    Yes.

10     Q    What do you understand in terms of who

11  might have worked on this section?

12     A    I think Phoebe Venable and Scott

13  probably had something to do with this section.

14  And it had to do with a general discussion about

15  how our business was evolving.

16     Q    Do you know that for certain or is that

17  really speculation though?

18     A    In context I think, you know, it's --

19  it's relatively certain, yes.

20     Q    Okay.

21     A    If you'll let me -- if you -- you know,

22  I'll -- I'll supplement that with, you know,

23  buying -- towards the end of CapWealth Investment

24  Services and as part of the evolution, the process

25  of the industry, we were dealing with -- you know,

1   we started dealing with clients that didn't

2   custody with us.  That had custody arrangements at

3   Charles Schwab, narrowly, and maybe a couple of

4   other firms like Fidelity.  And so, I think

5   that -- that's probably the genesis of where that

6   disclosure came from in that general discussion

7   of -- of how the industry was changing during that

8   period.

9          Q    So, even in 2016 when this version was

10  created you think that you had clients that were

11  custodying their assets at Charles Schwab?

12         A    Yes.  We didn't -- we didn't start a

13  relationship or even open an account at Charles

14  Schwab, but they may have had a relationship --

15  they may have already been custodied at Charles

16  Schwab and they asked us to do advisory -- you

17  know, to take over advisory work for them.  So,

18  that was starting, I believe, about in that

19  period.

20         Q    Okay.  In 2016 though, there were still

21  a good number of clients that were using CWIS as

22  their introducing broker-dealer for their

23  accounts, right?

24         A    Yes.

25         Q    And CWIS was using Sterne Agee as the

1    clearing broker-dealer for those accounts?

2         A    Yes.

3         Q    The section we were looking at at the

4    top of page nine reads, quote, The principals of

5    CapWealth may receive compensation as a result of

6    acting in one or both capacities, including the

7    receipt of 12b-1 distribution payments from

8    certain funds, end quote.

9              At this point in 2016 you were one of

10   the principals of CapWealth, correct?

11        A    Yes.

12        Q    And were you regularly receiving 12b-1

13   fees from clients investments in mutual funds that

14   were custodied through Sterne Agee at this time?

15        A    The firm was.  You know, I'm paid off

16   the profitability of the firm as a principal, but

17   yes, we -- we received them.

18        Q    And as far as you know, did most 12b-1

19   fees -- did most clients who were invested in

20   12b-1 fees I should say, did they incur those

21   12b-1 fees on an ongoing basis such as monthly or

22   quarterly?

23        A    You know, your question, you need to

24   reframe it.  Clients don't invest in 12b-1 fees.

25        Q    I'm sorry.

1    A    I'm sorry, I didn't understand the

2    question.

3    Q    Sure.  Let me rephrase the question. I'm

4    sorry.  There was a man weed whacking right

5    outside my window and it was throwing me off.  I

6    apologize.

7    A    No problem.

8    Q    At this point in 2016 did you understand

9    that clients who were invested in mutual fund

10   share classes were incurring 12b-1 fees on a

11   recurring basis such as monthly or quarterly?

12   A    Yes.

13   Q    And is that your -- your understanding

14   today in terms of how mutual fund share classes

15   charged 12b-1 fees is that they typically recur on

16   a regular basis?

17   A    Yes.

18   Q    This language in Exhibit 6 says that the

19   principals of CapWealth may receive compensation

20   such as 12b-1 fees, but if you actually were

21   regularly receiving it why did it use the word

22   "may"?

23   A    Because it was custodial dependent. If

24   the assets were custodied at BNY Mellon/Pershing

25   we didn't receive compensation.  If they were

1    custodied at Charles Schwab we didn't receive

2    compensation.  If they were custodied in an

3    account at Sterne Agee and they had an account at

4    Charles Schwab we would get a 12b-1 fee if it was

5    paid through our CapWealth Investment Services

6    relationship at Sterne Agee, but we wouldn't get

7    one at Charles Schwab.  So, it was the only

8    accurate way that we could list that.

9         Q    Well, for the -- could you have gone

10   back and listed out what you just said which is

11   that, for clients custodied at Sterne Agee we do

12   get 12b-1 fees if you have a mutual fund held

13   through Sterne Agee?

14        A    Yes.

15        Q    Do you know why that level of

16   specificity was not included in this version of

17   the brochure in 2016?

18        A    Well, I think it would have one confused

19   the hell out of people and I don't think it was

20   necessary, you know.  And we -- we could explained

21   that client by client based upon the relationship

22   that we had with the client.

23        Q    Did you regularly --

24        A    Pardon?

25        Q    Did you explain that to clients

1   verbally?

2       A    Absolutely.  I discussed fees in

3   excruciating detail with clients.  I used it as a

4   way to differentiate ourselves and the efficiency

5   that we have in our relationship with clients and

6   the compensation that we received from them.

7       Q    Walk us through what you would have

8   regularly said to a client about 12b-1 fees in

9   2016 for clients who had their assets custodied at

10  Sterne Agee?

11      A    You'd have to give me a more specific

12  example because I don't know -- you know, every

13  client's different.

14      Q    So, if you had a client in 2016 around

15  the same time as this version of the brochure was

16  being used in February of 2016 whose assets were

17  custodied at Sterne Agee and they were going to be

18  invested or were already invested in mutual funds

19  that involved the charging of 12b-1 fees for the

20  share classes that they held, did you explain to

21  them the receipt of 12b-1 fees verbally and how it

22  flowed to you through your role as a registered

23  representative of CWIS or as an owner of CapWealth

24  Group or CapWealth Advisory, LLC?

25      A    Yes.

1    Q    Walk us through what you would have said

2    to a client who was in that type of a situation in

3    2016?

4    A    I would have said, you know, we are, you

5    know, committed to providing you the lowest cost

6    that we can, you know.  We will -- for example,

7    with that client relationship that I talked about,

8    if they opened a new trust account, I would have

9    said, Look, we're going to put you in a share

10   class where we'll get compensation at 25 basis

11   points.  We're not going to charge you an

12   administrative fee. We're not going to charge you

13   an advisory fee. We'll do this as an accommodation

14   based upon the whole relationship that we have

15   with you.  We would adjust our discounting policy

16   to the total relationship and -- and what we would

17   be paid.

18           So, it was part of a broad discussion

19   that we had with every client where we were trying

20   to price the relationship fairly and equitably

21   based upon everything that they had with us.

22   Q    At this point in February of 2016, if

23   you were choosing a mutual fund investment for an

24   advisory client was it usually an American Funds

25   fund?

1     A     It's hard to say, but I would generally

2  say yes.  And again, I was doing less and less

3  work with mutual funds as time went on.  You know,

4  most of our accounts are dominated by individual

5  security selection.

6     Q     For -- for clients that you were making

7  or providing advice about mutual fund investments

8  in 2016, was American Funds -- were American Funds

9  funds often some of the funds you advised them to

10 purchase?

11    A     Yes.

12    Q     Okay.  In discussing 12b-1 fees with

13 clients that might be generated by those types of

14 mutual fund investments in 2016, did you highlight

15 for them the different share classes, such as F1

16 and F2, in your discussions with clients, your

17 verbal discussions?

18    A     Yes.

19    Q     How would you do that?

20    A     I'd just -- you know, we would -- it got

21 to the point where it was confusing because we had

22 F1 shares and F2 shares in the same account and

23 the same fund.

24    Q     Walk us through what you had said to

25 clients about the differences between F1 and F2

1    shares at that time in 2016?

2        A    That they created a lower share class

3    and it's our intention to -- we -- typically we --

4    that's -- we would purchase them and then it would

5    come up in the discussion as to why they've got F1

6    and they've got F2.  And, you know, the discussion

7    centered around, you know, this is where the

8    industry is going and eventually we'll convert all

9    of these to a single share class.

10       Q    Were there many clients that held both

11   F1 and F2 shares at the same time?

12       A    I would say it was -- you know, it

13   was -- when we made additional purchases, yes, it

14   started to become -- started to become an issue.

15       Q    And what do you mean by an issue?

16       A    Well, we were trying to -- from 2015 on

17   we were trying to get our custody arrangements

18   moved from Sterne Agee to Pershing, you know, to

19   get a final home for all of our assets.

20            And so, you know, you had -- the whole

21   industry was exploding.  You had F1 shares. You

22   had F2 shares.  You had American Funds announcing

23   that they were creating F3 shares.  You had this

24   problem with -- that existed with Charles Schwab

25   and all of the big firms.  You know, we literally

1    had to force them into F3 shares.

2              So, even from the point that it was

3    announced that they were going to make those

4    available in 2016, we couldn't buy them.  They

5    weren't available.  And it was very expensive both

6    in terms of time and money for the client to -- to

7    make those conversions.

8              You understand how those conversion

9    process works, don't you?  It's a very complicated

10   thing.

11        Q    So, were these the type of things you

12   would have explained to clients in terms of

13   talking about the different share classes?

14        A    Yeah.  As they asked me, you know, why

15   have I got F1 and F2 shares?  You know, and it

16   was -- it was a difficult situation for us too.

17        Q    So, I don't see -- in this language

18   concerning 12b-1 fees in Exhibit 6 I don't see any

19   discussion about share class differences.  Did you

20   ever consider having the firm add any language

21   about share class differences and how it would

22   impact 12b-1 fees to the firm's brochure?

23        A    No.

24        Q    And give us an explanation as to why

25   that was?  Why not add that to the brochure?

1        A    We didn't think it was necessary.

2        Q    And we just want to -- I don't want to,

3   you know -- you know, we'll obviously go back and

4   we'll talk with other folks at the SEC about, you

5   know, testimony today and I don't want to put

6   words in your mouth.  So, could you just walk us

7   through a little bit more why you didn't think

8   that level of disclosure in the brochure was

9   necessary?

10       A    We were still operating under the

11  understanding about our disclosures in 2011 that

12  we had worked through the SEC with.  This, you

13  know, page eight that you're talking about, was an

14  enhancement to reflect changes that were

15  occurring. We never had more than one custodian in

16  2011.

17            So, you know, don't let the good be the

18  enemy of the perfect.  I mean, we could have taken

19  this document and, you know, thrown a lot of

20  things in there, you know, but you're trying to do

21  the best you can and communicate the best you can

22  with your clients.  And that's what we were doing.

23  And that was the direction we were taking

24  everything in.

25       Q    So, this section where it does describe

1   in Exhibit 6 on page eight and nine, the 12b-1

2   fees, I also don't see 12b-1 fees described as

3   conflicts of interest.  Do you consider 12b-1 fees

4   to be a conflict of interest for CapWealth or its

5   registered representatives back when CWIS was in

6   existence?

7        A    Conflicts of interest are inherent and

8   you minimize the inherent nature of a conflict of

9   interest through disclosure.  And the disclosures

10  that we made go back to when we first set up the

11  firm.  And the SEC examination of our firm that

12  took two weeks with eight examiners and we went

13  through all of this in detail, we were operating

14  under that.

15            The way we received 12b-1 fees because

16  of the disclosures we make, I don't think that was

17  a conflict of interest.  I think we minimized that

18  through disclosure, but that's something that

19  exists every where.  You have a conflict of

20  interest in this examination.  Every time a

21  transaction is done at Charles Schwab when we buy

22  a bond they potentially -- there is a conflict of

23  interest.  Did they get the best execution on that

24  bond.

25            If you're an adviser at UBS and you're

1   operating under an investment management agreement

2   and you execute a transaction through UBS's

3   brokerage division there's a conflict of interest.

4   So, this whole talk about conflict of interests,

5   you know, suggests that we were doing something

6   that wasn't in the best interest of our clients

7   and I object to that.

8        Q    So, do you feel that any conflict of

9   interest that related to 12b-1 fees was cured in

10  some way through verbal disclosures that you made

11  to clients?

12       A    Verbal and written.

13       Q    And if you could walk us through -- I

14  think we've talked about the verbal.  Which

15  written ones are you specifically referring to?

16       A    The disclosures that existed in CWIS,

17  the disclosures that you're referencing here, ADV

18  Part II A, page eight and nine.  It was just part

19  of our practice.  Everybody knew that.  It wasn't

20  anything that was hidden and it was very

21  proactively dealt with as we attempted to be a low

22  cost provider of advisory services to our clients.

23       Q    So, I think -- why don't we take a break

24  at this point.

25            MR. BASINGER:  Would folks like to take

1    a longer break for lunch now at this point for

2    about 30 minutes or so?

3              THE WITNESS:  That would be great.

4              MR. BASINGER:  So, why don't we start

5    back up in about 35 minutes at 12:45 if that works

6    for everybody.

7              Gino, does that work for you?

8              MR. BULSO:  Yes, that works fine, Brian.

9              MR. BASINGER:  Okay.

10             So, we are off the record at 12:09 p.m.

11             (Whereupon, at 12:09 p.m., a luncheon

12   recess was taken.)

13         A F T E R N O O N   S E S S I O N

14             MR. BASINGER:  We are back on the record

15   at 12:46 p.m. on Friday, May the 1st, 2020.

16             BY MR. BASINGER:

17        Q    Mr. Pagliara, can you confirm that while

18   we were off the record that we did not continue

19   having substantive discussions of this matter?

20        A    Yes.

21        Q    Thank you.

22             So, before the break we were looking at

23   Exhibit No. 6 and specifically we were in the

24   section that runs pages seven through nine which

25   is the subsection -- and I'll scroll to the top of

1    page seven again -- called Fees and Compensation.

2    And what I wanted to do -- and we'll come back to

3    Exhibit 6, but I'm going to open another exhibit.

4           This is a new exhibit marked as CAP

5    Exhibit No. 23 which is the Form ADV Uniform

6    Application for Investment Adviser Registration.

7    And this provides the Part II uniform requirements

8    for the investment adviser brochure and brochure

9    supplement.

10          I'll scroll down to the bottom just to

11   note the exhibit stamp for Exhibit No. 23.  And

12   then for the record, I'll note I just pulled this

13   from the SEC.  This is not something that was

14   produced by CapWealth in this matter.  This was

15   just an SEC document that's made available to

16   registrants that are completing their Form ADV

17   brochures.

18          This version is the version that was in

19   effect through February 28th of 2018 and was

20   subsequently replaced by a more recent version,

21   but this is the version that was in effect back in

22   early 2018 and in the months before that.

23          And what I was going to do was go to the

24   instructions for the Part II A brochure.  They

25   begin on page three.  And then specifically, since

1   we were looking at section five of the CapWealth

2   brochure I was going to go to the instructions for

3   section five which is the fees and compensation

4   section.

5            And I'll note -- draw your attention, I

6   should say, to item E, section 5E which reads,

7   quote, If you or any of your supervised persons

8   accepts compensation for the sale of securities or

9   other investment products, including asset-based

10  sales charges or service fees from the sale of

11  mutual funds, disclose this fact and respond to

12  Items 5.E.1, 5.E.2, 5.E.3 and 5.E.4, end quote.

13           And then, those sub parts 5.E.1 through

14  5.3.4 are listed below with the first one 5.E.1

15  reading, quote, Explain that this practice -- let

16  me start over.

17           Quote, Explain that this practice

18  presents a conflict of interest and give you or

19  your supervised person's an incentive to recommend

20  investment products based on the compensation

21  received rather than on a client's need.  Describe

22  generally how you address conflicts that arise,

23  including your procedures for disclosing the

24  conflicts to clients.  If you primarily recommend

25  mutual funds, disclose whether you will recommend,

1    quote, no load, unquote, fund, end quote.

2              So, I just want to start there with

3    these instructions about item 5.E.1.  Mr.

4    Pagliara, we were looking earlier at the CapWealth

5    Exhibit No. 6 which was the Part II A brochure for

6    the firm from February of 2016.  And while there

7    was some language there about the firm principals

8    may receive -- stating that the firm principals

9    may receive 12b-1 fees, as I noted before the

10   break, I didn't see language in that section about

11   12b-1 fees which are a type of service or

12   distribution fee representing a conflict of

13   interest or presenting a conflict of interest.

14             Were you -- were you aware of these

15   instructions that existed concerning what was

16   supposed to be in the Form ADV Part II A Brochure

17   for an advisory firm?

18        A    These specific instructions --

19        Q    Correct?

20        A    -- as outlined by E.1?

21        Q    Correct.

22        A    Yes.

23        Q    And so, if the instructions calls for

24   the firm to explain that the receipt of service

25   fees for the sale of mutual funds presents a

1   conflict of interests why was that not stated in

2   CapWealth's brochure as we saw in Exhibit 6?

3        A    Because I don't think it was a conflict

4   of interest.  Period.

5        Q    So, that's your personal view that it

6   was not a conflict of interest?

7        A    That's my view and it's the position of

8   my firm.

9        Q    Do you disagree with the instructions

10  that -- that say to explain specifically that that

11  does present a conflict of interest?

12       A    Yes.

13       Q    Was it a conscious decision to not

14  follow instruction 5.E.1 when the CapWealth

15  brochure was drafted?

16       A    No.  If I didn't believe it was a

17  conflict of interest there was nothing to

18  disclose.

19            We've been through this, Mr. Basinger.

20  This goes all the way back to 2011, you know, when

21  we sat down and we explained our business, our

22  business model to the SEC during a two-week audit

23  with eight examiners present. Period.

24            There was no conflict of interest in the

25  process that we either selected mutual funds or

1   placed them in our clients accounts as we met

2   their investment objectives.

3       Q    So, in the instruction for 5.E.1 do you

4   see there being latitude for you to decide

5   unilaterally that there is not a conflict of

6   interest related to service fees from the sale of

7   mutual funds?

8       A    Would you repeat the question?

9       Q    So, when I look at the instruction for

10  5.E.1 I don't see there being ability for an

11  investment adviser who's registered and completing

12  the Part II A Brochure to decide whether or not

13  service fees from the sale of mutual funds present

14  a conflict of interest.  The way I read the

15  instructions is that the instructions say, If you

16  do receive service fees from the sale of mutual

17  funds you are supposed to, in your Part II A

18  Brochure, explain that this practice presents a

19  conflict of interest and then explain how you

20  address that conflict.  Do you disagree with --

21      A    You and I disagree on the interpretation

22  of that section, yes.

23      Q    Okay, that's my question.  I just wanted

24  to find out your reaction to reading the

25  instructions now that you have a chance to see

1   them here.

2           MR. BASINGER:  I don't think I have any

3   questions on instructions 5.E.2, 3 or 4, but I'm

4   going to move down to give everyone a chance to

5   look at them.

6           Kristin, Steve, did you have any other

7   questions that you wanted to ask on this part

8   before I move on to another section.

9           MS. MURNAHAN:  I do not.

10          MR. BASINGER:  Okay.

11      Q   I'm going to move on to the instruction

12  for item ten.  So, I'm moving to page ten of

13  Exhibit 23 which is titled, Other Financial

14  Industry Activities and Affiliations.  And I'm

15  going to draw your attention to item 10.C where

16  the instruction reads, quote, Describe any

17  relationship or arrangement that is material to

18  your advisory business or to your clients that you

19  or any of your management persons have with any

20  related person listed below.  Identify the related

21  person and if the relationship or arrangement

22  creates a material conflict of interest with

23  clients, describe the nature of the conflict and

24  how you address it.  End quote.

25          And then the list of related persons

1    below that include broker-dealer, municipal

2    securities dealer or government securities dealer

3    or broker-dealer, among other items that are

4    listed.

5           Now, as we saw earlier today in Exhibit

6    6, Mr. Pagliara, the brochure for CapWealth did

7    identify the relationship between CWIS and

8    CapWealth Advisors, correct?

9        A    Yes.

10       Q    But it did not identify any specific

11   material conflict of interest from that

12   relationship, correct?

13       A    Yes.

14       Q    So -- and again, is -- is that because

15   you did not believe there was a conflict of

16   interest to disclose?

17       A    Yes.

18       Q    Okay.

19           MR. BASINGER:  Kristin, or, Steve, did

20   you have any other questions you wanted to ask on

21   this section?

22           MS. MURNAHAN:  No, I do not.

23           MR. BASINGER:  Okay.  I'm going to close

24   Exhibit 23 and go back to Exhibit 6 and move on to

25   page 22.

1      Q      At the top of page 22 of Exhibit No. 6

2   is a subsection called, Best Execution.  And it

3   reads, quote, It is CapWealth's policy to obtain

4   the, quote, best execution, end quote, of its

5   customers securities transaction on a best efforts

6   basis since the firm does not control trade

7   execution.  CapWealth, through the trading

8   department at SAL or any other custodian will

9   cause each customer's securities transaction to be

10  executed in such a manner that the customer's

11  total cost or proceeds in each transaction is the

12  most favorable under the circumstances.  End

13  quote.

14          Mr. Pagliara, are you familiar with this

15  best execution language that I described?

16      A      Yes.

17      Q      What do you understand this to mean?

18      A      Just exactly what it says.

19      Q      And what does it mean in terms of how

20  you service a client in terms of a transaction?

21  Can you give us an example?

22      A      I don't understand the question.

23      Q      Okay.  Let's go to the scenario where

24  you're making an advisement for a client and

25  you're advising them to invest in a specific

1  mutual fund. And let's -- you know, we'll go back

2  to what you were doing in, say, calendar year

3  2016.  If a client qualified or was eligible to

4  buy the F1 share or F2 share of a mutual fund and

5  you were recommending the fund how would you go

6  about choosing a fund share class in light of this

7  best execution policy?

8      A    That question doesn't even apply to

9  mutual funds.  Best execution in this context has

10  to do with trade execution and it has to do with

11  pricing.  Mutual funds are bought and sold on the

12  executed price of the day that they're purchased

13  or the day that they're sold.  So, this doesn't

14  even apply to mutual funds.

15      Q    So, is it your view that the mutual

16  funds if the share classes have a differentiation

17  in terms of the 12b-1 expense that does not impact

18  best execution?

19      A    Mr. Basinger, this does not apply to

20  mutual funds.  This best execution section does

21  not apply to mutual funds.  It has to do with

22  individual security transactions of bonds and

23  stocks and trade execution.  It's understood by

24  the plain meaning of that section that it does not

25  apply to mutual funds.

1     Q    And I'm just asking for your

2   understanding.  So, I just want to be clear.  So,

3   you've made that clear.  And my -- my only

4   follow-up question I have is, so you don't view

5   any type of mutual fund transaction, whether it

6   involves a 12b-1 fee or not, as being impacted by

7   the best execution policy?

8     A    Not as it's contained in that section,

9   no.

10    Q    Okay.

11         MR. BASINGER:  Steve, or, Kristin, did

12   you have any other questions on that section?

13         MS. MURNAHAN:  Not at the moment.

14         MR. BASINGER:  Okay.  I'm going to close

15   Exhibit No. 6 and move on to a new exhibit.

16    Q    Now we are going to display what has

17   been marked as CAP Exhibit No. 22 which is a Form

18   ADV Part II B Brochure Supplement for Timothy J.

19   Pagliara.  And I'll scroll down to show you the

20   whole front page with the exhibit stamp and the

21   Bates stamp of CW 000112 at the bottom.

22         MR. BASINGER:  I'll note for the record,

23   the front page here does not show a date on the

24   document, but I will note that when this document

25   was produced to us the file extension showed that

1   the title of the document was dated February 8th,

2   2016.  So, I just wanted to note that for the

3   record from February of 2016 according to the

4   document title, even though I'm not aware that

5   there's actually a date within the document

6   itself.

7        Q    Mr. Pagliara, are you familiar with

8   Exhibit No. 22?

9        A    In general.

10       Q    And what do you understand this to be?

11       A    Form ADV Part II B.

12       Q    Is this a particular document that you

13  use in a certain way with your clients?

14       A    It's part of the disclosure that we hand

15  every client, yes.

16       Q    And so, a copy of this is provided to

17  each of your clients?

18       A    Yes.

19       Q    Who put this document together?

20       A    Scott Roland, the compliance officer,

21  and possibly in consultation with our compliance

22  consultant.

23       Q    Before this document was ever given to

24  clients did you have a role in reviewing and

25  approving it for final form?

1    A    Yes.

2    Q    And did you approve it before it was

3    finalized and given to the client?

4    A    I believe so, yes.

5    Q    Okay.  I'm going to turn to, or advance

6    I should say, to page five of Exhibit No. 22 which

7    is a section called, Additional Compensation. And

8    that reads, quote, Neither CapWealth, nor Mr.

9    Pagliara, have any arrangements, oral or in

10   writing, where it:  One, is paid cash by or

11   receives some economic benefit from a non client

12   in connection with giving advice to client; Two,

13   directly or indirectly compensates any person for

14   client referrals.  End quote.

15           Mr. Pagliara, are you familiar with this

16   language on page five?

17   A    Yes.

18   Q    How does this relate to your receipt of

19   12b-1 fees that you received from 2018 and prior?

20   A    It doesn't have anything to do with

21   12b-1 fees.

22   Q    And why is that?

23   A    Industry practice at the time and it has

24   since been kind of -- it was for CPAs and other

25   professionals and other individuals to solicit

1    cash payments and referral arrangements.  We never

2    engaged in those and we made that statement that

3    we don't do that.

4              And that was actually a requirement and

5    a suggestion by the SEC with specific reference to

6    those referral arrangements between CPAs and other

7    professionals and we never engaged in that process

8    or that -- or that -- any type of arrangement like

9    that.  That is what that disclosure is for.

10    Q    So, it's your understanding this

11   language where it talks about an economic benefit

12   from a non client would not be meant to capture

13   12b-1 fees that you or CWIS received from a mutual

14   fund based on a client's mutual fund investment?

15    A    It had absolutely nothing to do with

16   mutual funds or 12b-1 fees as I've previously

17   qualified my answer.

18    Q    I'm going to go back one page in the

19   document to the Other Business Activities page.

20   And unfortunately, it's longer than I think I

21   could make it fit on the screen at one time, but

22   I'm just going to put up the top part of the page.

23   And if you want to take a look at it and let me

24   know when you're ready for me to advance to the

25   bottom of the page so I can give you a chance to

1   look at the whole section then I can proceed.

2       A    You can go down.  You can go lower.

3            (The witness examined the document.)

4       Q    Let me know when you're ready for

5   questions.

6       A    I'm ready for questions.

7       Q    So, my questions really are on the

8   bottom part of the page where it talks about your

9   being an associated person of CWIS, the affiliated

10  broker-dealer of CapWealth.  There's a section

11  here which describes effectively what is a

12  transaction charge that clients incur based on

13  certain transactions for their account, but I

14  don't see any language in here concerning 12b-1

15  fees or your receipt of them at this time period

16  in 2016 for clients who were having their assets

17  custodied at Sterne Agee.  Do you know why there's

18  no disclosure in here about your receipt of 12b-1

19  fees?

20      A    Because that's not the intention of this

21  section.  If you'll go back to our 2011 audit and

22  the recommendation of the SEC, they -- for not

23  clarifying the relationship of that 14.95

24  transaction fee and the fact that there was a

25  difference between what Sterne Agee charged us and

1  what we ultimately collected.  So, in response to

2  what they suggested, and it's in the audit, this

3  is how we updated that disclosure based upon their

4  recommendations.

5      Q    Did CapWealth ever continue to consult

6  the instructions though for the Part II B

7  Supplements that were issued by the SEC?

8      A    I don't understand the question.

9      Q    So, you're talking about content -- I

10  understood your most recent response to be that

11  certain content about the transaction charges

12  added after an examination by the SEC in 2011,

13  correct?

14      A    Yes.

15      Q    And my question is, when this document

16  was updated or reviewed after 2011, did CapWealth

17  review the then operative instructions about Part

18  II B supplements to see if CapWealth was also

19  addressing everything else the instructions called

20  for?

21      A    Yes.

22      Q    And how do you know that?  Were -- did

23  you have a role in that process?

24      A    We would have discussed it in very

25  specific forms.  Again, our disclosures did not

1   change substantially from 2011 following that

2   audit. So, there wouldn't have been a whole lot to

3   do with anything to update our disclosures or

4   update a discussion of our business policy or any

5   of the things that you keep hammering away at.

6          MR. BASINGER:  Steve, or, Kristin, do

7   you have anything else that you want to ask about

8   on this document?

9          MS. MURNAHAN:  No.

10          MR. BASINGER:  Okay.  I'm going to close

11   Exhibit 22 and I'm going to put up what was

12   previously marked as CAP Exhibit No. 8.

13      Q    And this is an e-mail chain that

14   concludes on May 13 of 2015.  My first question is

15   going to be, at the top of the page you'll see the

16   from field shows it's from Phoebe Venable at --

17   and her address is listed as PVenable

18   CapWealthAdvisors.com.  And the recipient in the

19   to field is Tim Pagliara at TPagliara

20   CapitalWealthAdivsors.com.

21          Mr. Pagliara, is that your work e-mail

22   address?

23      A    That's it.

24      Q    Is there any other work e-mail address

25   that you currently use?

1        A      No.

2        Q      Okay.  If we see an e-mail today that is

3    sent to that address or from that address could we

4    assume that it was you that was sending or

5    receiving it?

6        A      Yes.

7        Q      So, I'm going to scroll down to the

8    second page where the e-mail chain begins.  And as

9    I scroll down I'm going to stop and note that the

10   Bates stamp on the first page is CW 001862.  And

11   then you'll see on the second page the only

12   content that's on that page at all is, basically,

13   a -- some disclaimers that were at the bottom of

14   the signature block from the first page.  So, I'm

15   going to go back up now to the first page where

16   the actual e-mail exchange occurs.

17           MR. BASINGER:  So, I'll note for the

18   record that the subject line is Re, or R-E, colon,

19   Update on Mark, dot, dot, dot.

20       Q      Mr. Pagliara, can you identify what's

21   going on in this e-mail chain in Exhibit No. 8?

22       A      Yeah.  No, I know exactly what's going

23   on in this e-mail chain.  Mark Willoughby was an

24   adviser with us that we essentially parted ways

25   with early in 2014, but the process was underway

1    in 2000 -- early 2015 and the process was underway

2    to have him find a new home from the firm in 2014.

3              And so, when he left he only took the

4    accounts that he wanted and he left us with a

5    number of really small accounts that didn't fit

6    into the type of business that we were doing which

7    was really the basis of why he left in the first

8    place.  And when I refer to the kids I'm talking

9    to my -- you know, I've got a group of millennials

10   that are really high energy, get good experience

11   in dealing with clients and I wanted them to, you

12   know, work with these people that were going to

13   stay or were on the fence or for whatever reason

14   hadn't moved their accounts.  We had an obligation

15   to try and make sure that their objectives were

16   being met.  And we had fundamentally disagreed

17   with how Mr. Willoughby was -- had his accounts

18   structured before he left.

19       Q    Walk us through what were some of the

20   ways you disagreed with Mr. Willoughby's account

21   structuring.

22       A    Reasonable minds differ, you know. He

23   thought the world was going to end for the

24   previous five years and, you know, he had in -- in

25   his interpretation of what his clients needs were

1   and his belief of the markets that, you know,

2   again, the world was going to end.  So, he had a

3   lot of cash and a lot of gold in his accounts and

4   it didn't work well.

5       Q    And I just want to make sure we

6   understand, when you say he thought the world

7   would end do you really mean he anticipated an

8   apocalypse or more of a market crash?

9       A    Both.

10      Q    Okay.  Had Mr. Willoughby participated

11  before he left in migrating any of his clients

12  over to Pershing?

13      A    No.

14      Q    So, for the clients that were left

15  behind that stayed with CapWealth, did any of them

16  move over to Pershing or were they all kept with

17  Sterne Agee for the custody of their assets?

18      A    They would have stayed at Sterne Agee.

19  You know, we went through this process of even

20  trying to get his clients to respond to this. We

21  didn't know if he was sending them transfer

22  instructions.  It was a very difficult -- very

23  difficult because we couldn't just -- I would have

24  gladly just transferred those accounts over to

25  Hilliard Lyons where he ended up, but I couldn't

1  do that under the rules.  We had to get them, you

2  know, manually to agree.

3       Q    So, Ms. Venable in the first e-mail in

4  the chain wrote that she had calculated a net loss

5  revenue from Mr. Willoughby's departure of

6  $118,500.00.

7       A    181,000.  It was 181,000.

8       Q    Well, if you look there at the line

9  above that initially it says, A net loss of

10  revenue of 118,500.  And then the next line it

11  says, I calculated 181,500.

12       A    Yes.

13       Q    So, it was one of the two numbers

14  obviously.  My question though is really about

15  your reply regardless of the amount.  You write

16  back in the e-mail above writing, quote, I doubt

17  that it would be that much of a loss.  Remember

18  his revenue was rapidly trailing down.  Put the

19  kids on getting his people in and restructuring

20  the accounts to our mutual fund model, et cetera,

21  end quote.

22            I just wanted to ask, what did you mean

23  about having the kids restructure the account to

24  the mutual fund model?  What was that a reference

25  to?

1     A     His revenue was rapidly trailing down

2     because people were tired of his advice.  His

3     advice wasn't working.  The apocalypse never

4     occurred and the meltdown never occurred.  And,

5     you know, we needed to address that head on with

6     his clients.  I actually dealt with some of those

7     clients individually myself, you know.  And if he

8     hadn't left they were going to leave anyway.  So,

9     the people that stayed, you know, by enlarge were

10    very, very frustrated with his advice, the advice

11    that he had given.

12         Q     What's the mutual fund model that you

13    refer to in your e-mail?

14         A     We had put together a mutual fund model

15    in -- to handle really small accounts. Remember,

16    mutual funds were a small percentage of our

17    business and we deal primarily with individual

18    portfolios, individual -- that are constructed

19    with individual companies.  So, a lot of Mr.

20    Willoughby's accounts were 50,000, 100,000,

21    $200,000.00.  And they didn't reflect -- we needed

22    to get in, determine what their investment

23    objectives were, and then, you know, do our best

24    to try and get them on a better path.  And our

25    mutual fund models seemed to be the -- the most

1   efficient way of doing that if we couldn't do it

2   with individual stocks.

3       Q    What do you -- well, what was the

4   difference between the mutual funds that Mr.

5   Willoughby had been using versus what was at that

6   time listed on the mutual fund model?  Were they

7   different funds or different share classes?

8       A    No.  No.  It was just primarily a gold

9   fund that he had.  I don't remember specifically.

10  And it was just -- it was not the way I would have

11  structured an account given the objectives that a

12  client had.  But, you know, we were also during a

13  period where he could have been right, the world

14  could have ended, you know.  And I didn't impose,

15  you know, my beliefs on him, but at the time that

16  it didn't make sense for him to be losing as much

17  business as he was, it made sense for him to leave

18  which.

19      Q    When Mr. Willoughby did choose

20  investment funds -- or let me rephrase.

21           When Mr. Willoughby did choose mutual

22  fund investments for his clients, did he tend to

23  also choose 12b-1 fee paying share classes for his

24  clients?

25      A    I don't know.

1      Q    Do you know if there was an increase --

2    in the clients that were left behind was there an

3    increase in those that were invested in 12b-1 fee

4    charging share classes once they were converted

5    over to the mutual fund model that you referenced?

6      A    I wouldn't know.

7      Q    Okay.

8           MR. BASINGER:  Steve, or, Kristin, do

9    you have any questions on this document before I

10   move on?

11          MS. MURNAHAN:  I do not.

12          MR. BASINGER:  Okay.  So, I am closing

13   Exhibit 8 and I'm going to now open Exhibit No.

14   13.  Give me one second to get that opened up.

15          And this is also an e-mail chain. This

16   one concludes on March 15, 2018.  And the Bates

17   stamp on the first page is CW 001755.  And I'll

18   search here the -- there's only a handful of words

19   that go over on the second page.

20     Q    The first e-mail in the chain is from

21   you, Mr. Pagliara, on March 14, 2018 writing,

22   quote, We need to make sure share classes convert

23   immediately upon receipt by Schwab.  Lowest share

24   class cost available, end quote.

25          Do you recall sending this e-mail on

1    March 14, 2018?

2         A    Yes.

3         Q    What do you recall about why you -- what

4    do you recall about why you sent this message?

5         A    Because there had been an intention to

6    convert all of our shares to F3 series from

7    American Funds.  From the point in time where

8    American Funds started talking about the

9    availability of those funds through their

10   wholesaling network in 2015 it -- it just -- there

11   was also the fiduciary rule that was getting ready

12   to be voted on and -- and adopted by the

13   Department of Labor.  There was -- there were a

14   lot of things swirling during that time period.

15   And we had had the aborted, you know, move to

16   Pershing.  You know, we went to move from Pershing

17   to Schwab and from Sterne Agee to Schwab,

18   basically, at the same time we were covered up

19   with administrative details.  And when we arrived

20   at Charles Schwab, even those F3 shares existed,

21   none of the custodial firms were making them

22   available and we headed into a very, very

23   contentious round of discussions with Charles

24   Schwab and we said, Look, that's why we're here.

25   We want that fund.

1          And, you know, that's why my

2    instructions to the firm were, Get this done

3    immediately upon receipt by Schwab.  And you've

4    got enough of the correspondence to know how

5    difficult that was and what an undertaking it is

6    to do a tax free exchange of thousands -- hundreds

7    of thousands of lines of dividend reinvestment and

8    different shares by different funds and going from

9    F1 to F3 and F2 to F3.  And -- and that's what we

10   did, you know.  And we were doing this as fast as

11   we could get it done at the same time that we were

12   implementing a new fee schedule to off set what we

13   were going to lose in the conversion.

14        Q    So, I feel like -- I want to make sure I

15   heard you correctly.  When the conversion to

16   Schwab was taking place there were still some of

17   the clients that had been migrated to Pershing in

18   2015 who were still at Pershing?

19        A    Yeah.  We went from Pershing to Schwab

20   and we went from Sterne Agee to Schwab.  So, we

21   were -- we were executing a movement from two

22   different custodians at the same time account by

23   account, at the time almost $800 million, and

24   every account had to be -- every account had to go

25   through that account transfer process.  Even those

1   20 some odd kids accounts that, you know, I

2   referenced earlier as an example that we had.

3   So --

4        Q    Let me -- let me jump in real quick.  I

5   may have misspoken.  Let me rephrase the question.

6             What I was trying to understand was,

7   when clients were migrated to Pershing in 2015,

8   did they stay at Pershing until they were moved to

9   Charles Schwab?

10       A    Yes.

11       Q    Okay.  I may have just used the wrong

12  term in my prior question and misstated something.

13  So, thank you, that's all I wanted to clarify.  I

14  just wanted to make sure none of the Pershing

15  clients ever moved back to Sterne Agee or to INTL

16  FCStone at some point?

17       A    No.

18       Q    Okay.  So, going up to the next e-mail

19  in the chain, Ms. Venable writes back to you,

20  quote, Tim, Schwab will do the share class

21  conversion upon instruction as opposed to receipt.

22  To keep things clean, our plan was to convert

23  everything at quarter end, but we could go ahead

24  and initiate the first rounds now.  Assets have

25  been cornered into Schwab the last two weeks.

1  Each mutual fund family has specific days for

2  share class conversion.  It won't all happen at

3  once when we pull the trigger, but within two

4  weeks we should be 95 percent complete, end quote.

5          Do you recall, Mr. Pagliara, is what Ms.

6  Venable described in her e-mail what actually

7  happened in terms of things being 95 percent

8  complete in two weeks?

9      A    No, because the operational difficulties

10 identified by the coordination that had to occur

11 both with -- between the mutual fund company,

12 between us and the operations department at

13 Charles Schwab.

14     Q    And when would you say that that overall

15 conversion process was effectively completed for

16 most CapWealth clients?

17     A    By September of 2019.  It was -- I would

18 say call that the 100 percent complete date.

19     Q    So, that was about 18 months after this

20 e-mail?

21     A    Yes.

22     Q    Okay.  I'm going to go up in the e-mail

23 chain to the next e-mail that you sent to Ms.

24 Venable.  And this time it does show more --

25 sometimes an e-mail chain, you know, doesn't

1    always show all of the other meta data like BC

2    recipients until you get to the top of the chain.

3         A    Yes.

4         Q    So, now it is showing -- this -- this

5    e-mail at least there was some people CC'ed on the

6    e-mail such as Ryan Hitt, Traci Olive.  And in

7    this you write back to Ms. Venable, quote, Phoebe,

8    my inquiry was motivated by horror stories I have

9    heard about the SEC doing clawbacks over share

10   cost differences at this conference.  I believe we

11   are differentiated, but I expect the SEC will be

12   here this year.  I want it closed down and in the

13   rear view mirror, end quote.

14             What conference were you at?

15        A    I think it was a Baron's conference.

16        Q    And what is a Baron's conference?

17        A    Baron's brings together industry experts

18   in a wide variety of fields.  It's, you know,

19   engaged in best practices, everything from

20   different practice management techniques to the

21   different types of alternative investments,

22   private equity and -- and a lot of it's compliance

23   too.

24        Q    What did you mean by the term horror

25   stories that you heard?

1      A    Well, I -- exactly what I'm experiencing

2  right now, you know.

3      Q    Well, let me -- let me rephrase the

4  question.

5           Was -- was this something that someone

6  mentioned to you in an off-the-cuff kind of

7  conversation or were you talking about hearing

8  something about the SEC as part of a presentation

9  at the conference?

10      A    It was a presentation at the conference.

11      Q    What do you recall about the

12  presentation?

13      A    That you guys are hammering everything

14  that looks like a nail.  And that you were heavy

15  handed, unreasonable.  You were forcing these

16  firms to settle because they didn't want to

17  litigate.  And when I said, we're differentiated,

18  we absolutely were differentiated.

19      Q    And what did you mean by --

20      A    Our practices were sound.

21      Q    So, if you could just walk us through,

22  what did you mean by the term differentiated?

23      A    Everything that we've talked about. We

24  had done full disclosure.  We had consulted with

25  you in 2011.  We were already moving towards a

1    pure RIA model.  We were -- we had already shut

2    down our broker-dealer.  We were consolidating to

3    Charles Schwab.  We had reduced our costs to

4    virtually zero in terms of transaction fees.  You

5    know, we -- we're one of the good guys.  You know,

6    we have consistently reduced costs for our clients

7    and -- but I wanted it cleaned up.  I wanted to

8    have it so that when you guys got in here you

9    could see that from 2014 on we had been

10   consistently attempting to stay ahead of trends in

11   the industry and reduce costs for our clients.

12   And be fair and equitable in how we do it and

13   meeting our fiduciary responsibility.  But, yeah,

14   there were a lot of horror stories about how you

15   treated people.

16        Q    And so when you say differentiated, were

17   you also comparing yourself to a specific other

18   type of firm?  I just want to make sure,

19   differentiated from what?

20        A    I could use Raymond James as an example.

21        Q    How so?

22        A    And I've sold many times against Raymond

23   James.

24             Raymond James, not only did they not

25   allow their advisors to keep 12b-1 fees, they kept

1    them in house in the firm.  They never made it

2    part of the process.  You know, the administrative

3    fee that you haven't asked about yet, Raymond

4    James expressed that as a percentage of assets.

5          There were clients that had $10 million

6    accounts that were paying $10,000.00 a year for

7    less administrative reporting than I was charging

8    clients $200.00 that we subsequently increased to

9    $300.00 at that point in time.  You better believe

10   me we differentiated.

11         We were not settling mutual funds. We

12   were not doing commission products at the same

13   time that we had advisory accounts.  We had

14   stopped all of that and we were going to a pure,

15   conflict free fiduciary model.  That had been our

16   intent since 2014 as expressed by the news we made

17   in 2015 to the present.

18      Q    But that process in terms of the

19   conversion wasn't completed, as you said, until

20   September of 2019 when the F3 share class

21   conversions were completed, correct?

22      A    That's correct.

23      Q    But we're just trying to understand a

24   little bit more about the other alternative paths

25   that might have been available in the past.  So,

1  if you go back to say 2016, 2015, for the clients

2  that were still at -- whose assets were still at

3  Sterne Agee at that time, even after the Stifel,

4  or Stifel, however you pronounce it, acquisition

5  had concluded was there not a point in 2016 or

6  2017 where things had settled down and conversions

7  to F2 share classes without 12b-1 fees could have

8  been done for those assets at that time.

9      A    You are not listening to me, Mr.

10 Basinger.  I've answered that question.  And just

11 because you keep asking it doesn't mean the

12 answers going to change.  Nothing was being done

13 at Sterne Agee.  They were cutting services.  They

14 were planning for the shut down or sale of that

15 broker-dealer.

16         The conversion of a share class from F1

17 to F2 is a complicated thing that requires IT

18 time, it requires collaboration from the mutual

19 fund company.  And during that period, the F3

20 shares were on the horizon.  So, that would have

21 required us to get their cooperation to do three

22 conversions.

23         We were more concerned about getting out

24 of Sterne Agee without having to do deal with the

25 embarrassment of a firm that could have been put

1    in receivership.  Thankfully, they weren't.  And

2    Stifel Nicolaus gave them to International -- IC

3    International FCStone that didn't have a clue and

4    the service model got nothing but worse.  It was

5    impossible to get that done at Sterne Agee during

6    that period of time.

7              Does that answer and put that to rest?

8        Q    So, Mr. Pagliara, I'm just trying to

9    understand what your recollection was.  So, I hear

10   your answer and I just wanted to circle back and

11   see how that compared to the experience in terms

12   of the F3 conversion that happened with Charles

13   Schwab. Just trying to clarify.

14       A    The F3 conversion was simply we had to

15   force the issue on -- with Charles Schwab when

16   they realized that they were going to be giving up

17   hundreds of millions of dollars in 12b-1 fees on

18   those F2 and F1 shares they panicked.  And they

19   wanted to put the cost of all of that on us.  And

20   so, we had to just make it real, real clear to

21   them. And they eventually said, Yep, you're right.

22   And -- and they did what we instructed them to do,

23   but that wasn't an easy thing either.

24       Q    Understood.  So --

25       A    You asked me -- and I'll just finish

1    with this.  You asked me to differentiate my

2    position versus my understanding of another firm.

3    Raymond James, because they are their own

4    custodian and they are their own RIA and they have

5    their own broker-dealer, the differentiating

6    factors Raymond James has control over that.  I

7    did not.  I am a fly in ointment compared to the

8    rest of these other firms that you've

9    investigated.  We don't have the plow at the time

10    that we did as an $800 million firm.  We were

11    dependent on what we could get accomplished

12    through the custodians that we worked with.

13    That's all, go ahead.

14        Q    Where was the Baron's conference taking

15    place at that you were attending?

16        A    There's some of them in -- outside of

17    Orlando at a Ritz-Carlton there and they held them

18    in Las Vegas.  I don't remember where it was in

19    that particular year, but it's in both --

20        Q    Okay.

21        A    Both places.

22        Q    So, in 2018, about four weeks before you

23    sent this e-mail that we see in Exhibit 13, did

24    you recall hearing about the SEC announcing its

25    share class selection disclosure self-reporting

1    initiative for investment advisors?

2         A     I don't remember.

3         Q     Have you ever heard --

4         A     I have heard of it, yes.

5         Q     What do you understand that initiative

6    to be?

7         A     I understood that initiative as, if you

8    did something wrong you had an opportunity to

9    throw yourself under the bus so that you would

10   avoid maximum penalties and any other things.  It

11   didn't apply to us.  We were differentiated.  We

12   had no reason to throw ourselves under your bus.

13              MR. BASINGER:  I'm going to close

14   Exhibit 13 and open a new exhibit which is Exhibit

15   24.  And CAP Exhibit 24 is a press release from

16   the SEC.  And the date of the release is February

17   12, 2018.  And the title of the press release is,

18   quote, SEC Launches Share Class Selection

19   Disclosure Initiative to Encourage Self-Reporting

20   and The Prompt Return of Funds to Investors, end

21   quote.

22        Q     So, Mr. Pagliara, do you recall if you

23   saw the announcement of the initiative from the

24   SEC in terms of the written announcement with the

25   details such as I'm presenting here in Exhibit 24?

1      A     I don't recall, no.

2      Q     Do you recall how you became aware of

3    the initiative in terms of how you first came to

4    learn about its existence?

5      A     It was brought front and center to us in

6    our -- in our field audit back in the fall of '19.

7      Q     Okay.

8            MR. BASINGER:  So, I'll note for the

9    record that the initiative was announced in

10   February of '18 and self-reporting was required to

11   have been concluded by the summer of 2018.

12     Q     So, are you saying you didn't hear about

13   the initiative until some point in 2019?

14     A     No.  I knew about this when it was going

15   around the industry.  I violated no federal

16   securities laws.  There was nothing for me to do.

17   This release, if I had it pasted to your forehead

18   would have meant nothing because we had nothing to

19   report and we did nothing wrong.

20     Q     So, Mr. Pagliara, I'm just trying to

21   understand whether the firm considered

22   self-reporting and what the process was.  So, I'm

23   going to ask a couple of more questions.

24     A     We never considered self-reporting.

25     Q     Why is that?

1       A    Because we did nothing wrong and we

2    violated no federal securities laws.

3       Q    So, I'm not -- let me make a few

4    statements here.  One, I'm going to ask a few more

5    questions.  I want to make clear, I'm not asking

6    for any attorney-client privileged information.

7    Does that make sense?

8       A    Sure.  Yes.

9       Q    Okay.  In terms of CapWealth's decision

10   not to self-report as part of the SEC's initiative

11   in 2018, did it review the announcement of the

12   initiative to see if it was eligible to

13   self-report?

14      A    No.

15      Q    Okay.  Did you talk with anybody at all

16   to consider self-reporting within CapWealth such

17   as the chief compliance officer?

18      A    No.

19      Q    I don't want to hear from you anything

20   about any attorney-client privileged information,

21   but I believe you mentioned earlier today you've

22   had some compliance consultants that have worked

23   with CapWealth, correct?

24      A    Yes.

25      Q    Did any of them provide legal advice at

1    all?

2         A    No.

3         Q    And is that spelled out in their

4    contract that they do not provide legal advice?

5         A    Yes.

6         Q    Did you consult with any of your

7    compliance consultants -- your external compliance

8    consultants about whether to self-report to the

9    SEC's initiative in 2018?

10        A    No.

11             MR. BASINGER:  Kristin, Steve, I don't

12   have anymore questions on Exhibit 24.  Do you have

13   any questions you would like to ask?

14             MS. MURNAHAN:  I do not.

15             MR. DONAHUE:  I do not.

16        Q    Mr. Pagliara, earlier today we had been

17   looking at some of the documents such as the

18   investment management agreement that we saw and it

19   noted that there was a administrative fee that was

20   incurred by some accounts.  And I think you

21   mentioned that sometimes for such as the smaller

22   accounts you described you may not always charge

23   that administrative fee for an account.  Could you

24   just walk us through that administrative fee and

25   what it is and when it was applied to accounts and

1  why.

2      A    One of the unique characteristics of our

3  business model is that we do time weighted

4  performance reporting for our clients.  They are

5  part of a database of assets.  We take fees from

6  our custodians and then replicate the performance

7  of their account based upon the amount of money

8  they put into the account, the amount of money

9  that they take out of the account.  Then on a cost

10  adjusted basis we report to them what their return

11  is then we compare it to various different

12  indexes.  It's a -- it's an amazing system.

13          So, if you were a client of mine in

14  2001, I can tell you exactly what the return has

15  been on your account adjusted for the money that

16  you put in, the money that you took out adjusted

17  for all fees and how it compares to other indexes.

18  We provide that service because we think it's

19  important as part of the transparency that we

20  engage in in letting people know that they're

21  meeting their objectives.

22          And so, that has a cost attached to it.

23  The software itself costs a littler over

24  $250,000.00 a year.  There's specific hardware we

25  have to have in place in order to deliver that

1    service.  We reflect that administrative fee as

2    best we can to the costs of that hardware as

3    differentiated from Raymond James and the other

4    firms that charge that fee as a percentage of

5    assets as an administrative cost.

6             So, that is what it's -- does that

7    answer your question?

8        Q    It does.  That -- that gives a helpful

9    context.

10            You mentioned that sometimes for a

11   smaller account you may not impose that

12   administrative fee, correct?

13       A    That's correct.

14       Q    Is it accurate that most of your clients

15   do pay that fee though?

16       A    Yes.

17       Q    And that fee was increased from 200 to

18   $300.00 in 2018, correct?

19       A    Yes.

20       Q    Walk us through the background in terms

21   of the decision to increase the fee to $300.00.

22       A    We just looked at the cost of the

23   software, the cost of maintaining the program, all

24   of the costs associated with it.  We hadn't

25   increased the fee in -- I don't think we increased

1  it since 2011.  And everything else related to

2  those costs had gone up.  In addition to the other

3  costs that we had in delivering that service, we

4  also brought in an outside consultant by the name

5  of Asland Partners and Asland Partners did a lot

6  of our process.  They do an audit of our process

7  every quarter to make sure we are GISR compliant

8  which stands for Global Investment Standard

9  Reporting.

10         So, it's a very extensive part of our

11  process and it's -- it's part of our obligation,

12  we believe, to disclose.

13     Q    Now, do you recall during the 2019 SEC

14  exam program visit to your office they pointed

15  during the period there was no reference to the

16  administrative fee in the firm's advisory

17  management agreement or the firm's brochure?

18     A    Yes.

19     Q    And do you recall that the fee was then

20  added to the advisory agreement and the brochure

21  after that?

22     A    Yes.  We corrected that oversight

23  immediately.

24     Q    In the interim, between January of 2018

25  when the $300.00 fee amount became effective and

1   that amendment to the document in September of

2   2019, did you verbally inform clients that there

3   was a $300.00 administrative fee when new clients

4   were on boarded at CapWealth?

5         A    Yes.

6         Q    Walk us through what you told new

7   clients in that time period when the dollar amount

8   was not reflected in the advisory agreement or the

9   firm brochure?

10        A    As part of our process in explaining the

11  costs that a client would incur in doing business

12  with us, you know, it was the advisory fee and it

13  was the administrative fee.  By that point in

14  time, as we had no longer had a broker-dealer and

15  we were working on a pure RIA platform at Charles

16  Schwab, we were receiving no other compensation

17  from their account other than what we charged them

18  in the advisory and the administrative fee.

19             We -- we did it as kind of a badge of

20  honor.  We also negotiated zero commissions.  So,

21  we -- we cut their commissions from what they were

22  paying at Sterne Agee at 14.95 to zero.  Which

23  again, we were very proud of.  Other than, you

24  know, we had to implement a mutual -- there's a

25  transaction fee for mutual funds now because

1  Charles Schwab doesn't get anything related to

2  12b-1 fees since we had converted everything to F3

3  shares.

4      Q    So, from that -- during that time period

5  of January 2018 to September of 2019, were there

6  other materials -- written materials that were

7  given to new clients that did spell out the

8  $300.00 administrative fee?

9      A    Yes.  It was in all of our marketing

10  material that we handed to a client in addition to

11  the discussions we had with them.

12      Q    Did clients receive those types of

13  documents either through e-mail or in paper?

14      A    They'd receive them in paper.

15      Q    And did you review that administrative

16  fee with clients in person ever?

17      A    Always.

18          MR. BASINGER:  Why don't we take a --

19  let's take a 15-minute break at this point, or 14

20  minutes, until 1:55 p.m. and then I think we can

21  come back and wrap up.

22          So, we are off the record at 1:41 p.m.

23          (A brief recess was taken.)

24          MR. BASINGER:  So, we're back on the

25  record at 1:55 p.m. on Friday, May the 1st, 2020.

1          BY MR. BASINGER:

2     Q    Mr. Pagliara, can you please confirm

3   while we were off the record we did not continue

4   having substantive discussions of this matter.

5     A    Yes.

6     Q    Thank you.

7          I just wanted to touch real quickly on

8   the concept of any annual compliance training that

9   takes place at CapWealth.  Could you speak to that

10  and whether there is any type of annual compliance

11  education or training that occurs at the firm.

12    A    Yes.  We have an annual compliance

13  meeting and then we use outside sources to provide

14  modules of training that everybody participates

15  in.

16    Q    So, let's just talk about each of those

17  real quick.  Tell us about the annual meeting and

18  what takes place there for that annual compliance

19  meeting.

20    A    The annual compliance meeting summarizes

21  the material that was covered in those on line

22  modules that, you know, we all have to incorporate

23  and take.

24    Q    Is the annual meeting lead by somebody?

25  Is there an instructor or a person that leads the

1  annual meeting?

2      A    The head of the compliance department.

3  Everybody has to participate.  It's one of those

4  things where we require everybody to be present.

5      Q    Does any external person come in as part

6  of the annual meetings and provide any information

7  or education?

8      A    Not generally.  I can't say it didn't

9  happen since 2009, but I don't believe so.

10     Q    So, is it typically the chief compliance

11  officer that leads the annual compliance meeting?

12     A    Yes.

13     Q    Then, approximately how many on line

14  modules per year do individuals at CapWealth have

15  to complete as part of the compliance training?

16     A    I don't know.  It's part of a package

17  that's satisfies our compliance requirements in

18  continuing education.

19     Q    Can you speak to whether it's one versus

20  more than one module throughout the course of the

21  year?

22     A    It's actually a -- a long series of

23  things.  You don't have to complete it all at one

24  time.  So, it's -- it's one long module.

25     Q    Okay.  Mr. Pagliara, we have no further

1    questions at this time.  We may, however, call you

2    again to testify in this investigation. Should

3    that be necessary, we will reach out to Mr. Bulso

4    first to let him know.

5         Mr. Pagliara, do you wish to make any

6    clarifying statements to the statements you've

7    already made today?

8    A    No.

9         MR. BASINGER:  Mr. Bulso, do you want to

10   ask any clarifying statements -- or, I'm sorry, do

11   you want to ask any clarifying questions of the

12   witness?

13        MR. BULSO:  No, Brian, I've got no

14   questions.

15        MR. BASINGER:  Okay.  We are off the

16   record at 1:58 p.m.

17        (Whereupon, at 1:58 p.m., the

18   examination was concluded.)

19              *  *  *  *  *

20

21

22

23

24

25

1                    PROOFREADER'S CERTIFICATE

2

3    In The Matter of:   CAPWEALTH ADVISORS, LLC

4    Witness:            Timothy Pagliara

5    File Number:        A-03907-A

6    Date:               Friday, May 1, 2020

7    Location:           Atlanta, GA

8

9            This is to certify that I, Maria E. Paulsen,

10   (the undersigned), do hereby certify that the

11   foregoing transcript is a complete, true and accurate

12   transcription of all matters contained on the recorded

13   proceedings of the investigative testimony.

14

15   _____         _____

16   (Proofreader's Name)            (Date)

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2          I, SHAUNNA H. MORAN, a Certified Shorthand

3    Reporter and Registered Professional Reporter in the

4    States of New Jersey, New York and The District of

5    Columbia, and Notary Public of the State of New

6    Jersey, do hereby certify that the foregoing is a true

7    and accurate transcript of the testimony as taken

8    stenographically by and before me at the time, place

9    and on the date hereinbefore set forth.

10          I DO FURTHER CERTIFY that I am neither a

11   relative nor employee nor attorney nor counsel of any

12   of the parties to this action, and that I am neither a

13   relative nor employee of such attorney or counsel, and

14   that I am not financially interested in the action.

15

16        _____

17        SHAUNNA H. MORAN, CSR, RPR

18        Shorthand Reporter

19

20

21

22

23

24

25