# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## AT NASHVILLE

**SECURITIES AND EXCHANGE COMMISSION,**

        **Plaintiff,**

**v.**

**CAPWEALTH ADVISORS, LLC** *et al*

        **Defendants.**

**Case No. 3:20-cv-01064**

**Judge Waverly D. Crenshaw Jr./Magistrate Judge Jeffrey S. Frensley**

**JURY DEMAND**

---

## ANSWER

---

The defendants CapWealth Advisors, LLC ("CapWealth"), Timothy J. Pagliara, and Timothy R. Murphy, for answer to the Complaint, state:

1.     From June 2015 through June 2018 (the "Relevant Period") and for a number of years preceding the Relevant Period, Defendants CapWealth Advisors, LLC ("CapWealth"), Timothy J. Pagliara ("Pagliara") and Timothy R. Murphy ("Murphy") (collectively "Defendants") purchased, recommended, or held for advisory clients mutual fund share classes that charged fees pursuant to Rule 12b-1 under the Investment Company Act of 1940 ("12b-1 fees"), even though lower-cost share classes of the same funds were available.

      **RESPONSE:**  Denied.

2.      CapWealth's affiliated broker-dealer received 12b-1 fees from these investments and shared portions of the fees with Pagliara and Murphy, who were registered representatives of the broker-dealer.

**RESPONSE:**  Admitted that CapWealth Investment Services, LLC received 12b-1 fees, which CapWealth used to discount its advisory fees to clients.

3.      Pagliara instructed the broker-dealer to send the 12b-1 fees from his clients' accounts to CapWealth's holding company, of which Pagliara was the majority owner and through which he received compensation from his advisory and brokerage roles.

**RESPONSE:**  Denied.

4.      Separately, Murphy received 12b-1 fees from his clients' mutual fund investments as a portion of the compensation he received.

**RESPONSE:**  Denied as stated. CapWealth used 12b-1 fees to discount its advisory fees to clients.

5.      During the Relevant Period and for a number of years preceding the Relevant Period, Defendants failed to disclose adequately the material conflicts of interests with respect to the 12b-1 fees Pagliara and Murphy received, through CapWealth's affiliated broker-dealer, from their advisory clients' investments in mutual funds. Defendants' failure to disclose

adequately these material conflicts of interests prevented their advisory clients from the opportunity to provide informed consent to these conflicts.

**RESPONSE:** Denied.

6.     As an investment adviser, CapWealth owed its advisory clients a fiduciary duty to act in their best interests and to fully disclose all material facts about the advisory relationship, including disclosing any conflicts of interest that might cause CapWealth to put its own interests before those of its clients.

**RESPONSE:** Admitted that CapWealth owed its advisory clients a fiduciary duty. Denied that paragraph 6 accurately defines that duty.

7.     CapWealth failed to disclose adequately the conflicts of interests with respect to 12b-1 fees. Its Forms ADV Part 2A brochures disclosed only that firm "principals" may receive 12b-1 fees, making no mention of the financial benefits to Murphy, who was not a firm principal, and not otherwise disclosing that CapWealth was indeed investing advisory clients in 12b-1 fee paying share classes when lower-cost share classes were available, or the conflicts of interest associated therewith.

**RESPONSE:** Denied.

8.     As an investment adviser representative ("IAR"), Pagliara owed his advisory clients a fiduciary duty to act in their best interests and to fully disclose all material facts about the advisory relationship, including disclosing

any conflicts of interest that might cause Pagliara to put his own interests before those of his clients.

**RESPONSE:** Admitted that Pagliara owed its advisory clients a fiduciary duty. Denied that paragraph 8 accurately defines that duty.

9. Pagliara failed to disclose adequately the conflicts of interests to his advisory clients. For example, Pagliara's individual Forms ADV Part 2B Brochure Supplements made no mention of him receiving 12b-1 fees, nor did the management agreement governing his relationship with his advisory clients.

**RESPONSE:** Denied.

10. As an IAR, Murphy owed his advisory clients a fiduciary duty to act in their best interests and to fully disclose all material facts about the advisory relationship, including disclosing any conflicts of interest that might cause Murphy to put his own interests before those of his clients.

**RESPONSE:** Admitted that Murphy owed its advisory clients a fiduciary duty. Denied that paragraph 10 accurately defines that duty.

11. Murphy failed to disclose adequately the conflicts of interests to his advisory clients. For example, Murphy's individual Forms ADV Part 2B Brochure Supplements made no mention of him receiving 12b-1 fees, nor did the management agreement governing his relationship with his advisory

4

clients. Moreover, Murphy made misleading statements to advisory clients regarding the availability of lower-cost share classes.

**RESPONSE:** Denied.

12.  In addition, the Defendants breached their duty to seek best execution for their clients by investing them in share classes with 12b-1 fees rather than lower-cost share classes of the same funds.

**RESPONSE:** Denied.

13.  Finally, CapWealth failed to adopt and implement written compliance policies and procedures reasonably designed to prevent violations of the Investment Advisers Act of 1940 ("Advisers Act") and the rules thereunder in connection with its mutual fund share class selection practices.

**RESPONSE:** Denied.

14.  By the conduct detailed in this Complaint, Defendants violated Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)] and CapWealth violated Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-7 thereunder [17 C.F.R. § 275.206(4)-7].

**RESPONSE:** Denied.

## JURISDICTION AND VENUE

15.  The Commission brings this action pursuant to Section 214(a) of the Advisers Act [15 U.S.C. § 80b-14(a)] to enjoin Defendants from engaging in the transactions, acts, practices, and courses of business alleged in this

Complaint, and transactions, acts, practices, and courses of business of similar purport and object, for civil penalties, and for other equitable relief.

**RESPONSE:** Admitted that this Court has jurisdiction of this action. Denied that defendants are liable to any party in any respect.

16. This Court has jurisdiction over this action pursuant to Section 214(a) of the Advisers Act [15 U.S.C. § 80b-14(a)].

**RESPONSE:** Admitted.

17. Defendants, directly and indirectly, have made use of the mails, the means and instruments of transportation and communication in interstate commerce, and the means and instrumentalities of interstate commerce in connection with the transactions, acts, practices, and courses of business alleged in the Complaint.

**RESPONSE:** Denied.

18. Venue is proper because certain of the transactions, acts, practices, and courses of business constituting violations of federal securities laws occurred in the Middle District of Tennessee, Pagliara and Murphy reside in the District and resided in this District at the time of the events alleged herein, and CapWealth has its principal place of business in this District.

**RESPONSE:** Defendants admit that venue is proper in this Court.

19. Defendants, unless restrained and enjoined by this Court, will continue to engage in the transactions, acts, practices, and courses of business

alleged in this Complaint, and in transactions, acts, practices, and courses of business of similar purport and object.

**RESPONSE:** Denied.

## DEFENDANTS

20. CapWealth is a Tennessee limited liability company based in Franklin, Tennessee that has been registered with the Commission as an investment adviser since 2009. On its Form ADV dated March 30, 2020, CapWealth reported that it had approximately $1.1 billion in regulatory assets under management. CapWealth is a wholly-owned subsidiary of CapWealth Group, LLC ("CapWealth Group").

**RESPONSE:** Admitted.

21. Pagliara, aged 63, is a resident of Franklin, Tennessee and is CapWealth's founder and chairman, chief investment officer, and an IAR of the firm. During the Relevant Period, Pagliara also was a registered representative of CapWealth's affiliated broker-dealer, CapWealth Investment Services, LLC ("CWIS"), which operated as a Commission-registered broker-dealer from 2009 until June 2018. Pagliara is the majority owner of CapWealth Group which wholly owned CWIS when it operated as a broker-dealer. Instead of directly receiving 12b-1 fee compensation earned through his role as a CWIS registered representative, Pagliara instructed that his personal share of 12b-1

7

fees generated by his advisory clients' accounts be sent to CapWealth Group, which then paid him firm profits, after expenses, based on his ownership stake.

**RESPONSE:**  Defendants admit the first sentence of paragraph 21. Defendants deny the allegations of the second sentence as incomplete.

22.    Murphy, aged 61, is a resident of Franklin, Tennessee and is a CapWealth IAR, and was a registered representative of CWIS during the Relevant Period. Murphy also serves as CapWealth's Managing Director of Wealth Management. Murphy, as a CWIS representative, received as compensation portions of the 12b-1 fees incurred by his advisory clients' accounts.

**RESPONSE:**  Defendants admit the first sentence of paragraph 21. Defendants deny the allegations of the second sentence as incomplete.

## STATEMENT OF FACTS

*A. Background regarding mutual fund share classes*

23.    Mutual funds are common investments for individuals. A mutual fund pools money from many investors and invests the money in securities or other assets.

**RESPONSE:**  Admitted

24.    A mutual fund frequently offers investors different "share classes." Each class represents an interest in the same "pool" (or investment

8

portfolio) of securities and other assets, and a mutual fund's investment objective does not vary among classes.

**RESPONSE:** Admitted.

25. A single mutual fund will often have share classes with different expense ratios, with the share classes that have higher total annual fund operating expenses generally having lower returns than share classes with lower total annual fund operating expenses.

**RESPONSE:** Denied.

26. For example, some share classes have higher expenses because they pay brokers more for selling or servicing that particular share class.

**RESPONSE:** Admitted.

27. In contrast, other share classes of the same fund may have lower expenses because they do not pay brokers this additional compensation.

**RESPONSE:** Admitted.

28. In other words, an individual investor may pay more, or less, for precisely the same mutual fund investment, depending on the share class.

**RESPONSE:** Denied that this general statement applies to CapWealth investors.

29. Fees and expenses are an important consideration in selecting a mutual fund share class because these charges lower an investor's returns.

**RESPONSE:** Admitted that fees and expenses are important but denied that returns to CapWealth investors were lowered.

30. Some mutual fund share classes offered to retail investment clients charge fees pursuant to Rule 12b-1 under the Investment Company Act of 1940 to cover fund distribution and sometimes certain shareholder services ("Retail Class shares"). The 12b-1 fees are charged throughout the life of the mutual fund investment and are deducted on an ongoing basis from the mutual fund's assets. Mutual funds pay these fees to the fund's distributor or principal underwriter, which generally remits the 12b-1 fees to the broker-dealer that distributes or sells the shares. If the shares are subsequently transferred to another broker-dealer, then the distributor will pay the 12b-1 fees to the new broker-dealer holding the shares.

**RESPONSE:** Admitted that paragraph 30 describes the behaviour of some mutual funds.

31. CapWealth's affiliate, CWIS, received 12b-1 fees through such an arrangement. A portion of the 12b-1 fees were paid to Murphy as compensation, while Pagliara, in turn, received certain 12b-1 fees that he earned as a CWIS registered representative as net profits after expenses were paid through his ownership stake in CapWealth Group.

**RESPONSE:** Admitted that CWIS received 12b-1 fees that CapWeslth used to discount advisory fees to its clients. Otherwise denied.

10

32.     Many mutual funds also offer other share classes that do not charge 12b-1 fees and that go by a variety of names (e.g., "Class F2," "Class Y," "Class Z," "Advisory" or "Institutional" class shares (collectively, "Class I shares")). Over approximately the last fifteen years, mutual funds have increasingly made Class I shares available to advisory clients through (among other things) the creation of new adviser and institutional share classes or the utilization of existing institutional share classes, all with either waived or reduced minimums in line with Retail Class minimums.

**RESPONSE:**  Admitted.

33.     Class I shares are, overall, lower-cost than Retail Class shares of the same fund. An investor who holds Class I shares of a mutual fund will usually pay lower total annual fund operating expenses – and, thus, will almost always earn higher returns over time – than one who holds Retail Class shares of the same fund.

**RESPONSE:**  Denied.

34.     Therefore, if a mutual fund offers a Class I share, and an investor is eligible to own it, it is often better for the investor to purchase or hold the Class I share because her returns will be higher, and the adviser is required to disclose its conflict of interest if it does not recommend or select that class for the client. In many cases, advisory clients who hold shares in classes charging

12b-1 fees may convert those shares to Class I shares without cost or tax consequences to the clients.

**RESPONSE:** Denied. CapWealth's investors received a tax benefit from CapWealth's use of 12b-1 fees to discount its advisory fee.

### B. CapWealth Invested Clients in Share Classes That Charged 12b-1 Fees When Lower-Cost Share Classes Were Available.

35. During the Relevant Period, CapWealth offered asset management services to its advisory clients. As part of these services, CapWealth invested many clients in a selection of mutual funds, chiefly using funds offered by Capital Group's American Funds.

**RESPONSE:** Admitted.

36. During the same period, CapWealth represented to clients that it performed periodic account reviews to determine if the investments in client accounts remained consistent with the client's specified investment criteria and the client's financial goals and objectives.

**RESPONSE:** Admitted.

37. Advisory clients signed an Investment Management Agreement ("IMA") with CapWealth when they engaged Defendants to provide asset management services. Those IMAs contained a schedule of management fees to be charged. The fee schedule stated that the client would be charged a management fee equal to a percentage of the total of the client's assets under management, with the percentage decreasing the larger the amount of assets

12

under management. Nothing in the IMAs disclosed or discussed the receipt of 12b-1 funds by CWIS, nor the portions of such fees that were passed on to Pagliara and Murphy.

**RESPONSE:** Denied.

38. CWIS, CapWealth's affiliated broker-dealer, acted as the introducing broker-dealer on the mutual fund transactions in CapWealth's advisory programs.

**RESPONSE:** Admitted.

39. CWIS accepted payments of ongoing 12b-1 fees for mutual fund investments bought and held in clients' advisory accounts well before the Relevant Period. Over time, many mutual funds began offering share classes to investors, including investors in fee-paying advisory accounts that did not charge 12b-1 fees. These share classes typically had lower costs to investors than 12b-1 share classes of the same funds because, among other things, they did not pay broker-dealers 12b-1 fees. The availability of these lower-cost share classes meant that CapWealth's advisory clients could often hold the same mutual fund's pool of securities and other assets, but pay less for precisely the same investment.

**RESPONSE:** Denied.

40. During the Relevant Period, the Defendants invested, recommended or held advisory clients' assets in mutual fund share classes that

charged 12b-1 fees, even though clients were eligible to invest in or convert to share classes of the same funds without 12b-1 fees.

**RESPONSE:** Denied as stated. As the Commission is well aware, CapWealth used 12-b1 fees as part of a tax strategy to provide lower over all fees to its clients. Despite having received evidence of CapWealth's strategy and the benefit it provided to its clients, the Commission continues to make the same boilerplate allegations here that it has made against other advisors who did not employ such a strategy.

41. As a result, CapWealth's broker-dealer affiliate, CWIS, received 12b-1 fees that were later passed on to Pagliara and Murphy.

**RESPONSE:** Denied as stated. As the Commission is well aware, CapWealth used 12-b1 fees as part of a tax strategy to provide lower over all fees to its clients. Despite having received evidence of CapWealth's strategy and the benefit it provided to its clients, the Commission continues to make the same boilerplate allegations here that it has made against other advisors who did not employ such a strategy.

42. Between June 2015 and June 2018, the advisory clients of Pagliara incurred a collective total of more than $228,000 in avoidable 12b-1 fees.

**RESPONSE:** Denied as stated. As the Commission is well aware, CapWealth used 12-b1 fees as part of a tax strategy to provide lower over all fees to its clients. Cap Wealth absorbed the cost of the 12b-1 fees through lower

14

advisory fees. Despite having received evidence of CapWealth's strategy and the benefit it provided to its clients, the Commission continues to make the same boilerplate allegations here that it has made against other advisors who did not employ such a strategy.

43.    Between June 2015 and June 2018, the advisory clients of Murphy incurred more than $223,000 in avoidable 12b-1 fees.

**RESPONSE:**   Denied as stated. As the Commission is well aware, CapWealth used 12-b1 fees as part of a tax strategy to provide lower over all fees to its clients. Cap Wealth absorbed the cost of the 12b-1 fees through lower advisory fees. Despite having received evidence of CapWealth's strategy and the benefit it provided to its clients, the Commission continues to make the same boilerplate allegations here that it has made against other advisors who did not employ such a strategy.

44.    Both Pagliara and Murphy served on the firm's Investment Committee, which, among other functions, reviewed and discussed the mutual funds share classes that would be included on the firm's model portfolio from which IARs would select investments for clients.

**RESPONSE:**  Admitted.

45.    Mutual funds published the availability of the lower-cost share classes in publicly available prospectuses. Defendants thus knew or should have known, and could have disclosed to their clients, that clients had an

opportunity to obtain lower-cost shares of the mutual funds they held or purchased, and Defendants could have undertaken efforts to secure such shares for their clients whose accounts they managed or advised.

**RESPONSE:** Denied as stated. As the Commission is well aware, CapWealth used 12-b1 fees as part of a tax strategy to provide lower over all fees to its clients. Cap Wealth absorbed the cost of the 12b-1 fees through lower advisory fees. Despite having received evidence of CapWealth's strategy and the benefit it provided to its clients, the Commission continues to make the same boilerplate allegations here that it has made against other advisors who did not employ such a strategy.

46. During the Relevant Period, Pagliara and Murphy understood that advisory clients, as a general matter, could avoid 12b-1 fees by investing in Class I shares and other lower-cost share classes of a fund, when such a share class was available to their clients.

**RESPONSE:** Denied as stated. As the Commission is well aware, CapWealth used 12-b1 fees as part of a tax strategy to provide lower over all fees to its clients. Cap Wealth absorbed the cost of the 12b-1 fees through lower advisory fees. Despite having received evidence of CapWealth's strategy and the benefit it provided to its clients, the Commission continues to make the same boilerplate allegations here that it has made against other advisors who did not employ such a strategy.

16

47. Both Pagliara and Murphy, respectively, sent or received emails concerning the availability of the lower-cost share classes during the Relevant Period and, on occasion, did convert certain, but not all, client positions to those cheaper shares.

**RESPONSE:** Denied as stated. As the Commission is well aware, CapWealth used 12-b1 fees as part of a tax strategy to provide lower over all fees to its clients. Cap Wealth absorbed the cost of the 12b-1 fees through lower advisory fees. Despite having received evidence of CapWealth's strategy and the benefit it provided to its clients, the Commission continues to make the same boilerplate allegations here that it has made against other advisors who did not employ such a strategy.

48. For example, Murphy sent an email on June 21, 2016 instructing CapWealth's trading staff to have the firm's clearing broker-dealer "convert the following F1 shares to F2 shares" for two client accounts. However, other clients were not converted at that time to the lower-cost F2 shares that were available for the funds listed by Murphy in his email.

**RESPONSE:** Denied as stated. As the Commission is well aware, CapWealth used 12-b1 fees as part of a tax strategy to provide lower over all fees to its clients. Cap Wealth absorbed the cost of the 12b-1 fees through lower advisory fees. Despite having received evidence of CapWealth's strategy and the benefit it provided to its clients, the Commission continues to make the

same boilerplate allegations here that it has made against other advisors who did not employ such a strategy.

49.     Additionally, a portion of CapWealth's clients were converted to lower-cost share classes in 2015 as part of a trial effort to custody certain clients' assets at a new clearing broker-dealer.

**RESPONSE:**   Denied as stated. As the Commission is well aware, CapWealth used 12-b1 fees as part of a tax strategy to provide lower over all fees to its clients. Cap Wealth absorbed the cost of the 12b-1 fees through lower advisory fees. Despite having received evidence of CapWealth's strategy and the benefit it provided to its clients, the Commission continues to make the same boilerplate allegations here that it has made against other advisors who did not employ such a strategy.

50.     The clients that were migrated in 2015 to the new clearing broker-dealer and placed in lower-cost shares classes were mostly the higher net worth clients and the clients with whom the Defendants had their best relationships.

**RESPONSE:**   Admitted.

51.     After these client assets were moved to the new clearing broker-dealer, Pagliara asked CapWealth staff to calculate how much 12b-1 fee revenue had declined as a result. Pagliara received an email on May 13, 2015, explaining that the migration of clients to the new broker resulted in a $45,000 decline in 12b-1 fee revenue so far.

18

**RESPONSE:** Admitted.

52. Despite the ability during the Relevant Period to convert client assets remaining at CapWealth's old clearing broker-dealer to the same lower-cost share classes being used for clients who were migrated to the new clearing broker-dealer, Pagliara and Murphy did not convert all of their clients to the lower-cost alternatives until those clients' assets were moved to another, unaffiliated broker-dealer in late 2017 and the first half of 2018 and CWIS was closed.

**RESPONSE:** Denied.

53. Instead, between 2015 and June 2018, Pagliara and Murphy regularly placed or held many of their advisory clients in higher-cost share classes with 12b-1 fees that could have been avoided through investment in lower-cost share classes of the same funds. These avoidable 12b-1 fees continued flowing to CWIS on a recurring basis, and then on to Pagliara and Murphy, as compensation.

**RESPONSE:** Denied.

54. These investments were made without giving clients full and fair disclosures concerning the conflicts of interest stemming from CapWealth's, Pagliara's and Murphy's share class selection practices for clients.

**RESPONSE:** Denied.

19

55.     Pagliara admitted that he did not disclose any conflict of interest arising from his share class selection practices because he did not believe that there was a conflict of interest.

**RESPONSE:**   Denied. Pagliara admitted that CapWealth's practice of discounting its advisory fees to account for 12b-1 fees removed any possible conflict of interest because CapWealth, not the client, bore the expense of the 12b-1 fees.

56.     After the transition to the new broker-dealer in 2018, Murphy made misleading statements to certain clients who inquired about the reason for the conversions.

**RESPONSE:**   Denied.

57.     For example, one client inquired in an email on August 16, 2018: "What prompted the recent trades?" Murphy responded that the client was "recently converted" to a "new" share class "symbol," adding: "same fund just lower expenses."

**RESPONSE:**   Admitted.

58.     Murphy's statement was misleading as it suggested the share class itself was new (as opposed to new for the client), when it had been available since at least March 2012, and Murphy had, as far back as 2015, individually converted a handful of other clients to the same lower-cost share

class without 12b-1 fees, while leaving the client who emailed in 2018 in the higher-cost share classes.

**RESPONSE:** Denied.

59. Similarly, another client reached out to Murphy about the conversions and noted via email on March 17, 2019, that he was "still confused over exact same funds having different expense ratios. That is a BIG difference compounded over years … Why didn't we do this years ago if its [sic] so good? It sure looks good." Murphy responded on March 25, 2019, writing: "…the industry continues to evolve and as lower cost share classes become available we transition to them."

**RESPONSE:** Admitted.

60. Murphy's written statement to the client was inaccurate and misleading, as CapWealth had failed for years to transition all clients to available lower-cost share classes without 12b-1 fees.

**RESPONSE:** Denied.

61. Despite the availability of lower-cost share classes, for years Pagliara and Murphy collected 12b-1 fees and left their clients uniformed about the Defendants' conflicts of interest. In doing so, Defendants failed to disclose the economic incentive underlying their share class selections for clients such that the clients could decide whether or not to consent to a conflict that would result in them paying more for their mutual fund investments.

21

**RESPONSE:** Denied.

62.     Moreover, CapWealth did not adopt and implement any policies and procedures designed to ensure that the costs associated with different available share classes of a fund would be evaluated when it made purchases for all clients, or policies and procedures requiring the firm to seek the share class that offered the most favorable value for each client.

**RESPONSE:** Denied.

*C. CapWealth's Mutual Fund Share Class Disclosure Failures*

63.     As investment advisers, Defendants are fiduciaries for their advisory clients. As such, Defendants owe their clients an affirmative duty of utmost good faith, are obligated to provide full and fair disclosure of all material facts, and have an affirmative obligation to employ reasonable care to avoid misleading their clients.

**RESPONSE:** Admitted.

64.     Defendants' duty to disclose all material facts includes a duty to tell clients about all actual or potential conflicts of interest that might incline CapWealth and its representatives to render investment advice that is not disinterested, and how those conflicts could affect the advice provided to Defendants' advisory clients.

**RESPONSE:** Denied that paragraph 64 fully and accuratey describes CapWealth's fiduciary duty.

22

65.    Defendants were required to provide their advisory clients with disclosure sufficiently specific for the clients to understand the conflicts of interest concerning Defendants' advice about their investments in different classes of mutual funds and to have an informed basis for consenting to or rejecting conflicts of interest.

**RESPONSE:**   Denied as stated. CapWealth eliminated any potential conflict of interest because it absorbed the cost of the 12b-1 fees, as the Commission knows from its investigation.

66.    Defendants failed to adequately disclose these conflicts of interest in any of the disclosure documents provided to advisory clients, including CapWealth's Forms ADV or the IMAs provided to clients.

**RESPONSE:**   Denied.

67.    The Securities and Exchange Commission (the "Commission") mandates disclosure forms for certain investment advisers. These forms are known as Form ADV, and more specifically Form ADV Part 2A. The Form ADV Part 2A is commonly referred to as an investment adviser's brochure.

**RESPONSE:**   Admitted.

68.    Investment advisers like CapWealth must file the brochure with the Commission and update it at least annually, and must provide their current brochure to advisory clients, including prospective clients, prior to or concurrent with the execution of an advisory agreement.

**RESPONSE:** Admitted.

69.     Brochures must include required disclosures about an investment adviser's business, including how the adviser is compensated, and advisers are required, per the Brochure instructions, to disclose compensation they, or their supervised persons, accept, "including asset-based sales charges or service fees from the sale of mutual funds," and they are required to "[e]xplain that this practice presents a conflict of interest and gives you or your supervised persons an incentive to recommend investment products based on the compensation received, rather than on a client's needs."

**RESPONSE:** Admitted.

70.     CapWealth knew or should have known that it was required by law to disclose conflicts of interest to its advisory clients in its brochure because, among other reasons, the instructions to Form ADV provided such guidance.

**RESPONSE:** Denied.

71.     Throughout the Relevant Period, CapWealth disclosed to advisory clients in the firm's Form ADV Part 2A brochure that: [m]ost of the investment professionals of CapWealth are also registered with CWIS. It is not mandatory that clients open an account with CWIS. Compensation may be received by the principals of CapWealth when certain portfolio transactions are effected on behalf of investment advisory clients. Therefore, the principals

24

of CapWealth may receive compensation as a result of acting in one or both capacities, including the receipt of 12b-1 distribution payments from certain funds.

**RESPONSE:** Admitted.

72. The disclosure remained unchanged from at least July 2014 until client assets were moved to an unaffiliated broker-dealer in 2018.

**RESPONSE:** Admitted.

73. When compared to the Defendants' mutual fund selection practices for clients, these disclosures were deficient.

**RESPONSE:** Denied.

74. First, the disclosures indicate that CapWealth's principals "may receive" such compensation when Pagliara was in fact receiving that compensation.

**RESPONSE:** Denied. Cap Wealth's disclosure accurately stated that Pagliara "may" receive such compensation because he did not invariably receive such compensation in every case. The disclosure the Commission proposes is inaccurate and was not made.

75. Second, there is no disclosure that non-principals such as Murphy, who had no ownership stake in the firm, would receive 12b-1 fees.

**RESPONSE:** Denied.

25

76.     Third, CapWealth's brochure did not disclose facts to explain that the firm and certain IARs had a conflict of interest in selecting a fund's 12b-1 fee paying share class when a lower-cost share class of the same fund without 12b-1 fees was available, and that they would and did regularly select share classes paying 12b-1 fees when less-expensive share classes for the same fund were available to their advisory clients. 77. Fourth, CapWealth failed to disclose to clients a significant aspect of the financial conflict: that investing, or remaining invested, in share classes that paid 12b-1 fees would generally reduce the overall return of such investments to the clients in comparison to lower-cost share classes of the same mutual funds.

**RESPONSE:**  Denied.

78.     A reasonable reader could infer that the possible receipt of 12b-1 fees described in the CapWealth brochure related only to recommending a certain mutual fund over other mutual funds as an investment vehicle, as opposed to the selection of a particular share class of a specific fund.

**RESPONSE:**     Denied. CapWealth's investors also received oral disclosures and were not misled in any respect.

79.     Separately, both Pagliara and Murphy provided their respective clients with Forms ADV Part 2B Brochure Supplements, for which each IAR provided approval of his own Supplement for distribution to clients after reviewing a draft prepared by firm personnel.

**RESPONSE:** Denied.

80. The instructions for the Supplements state in pertinent part: "If the supervised person receives commissions, bonuses or other compensation based on the sale of securities or other investment products, including as a broker-dealer or registered representative, and including distribution or service ("trail") fees from the sale of mutual funds, disclose this fact."

**RESPONSE:** Admitted.

81. Pagliara's Supplements contained no disclosure at all about the 12b-1 fees, commonly known in the securities industry as "trails," that Pagliara received through his ownership stake in CapWealth Group.

**RESPONSE:** Denied.

82. Murphy's Supplements contained no disclosures at all about the 12b-1 fees that Murphy received as compensation as a CWIS registered representative.

**RESPONSE:** Denied.

83. Similarly, the CapWealth IMA stated that clients' investments in mutual funds "will also be subject to additional advisory and other fees and expenses, as set forth in the prospectuses of those funds…" without providing any more specificity about such fees and without identifying the conflict of interest with respect to the 12b-1 fees received by CWIS and passed on to Pagliara and Murphy.

27

**RESPONSE:** Denied.

84. Additionally, the IMAs did not explain that the vast majority of the 12b-1 fees generated by CapWealth client investments were entirely avoidable by using lower-cost share classes of the same funds selected for clients.

**RESPONSE:** Denied.

85. The disclosure failures are significant because the CapWealth brochure also stated: "CapWealth representatives must adhere to their fiduciary duty. All representatives have to act in the best interests of its clients and make full and fair disclosure of all material facts. This is especially of concern where conflicts of interest arise." 86. Defendants did not provide full and fair disclosure to advisory clients concerning their mutual fund share class selection practices and the resulting material conflicts of interest.

**RESPONSE:** Denied.

*D. CapWealth's Best Execution Failures*

87. During the Relevant Period, CapWealth's Form ADV Part 2A brochure also stated:

> It is CapWealth's policy to obtain the "best execution" of its customers' securities transactions on a best efforts basis since the firm does not control trade execution. CapWealth, through the trading department at [CapWealth's clearing broker-dealer] or any other custodian will cause each customer' [sic] securities transactions to be executed in such a manner that the customer's total cost or proceeds in each transaction is the most favorable under the circumstances.

28

**RESPONSE:** Admitted.

88.     However, CapWealth routinely invested its clients in mutual fund share classes that charged 12b-1 fees when share classes of the same funds that presented a more favorable value to the clients, under the particular circumstances in place at the time of the transactions, were available to the clients.

**RESPONSE:** Denied.

89.     CapWealth did not adopt and implement any procedures designed so that the costs associated with different share classes of a fund would be evaluated when it made purchases for each client, or otherwise seek the share class that offered the most favorable value for each client. CapWealth therefore failed to seek best execution for these transactions.

**RESPONSE:** Denied.

90.     For example, since January 2016, CapWealth invested certain advisory clients in the American Funds Fundamental Investors Class F1 shares (ticker: AFIFX), which had a 12b-1 fee of 25 basis points, when clients could have been placed in a lower-cost share class of the same fund. Clients could have been placed in the fund's Class F2 (ticker: FINFX), which had no 12b-1 fee, a lower-expense ratio, and the same associated ticket charges.

**RESPONSE:** Denied.

91.    Nevertheless, Pagliara and Murphy generated more than $3,500 in 12b-1 fee revenue by placing more than 50 client accounts into higher-cost Class F1 shares of the fund in 2016, 2017 and the first half of 2018.

**RESPONSE:**  Denied.

92.    Similarly, since January 2016, CapWealth invested certain advisory clients in the American Funds New Perspective Class F1 shares (ticker: NPFFX), which had a 12b-1 fee of 25 basis points, when clients could have been placed in a lower-cost share class of the same fund. Clients could have been placed in the fund's Class F2 shares (ticker: ANWFX), which had no 12b-1 fee, a lower-expense ratio, and the same associated ticket charges.

**RESPONSE:**  Denied.

93.    Nevertheless, Pagliara and Murphy generated more than $3,300 in 12b-1 fee revenue by placing more than 45 client accounts into the higher-cost Class F1 shares of the fund in 2016, 2017 and the first half of 2018.

**RESPONSE:**  Denied.

*E. CapWealth's Compliance Deficiencies Regarding Mutual Fund Share Class Selection.*

94. During the Relevant Period, CapWealth failed to adopt and implement written policies and procedures reasonably designed to prevent violations of the Advisers Act and the rules thereunder arising from the firm's mutual fund share class selection practices.

**RESPONSE:**  Denied.

30

95. While the firm had some general written policies concerning conflict disclosures, it did not apply those policies to its share class selection practices. Specifically, the firm's "Policies and Procedures Manual" from June 2016 stated:

CapWealth must disclose any possible conflicts of interest to clients in Part 2A of Form ADV and the Firm's Disclosure Brochure. The specific information regarding any current or potential conflicts of interests must be described clearly. Generally, conflicts of interest may be defined as any existing or prospective business relationship in which the Firm or its Investment Advisor Representatives may have actual or potential incentives to place their interests above those of the client, and thereby violate Cap Wealths' [sic] fiduciary responsibilities to the client.

**RESPONSE:** The allegations of the first sentence of paragraph 95 are denied. The allegations of the second sentence of paragraph 95 are admitted.

96. The firm never implemented this policy concerning the disclosure of conflicts of interest in the context of mutual fund share class selection and 12b-1 fees. The firm had the same deficient disclosures about 12b-1 fees from at least July 2014 until June 2018.

**RESPONSE:** Denied.

97. CapWealth also failed to adopt and implement a reasonably designed process for regularly reviewing fund prospectus materials to assess whether a client had become eligible for conversion to a lower-cost share class without 12b-1 fees.

**RESPONSE:** Denied.

31

98.     Similarly, during the Relevant Period, CapWealth had a "best execution" policy which stated: "The Firm, through the trading department at [CapWealth's clearing broker-dealer] or any other custodian will cause each customer's securities transactions to be executed in such a manner that the customer's total costs or proceeds in each transaction is the most favorable under the circumstances."

**RESPONSE:**  Admitted.

99.     CapWealth failed to implement this policy with respect to mutual fund share class selections for clients' new purchases during the Relevant Period.

**RESPONSE:**  Denied.

*F. Defendants Agreed to Toll the Statute of Limitations*

100. Defendants agreed to toll any statute of limitations applicable to the claims alleged herein during the period from May 15, 2020 through November 16, 2020.

**RESPONSE:**  Admitted.

## COUNT I – FRAUD
### Violations of Section 206(2) of the Advisers Act
### [15 U.S.C. § 80b-6(2)]

101. Paragraphs 1 through 100 are hereby re-alleged and are incorporated herein by reference.

**RESPONSE:** Defendants incorporate their responses to such paragraphs.

102. Defendants, acting as investment advisers, by use of the mails or means or instrumentalities of interstate commerce, directly and indirectly engaged in transactions, practices, and courses of business which operated as a fraud and deceit upon clients and prospective clients, all as more particularly described above. 103. By reason thereof, Defendants violated and, unless enjoined, will continue to violate Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)].

**RESPONSE:** Denied.

## COUNT II – FRAUD
### Violations of Section 206(4) of the Advisers Act and Rule 206(4)-7 thereunder
### [15 U.S.C. § 80b-6(4) and 17 C.F.R. § 275.206(4)-7]

104. Paragraphs 1 through 100 are hereby re-alleged and are incorporated herein by reference.

**RESPONSE:** Defendants incorporate their responses to such paragraphs.

105. Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] provides that it is unlawful for an investment adviser to engage in an act, practice or course of business which is fraudulent, deceptive or manipulative. It further states that the Commission shall issue rules to define and prescribe measures to prevent such misconduct. Rule 206(4)-7 under the Advisers Act [17 C.F.R. §

33

275.206(4)-7] requires, among other things, that investment advisers registered with the Commission adopt and implement written policies and procedures reasonably designed to prevent violations, by the investment adviser and its supervised persons, of the Advisers Act and its rules. Such investment advisers must also review the adequacy of those policies and procedures and the effectiveness of their implementation, at least annually.

    **RESPONSE:** Admitted.

    106.   CapWealth failed to adopt and implement written policies and procedures reasonably designed to prevent Defendants' inadequate conflicts disclosures and failure to seek best execution arising from their mutual fund share class selection practices.

    **RESPONSE:** Denied.

    107. By reason thereof, CapWealth violated and, unless enjoined, will continue to violate Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-7 [17 C.F.R. § 275.206(4)-7] thereunder.

    **RESPONSE:** Denied.

    108.   Any allegations of the Complaint not heretofore admitted, denied or otherwise addressed is hereby denied.

    109.   The Complaint fails to state a claim for which relief may be granted, as set out in defendants' Motion to Dismiss.

110. The Complaint is barred by the doctrines of waiver, laches, and estoppel. Prior to the Relevant Period, the Commission had audited CapWealth and thus was fully aware of its practices and disclosures regarding 12b-1 fees and advisory fees. Yet, at no point prior to January 2020 did the Commission ever allege tha CapWealth's practices or disclosures were inadequate in any respect.

111. The Complaint, or certain of the claims raised therein, are barred by the applicable statute of limitations.

AND NOW having fully answered, defendants request that the Complaint be dismissed, that CapWealth recover any relief to which it may be entitled against the Commission, and that this Court award such other and further relief to which CapWealth may be entitled.

Respectfully submitted,

s/ Eugene N. Bulso Jr.
Eugene N. Bulso, Jr. (BPR No. 12005)
BULSO PLC
155 Franklin Rd., Suite 400
Brentwood, TN 37027
Tel: (615) 913-5135
gbulso@bulso.com
*Attorneys for Defendants*

s/ Bradley J. Bondi
Bradley J. Bondi
New York Bar No. 4432738
1990 K Street, N.W., Suite 950
Washington, D.C. 20006
Tel: (202) 862-8910
bbondi@cahill.com

s/ Sara E. Ortiz
Sara E. Ortiz
New York Bar No. 5302070
32 Old Slip
New York, NY 10005
Tel: (212) 701-3368
sortiz@cahill.com
*Attorneys for CapWealth Advisors, LLC*

# CERTIFICATE OF SERVICE

I certify that the foregoing is being filed via the Court's ECF system, which is expected to deliver a copy by electronic means to the following on this 2nd day of August 2021:

M. Graham Loomis
Kristin W. Murnahan
Harry B. Roback
Securities and Exchange Commission
Atlanta Regional Office
950 East Paces Ferry Road, N.E.,
Suite 900
Atlanta, GA  30326-1382
*Attorneys for Plaintiff*

s/Eugene N. Bulso, Jr.
Eugene N. Bulso, Jr.

36